Bradley T. Hunsicker (Wyo. Bar 7-4579)
**MARKUS WILLIAMS YOUNG & ZIMMERMANN LLC**
106 East Lincolnway Suite 300
Cheyenne, WY  82001
Telephone: 307-778-8178
bhunsicker@markuswilliams.com

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF WYOMING

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| POWELL VALLEY HEALTH CARE, INC., | ) | Case No. 16-20326 |
| | ) | |
| Debtor-in-Possession. | ) | |

## DECLARATION OF MICHAEL L. LONG IN SUPPORT OF CHAPTER 11 PETITION AND VARIOUS FIRST DAY MOTIONS

Michael L. Long, being duly sworn, deposes and states:

1.     I am the Chief Financial Officer of Debtor Powell Valley Health Care, Inc (the "**Debtor**", or "**PVHC**").  Based on my position with the Debtor, I am familiar with the Debtor's day to day operations, business and affairs and have personal knowledge of the matters set forth herein

2.     On May 16, 2016 (the "**Petition Date**"), the Debtor filed with its voluntary petition (the "**Petition**") under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**"), thereby commencing the above-captioned bankruptcy case (the "**Bankruptcy Case**" or the "**Chapter 11 Case**").  The Debtor is authorized to operate its business and manage its properties as a debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No creditors' committee has yet been appointed in this Chapter 11 Case by the Office of the United States Trustee, nor has any trustee or examiner been requested or appointed.

3.      In order to enable the Debtor to minimize any adverse effects that filing for chapter 11 may have on its business, the Debtor has requested various types of "first day" relief, (the "**First Day Motions**"), described in more detail below, which this Declaration supports.

4.      The First Day Motions seek relief intended to allow the Debtor to perform and meet those obligations necessary to fulfill its duties as debtor in possession.  I am familiar with the contents of the First Day Motions (including the exhibits thereto), and I believe that the relief sought by the First Day Motions: (a) is necessary to enable the Debtor to operate in chapter 11 with minimum disruption or loss of productivity or value; (b) constitutes a critical element in achieving a successful restructuring of the Debtor's business; (c) best serves the Debtor's estate and creditors' interests; and, (d) is, in those instances where the relief seeks immediate payment of prepetition amounts, necessary to avoid immediate and irreparable harm.

5.      I also submit this Declaration to provide an overview of the Debtor, its business and this Chapter 11 Case, as well as in support of the Debtor's Petition and the First Day Motions.  Except as otherwise indicated herein, all facts set forth in this Declaration are (a) based upon my personal knowledge of the Debtor's operations and finances, (b) learned from my review of relevant documents and information supplied to me by other members of the Debtor's management and the Debtor's advisors, or (c) my opinion based on my experience, knowledge and information concerning the Debtor's industry, operations and financial condition. I am authorized by the Debtor's board of directors to submit this Declaration on behalf of the Debtor, and, if called upon to testify, I could and would testify competently to the facts set forth herein.

6.      This Declaration is divided in four parts.  Section I of this Declaration provides an overview of the Debtor's background, business operations and management.  Section II of this Declaration describes the Debtor's prepetition capital structure.  Section III describes the events

2

leading to the commencement of this Chapter 11 Case.  Finally, Section IV summarizes the relief requested in the First Day Motions.

## I.  DESCRIPTION OF THE DEBTOR'S BACKGROUND AND BUSINESS OPERATIONS

### A.  PVHC's Business

7.      PVHC is a Wyoming non-profit corporation qualified to do business pursuant to section 501(c)(3) of the United States Internal Revenue Code as a public charity.  Its mission is to improve quality of life through excellent healthcare services to the greater-Powell, Wyoming community.  In fulfilling its mission statement, PVHC serves a total population of approximately 7,500 people with the highest concentration of the population in Powell, with over 7,000 residents.

### B.  The Hospital and its History

8.      The first hospital in Powell was constructed by Dr. J.R.A. Whitlock and was located at Avenue C and Edmonds Street. It was completed in 1919 and had 18 beds. Dr. Whitlock owned and operated the hospital as a private institution for nearly 20 years. After his death in 1936, the hospital was purchased by Dr. Robert Siddle. His death in the early 1940s prompted three Powell businessmen to purchase the hospital in order to maintain a medical facility in the community. The purchase price at that time was $17,000.

9.      A community association was formed to take over the hospital operations. A board of directors was appointed, and a fund drive was initiated to allow for renovation of the hospital building. The facility was renamed War Memorial Hospital to honor World War II veterans.  In 1946, a lease agreement was initiated with Lutheran Hospitals and Homes Society ("LHHS") of Fargo, North Dakota. This lease agreement continued until 1992.

3

10.     The hospital became a tax-supported facility with the establishment of Powell Hospital District (the "**Hospital District**") in September 1949.  The Hospital District is a special governmental hospital district.  The decision was made to construct a new facility, and in 1952, the new War Memorial Hospital, located at 630 Avenue H (now the location of The Heartland Assisted Living) was dedicated.  The old Whitlock Hospital was then converted to a rest home for older adults.  In 1964, a nursing home addition was built onto the new hospital, and the name was changed to Powell Hospital & Nursing Home.

11.     In 1962, the Hospital District initiated ambulance service to the community.  The forerunner of the auxiliary was formed in 1957 and was called the Gray Ladies.  The present volunteer services organization (PVHC volunteer services), was established in 1982.  The volunteers began offering LifeLine services within the community.  They currently provide this service to over 100 community members.

12.     In 1983, the decision was made to build a new hospital.  A bond issue of $8.5 million was passed by the voters, and the new facility was dedicated in April 1986.  The old hospital was then renovated to provide additional nursing home capacity.  In the 1980s, four medical office buildings were constructed south of the hospital building.  A new nursing home facility (located at 777 Avenue H) was constructed and dedicated in February 1997.

13.     In late 2000, a new assisted-living facility (The Heartland) was completed and occupied.  In November of 2008, eight medical staff members and their support staff moved into the newly constructed Powell Valley Clinic building.  The building is right next to Powell Valley Hospital.  The facilities now include a 25-bed hospital, a 100-bed long-term care facility, four medical office buildings, a 24-unit assisted living facility and five emergency medical vehicles

with equipment (collectively the "**Facilities**").  The Hospital District owns the Facilities and leases them to PVHC.

14.     In 1992, the Hospital District formed a not-for-profit corporation called Powell Valley Health Care, Inc. (*i.e*., the Debtor, or PVHC) for the purpose of operating the Hospital District's Facilities.  It should be noted that PVHC does not share any revenues with the Hospital District (apart from satisfying its obligations to the Hospital District under various leasehold interests), and no loses of PVHC are borne by the Hospital District.

15.      Also in 1992, PVHC entered into a management contract with Brim Healthcare.  Brim later changed its name to HealthTechS3.  The company provides management and group purchasing services.  Powell Hospital District is governed by seven elected members of the board of trustees.  All tax monies received by the Hospital District are dedicated to capital expenditures, including equipment, and are not utilized for operating expenses of PVHC.  The seven district board members, as well as three additional members (typically medical staff), serve as the board of directors for PVHC.

16.     The Hospital is one of two acute healthcare facilities in Park County, Wyoming and is over 25 miles driving distance from the closest comparable facility.  The Hospital features, among other things, diagnostic imaging services (*i.e.*, MRI, and CT scan), cardiopulmonary services, an intensive care unit, and a maternal child unit. It is also designated as a Community Designated Trauma Hospital.

17.    A significant volume of patients make use of the Hospital services each year.  In 2014 and 2015 the hospital had the following activity:

| Type of Patient Care | 2014 | 2015 |
|---|---|---|
| Inpatient Admissions | 596 | 579 |
| Obstetrical Deliveries | 149 | 185 |
| Surgeries | 721 | 570 |
| Emergency Room Patients | 4,402 | 4,329 |
| Outpatient Registrations | 31,017 | 30,143 |
| Laboratory Tests | 65,147 | 49,048 |

18.    PVHC relies upon a workforce of approximately 403 employees, including approximately 313 full-time employees, 38 part-time employees and 52 PRN or as-needed employees. In fiscal year 2015, PVHC paid approximately $28,988,000 in salaries and benefits to its employees.

### C.    PVHC's Commitment to Community Healthcare Beyond its Doors

19.    PVHC's efforts to meet the healthcare needs of its community go well beyond the direct provision of care at the Hospital.  In addition to those core healthcare services, PVHC provides many goodwill services  for the community throughout the year that PVHC believes serve a bona fide community health need.  For example, PVHC provides direct support to diabetic, hepatitis C, sign language, and cardiac and stroke patient support groups.  PVHC also conducts health fairs and health screening clinics for cholesterol, diabetes, blood pressure and blood type, and seminars in order to foster better health awareness.  PVHC additionally serves as an educational training site for physicians, registered nurses, x-ray technologists, medical technologists, physical therapists, emergency medical technicians, and nursing assistants.  PVHC

participates in health fairs in order to foster better health awareness in the community.  Finally, PVHC directly engages in many other health-related community activities, such as Lamaze, breast feeding, new baby and sibling classes, and CPR training to members of the community.

20.     PVHC's contributions to community health are not limited to direct provision of services.  It also partners with Heritage Health Center to support and fund the provision of medical services to patient populations with limited/underserved access to the Hospital.

21.     PVHC provides further support, both directly and indirectly, to community health and wellness programs, such as: access to mental health services, access to preventive health services, and public transportation.

22.     Through its numerous facilities, programs, and projects, PVHC is directly or indirectly responsible for nearly all of Powell's healthcare infrastructure.

23.      One of PVHC's most fundamental and critical functions in maintaining Powell's healthcare infrastructure is its active recruitment of healthcare providers, especially physicians, to meet specifically identified community needs.  Over the past two years, PVHC has been responsible for bringing approximately ten health providers to the community, including practitioners of emergency medicine, hospitalist services, radiology, obstetrics, family medicine, and orthopedics.   Offering direct employment to physicians has become an increasingly important practice tool for hospitals throughout the country.  As a result, physicians will often only agree to come to the community if employed directly by PVHC.

### D.     PVHC's Management

24.     In 1992, PVHC entered into a management contract with Brim Healthcare.  Brim later changed its name to HealthTechS3.

25.     Pursuant to PVHC's current contract, HealthTechS3 provides PVHC with, among other things, highly skilled and experienced managers at the chief executive officer position, group purchasing privileges that significantly reduce PVHC's costs, and access to an array of training opportunities and administrative resources that would not otherwise be available to a hospital of PVHC's size.  The ultimate decision-making authority of PVHC rests with a board of trustees comprised of ten (10) volunteer community leaders.

26.     PVHC has brought quality healthcare closer to home, and improved the overall health and quality of life of the people it serves. As a non-profit corporation, PVHC's success equates to the community's success, as all revenues earned from operations are reinvested in improvements to its facilities, services, and other health-related initiatives.

## II.     PVHC'S CAPITAL STRUCTURE

27.     For its current capital/debt structure prior to the petition date, the facility has not incurred revenue bonds.   PVHC requires capital in order to, among other things, establish and maintain an income stream so that equipment may be purchased to grow and sustain operations of the facility.  The Debtor has entered into certain lease agreements with Powell Hospital District whereby the Hospital District leases the Facilities to PVHC in exchange for lease payments.  PVHC also has incurred debt in the form of a line of credit with First Bank of Wyoming (the "**Bank**"). As of April 30, 2016 the current amount outstanding on the line of credit is $900,000.00, with interest only payments of $3,000 per month for a thirty day month. PVHC is also the borrower under a second loan from the Bank in the outstanding amount of approximately $382,295 with monthly payments of $12,207.26.

### III.     EVENTS GIVING RISE TO THE BANKRUPTCY FILING

28.     Since 2011, PVHC, along with HealthTechS3 and a number of other defendants, has been subject to an onslaught of personal injury lawsuits stemming from a series of procedures performed at the Hospital (the "**Lawsuits**") between 2011 and 2014.  In total, twenty individuals who underwent such procedures have filed the Lawsuits against the PVHC and their treating physician, Dr. Hansen, who is no longer employed at PVHC.  Three additional personal injury lawsuits have been filed against PVHC unrelated to Dr. Hansen (collectively, the twenty-three tort claimants shall be referred to herein as the "**Tort Claimants**").

29.     The Lawsuits are being brought by former patients of Dr. Hansen for services rendered in 2013 and prior years.  Dr. Hansen has not provided services at the Hospital since 2013.  The Lawsuits have nothing to do with the current medical staff nor are they in any way indicative of the quality of care currently being provided by the medical staff and PVHC to its patients.

30.     The costs, fees and work needed to litigate the Lawsuits have and will continue to consume considerable time from staff at PVHC and have forced PVHC to consider various alternatives for managing and resolving these lawsuits.  This burden is amplified by the fact PVHC's insurers have also commenced litigation against PVHC (the "**Carrier Litigation**"), claiming they have no obligation to defend or cover the underlying Lawsuits notwithstanding that they issued insurance policies which were in force and effect when the underlying claims were filed.  A Chapter 11 bankruptcy is the best available alternative to PVHC for managing and effectively dealing with the Lawsuits and the underlying personal injury claims.

31.     Although the physician whose work was the subject of the underlying litigation matters is no longer with PVHC, PVHC's potential exposure in connection with the Lawsuits remains and poses a significant threat to its ability to effectively carry out its mission.  As the sole community acute care provider in Powell, the pendency of the Lawsuits has affected

PVHC's ability to raise the funds necessary to continue to meet the current and future healthcare needs of the community.

32.      PVHC faces significant uncertainty as well as administrative and financial burdens in defending the Lawsuits and addressing the Carrier Litigation.  PVHC voluntarily filed its Petition with the objective of dealing with the Carrier Litigation and resolving the Lawsuits in a fair, reasonable, and efficient manner while ensuring its long-term stability for the benefit of the community it serves.

33.      PVHC commenced this Chapter 11 Case to provide a framework for the fair and expeditious resolution of the Lawsuits.  Once the Lawsuits are resolved, PVHC will be able to refocus its attention on fulfilling its mission to provide quality healthcare services to its community.

## IV.    FIRST DAY MOTIONS

34.      To enable PVHC to minimize the adverse effects of the commencement of this Chapter 11 Case on its ongoing business operations and promote efficiency in chapter 11, PVHC has requested various forms of relief in its First Day Motions.  Summaries of each request for relief sought in the First Day Motions are set forth below.  Generally, the First Day Motions seek authority, among other things, to keep PVHC's business operating without interruption, pay prepetition wages and benefits to employees, obtain authorization for use of cash collateral on an interim and final basis and ensure the continuation of PVHC's cash management systems and other business operations without interruption.  Obtaining Court approval of the relief sought in the First Day Motions is essential to PVHC's ability to work toward a successful restructuring that will benefit all of PVHC's constituents, preserve patient relationships and maintain employee morale.

10

35.     Several of the requests in the First Day Motions seek authority to satisfy certain prepetition obligations. I am advised by counsel that Rule 6003 of the Federal Rules of Bankruptcy Procedure  provides, in relevant part, that the Court shall not consider motions to pay prepetition claims during the first twenty-one days following the filing of a chapter 11 petition, "[e]xcept to the extent that relief is necessary to avoid immediate and irreparable harm."  In light of this requirement, PVHC has tailored its requests for immediate authority to pay certain prepetition claims in those circumstances where failure to pay such claims would cause immediate and irreparable harm to PVHC and its estate. Other relief will be deferred for consideration at a later hearing.

36.     The Debtor has filed the following First Day Motions:

A.      Debtor's Motion for Expedited Entry of an Interim and Final Order (I) Authorizing  Use of Cash Collateral, (II) Providing for Adequate Protection Payments; and, (III) Granting Related Relief (the "**Cash Collateral Motion**").

B.      Debtor's Motion for Interim and Final Orders Authorizing (I) the Continued Use Of Existing Cash Management System, Bank Accounts, and Business Forms, (II) a Waiver of Certain Operating Guidelines Relating To Bank Accounts and (III) Granting Related Relief (the "**Cash Management Motion").**

C.      Debtor's Emergency Motion to Authorize Certain Procedures to Maintain Confidentiality of Patient Information as Required by Law (the "**Patient Confidentiality Motion**").

D.      Emergency Motion for Authority to Pay Prepetition Wages, Compensation and Employee Benefits *Nunc Pro Tunc* May 16, 2016 (the "**Wage and Benefit Motion**").

E.      Emergency Motion for Authority to (I) Honor and Maintain Certain Employment Agreements; (II) Pay Certain Prepetition Wages and other Agreed Compensation; and (III) Honor Additional Related Contractual Benefits as to Certain Medical Providers *Nunc Pro Tunc* May 16, 2016 (the "**Medical Provider Motion**").

11

F. Debtor's Motion Pursuant to Bankruptcy Code §§ 105((a) and 366  for Interim and Final Orders (I) Deeming Utility Companies Adequately Assured of  Future Performance, (II) Establishing Procedures for Resolving Objections by Utility Companies and (III) Prohibiting Utility Companies from Altering refusing or Discontinuing Service (the "**Utilities Motion**").

**A. The Cash Collateral Motion.**

37. The Cash Collateral Motion is a consensual motion for authority to use cash collateral.

38. As with any large chapter 11 case, the use of cash collateral is essential to the Debtor's ability to continue its business operations and to preserve and maximize the value of its assets as its transitions into chapter 11.

39. The Debtor is indebted to First Bank of Wyoming (the "**Secured Lender**") in the approximate amount of $904,900 under a line of credit and approximately $382,290 under an amortized loan (collectively the "**Loans**") for a total approximate indebtedness of $1,287,225 (exclusive of accrued but unpaid interest, attorneys' fees, legal expenses and other costs (the "**Prepetition Secured Debt**").

40. The Prepetition Secured Debt is secured by a valid and perfected first priority lien and security interest in, among other things, the Debtor's accounts receivable.

41. The Debtor, in consultation with its Secured Lender, has developed a cash flow budget attached as an exhibit to the Cash Collateral Motion. (the "Budget"), which covers the period from the Petition Date through September 1, 2016 (the "**Budget Period**").

42. The Debtor projects that it will utilize approximately $14,530,000 in cash collateral to fund its operations through the Budget Period. During the Budget Period, the Debtor projects that it will have sufficient proceeds from operations to pay all projected operating costs

12

and expenses of the Debtor and all administrative expenses incurred during that time period in accordance with the Budget.  As such, the Debtor is not seeking to obtain any postpetition financing at this point in the case.

43.    The Secured Lender has consented to the Debtor's use of cash collateral through September 1, 2016, subject to certain customary events that could cause an earlier termination, in accordance with the Budget, on the terms described in the Cash Collateral Motion and as set forth in the proposed interim and final Order Authorizing use of Cash Collateral and Providing Adequate Protection Payments (the "Cash Collateral Orders").  The Debtor proposes to provide the Secured Lender with, among other things, a superpriority claim and replacement liens (but not on any avoidance actions under Chapter 5 of the Bankruptcy Code) as adequate protection of the Secured Lender's interests in the cash collateral solely to secure any diminution in the value of its prepetition collateral from and after the Petition Date.   The Debtor also proposes to continue with ordinary course payments of interest only on the line of credit in the amount of $3,000 per month (for a thirty day month) and regular monthly payments of $12,207.26 on the amortized loan.

44.    The Debtor has an urgent and immediate need to use its cash collateral.

45.    I have read the Cash Collateral Motion and if called as a witness would testify that the statements contained therein are true and correct.  Those statements are incorporated herein by reference.

46.    For these reasons and those set forth below, it is critical for the Debtor to be able to use its cash collateral in order to keep the business operating as it works to fulfill its primary mission of providing continued medical services to the greater Powell area.

13

47.     The Debtor respectfully requests that the Court enter the Cash Collateral Orders authorizing the use of cash collateral in accordance with the Budget.

**B.     The Cash Management Motion**

48.     The Debtor has numerous bank accounts comprising an integrated cash management system (the "**Cash Management System**") through which the Debtor's funds are collected, managed, and disbursed in the ordinary course of business.

49.     By the Cash Management Motion, the Debtor seeks an order authorizing, but not directing, it to continue using the Cash Management System, pay or satisfy certain related prepetition obligations, maintain its existing Bank Accounts and Business Forms (as defined in the Cash Management Motion) and waiving certain requirements under the Operating Guidelines of the United States Trustee and the investment and deposit requirements under section 345(b) of the Bankruptcy Code.

50.     In the ordinary course of business, the Debtor utilizes an integrated Cash Management System to (a) facilitate the efficient transfer of funds, which reduces the administrative burden and costs associated with manual transfers; (b) enable management to control, monitor and report on the Debtor's collection and disbursement of funds; and (c) ensure sufficient cash availability on a daily basis.

51.     The Debtor has a variety of financial accounts that it wishes to maintain during the pendency of the bankruptcy case.  The existing accounts are comprised of nine operating accounts and several small petty cash accounts at various locations within the hospital and clinics as necessary to conduct business.

52.    The bank accounts are maintained at stable, Federal Deposit Insurance Corporation (FDIC) insured financial institutions.  The checking account ending in 7301 is the Debtor's primary account where electronic fund transfers are deposited from third party payors such as Medicare or Blue Cross (this is a non-interest bearing account).  Funds in excess of $25,000.00 are then swept to an interest bearing account ending in 7307.  Additionally, the Debtor maintains the account ending in 4501 (Payroll checking), account ending in 6301 (EBMS Employee Health Insurance), account ending in 3101 (Flex spending benefit account), account ending in 5601 (Employee Jeans Day Donation) and account ending in 7901 (Pension transfer account).  The above-referenced accounts are all maintained at First Bank of Wyoming ("**Bank**").

53.    The Debtor also maintains a Nursing Home Resident Trust Account ending in 2088 at Bank of the West, and the amounts deposited therein are not property of the Debtor or its estate.  Last, the Debtor maintains an account as South Carolina Bank.  This account is a joint account between the Debtor and Equiscript (the entity recently contracted with to handle mail delivery of 340B pharmaceuticals).  This account was recently set up with a $0 balance, and funds will eventually be deposited into the account and then disbursed to PVHC each quarter after payment for the cost of pharmaceuticals and handling fees.

54.    Finally, the Debtor uses cash in the ordinary course of its business as necessary to consummate small sales transactions with its patients (*i.e.*, to make change and accept payments), to fund minor purchases and to provide employees with reimbursements for personal outlays in amounts less than $25 unless preapproval is received.  In total, the Debtor holds no more than approximately $2,170 in total petty cash and no more than $500 in any one location. The use of petty cash is governed by a written policy which sets forth restrictions, audit, and

15

security protocols relating to petty cash. For security reasons, the amounts and locations of the petty cash accounts are not disclosed herein.

55.    Disbursements from the Debtor's various accounts are made by numbered check, ACH transfer, wire transfer, or by other means. Notably, the Debtor handles the majority of payroll disbursements in-house and makes the vast majority of its payroll disbursements by ACH transfer. This method of making disbursements is superior to disbursements by physical check in terms of cost, speed, and convenience.

56.    If the Court grants the relief requested in the Cash Management Motion, the Debtor intends to continue to maintain strict accounting records so that the United States Trustee and parties in interest may readily monitor to Debtor's financial activity

57.    Under the Operating Guidelines and Reporting Requirements for Debtors in Possession and Trustees (the "**Operating Guidelines**") established by the Office of the United States Trustee for Region 19, the Debtor would be required, among other things, to close all of its pre-petition bank accounts and open new debtor-in-possession bank accounts.

58.    Requiring the Debtor to close all of the existing bank accounts in its sophisticated Cash Management System and open new debtor-in-possession accounts would cause enormous and unnecessary disruption in the Debtor's business, would cost the estate tremendous and unnecessary expense, and would impair the Debtor's efforts to successfully reorganize.

59.    Requiring the Debtor to close existing Bank Accounts and reconfigure cash receipts, insurer payments, payroll obligations and other cash functions using new accounts will impede and frustrate the Debtor's ability to operate in the ordinary course of business. The existing Cash Management System functions well and allows Debtor to accurately track cash

flow and allows the Debtor, among other things, to efficiently collect and allocate receipts and make timely disbursements on behalf of the entire business operation.

60.     The continued use of the bank accounts and the Cash Management System is imperative and will enable the Debtor to maintain its business operations with minimal disruption.

61.     By the Cash Management Motion, the Debtor seeks authority, notwithstanding the contrary provisions of the Operating Guidelines, to maintain its existing bank accounts and Cash Management System to avoid unnecessary disruption to its business and irreparable harm to its estate.  That said, the Debtor is proposing to set up a new debtor in possession account for future disbursements (the "**DIP Account**").  While all current bank accounts would stay active, all postpetition funds received by the Debtor would be swept into the DIP Account and then disbursed in the ordinary course of the Debtor's business.  This will ensure that all postpetition disbursements can be appropriately monitored.  Additionally, all cash in the Debtor's main operating account at the Bank will be transferred to the DIP Account once it is active.

62.     The Operating Guidelines further restrict debtors to utilizing deposit accounts only at certain pre-approved depository institutions listed on the UST List of Authorized Depositories.[1]  The primary U.S. accounts are at an institution that is seeking to be included on the list.  The Debtor operates in Wyoming and has an established relationship with its bank and respectfully submits that its accounts are at a creditworthy financial institution.

---

[1] *See* UST List of Authorized Depositories, available for download at http://www.justice.gov/file/440966/download

63.     By the Cash Management Motion, the Debtor further seeks waiver of the Operating Guidelines to the extent that these accounts are not at banks on the UST List of Authorized Depositories.

### C.     The Patient Confidentiality Motion.

64.     The Debtor is an independent non-profit 501(c)(3) corporation whose sole mission has been to provide medical care to the residents of Powell, Wyoming and the surrounding areas.

65.     The Debtor operates a hospital and is thus a "covered entity" under the Health Insurance Portability and Accountability Act of 1996 ("HIPAA") and Wyoming law.

66.     HIPAA prohibits the "wrongful disclosure" of individually identifiable health information, which includes any information relating to, inter alia, the provision of health care to, and payment for health care by an individual.  Likewise, under Wyoming law, a hospital, or agent or employee of a hospital, may only disclose a patient's health care information if authorized to do so by the patient.  *See* W.S. 1977 § 35-2-606(a).  Wyoming also prohibits the disclosure of health care information in any judicial proceeding.  W.S 1977 § 35-2-610(a).

67.      The Debtor has provided and continues to provide health care services to thousands of patients ("**Patients**").  Certain current and past Patients of the Debtor have already asserted claims against the Debtor's estate based on tort, services rendered or otherwise (the "**Known Patient Creditors**").  Furthermore, a number of Patients may also hold a right to a refund of amounts previously paid to the Debtor ("**Refund Claimants**").  Under the Bankruptcy Code and the applicable Bankruptcy Rules, the Debtor is required to list information about such patients as creditors, including their names and addresses, in the creditor matrix and in the Schedules and Statements.  Listing any patient's name or address in the matrix, Schedules, and

18

Statements, or any notice or certificate of service, however, may violate the HIPAA Privacy Rule, unless an exception permitting such distribution is satisfied.

68.     The Patient Confidentiality Motion requests that the Court establish certain procedures to balance the need to protect patient health information with the need to disclose information regarding this case to the public as follows:

   a.   the Debtor shall omit any reference to current or former patients, including the Known Patient Creditors and Refund Claimants, from the matrix of creditors and any certificate of service;

   b.   the Debtor shall identify Known Patient Creditors and Refund Claimants in the Schedules (in particular, on Schedule F) and Statements solely by a code number, such as "Patient 1," "Patient 2," and so forth, and shall make an unredacted copy of the Schedules and Statements available to (i) the Court and to the United States Trustee upon request; and (ii) any other party-in-interest only after this Court has entered an order, after notice and a hearing, authorizing the Debtor to do so;

   c.   the Debtor shall maintain a list of all Known Patient Creditors and Refund Claimants (the "Patient List") that appear on the matrix of creditors, and shall make the Patient List, or any portion thereof, available to any party-in-interest only after this Court has entered an order, after notice and a hearing, authorizing the Debtor to do so; and,

   d.   when the Debtor serves any paper upon any person listed on the Patient List, the Debtor shall note in the respective certificate of service that the parties served include persons listed on the Patient List.

69.     The Debtor further requests that the proposed procedures need not apply to those Known Patient Creditors represented by counsel that commenced litigation against the Debtor (by filing a complaint in the public records in which the Debtor was a named defendant) prior to the Petition Date (the "**Tort Claimants**").  The Tort Claimants will be identified in the Debtor's filings by name only, and all pleadings required to be served upon the Tort Claimants will be served upon the Tort Claimants via their attorney of record.

70.     More detailed information regarding the relief requested is contained in the Patient Confidentiality Motion. I have read the Patient Confidentiality Motion and if called would testify that the statements contained therein are true and correct.  I incorporate those statements into this Declaration by reference.

### D.     The Wages and Benefits Motion.

71.     The Debtor has a workforce of approximately 403 employees, including 313 full-time employees.

72.     The Debtor respectfully requests that the Court enter an order authorizing it, in its sole discretion, to pay (a) prepetition employee wages, salaries and related items; (b) prepetition reimbursable expenses; (c) payroll deductions and withholdings, including payroll taxes and garnishments; (d) prepetition contributions to, and benefits under, employee benefit plans; and, (e) all costs and expenses incident to the foregoing.

73.     In fiscal year 2015, PVHC paid approximately $28,987,900 in salaries and benefits to its employees.

74.     On a bi-weekly basis, the Debtor's payroll averages approximately $910,000 in the aggregate. Since the non-Medical Provider Employees (as defined in the motion) have only been paid through May 7, 2016, the Debtor estimates that approximately $312,500 has accrued but is not yet due to its non-Medical Provider Employees.[2]

75.     More detail concerning the employees and the wages, salaries and benefits owed is contained in the Wage and Benefit Motion.  I have read the Wage and Benefit Motion and if

---

[2] See the following section regarding unpaid wages to Medical Providers.  Their share represents the remainder of the unpaid prepetition wages and benefits.

called would testify that the statements contained therein are true and correct.  I incorporate those statements into this Declaration by reference.

76.    The Debtor seeks authority to pay unpaid prepetition wages, benefits including paid time off, medical, dental, vision, life and disability insurance and worker's compensation premiums, education assistance payments, retirement plan contributions, employee expense reimbursements and various ordinary course withholdings and deductions from employee paychecks, to the extent such payments do not exceed the amount of $12,850 for any given employee.

**E.    The Medical Providers Motion.**

77.    The Debtor employs sixteen full or part-time physicians as well as one (1) full-time Certified Nurse Midwife, two (2) full-time Certified Nurse Practitioners and two (2) full time and two (2) part time physician assistants under varying forms of employment agreements. The Debtor has filed the Medical Providers Motion seeking authority to honor the terms of such employment contracts as to amounts that may be owed for the one week after the last payroll but prior to the Petition Date.

78.    Debtor estimates that approximately $143,000 has accrued but is not yet due to the Employee Medical Providers, and seeks authority to make such payment with the next regular payroll.

79.    The amounts owed to the Medical Providers do not exceed the sum of $12,850 each, with the exception of one provider who is owed $670 above that amount.

80.    More detail concerning the Medical Providers and the employment agreements is contained in the Medical Provider's Motion.  I have read the Medical Provider's Motion and if

called would testify that the statements contained therein are true and correct.  I incorporate those statements into this Declaration by reference.

### F.      The Utilities Motion.

81.      In the ordinary course of its business, the Debtor incurs utility expenses for electricity and various telecommunications needs. The Debtor will require uninterrupted utility service throughout the pendency of this Chapter 11 Case.

82.      In connection with the operation of its business, the Debtor receives utility service from seven different utility companies (each a "**Utility Company**" and together the "Utility Companies") listed on Exhibit A to the Utility Motion (the "**Utility Service List**"), including providers of electricity, gas, telephone, internet and disposal services (collectively, the "**Utility Services**").

83.      The Debtor proposes the following Adequate Assurance Procedures to resolve additional assurance requests in an orderly and fair manner:

  a. Within three (3) business days after the date of entry of the Interim Order, the Debtor will mail a copy of the Interim Order to the Utility Companies on the Utility Company List.

  b. If a Utility Company is not satisfied with the proposed adequate assurance herein and seeks additional adequate assurance of payment, it must serve an additional assurance request upon counsel for the Debtor, whose address appears below. Each additional assurance request must (i) be made in writing; (ii) set forth the amount and form of additional assurance of payment requested; (iii) set forth the type of Utility Services, any account numbers, and the location for which Utility Services are provided; (iv) include a summary of the Debtor's payment history to such Utility Company, including whether the Utility Company holds any deposits or other security, and, if so, in what amount; and (v) set forth why the Utility Company believes that the proposed adequate assurance herein is not sufficient adequate assurance of payment.  Said request must be made within fifteen (15) days of the entry of the Interim Order.

  c. Upon the Debtor's receipt of an additional assurance request, the Debtor will have ten (10) days from the receipt of such additional assurance request (the

"**Resolution Period**") to negotiate with the requesting Utility Company and resolve its additional assurance request.

d.  The Debtor may resolve any additional assurance request, objection or Determination Motion (as defined below) by mutual agreement with the Utility Company and may provide the Utility Company with an alternative form of adequate assurance of payment, without further order of this Court, if the Debtor believes that such additional assurance is reasonable; provided, however, that the Debtor shall maintain a summary record of such agreements and their respective terms, and such summary record and the agreements themselves shall be available upon demand to any official committee appointed in the Chapter 11 case and to the U.S. Trustee.

e.  Should the Debtor be unable to reach a mutual resolution with respect to an additional assurance request within the Resolution Period, the Debtor shall file a motion with the Court seeking a hearing to determine the adequacy of assurance of payment with respect to a particular Utility Company (the "**Determination Motion**") and, if the Determination Motion is not withdrawn, the Court will determine the adequacy of the proposed adequate assurance with respect to that Utility Company.

f.  The Debtor proposes that any Utility Company that objects to this Motion, including the Adequate Assurance Procedures, must file a written objection (an "Objection") and serve such Objection on the Debtor no later than seven (7) days prior to the date of the Final Hearing.

g.  Until the conclusion of the Final Hearing and entry of an appropriate order by the Court any Utility Company that files an objection is prohibited and enjoined from altering, refusing or disconnecting its Utility Services to the Debtor.

## V.    RESERVATION OF RIGHTS

84.    Notwithstanding anything in this Declaration or any of the First Day Motions or associated order of this Court granting any of the First Day Motions, if any, the payment of any claims or other honoring of the obligations described in this Declaration shall not make such obligations administrative expenses of the estate entitled to priority status under sections 503 and 507 of the Bankruptcy Code.

85.     The Debtor does not to seek to assume any executory contracts or obligations at this time and, therefore, nothing contained in this Declaration or the First Day Motions should be deemed to be an assumption or adoption of any policy, procedure or executory contract that may be described or referenced herein.

## VI.      REQUESTS FOR IMMEDIATE RELIEF AND WAIVER OF STAY

86.     Pursuant to Bankruptcy Rules 6003(b) and 6004(h), the Debtor seeks (a) immediate entry of orders granting the relief sought in the First Day Motions and (b) a waiver of any stay of the effectiveness of such an orders.

87.     Pursuant to Bankruptcy Rule 6003, the Court may grant relief within twenty-one (21) days after the filing of the petition regarding a motion to pay all or part of a prepetition claim only to the extent that such relief is necessary to avoid immediate and irreparable harm. Here, the relief requested is necessary to avoid immediate and irreparable harm to the Debtor's estate for the reasons set forth above. Accordingly, Bankruptcy Rule 6003 has been satisfied and the relief requested herein should be granted.

88.     The Debtor requests a waiver of any stay of the effectiveness of any orders approving any of the First Day Motions to further avoid immediate and irreparable harm and so that the Debtor may transition into chapter 11 as efficiently and effectively as possible.

## VII.    CONCLUSION

89.     I have reviewed each of the requests included in each of the First Day Motions. The facts stated therein and herein are true and correct to the best of my information and belief, and I believe that each request for relief sought in each of the First Day Motions is necessary to enable the Debtor to operate in chapter 11 with minimal disruption to its business operations and constitutes a critical element in successfully restructuring the Debtor's business.

24

90.    For the reasons stated in herein and in the First Day Motions filed concurrently herewith, I respectfully request that each request in each of the First Day Motions be granted in its entirety, together with such other and further relief as this Court deems just, proper and equitable.

I certify under penalty of perjury that, based upon my knowledge, information and belief as set forth in this Declaration, the foregoing is true and correct.

Date: May 16, 2016

_____
Michael L. Long - Chief Financial Officer
Powell Valley Health Care, Inc.

25