RANDY L. ROYAL (Wyo. Bar 5-1754)
ATTORNEY AT LAW
P.O. BOX 551
GREYBULL, WY 82426
PHONE: 307-765-4433
rlroyal@randyroyalpc.com

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF WYOMING

| | | |
|---|---|---|
| In Re: | ) | |
|     POWELL VALLEY HEALTH CARE, INC. | ) | |
| | ) | Case No. 16-20326 |
| | ) | |
|     Debtor(s) | ) | |

## AMENDED

### RESPONSE IN OPPOSITION TO DEBTOR'S MOTION TO ENFORCE SCOPE OF THE AUTOMATIC STAY, OR IN THE ALTERNATIVE, MOTION TO EXTEND AUTOMATIC STAY

Creditors, Nathaniel and Sheena Bates *individually and as the parents and natural guardians of* I.S.B., Jan and Bart Brinkerhoff, Nancy and Earl Crawford, Anthony and Laurie DiPilla, Shannon Eller, Nancy and Larry Heiser, Sheryl and Darin Henderson, Joetta Johnson, Kalan Nicholson, Martha and Richard McMillen, Keela and Brock Meier, Michelle Oliver, Darcy Ronne, Jody and Jerry Sessions, Lynn and Janet Snell, Veronica and William Sommerville, *individually and as the parents and natural guardians of* A.L.S., by and through their counsel, Randy Royal of RANDY ROYAL, P.C., hereby file their Response in Opposition to Debtor's Motion to Enforce Scope of the Automatic Stay, or in the Alternative, Motion to Extend Automatic Stay, and state as follows:

I.      INTRODUCTION

1

Creditors are the Plaintiffs in sixteen underlying lawsuits[1] arising out of the medical malpractice of Dr. Jeffrey Hansen and the negligence of Powell Valley Health Care, Inc. ("PVHC"), HealthTech Management Services, Inc. ("HealthTech") and/or William D. Patten.[2] Creditors strongly oppose PVHC's Motion for an extension of the bankruptcy stay to PVHC's solvent co-defendants because an extension of the stay would only serve to further delay their day in court. The Court should decline to consider this Motion because PVHC has not filed an adversary proceeding. Even if the Court decides to consider this Motion on the merits, the Court should deny the Motion because (1) Creditors' claims against the solvent co-defendants do not implicate the property of PVHC's estate; (2) the "unusual circumstances" exception does not

---

[1] The underlying lawsuits are: *Bates v. HealthTech Management Services, Inc., et al.*, Civ. No. 28112 (Wyo. Dist. Ct. 5th Jud. Dist. filed July 28, 2015); *Brinkerhoff v. HealthTech Management Services, Inc., et al.*, Civ. No. 27946 (Wyo. Dist. Ct. 5th Jud. Dist. filed Jan. 20, 2015); *Crawford v. HealthTech Management Services, Inc., et al.*, Civ. No. 28199 (Wyo. Dist. Ct. 5th Jud. Dist. filed Oct. 23, 2015); *DiPilla v. HealthTech Management Services, Inc., et al.*, Civ. No. 27947 (Wyo. Dist. Ct. 5th Jud. Dist. filed Jan. 20, 2015); *Eller v. HealthTech Management Services, Inc., et al.*,Civ. No. 28015 (Wyo. Dist. Ct. 5th Jud. Dist. filed Apr. 8, 2015); *Heiser v. HealthTech Management Services, Inc., et al.*, Civ. No. 28198 (Wyo. Dist. Ct. 5th Jud. Dist. filed Oct. 23, 2015); *Henderson v. HealthTech Management Services, Inc., et al.*, Civ. No. 28134 (Wyo. Dist. Ct. 5th Jud. Dist. filed Aug. 13, 2015); *Johnson v. HealthTech Management Services, Inc., et al.*, Civ. No. 27821 (Wyo. Dist. Ct. 5th Jud. Dist. filed Sept. 29, 2014); *Nicholson v. HealthTech Management Services, Inc., et al.* (Civ. No. 28178 (Wyo. Dist. Ct. 5th Jud. Dist. filed Oct. 6, 2015); *McMillen v. HealthTech, Management Services, Inc., et al.*, Civ. No. 27948 (Wyo. Dist. Ct. 5th Jud. Dist. filed Jan. 20, 2015); *Meier v. HealthTech Management Services, Inc., et al.*, Civ. No. 28084 (Wyo. Dist. Ct. 5th Jud. Dist. filed June 23, 2015); *Oliver v. HealthTech Management Services, Inc., et al.*, Civ. No. 28035 (Wyo. Dist. Ct. 5th Jud. Dist. filed May 4, 2015); *Ronne v. HealthTech Management Services, Inc., et al.*, Civ. No. 28123 (Wyo. Dist. Ct. 5th Jud. Dist. filed Aug. 5, 2015); *Sessions v. HealthTech Management Services, Inc., et al.*, Civ. No. 28090 (Wyo. Dist. Ct. 5th Jud. Dist. filed June 25, 2015); *Snell v. HealthTech Management Services, Inc., et al.*, Civ. No. 27805 (Wyo. Dist. Ct. 5th Jud. Dist. filed Sept. 12, 2014); *Sommerville v. HealthTech Management Services, Inc., et al.*, Civ. No. 27813 (Wyo. Dist. Ct. 5th Jud. Dist. filed Sept. 22, 2014).

[2] Although other tort claimants may have named the Powell Hospital District as a Defendant, the District was not named by these plaintiffs.

justify extending the stay; and (3) PVHC has not carried its burden of showing its entitlement to an extension of the stay under the preliminary injunction standard.

Debtor PVHC operates a hospital in Powell, Wyoming.  Dr. Hansen is an orthopedic surgeon who treated patients at PVHC from 2006 until 2013, when Dr. Hansen's privileges were suspended for "patient safety concerns."   Exh. A, Ilene Olson, *Powell hospital files for bankruptcy to deal with lawsuits*, POWELL TRIBUNE, May 16, 2016.  HealthTech is a hospital management company that contracted with PVHC to manage the hospital.  Pursuant to its Management Agreement with PVHC, HealthTech placed one of its employees, Mr. Patten, to serve as the CEO of PVHC.  Although HealthTech still manages PVHC, Mr. Patten is no longer the CEO.  Creditors' negligence claims against these parties are pending in the Park County District Court and while they are each at different stages of discovery, most of the claims were filed over a year ago.  In fact, some of the cases have now been pending for almost two years.

While the nature of the malpractice claims against Dr. Hansen differs, each of the Plaintiffs has also asserted direct negligence claims against PVHC, HealthTech and/or Mr. Patten[3] based on the fact that they ignored credible complaints about Dr. Hansen.  For example, Dr. Bradley Mangum, a doctor of chiropractic medicine and a nurse practitioner who worked closely with Dr. Hansen testified[4] that he expressed detailed concerns about Dr. Hansen to Mr. Patten and others.  According to Mr. Mangum, in May 2013, he went to Mr. Patten and told him "that I felt like I had moved from a surgery suite into a butcher shop, and that there had been multiple injuries.  And I turned it over to the right person and nothing was happening."  Exh. B, Mangum Dep. (*Durose*), at 136:4-8.   In fact, when Mr. Mangum questioned why the

---

[3] Mr. Patten is not named in the *Sommerville* or *Johnson* cases because he was not the CEO at the time of those surgeries.

[4] Mr. Mangum's testimony came in the case *Durose v. Powell Valley Healthcare, Inc., et al.,* Civ. No. 13-CV-216-S (D.Wyo. dismissed Aug. 3, 2015).  That case settled.

administration was not acting on his concerns about Dr. Hansen, he was told by Timothy Seeley, the risk manager of PVHC, "we can't kill the goose that's laying the golden egg until we get another goose." *Id.* at 138:9-11. Mr. Patten has admitted that he knew Mr. Seeley made this statement. *See* Exh. C, Patten Dep. (*Durose*), at 77. Dr. Hansen was not suspended until the end of November 2013, roughly eight months after Mr. Mangum began complaining. *See* Exh. B, Mangum Dep. (*Durose*), at 140-141.

By way of illustration of the severity of Creditors' injuries and slow progression of these cases, Veronica "Ronnie" Sommerville was injured on October 11, 2011, when Dr. Hansen negligently performed a bunion surgery, a gastroc lengthening, and an unconsented medial column fusion. Exh. D, *Sommerville First Amend. Compl.*, at ¶¶ 25, 27, 29. Before this surgery Ms. Sommerville was an avid runner. Today she endures constant and all-consuming nerve pain, which is so severe that she may have to have her foot amputated. *Id.* at ¶ 42. Ms. Sommerville filed her case on September 22, 2014. Depositions were scheduled to begin on May 17, 2016 — but PVHC filed this bankruptcy at the eleventh hour.

Similarly, Martha McMillen saw Dr. Hansen for a partial sprain of her MCL and a medial meniscus tear. Exh. E, *McMillen First Amend. Compl.,* at ¶ 29. On July 17, 2012, Dr. Hansen operated to addresses these injuries and intraoperativley expanded the scope of the surgery to include an unconsented lateral release. *Id.* at ¶ 30. Only three months later, Dr. Hansen hastily recommended a total knee replacement, which he performed on November 13, 2012. *Id.* at ¶ 33. This was followed by a manipulation of the knee, during which Dr. Hansen negligently fractured Ms. McMillen's distal femur. *Id.* at ¶ 38. On March 29, 2013, Dr. Hansen operated yet again, this time to repair the fracture and perform a total knee revision. *Id.* at ¶ 39. Ms. McMillen filed her case on January 20, 2015.

4

Like Ms. McMillen and Ms. Sommerville, the other Creditors continue to endure constant physical pain as a result of Dr. Hansen's inexcusable conduct and PVHC, HealthTech and Mr. Patten's refusal to take action when faced with credible concerns. Many of these people are awaiting relief in the underlying lawsuits in order to have the means to pursue much needed medical treatment. Further delay is simply not an option for them.

## II.    LEGAL STANDARDS

### A.    Protection of the debtor and the estate's property

The bankruptcy code provides an automatic stay pursuant to 11 U.S.C. §362(a)(1)(staying the "continuation… of a judicial… proceeding against the debtor") and §362(a)(3)(staying any "act to obtain property of the estate…"). 11 U.S.C. §362(a). By its express terms, the automatic stay protects only the debtor, not solvent co-defendants such as HealthTech, Mr. Patten and Dr. Hansen. *County Nat. Bank v. W & P Trucking, Inc.*, 754 F.2d 881, 883 (10th Cir. 1985)("Section 362(a) automatically stays proceedings against the debtor only and not co-debtors."). The purpose of the stay is "to permit the debtor to organize his or her affairs without creditor harassment and to allow orderly resolution of the claims." *Fortier v. Dona Anna Plaza Partners*, 747 F.2d 1324, 1330 (10th Cir. 1984). In the words of the Tenth Circuit, "[i]t would make no sense to extend the automatic stay protections to solvent co-defendants. They don't need it, and at the same time it would work a hardship on plaintiffs by giving unwarranted immunity from suit to solvent co-defendants." *Fortier*, 747 F.2d at 1330; *see Okla. Federated Gold & Numismatics, Inc. v. Blodgett*, 24 F.3d 136, 141 (10th Cir. 1994) ("While § 362 extends the stay provisions of the Bankruptcy Code to the 'debtor', the rule followed by this circuit and the general rule in other circuits is that the stay provision does not extend to solvent codefendants of the debtor.")(citing *Fortier,* 747 F.2d at 1330).

Only actions to recover **the estate's property** may be stayed pursuant to §362(a)(3). The mere fact that a judgment against a solvent co-defendant *may* implicate rights to the debtor's insurance policy does not justify staying claims against solvent co-defendants. *In re Granite Partners, L.P.*, 194 B.R. 318, 337 (Bankr. S.D.N.Y. 1996)("We are not convinced that an action by a third party to recover a judgment against another third party, whose liability may be covered under an insurance policy that also grants the debtor separate rights, implicates the automatic stay.").

B.      The narrow "unusual circumstances" exception

Some courts have extended the §362(a)(1) stay to solvent co-defendants pursuant to 11 U.S.C. § 105 under the narrow "unusual circumstances" exception. *See A.H. Robins Co. v. Piccinin,* 799 F.2d 994, 999 (4th Cir. 1986), *cert. denied*, 479 U.S. 876 (1986). In *Okla. Federated Gold*, the Tenth Circuit stated: "A narrow exception allows a stay to be imposed under section 362(a)(1) against a nonbankrupt party in 'unusual situations'…," but went on to hold that the unusual circumstances doctrine would not apply in that case. 24 F.3d at 141. In fact, Creditors have been unable to find, and PVHC has not cited, a single case in which the Tenth Circuit permitted an automatic stay to extend to non-debtors. Moreover, to the extent that PVHC's motion seeks to "enforce the scope" of the §362(a) stay, the Court should note that "although the stay provided by §362(a) is automatic to the debtor, it is not automatic as to others. Unless the bankruptcy court expressly extends the stay to others, it applies by its literal terms only to the debtor." *Fischer Sand & Gravel Co. v. Western Sur. Co.,* 2009 WL 4099768, at *4 (D.N.M. Oct. 20, 2009). Thus, the "scope" of the automatic stay is currently limited to the debtor, PVHC, unless and until this Court orders otherwise.

C.      The preliminary injunction standard

Some courts have imposed a stay on claims against solvent co-defendants by issuing a preliminary injunction pursuant to §105, which provides "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provision of this title."  11 U.S.C. § 105.  "Although the language of Section 105 is broad, **relief under this section is 'extraordinary.'**"  Exh. F, *In re Medical Management Group, Inc.*, No. 01-14494-WV, 2003 WL 21487310, at *6 (B.A.P. 10th Cir. June 27, 2003) (quoting *In re Arrow Huss,* 51 B.R. 853, 857 (Bankr. D. Utah 1985))(emphasis added).  The Tenth Circuit applies the general principles that govern injunctions in determining whether to extend the scope of the bankruptcy stay to solvent co-defendants and it is the burden of the party seeking extension of the stay to prove:

> (1) a substantial likelihood of prevailing on the merits; (2) irreparable harm unless the injunction is issued; (3) [that] the threatened injury outweighs the harm that the preliminary injunction may cause the opposing party; and (4) that the injunction, if issued, will not adversely affect the public interest.

*Id.* (quoting *Greater Yellowstone Coalition v. Flowers,* 321 F.3d 1250, 1255 (10th Cir. 2003)). "The pivotal question is whether the ***debtor*** will suffer irreparable harm if the proceedings against the nondebtor go forward."  *Id.* (emphasis in original).

    D.    <u>The adversary proceeding requirement</u>

Finally, pursuant to the Federal Rules of Bankruptcy Procedure, Rule 7001, "a proceeding to obtain an injunction or other equitable relief" is an adversary proceeding.  Fed. R. Bankrupt. P. 7001(7).  In order to properly invoke the jurisdiction of the bankruptcy court — PVHC was required to file an adversary proceeding.  Exh. G, *In re Red Eagle Oil, Inc.*, No. 11-20957, *8 (Bankr. D. Wyo. Oct. 17, 2011) (holding that a motion for an injunction pursuant to §105 was not properly before the bankruptcy court where the debtor failed to file an adversary proceeding)(citing *In re Riding*, 44 B.R. 846 (Bankr. D. Utah 1984)).

III.    A<small>RGUMENT</small>

PVHC argues that the bankruptcy stay should be extended to Creditors' claims against HealthTech, Dr. Hansen, and Mr. Patten pursuant to §362(a)(3), §362(a)(1) and §105 — but PVHC has not carried its burden of persuasion. As a preliminary matter, the Court should not consider this Motion because PVHC failed to file an adversary proceeding. Assuming, however, that the Court reaches the merits of PVHC's arguments, the Court should deny this Motion because an extension of the stay is not warranted under §362(a) or §105.

A.      The Court should refuse to consider this Motion because PVHC has not filed an adversary proceeding

The Court should refuse to consider PVHC's motion because Rule 7001 requires a request for a preliminary injunction to be brought as an adversary proceeding, not by motion. Exh. F, *In re Medical Management Group, Inc.*, No. 01-14494-WV, 2003 WL 21487310, at *7 (B.A.P. 10th Cir. June 27, 2003) (holding that "presumably" a §105(a) injunction could only be granted in an adversary proceeding); *see* Exh. G, *In re Red Eagle Oil, Inc.*, No. 11-20957, *8 (Bankr. D.Wyo. Oct. 17, 2011) ("[T]he court finds that the Debtor's motion is improperly before this court."); *In re Bryant*, 296 B.R. 516, 520 (Bankr. D. Colo. 2003)("Tenth Circuit has concluded that it is not appropriate to consider *reimposition* of the automatic stay under 11 U.S.C § 105 as a contested matter"); *In re Nieves*, 290 B.R. 370, 380 (Bankr. C.D. Cal. 2003)("Because the UST has sought injunctive relief by motion rather than adversary proceedings, the matter is not properly before the court and is denied without prejudice."). As the United States Court for the District of Colorado explained:

> Civil actions, generally, and adversary proceedings, specifically, have certain perquisites. They are commenced by the filing of a complaint, which must be personally served upon the defendant with a summons in order to create personal jurisdiction. Fed.R.Civ.P. 3 & 4; Fed. R. Bank. P. 7003 & 7004. The complaint must set forth a jurisdictional statement, a short and plain statement of the claim or claims, and a demand for judgment. Fed.R.Civ.P. 8; Fed. R. Bank. P. 7008.

> The defendant has an opportunity to file an answer or otherwise respond.
> Fed.R.Civ.P. 12; Fed. R. Bank. P. 7012. The litigants may engage in discovery.
> Fed.R.Civ.P. 16, 26–36; Fed. R. Bank. P. 7016, 7026–7036.

*Fulton v. McVay*, 318 B.R. 546, 553 (Bankr. D. Colo. 2004). Because PVHC has failed to

comply with these requirements — this Court has no jurisdiction to consider the pending motion.

PVHC's request for extension of the automatic stay under §362(a), although phrased as a

request to enforce the scope of the automatic stay, is also a request for injunctive relief under

§105. As one court explained: "Even where unusual circumstances exist, extension of the stay to

nonbankrupt parties is not automatic and must be requested affirmatively by the debtor. A

request for such an extension must be made by adversary proceeding." *In re Richard B. Vance*

*& Co.*, 289 B.R. 692, 697 (Bankr. C.D. Ill. 2003); *see In re Lengacher,* 485 B.R. 380, 384-85

(Bankr. N.D. Ind. 2012) ("Extending the automatic stay is actually a request for an injunction

and Rule 7001(7) of the Federal Rules of Bankruptcy Procedure requires and adversary

proceeding to obtain that kind of relief."). The Court may conclude its analysis here, and deny

this Motion.

> B.    <u>If the Court decides to consider the merits, PVHC's motion should be denied in so far
> as it seeks to expand the scope of the stay under §362(a)</u>

> 1.    **The extension of the stay is not warranted to protect PVHC's property pursuant
> to §362(a)(3)**

PVHC first argues that the stay should be extended to the solvent co-defendants pursuant

to §362(a)(3) because HealthTech, Mr. Patten and Dr. Hansen are named as additional insured

on PVHC's general liability polices and actions against these Defendants could deplete the

insurance policy. *Debtor's Motion*, at 5. Under §362(a)(3), the automatic stay applies narrowly

to "**an act to obtain possession** or **property of the estate**…or to exercise control over **property**

**of the estate**." 11 U.S.C. § 362(a)(3)(emphasis added). "Property" includes "all legal or

equitable interests of the debtor in property as of the commencement of the [Bankruptcy] case."

11 U.S.C. §541(a)(1).

First, this is not an act to obtain property of the estate.  Unlike the single case relied on by

PVHC, Creditors are not seeking to enforce rights under an insurance policy — that can only

happen after they have received judgments against HealthTech, Dr. Hansen and/or Mr. Patten.

As the court held in *Duval v. Gleason:*

> The present case, however, involves no such "direct action" against property of the estate. **Rather, the present action seeks to determine the liability of individual defendants in the allegedly fraudulent marketing and selling of limited partnerships. Only if such liability attaches will there arise the separate issue of whether any insurance policy proceeds are available to satisfy claims on the basis of indemnity**…. Thus, at this point in the litigation, interest in the debtor's insurance policy proceeds seems premature. Clearly enforcement of any judgment awarded in the present action which entailed an action against the Equitec debtors' property, including the insurance policy, would fall within the reach of § 362. However, this Court does not find such future concerns to have a sufficient, direct impact on the present proceedings to compel that they be stayed.

*Duval v. Gleason*, No. C-90-0242-DLJ, 1990 WL 261364, at *6 (N.D. Cal. Oct. 19,

1990)(emphasis added); *see In re Granite Partners, L.P.*, 194 B.R. 318, 337 (Bankr. S.D.N.Y.

1996)("[T]he mere threat to the policy does not implicate the automatic stay…").

In fact, there is little chance that a judgment against HealthTech, Dr. Hansen, and/or Mr.

Patten would be paid under the insurance policies at this time, given that PVHC's insurance

carriers have denied coverage in each of the creditors' underlying tort claims.  The coverage

claims were being litigated in the United State Court for the District of Wyoming but that case

has been stayed pending further notice from this Court.  *See Homeland Insurance Company of*

*New York v. Powell Hospital District et. al.*, No. 15-CV-31 J (D. Wyo. filed Feb. 27, 2015) .  To

the extent that this Court is concerned about protecting the insurance policy, these concerns are

more efficiently addressed in the context of the insurance case, such as by extending the stay in

that case.

Second, PVHC has not demonstrated that the proceeds of its liability policies constitute property of the estate.  PVHC simply states that it has "several insurance polices…the proceeds of which are property of the estate."  *Debtor's Motion*, at ¶11.  But PVHC has the burden of showing "that the insurer was liable to the debtors pre-petition under the policy at issue in order for any proceeds to possibly be property of the estate."  *In re White*, 148 B.R. 330, 332 (W.D. Okla. 1992) & *id*. ("If the policy is one for liability, the insurer becomes liable when liability attached to the insured.").  Likewise, "when a policy provides the debtor with indemnification coverage but indemnification either has not occurred, is hypothetical, or speculative, the proceeds are not property of the bankruptcy estate."  *In re MF Global Holdings Ltd.*, 515 B.R. 193, 203 (Bankr. S.D.N.Y. 2014)(internal quotations omitted).  PVHC has not discussed any of the details of its insurance policies or explained why it believes that the proceeds of these policies qualify as property of the estate.

2. **The "unusual circumstances" exception does not justify extending the stay under §362(a)(1)**

PVHC next argues that the stay should be extended pursuant to 11 U.S.C. §362(a)(1), which applies to "the commencement or continuation ... of a judicial ... proceeding **against the debtor**."  *See* 11 U.S.C. § 362(a)(1)(emphasis added).  The Tenth Circuit has been clear that §362(a) does not extend to solvent co-defendants.  The only exception is the narrow "unusual circumstances" doctrine — whereby the Debtor must demonstrate that "there is such identity between the debtor and the third-party defendant that the debtor may be said to be the real party defendant and that a judgment against the third-party defendant will in effect be a judgment or finding against the debtor."  *Blodgett*, 24 F.3d at 141.  PVHC has not demonstrated a compelling "identity" between itself and Dr. Hansen, HealthTech and Mr. Patten to meet the unusual circumstances test.

PVHC first argues that any judgment in the underlying cases against Dr. Hansen would be "automatically imputed on PVHC under the doctrine of respondeat superior." *Debtor's Motion*, at ¶ 17; *see In re Crazy Eddie Securities Litigation*, 104 B.R. 582, 583 (Bankr. E.D.N.Y. 1989)("[W]here the debtor and another are joint tortfeasors or where the nondebtor's liability rests upon his own breach of duty, an automatic stay would clearly not extend to such nondebtor.")(internal quotations omitted).    PVHC makes the related argument that the non-debtor defendants are only secondarily liable to PVHC/ Dr. Hansen. *Debtor's Motion*, at ¶ 19. Both of these arguments assume that PVHC would be bound if Dr. Hansen was found to be negligent in the pending state court litigation because PVHC is vicariously liable for Dr. Hansen's conduct. *But see Day v. Davis,* 951 P.2d 378, 381 (Wyo. 1997)(holding an employee was not bound by a consent judgment against his employer for vicarious liability which was entered in a case to which the employee was not a party).[5]

PVHC's assumptions contradict Wyoming law, which holds that PVHC most likely would not be bound by findings against Dr. Hansen, HealthTech, or Mr. Patten in cases to which it is not a party.  The Wyoming Supreme Court has held "that an employer and an employee are not in privity for the purpose of applying the rules of res judicata or collateral estoppel with respect to tort liability." *Day v. Davidson*, 951 P.2d 378, 381 (Wyo. 1997).  In other words, even if Dr. Hansen, HealthTech, and Mr. Patten are found to be negligent in the pending litigation, PVHC will not be bound by that determination if it is not a party to the litigation.

---

[5] As an aside, it is unclear whether PVHC is still even contesting its liability in the underlying suits.  On May 25, 2016, PVHC's attorney Bradley Hunsicker conceded, "we do recognize that these tort claimants have legitimate claims and that they need to be paid" and "we don't believe that that the tort claimants should have to continue to litigate these matters any further." Document 70 (audio file of May 25, 2016 hearing), at 8:33.  Since PVHC appears to have conceded liability in the underlying cases, its arguments about being found vicariously liable are moot.

In fact, a judgment against the solvent co-defendants in the current litigation could actually protect PVHC from future claims based on vicarious liability.  In *Day v. Davidson*, the plaintiff filed an action against an employer based solely on its vicarious liability for the acts of an employee.  951 P.2d at 379.  After accepting a consent judgment from the employer for vicarious liability, the plaintiff brought a claim against the employee based on the same acts of negligence.  *Id.*  The Wyoming Supreme Court held that although the claims against the employer were not limited by the doctrines of res judicata or collateral estoppel, the employee should be credited with the amount of any judgment recovered from the employer for the same damages.  *Id.* at 381.  This left nothing to be recovered in the second suit.  *Id.* at 382.

Creditors also have direct negligence claims against PVHC based on PVHC's negligent hiring, supervision, and credentialing of PVHC.  These claims will not be litigated if the state court actions proceed against Dr. Hansen, HealthTech and Mr. Patten.

Second, PVHC argues that the stay should be extended to the co-defendants because HealthTech, Mr. Patten and Dr. Hansen may assert claims for indemnity against PVHC.  *Debtor's Motion,* at ¶ 18.  However, no claims for indemnity have been asserted to date.  The mere fact that HealthTech "simply may seek indemnification" at an unknown date does not support extending the stay under § 362(a)(1).  *In re W. Real Estate Fund, Inc.*, 922 F.2d 592, 599 (10th Cir. 1990), *modified sub nom. Abel v. W.*, 932 F.2d 898 (10th Cir. 1991).

In addition, HealthTech, Mr. Patten, and Dr. Hansen's rights to indemnity are far from absolute. For example, it is unclear whether PVHC and HealthTech's indemnity provision even applies to the claims that Creditors have made against PVHC, as the agreement explicitly does not apply if HealthTech and Mr. Patten were grossly negligent.  *Ni Fuel Co., Inc. v. Jackson,* 257 B.R. 600, 616 (Bankr. N.D. Okla. 2000) (holding that a claim for indemnity was not absolute

where claims for gross negligence or willful conduct were excepted from the indemnity agreement). The merits of any indemnity claim will not be determined in the state court actions except to the extent that HealthTech and Mr. Patten might be found grossly negligent. *Forcine Concrete & Construction Co., Inc. v. Manning Equipment Sales & Services, et al.*, 426 B.R. 520, 525 (Bankr. E.D. Penn. 2012)("Because there is no indication that such obligations would be 'absolute' in this case, the prospect of indemnification does not provide the 'unusual circumstances' required… to extend the automatic stay to non-debtor parties."); *Ni Fuel Co., Inc.*, 257 B.R. at 616 ("The state court action would only determine liability and damages on the claims before the state court. Whether or not a claim for indemnity can be brought against the bankrupt debtors is a decision left for the bankruptcy court.").

Finally, PVHC argues that if the underlying lawsuits are not stayed as to the solvent co-defendants, "the ability of PVHC to pursue a successful plan of reorganization under Chapter 11 will suffer…." *Debtor's Motion*, at ¶ 20. Apparently, PVHC believes that it will be distracted from creating a reorganization plan because it will have to devote time to the ongoing lawsuits. PVHC has not explained this argument. As set forth above, to the extent that the lawsuits proceed against the underlying defendants, PVHC will not be bound by any judgment. PVHC will therefore not be required to devote any resources to defending those actions. *See* Exh. G, *In re Red Eagle, Inc.*, at *7 (the stress of pending litigation on individual officers does not justify extending the bankruptcy stay). PVHC's related argument, that unless the automatic stay is extended some creditors will be paid in full and others will be left with no recovery, is also unpersuasive and illogical. Again, PVHC overlooks the fact that Creditors' claims against the solvent co-defendants are not seeking assets from the estate.

B.    PVHC has not carried its burden of demonstrating that the stay should be extended under § 105(a)

Finally, PVHC has effectively asked the court to grant a preliminary injunction pursuant to 11 U.S.C. §105(a) to enhance the prospects of successful reorganization. *Debtor's Motion*, at ¶ 21. PVHC has not shown entitlement to this "extraordinary" relief. Exh. F, *In re Medical Management Group, Inc.*, at * 6. Assuming the Court is inclined to hear this argument even though PVHC has failed to file an adversary proceeding as required by the Bankruptcy Rules, the Court should hold that the facts do not weigh in favor of an injunction. *See id*. at *7 (explaining that in order to make the finding necessary to support a §105 injunction, the debtor would be required to present evidence, which could only be done in an adversary proceeding). PVHC has not carried its heavy burden to demonstrate that it is entitled to injunctive relief.

**No substantial likelihood of prevailing on the merits.** PVHC has addressed this requirement in a single sentence: "First, given the significant amount of revenue generated by PVHC, PVHC is a promising candidate for a successful reorganization." *Debtor's Motion*, at ¶ 22. The likelihood of reorganization turns on much more than PVHC's self-serving assertions. PVHC has not even supported its argument with any description of what a reorganization plan might look like or why this plan would be at all impacted if Creditors continue to pursue their claims against the solvent co-defendants.

**No showing of irreparable harm unless the injunction is issued**. As the court said in *In re Arrow,* "The movant must make out a clear showing of hardship and adverse impact on the reorganization case if there is even a fair possibility that the stay will prejudice an adverse party." *See* 51 B.R. at 859 ("It is therefore not surprising that injunctions to protect nondebtor co-obligors are seldom granted by this Court.")(internal citations omitted). PVHC's only argument in support of "irreparable harm" absent injunctive relief is that PVHC's officers might be distracted by having to defend the lawsuits. This is insufficient. *See* Exh. G, *In re Red Eagle,*

*Inc.,* at * 7 (holding that the stress of pending litigation on individual officers working to reorganize the debtor did not justify extending the bankruptcy stay); *In re Trans-Service Logistics, Inc.*, 304 B.R. 805, 808 (Bankr. S.D. Ohio 2004)("With appropriate scheduling and cooperation of counsel, discovery could be completed in a manner to minimize impact upon the Debtor's business operations."). PVHC would not be required to defend the underlying lawsuits, which would go forward only as to the claims against solvent co-defendants. The merits of Creditors' claims against PVHC would not be litigated in these suits. In fact, as discussed above, any judgment obtained against Dr. Hansen might actually protect PVHC from claims based on PVHC's vicarious liability for the same conduct. HealthTech and Mr. Patten might also be found grossly negligent, thereby eliminating the possibility of a claim for indemnification by HealthTech and Mr. Patten against PVHC.

**Threatened injury does not outweigh the harm that the preliminary injunction may cause the opposing party**. PVHC has completely overlooked the toll that an injunction would take on the Creditors, some of whom filed their cases almost two years ago. Instead, PVHC has merely asserted that the stay is necessary to assist it in its reorganization effort. But "[t]he power to prevent creditors from proceeding against nondebtors must only be used in extraordinary cases, and not simply to 'assist' the debtor in reorganizing or to relieve general 'pressure' on the debtor." *In re Arrow Huss,* 51 B.R. at 858.

**The injunction will adversely affect the public interest**. Finally, this injunction will adversely affect public interest by frustrating the ability of patients to recover when physicians injure them. Staying Creditors' claims against Dr. Hansen, HealthTech and Mr. Patten will only delay the opportunity for Creditors to recover for their injuries and their access to the medical

16

treatment that many desperately require.  PVHC cannot be allowed to prioritize its financial

health over Creditors' continued pain and suffering.

IV.    CONCLUSION

For the reasons set forth above, Creditors respectfully request that this Court refuse to

consider this Motion, as it was improperly presented.  If the Court is inclined to consider this

Motion, it should deny this Motion on its merits.

DATED:        August 30, 2016

/s/ Randy L. Royal, Attorney at Law

**CERTIFICATE OF SERVICE**

I, Randy L. Royal, do hereby certify that a copy of the **AMENDED RESPONSE IN
OPPOSITION TO DEBTOR'S MOTION TO ENFORCE SCOPE OF THE AUTOMATIC STAY,
OR IN THE ALTERNATIVE, MOTION TO EXTEND AUTOMATIC STAY** was served on the
following parties on August 30, 2016 as indicated below as well as the attached mailing list.  The
electronic notice will be done by the U.S. Bankruptcy Clerk.

Via: United States Mail:
Donald D. Allen
Markus Williams Young & Zimmermann, LLC
1700 Lincoln Street Suite 4550
Denver, CO 80203

Julie Nye Tiedeken
McKellar, Tiedeken & Scoggin, LLC
702 Randall Avenue
P.O. Box 748
Cheyenne, WY 82003

Stryker Medical, a Division of Stryker Corporation
c/o Lori L. Purkey, Esq.
Purkey & Associates, P.L.C.
5050 Cascade Road, SE, Suite A
Grand Rapids, MI 49546

Chris C. Voigt
Crowley and Fleck, PLLP
P.O. Box 10700
Billings, MT 59103-2529
Attorney for Defendant Jeffrey Hansen, M.D.

Paul Kapp
George E. Powers, Jr.
Sundahl, Powers, Kapp & Martin, LLC
1725 Carey Avenue
P.O. Box 328
Cheyenne, Wyoming 82003
Attorneys for Defendant HealthTech
and William D. Patten

Judith Struder
Schwartz, Bon, Walker & Studer, LLC
141 South Center Street, Suite 500
Casper, Wyoming 82601
Attorney for Plaintiff Homeland
Insurance Company of New York

Charles E. Spevacek
Tiffany M. Brown
Meagher & Geer, PLLP
33 South Sixth Street, Suite 4400
Minneapolis, MN 55402
Attorneys for Plaintiff Homeland
Insurance Company of New York

Joanna R. Vilos
Holland and Hart LLP
P.O. Box 1347
Cheyenne, Wyoming 82003-1347
Attorney for Defendants HealthTech
Management Services, Inc. and
William D. Patten

Jose A. Ramirez
Holland and Hart LLP
8390 E. Crescent Parkway, Suite 400
Greenwood Village, Colorado 80111
Attorney for Defendants HealthTech
Management Services, Inc. and
William D. Patten

John F. Sands
Sweetbaum Sands Anderson PC
1125 Seventeenth Street, Suite 2100
Denver, Colorado 80202
Attorney for CounterClaim Defendant
UMIA Insurance, Inc.

R. Jeff Carlisle
Catherine A. Naltsas
Farah Naz A. Namvar
Lynberg & Watkins, APC
888 South Figueroa Street, 16th Floor
Los Angeles, California 90012
Attorneys for Lexington Insurance
Company

Deborah M. Kellam
Hall & Evans, LLC
2015 Central Avenue, Suite C
Cheyenne, Wyoming 82001
Attorney for Lexington Insurance Company

W. Henry Combs, III
Andrew Sears
Murane & Bostwick, LLC
201 North Wolcott Street
Casper, Wyoming 82601
Attorneys for Defendant Jeffrey Hansen,
M.D.

Scott E. Ortiz
Brian J. Marvel
Williams Porter Day & Neville, P.C.
P.O. Box 10700
Casper, WY 82602
Attorneys for Pre-Petition Debtor

Via: Electronic Notice:
Greg C. Dyekman
Timothy L. Woznick
Bradley T. Hunsicker
Jennifer M. Salisbury
John F. Young
Daniel J. Morse, Assistant UST
Alan Motes, UST, Region 19

                                        /s/ Randy L. Royal, Attorney at Law








Connie Onstine · Cell: 307-254-0088 · Office: 307-754-9631    306 N. Bent    heart mountain REALTY    Connie Onstine    Kristy M. Tomash

(/component/banners/click/23)



Powell, WY
Mostly Sunny
Humidity: 49%
54°F    Wind: 11 mph


State Sponsor David H. Blevins 754-0841 State Farm

(/component/banners/click/18)

HOME    NEWS    SPORTS    OPINION    OBITUARIES    CLASSIFIEDS

DIRECTORY
(/NEWS)    (/SPORTS)    (/OPINION)    (/OBITUARIES)    (/IMAGES/STORIES/PDFS/CLASSIFIEDS-05-17-16.PDF)    (/DIRECTORY)

# POWELL TRIBUNE

(http://www.powelltribune.com)

Search...


The Golden Buffalo Clearance Jewelers
1356 Sheridan Ave. · 587-9959


(/component/banners/click/28)


flyyra.com

(/component/banners/click/12)

(/component/banners/click/22)

(/component/banners/click/34)


First Bank of Wyoming    Where YOU are FIRST!    FDIC

(/component/banners/click/20)

FREE Checking + FREE Gift!
FREE Online Banking & Bill Pay
FREE VISA Debit Card
FREE Electronic Statements

E-NEWS ALERTS SIGN UP!
(mailto:%20enews@powelltribusubject=Subscribe)

## Powell Valley Healthcare files for Chapter 11 bankruptcy

Print (/news/item/14844-powell-valley-healthcare-files-for-chapter-11-bankruptcy-process-will-help-organization-deal-with-lawsuits-involving-former-orthopedic-surgeon?tmpl=component&print=1)    Email (/component/mailto/?tmpl=component&template=jsn_pixel_pro&link=845fdab2933f32ef2003712c18ce7246c645f7b5)

Written by Ilene Olson (/news/itemlist/user/89-ileneolson)
May 16, 2016 5:29 pm

**Bankruptcy process will help PVHC deal with lawsuits involving former orthopedic surgeon**

Facing "a flood of litigation" over surgeries performed years ago by Dr. Jeffrey Hansen, the Powell Valley Healthcare Board of Directors unanimously approved filing for Chapter 11 bankruptcy on Monday.

The bankruptcy filing is intended as a way to deal with the litigation in an organized manner while allowing employees to focus on providing quality care for PVHC patients.

Approximately 20 lawsuits have been filed or are pending against Powell Valley Healthcare regarding surgeries performed by Hansen, an orthopedic surgeon who was employed by Powell Valley Healthcare from 2006-14.

"These lawsuits are being brought by former patients of Dr. Hansen for services rendered back in 2013 and prior years. ... The lawsuits have nothing to do with the current medical staff or care being provided by the medical staff and PVHC to its patients," according to a prepared statement from the PVHC board.

Hansen resigned in February 2014 after being placed on suspension by the PVHC Medical Executive Committee in November 2013. Bill Patten, former chief executive officer for Powell Valley Healthcare, said then that the committee took the action "because of patient safety concerns."

In Monday's statement, the PVHC board said, "A Chapter 11 bankruptcy is the best available alternative to PVHC for managing and effectively dealing with these multiple lawsuits and the underlying personal injury claims."

Planning for the bankruptcy took place in executive sessions during previous board meetings.

The lawsuits are the only reason for the board's decision to file for Chapter 11 bankruptcy, the statement said.

"Except for the litigation arising out of alleged events from several years ago, which has caused a tremendous strain in personnel time and finances at the hospital, PVHC would not be in bankruptcy," the statement said. "PVHC has not had creditor problems, and does not anticipate any going forward other than from the multiple litigants asserting claims arising out of care received from Dr. Hansen."

Terry Odom, interim PVHC chief executive officer, said Powell Valley Healthcare's gross revenue for the fiscal year to date (since July 1) is 7.2 percent higher than a year ago, and 6.5 higher than the same point in 2014.


BANK LOCAL    Big Horn Federal    www.bighornfederal.com

(/component/banners/click/9)


Buy or Sell!    runninghorserealty.com    307-754-9400

(/component/banners/click/7)


The REAL ESTATE Connection    PUT OUR EXPERIENCE TO WORK FOR YOU    CLICK TO CONNECT

(/component/banners/click/8)

While operating under Chapter 11, Powell Valley Healthcare will remain in control of its hospital and the day-to-day operations of Powell Valley Hospital, Powell Valley Clinic, Powell Valley Care Center and The Heartland. No layoffs or staff reductions are planned, the statement said.

According to Mike Long, PVHC's chief financial officer, the organization paid nearly $29 million in fiscal year 2015 in salaries and benefits to its approximately 400 employees, 313 of whom work full time.

"It is expected that the patients and community which support PVHC, and which PVHC highly values, will not be impacted and should see no changes resulting from the bankruptcy," the statement said.

"PVHC intends to retain its full staff of employees. There are no planned layoffs or staff reductions. PVHC intends to honor all its obligations to its employees and it is expected that there will be no financial impact upon the employees as a result of the Chapter 11 filing.

"The filing of the Chapter 11 case should have little or no effect upon the day-to-day operations of PVHC," according to the board's statement.

Attorney Tracy Copenhaver, who represents Powell Valley Healthcare, said Monday the PVHC board's decision to file for Chapter 11 bankruptcy was the result of much discussion over a long period of time, and it was not made lightly.

"It's an extremely difficult decision, but this is a very unusual situation," he said. "Just the volume of claims necessitated that this be managed in a more controllable fashion."

Copenhaver said a tremendous amount PVHC employees' time and effort has gone toward compiling huge document requests and other requirements for each lawsuit.

"When you have 20 of these going on at one time, you could spend a lot of time doing nothing but litigation," he said. "We needed to get this in an organized forum, and a bankruptcy seemed to be the best option to get this under control and manage it."

Odom said compiling the information for the lawsuits has consumed the time equivalent of 2.5 to three full-time employees, and Powell Valley Healthcare has spent $585,000 defending litigation related to Hansen during the current fiscal year.

The bankruptcy process will stay and stop all the litigation brought against Powell Valley Healthcare until a bankruptcy court judge determines the best way to deal with the lawsuits, he said.

"While the lawsuits are stayed, the lawyers and officers of PVHC can focus all their efforts on resolving the personal injury claims without the costs and distractions of litigating all these claims," the PHVC board's statement said. "The Chapter 11 case will allow PVHC to propose and negotiate a plan of reorganization with the personal injury creditors and to deal with Homeland Insurance and Utah Medical Insurance, Inc. which have also filed lawsuits against PVHC."

The insurance companies claim they have no obligation to defend or cover the many underlying lawsuits, the statement said.

Copenhaver said some of the possible ways the court could help PVHC resolve the lawsuits are (but are not limited to):

• Allow all 20 litigants to go forward and try to prove their cases, with the knowledge that the funds available to satisfy those claims are limited.

• Try to get the 20 claims settled on a specific dollar amount and set aside an account to fund that.

• Decide that none of the cases will move forward until questions about Powell Valley Healthcare's malpractice insurance coverage are answered.

Copenhaver said the bankruptcy process "should be very helpful" for the organization's longterm planning.

"They can plan; they can move forward now ... with planning future endeavors that before were extremely uncertain," he said.

It will take time for the Bankruptcy Court process to be completed, but "PVHC seeks to move through the bankruptcy as quickly as possible and hopes to have it resolved in less than one year," the statement said.

Eric Boley, president of the Wyoming Hospital Association, said he learned about the PVHC bankruptcy filing on Monday.

Boley said he's lived and worked with hospitals in Wyoming for 23 years, and he's never heard of a hospital in the state filing for bankruptcy in that time.

"But around the country, I have seen it," he said.

In this case, however, "from what has been described to me, I think it's a smart decision that really would, at this point, protect the hospital and allow them to take care of liability and the lawsuits," Boley said.




(/component/banners/click/10)

(/component/banners/click/29)



(/component/banners/click/15)



(/component/banners/click/14)



(/component/banners/click/16)

Case 16-20326    Doc 271    Filed 08/30/16    Entered 08/30/16 13:21:46    Desc Main
Powell Valley Healthcare files for Chapter 11 bankruptcy                Document              Page 22 of 94

5/17/16, 11:37 AM

"It would be great for Powell hospital to get out from under those ... (to) get them taken care of. It's too bad that they're in this situation, but from what I understand, it makes quite a bit of sense what they're trying to do. ... To me, this actually shores up the hospital."

Boley encouraged local residents to continue to support Powell Valley Hospital.

"I think the hospital is doing a good job," he said. "It's my understanding that Terry (Odom) and the board of trustees are doing all that they can to take care of this so that the hospital stays viable.

"The worst thing that could happen is if people quit supporting their local hospital."

The 10-member Powell Valley Healthcare board is composed of seven Powell Hospital District trustees — R.J. Kost, Deb Kleinfeldt, Jim Carlson, Bonita Katz, Larry Parker, Beth Glib and Mark Olson — plus three medical officers, Drs. Michael Tracy, Nathaniel Rieb and William Jarvis.

The lawsuits are against Powell Valley Healthcare only and do not involve Powell Hospital District, the public entity that owns the PVHC campus and its facilities, Copenhaver said.

1 comment (/news/item/14844-powell-valley-healthcare-files-for-chapter-11-bankruptcy-process-will-help-organization-deal-with-lawsuits-involving-former-orthopedic-surgeon#itemCommentsAnchor)

## 1 comment

Posted By Lisa Harhsman
May 17, 2016 8:23 Am

While DR. Hansen has to own responsibility for his actions. PVHC administration knew and had multiple concerns brought to their attention. It should have been about good patient care not pocket books.

Comment Link (/news/item/14844-powell-valley-healthcare-files-for-chapter-11-bankruptcy-process-will-help-organization-deal-with-lawsuits-involving-former-orthopedic-surgeon#comment42547)

## Leave a comment

The Powell Tribune reserves the right to remove inappropriate comments.
Fields marked (*) are required.

Message *

enter your message here...

Name *

enter your name...

Email *

enter your e-mail address...

Website URL

enter your site URL...

Enter the words you see below

 

Type the text                                                                    Privacy & Terms
                                                                    (http://www.google.com/intl/en/policies/)

Submit comment

More in this category:

- Bison calf euthanized due to misguided human efforts to help (/news/item/14843-bison-calf-euthanized-due-to-misguided-human-efforts-to-help)
- Former Hansen patients seeking tens of millions of dollars (/news/item/14848-former-hansen-patients-seeking-tens-of-millions-of-dollars)

back to top (/news/item/14844-powell-valley-healthcare-files-for-chapter-11-bankruptcy-process-will-help-organization-deal-with-lawsuits-involving-former-orthopedic-surgeon#startOfPageId14844)



(/component/banners/click/19)

## SUBSCRIBE

Get all the latest Powell news by subscribing to the Powell Tribune today!

Click here to find out more! (/subscribe)

## E-EDITION

Our paper can be delivered right to your e-mail inbox with a subscription to the Powell Tribune!

Find out more here! (http://www.etypeservices.com/Powell%20TribuneID160/default.aspx)

## STAY CONNECTED

Keep up with Powell news by liking us on Facebook or following us on Twitter.

**FACEBOOK**            **TWITTER**

(https://www.facebook.com/powelltribune)  (https://twitter.com/PowellTribu

Home (http://www.powelltribune.com/) | About Us (/about-us) | Contact Us (/about-us/contact-us) | Ad Rates (/about-us/ad-rates) | Classifieds (/images/stories/pdfs/classifieds-05-17-16.pdf) | Business Directory (/directory)

© 2016, Powell Tribune (http://www.powelltribune.com/) | 128 South Bent Street Powell, WY | 307-754-2221

Page 1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF WYOMING

███████████ BY AND      ) 13-CV-216-S
THROUGH HIS NEXT FRIENDS AND )
NATURAL PARENTS, WILLIAM K. )
AND MINDY E. DUROSE, WILLIAM )
K. DUROSE, AND MINDY E.     )
DUROSE,                     )
              Plaintiffs,)
                          )
      v.                  )
                          )
POWELL VALLEY HEALTHCARE, )
INC.; POWELL HOSPITAL      )
DISTRICT NO. 1; POWELL     )
VALLEY HOSPITAL; JEFFREY   )
HANSEN, M.D., AND JOHN DOES )
 THROUGH 10,               )
              Defendants.)
                          )

**EXHIBIT**
B

DEPOSITION OF

BRAD MANGUM

Taken at Copenhaver, Kath, Kitchen & Kolpitcke
224 North Clark Street
Powell, Wyoming 82435

Thursday, June 5, 2014
10:04 a.m. - 3:22 p.m.

GRAF COURT REPORTING INC.

2704 Highland Park Place

Billings, Montana 59102

(406) 254-2576

Page 135

1          would be the only part that might be a HIPAA

2          issue.  And I'll agree to have that redacted.

3          We'll just leave that as a blank in the

4          transcript.

5                MR. ORTIZ:  I think that's the best we

6          could do at this point in time, candidly.

7                MR. MOYERS:  I think just identifying her

8          is -- leave that alone.

9    BY MR. MOYERS:

10       Q.   Let's move on a little bit.

11            What discussions did you have with Mr.

12   Patton regarding your concerns about Dr. Hansen?

13       A.   Lisa and I went to him at the end of May,

14   in particular to discuss this issue because I had

15   brought it to Dr. Rieb in March.

16       Q.   "This issue," meaning what?

17       A.   The problems with patient care with Dr.

18   Hansen.

19       Q.   Okay.

20       A.   It had been -- it had been, now, in the

21   middle of May.

22       Q.   And she was going as your wife or in her

23   official capacity as director of surgery?

24       A.   I would say in that scenario both, because

25   we were concerned about our licenses, our employment.

                  Graf Court Reporting Inc.
                      (406) 254-2576

Page 136

1    But we were also concerned about patient safety,

2    patient care, and things that fell within both of our

3    employment descriptions.

4            So we sat down with him, and that's where I

5    told him frankly that I felt like had I moved from a

6    surgery suite to a butcher shop, and that there had

7    been multiple injuries.  And I turned it over to the

8    right person and nothing was happening.

9        Q.    Meaning who?

10       A.    Dr. Rieb.

11            I had talked to Tim Seeley, which is

12    another right person I should be visiting with, and

13    nothing was happening.  And I was under the

14    assumption this would be a 30- to 45-day

15    investigation and then I would get some word.  But it

16    was the middle of May and I hadn't gotten any word.

17       Q.    Of 2013?

18       A.    2013.

19            And he told me I'm -- his answer was I'm

20    not medical, and it has to be driven by the medical

21    staff and their committees.  And I don't have any say

22    in the matter.

23            And I got a little elevated, I should say,

24    with him and said what are you good for?  If you know

25    that bad things are happening and people are being

1    hurt in the OR of the hospital you're the CEO of and

2    you can't do nothing about it, and you say to me I'm

3    not medical, I say to you you are medical.  You're

4    managing a hospital; that makes you medical.  You

5    should know the law and know that surgeons can't

6    continually assault people without getting checked.

7    And that you should be very concerned from your

8    position that this is happening.

9         Q.   What was his response to that?

10        A.   Well, he said I am concerned, but it takes

11   an investigation, and I don't do the investigation.

12             And I said well, you can surely expedite

13   it.  I said do you realize how many people have been

14   hurt?

15             And he just simply didn't want to say any

16   more.  He shucked it off to the -- to the med staff.

17        Q.   Did anyone else, then, get back in contact

18   with you from the med staff about your -- and your --

19   and the director of surgery's concerns regarding Dr.

20   Hansen?

21        A.   No, that -- I finally went back in in

22   August and hadn't still heard anything.  And I talked

23   to Tim Seeley.  And at that point I said this has

24   been months and I can name -- I could name several

25   people that have been injured since I told you that

Page 138

1    this guy had a problem.

2        Q.   So since the discussion that you had with

3    Mr. Patton, you felt like the conduct of Dr. Hansen

4    had continued and resulted in other patient injuries?

5        A.   I was actually referring to Dr. Rieb, since

6    I initially talked to Dr. Rieb, several had hurt

7    [sic].  But, yes, even since I talked to the CEO

8    people have been hurt.

9             And that's when Tim Seeley made the comment

10   to me well, we can't kill the goose that's laying the

11   golden egg until we get another goose.

12            I was nearly speechless.

13       Q.   So recall as precisely as you can what Dr.

14   Seeley told you about Dr. Hansen.

15       A.   Doctor --

16       Q.   Tim Seeley.

17       A.   No, he's Tim Seeley.  He's not a doctor.

18       Q.   Let me re-ask the question.

19            Recall as clearly as you can what Tim

20   Seeley told you about Dr. Hansen.

21       A.   That's exactly what he said.  He said we

22   can't kill the goose that's laying the golden egg

23   until we get another goose.

24       Q.   When was this?

25       A.   August.

1        Q.    Of '13?

2        A.    Yeah.

3              And I was truly speechless from -- I shook

4    my head and I said you mean to tell me you guys are

5    willing to watch people get butchered until you get

6    your new orthopedic surgeon in here, and then you're

7    going to fire him.

8              Well, I didn't say we were going to

9    fire him.  But we're investigating right now -- I'm

10   not saying we're not investigating.

11             And I said you're telling me it's about

12   money.  You're talking about golden eggs.  And I said

13   I'm done with this.  And I walked out.

14       Q.    Did you ever have any other discussions

15   with Tim Seeley regarding --

16       A.    Oh, yeah.

17       Q.    -- Dr. Hansen?

18       A.    Yeah.  But from that point on, where Tim

19   had been more of a confidant and an ally, at that

20   point our relationship did change.

21       Q.    Had it been your understanding, based on

22   what Tim Seeley had told you before that golden goose

23   comment, is that he understood and shared your

24   concerns about Dr. Hansen?

25       A.    Yes.  Tim Seeley had told me in that same

Page 140

1    conversation -- I failed to mention he said now, you

2    do realize when a midlevel goes up against an

3    orthopedic surgeon, you're on thin ice?

4              And I say so you're telling me that I did

5    the wrong thing?  Or that I'm in trouble?

6              And he said no, no, you've brought plenty

7    of evidence.  There's no question there's a problem

8    here.  You brought plenty of evidence.  But we have

9    to be totally sure because this is an orthopedic

10   surgeon and you're a midlevel.  And we have to make

11   absolutely sure that what you're saying is correct.

12             And I said man, I've given you enough

13   assurance.  And that's when I walked out.

14        Q.   From the time that you initially raised

15   your concerns with Dr. Rieb until Dr. Hansen was

16   suspended, are you aware of any restrictions or

17   limitations that had ever been imposed upon his

18   medical practice?

19        A.   In November they suspended him for five

20   days.  And took -- Dr. Rieb told me that they sent

21   out five charts.  And when he showed back up to work

22   on the sixth day, I called Dr. Rieb, and he said the

23   bylaws don't allow us to suspend you more than five

24   days without having proof of a reason to keep him

25   suspended.



**Page 1**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF WYOMING

A.W.D.,

▮▮▮▮▮▮▮ BY AND ) 13-CV-216-S
THROUGH HIS NEXT FRIENDS AND )
NATURAL PARENTS, WILLIAM K. )
AND MINDY E. DUROSE, WILLIAM )
K. DUROSE, AND MINDY E.    )
DUROSE,    )
        Plaintiffs,)
            )
    v.    )
            )
POWELL VALLEY HEALTHCARE,  )
INC.; POWELL HOSPITAL    )
DISTRICT NO. 1; POWELL    )
VALLEY HOSPITAL; JEFFREY    )
HANSEN, M.D., AND JOHN DOES )
THROUGH 10,    )
        Defendants.)
            )

DEPOSITION OF

WILLIAM PATTEN

Taken at Powell Valley Healthcare
777 Avenue H
Powell, Wyoming 82435
Thursday, July 31, 2014
8:12 a.m. - 11:44 a.m.

GRAF COURT REPORTING INC.
2704 Highland Park Place
Billings, Montana 59102
(406) 254-2576

**Page 2**

1  APPEARANCES:
2    MOYERS LAW P.C.
     BY: JON M. MOYERS, ESQUIRE
3    490 North 31st Street, Suite 101
     Billings, Montana 59101
4      AND
     BOGUE, PAOLI & THOMAS, LLC
5    BY: ALFRED F. PAOLI, JR., ESQUIRE
     1401 17th Street, Suite 320
6    Denver, Colorado 80202
       AND
7    KOHN LAW, P.A.
     BY: KATHRYN KOHN, ESQUIRE
8    P.O. Box 26234
     St. Louis Park, Minnesota 55426
9
     Counsel for Plaintiffs
10
11   WILLIAMS, PORTER, DAY, AND NEVILLE, P.C.
     BY: BRIAN J. MARVEL, ESQUIRE
12   159 North Wolcott, Suite 400
     Casper, Wyoming 82601
13
     Counsel for Defendants Powell Valley Healthcare,
14   Inc.; Powell Hospital District No. 1; and Powell
     Valley Hospital
15
16   CROWLEY FLECK PLLP
     BY: ERIC PETERSON, ESQUIRE
17   490 North 31st Street, Suite 500
     P.O. Box 2529
18   Billings, Montana 59103-2529
19   Counsel for Defendant Jeffrey Hansen, M.D.
20
21
     Reported by John B. Graf
22
23
24
25
       Graf Court Reporting Inc.
       (406) 254-2576

**Page 3**

1          I N D E X
2
     WITNESS:        PAGE:
3
     WILLIAM PATTEN
4
       BY MR. MOYERS        5
5
6
7    Certificate of Witness      141
8    Certificate of Court Reporter    142
9
10         E X H I B I T S
11   NO.:    DESCRIPTION:
12   1    Mangum Notes
13   2    Mangum Diary Excerpt
14   3    Mangum Letter
15   4    October 29, 2013, Letter
16   5    Letter to Mr. Mangum
17   6    February 14, 2014, Letter
18   7    February 14, 2014, Letter
19   8    Newspaper Article
20
21
22
23
24
25
       Graf Court Reporting Inc.
       (406) 254-2576

**EXHIBIT**
C

**Page 4**

1        S T I P U L A T I O N S
2        It is hereby stipulated and agreed by and
3    among counsel for the respective parties that the
4    deposition be taken by John B. Graf, Freelance Court
5    Reporter and Notary Public for the State of Montana,
6    residing in Billings, Montana.
7
8        It was also stipulated by and among counsel
9    for the respective parties that the deposition be
10   taken in accordance with the Federal Rules of Civil
11   Procedure.
12
13       It was further stipulated by and among
14   counsel for the respective parties, and the deponent,
15   that the reading and signing of the deposition
16   transcript would be reserved.
17
18
19
20
21
22
23
24
25
       Graf Court Reporting Inc.
       (406) 254-2576

Page 73

1    Q.  How about referrals to physical therapy?
2    A.  Yes.
3    Q.  And any sense of how much additional
4  revenue was -- or billings was generated as a
5  consequence of his surgical activities?
6    A.  No, I wouldn't have.
7    Q.  We talked earlier about him being on a
8  production-based salary system.
9        Was there a percentage that he was paid of
10  his pro fees?
11    A.  Of the net --
12    Q.  Net.
13    A.  Of the net billings, that's the way.  And
14  it was a tiered approach, so the higher his
15  production, the higher the percentage, which is a
16  common model.
17    Q.  Do you remember what those tiers were for
18  Dr. Hansen?
19    A.  I do not.
20    Q.  There was no direct correlation between the
21  pro fees and the other income that would be generated
22  for the technical services; it would just depend on
23  the patient?
24    A.  He saw no benefit from the technical
25  income.  We're very careful about that.
              Graf Court Reporting Inc.
                 (406) 254-2576

Page 74

1    Q.  No, I know.  But I mean, as I understand
2  it, a patient comes in and if he needs one MRI or a
3  thousand MRIs, it's that other income from the MRI
4  scans that he's not compensated for and you can't
5  quantify for us today?
6    A.  Correct.
7    Q.  Your reason for not compensating the
8  physician for these technical charges is what?
9    A.  It's illegal.
10    Q.  Is that a Stark Act?
11    A.  Stark, antikickback.  They sort of all
12  bundle into the same happy collection for me.
13    Q.  Because you don't want a doctor churning
14  the MRI scanner just to make more money to pay off
15  his boat, something like that?
16    A.  Something like that.
17    Q.  Have you attempted to quantify what the
18  loss of income has been to the hospital as a
19  consequence of Dr. Hansen no longer being here?
20        MR. MARVEL:  I'm going to object to the
21  form of the question.  And I'll object to
22  relevance as well.
23        Go ahead and answer, Bill.
24        THE WITNESS:  So we haven't quantified as
25  we have explained the loss that we've
              Graf Court Reporting Inc.
                 (406) 254-2576

Page 75

1  experienced this past year.  We know that an
2  element of that is Dr. Hansen.  But we haven't
3  said of the 2.2 million, he accounts for X.  We
4  haven't done that level of detail, no.
5  BY MR. MOYERS:
6    Q.  Was Dr. Hansen your number one physician in
7  generating income?
8    A.  I would say yes.
9    Q.  Was he the most active surgeon?
10    A.  Yes.
11    Q.  In terms of number of procedures performed?
12    A.  Yes.
13    Q.  And income generated?
14    A.  Yes.
15    Q.  Do you know approximately how many surgical
16  procedures he was averaging per year?
17    A.  Oh, per year?
18    Q.  However you want to look at it.
19    A.  I usually look at it monthly.  And so I
20  would say his average was something in the
21  neighborhood of 40 to 60 -- at the most, 70 --
22  procedures per month.  Procedures, not necessarily
23  surgeries.  So an I&D would count as a procedure, but
24  I wouldn't think of that as a surgery.
25    Q.  He would be charging, though, in addition
              Graf Court Reporting Inc.
                 (406) 254-2576

Page 76

1  for his surgeries, also for his clinical work?
2    A.  Office work?
3    Q.  Yes.
4    A.  Yes.
5    Q.  His pre-op, post-op, follow-up?
6    A.  Correct, he would.
7    Q.  And that would be part of his pro fees?
8    A.  Correct.
9    Q.  Do you have a sense as to his performance
10  relative to other surgeons here?
11    A.  I don't.  Other than it being higher.  But
12  is it double?  Is it 50 percent?  I couldn't
13  estimate, no.
14    Q.  You had referenced Dr. Hansen as being a,
15  quote, workhorse, in the article to the Powell Trib.
16        Was that a quote from you?
17    A.  It was a term of endearment.
18    Q.  Meaning what?
19    A.  Dr. Hansen was great about covering the ED.
20  If he was in town and they needed help, he would
21  respond.  He was great about covering the OR.  So
22  "workhorse" was not intended in any way to be a
23  negative description.  He was a hard worker.
24    Q.  Right.  Have you ever heard him referred to
25  as the golden goose?
              Graf Court Reporting Inc.
                 (406) 254-2576

Graf Court Reporting Inc.
(406) 254-2576

Page 77

1  A. I have.
2  Q. And how have you heard him referred to as
3  golden goose?
4  A. Brad Mangum made that statement to me.
5  Q. What do you remember Brad Mangum saying
6  about that?
7  A. That he could understand why I wouldn't
8  want to kill the golden goose.
9  Q. Is that true?
10  A. He made the statement. He attributes it to
11  me. I never made such a statement.
12  Q. Are you aware of Mr. Seeley ever telling
13  anyone that he considered Dr. Hansen the hospital's
14  golden goose?
15  A. I'm under -- I understand that a
16  conversation between Mr. Mangum and Mr. Seeley took
17  place where Tim used that phrase.
18  Q. Have you ever talked to Mr. Seeley about
19  using that phrase?
20  A. Yes.
21  Q. Tell me about that discussion.
22  A. He acknowledges that it took place, and in
23  hindsight wishes he hadn't said it.
24  Q. And what I understand the full quote to be
25  was something in the order of we're not going to get

Graf Court Reporting Inc.
(406) 254-2576

Page 78

1  rid of our golden goose until we get a new goose.
2  Is that how you understood that comment?
3  A. That's my -- what I've been told, yes.
4  Q. What is your understanding of what the
5  facility's ethical and legal duty is to patients who
6  come here for care?
7  MR. MARVEL: Object to the extent it's
8  vague and ambiguous.
9  But you can go ahead and answer, Bill.
10  THE WITNESS: So I would point to our
11  mission statement. Out mission talks about the
12  reason we exist is to improve the quality of
13  people's lives. We do that both by the services
14  that we provide, but also by the contribution we
15  make to local economy through the employment and
16  the purchasing that we do.
17  I believe that part of improving the
18  quality of people's lives includes a
19  responsibility to do things the best we can. So
20  whether that's the provision of services,
21  whether it's the billing that we do.
22  And when we find that we have stubbed our
23  toe, we have a responsibility to -- to improve,
24  to learn from that experience, and to get
25  better.

Graf Court Reporting Inc.
(406) 254-2576

Page 79

1  BY MR. MOYERS:
2  Q. Right. Do you believe that it's the
3  obligation of the facility to place patient safety
4  ahead of other concerns?
5  A. Most --
6  MR. MARVEL: And I'll object to the form of
7  the question. I think it calls for a legal
8  conclusion.
9  But, Bill, go ahead.
10  BY MR. MOYERS:
11  Q. To clear the air on that, I'm not asking
12  for a legal opinion, and I understand you're not a
13  lawyer. I'm just asking what you understand to be
14  the purpose and function of this institution of which
15  you are the chief executive officer.
16  So my questions are in the nature of how
17  you understand your priorities and duties here,
18  so . . .
19  A. Patient safety clearly is one of our
20  foremost responsibilities. There is always a
21  tension. You've heard the mission versus margin.
22  There is always a tension there. But if we're going
23  to miss it, we're going to miss it on the side of
24  quality and safety.
25  Q. You would be critical of a hospital that

Graf Court Reporting Inc.
(406) 254-2576

Page 80

1  would put its bottom line ahead of patient safety?
2  A. Most certainly.
3  Q. And do you feel that the legacy of Dr.
4  Hansen, as you reflect back about it, is essentially
5  a stubbed toe for the hospital?
6  A. So . . .
7  Q. I mean that honestly. I mean, I'm not
8  trying to --
9  A. So knowing what we know now, would things
10  have been done differently? Hindsight many times
11  allows us to second-guess. But based on what we knew
12  at the time we knew it, I would have a hard time
13  being critical.
14  The challenge that I face as the leader of
15  the organization now is that I'm looking at issues
16  that have unfolded over a long period of time. And
17  looking at all of that now, this collection today,
18  it's easy to reach one conclusion.
19  But if you take each page individually on
20  each individual day and say -- to be critical. So when I
21  think it's difficult to be critical. So when I
22  think of myself personally and how I want to be
23  judged, I expect people to recognize that on each
24  individual day I may not have had the whole story.
25  And if I made the best decision I could on that day

Graf Court Reporting Inc.
(406) 254-2576

20  (Pages 77 to 80)

Robert A. Krause; krause@spencelawyers.com (WSB # 5-2824)
Mel C. Orchard, III; orchard@spencelawyers.com (WSB # 5-2894)
Sarah A. Kellogg; kellogg@spencelawyers.com (WSB # 7-5355)
THE SPENCE LAW FIRM, LLC
15 S. Jackson Street, P.O. Box 548
Jackson, Wyoming 83001
(307) 733-7290
(307) 733-5248 Fax



William L. Simpson; bsimpson@spencelawyers.com (WSB # 5-2189)
BURG, SIMPSON, ELDREDGE, HERSH & JARDINE, PC
1135 14th Street, P.O. Box 490
Cody, Wyoming 82414
(307) 527-7891
(307) 527-7897 Fax

PATRA LINDENTHAL
Clerk of District Court

FILED JAN 2 0 2015
LYNELL PRESTON
by_____
Deputy

*Attorneys for Plaintiffs*

IN THE DISTRICT COURT OF PARK COUNTY, WYOMING,
FIFTH JUDICIAL DISTRICT

| | |
|---|---|
| VERONICA SOMMERVILLE and WILLIAM SOMMERVILLE, individually and as the parents and natural guardians of their minor child, A.L.S.<br><br>    Plaintiffs,<br><br>v.<br><br>HEALTHTECH MANAGEMENT SERVICES, INC., JEFFREY HANSEN, M.D., and POWELL VALLEY HEALTH CARE, INC.,<br><br>    Defendants. | Civil No.  27813<br><br>**FIRST AMENDED COMPLAINT & JURY DEMAND** |

Plaintiffs, Veronica Sommerville, William Sommerville and A.L.S., by and

through their attorneys, Robert A. Krause, Mel C. Orchard, III, and Sarah A. Kellogg of

THE SPENCE LAW FIRM, LLC and William L. Simpson of BURG, SIMPSON, ELDREDGE,

HERSH & JARDINE, PC, plead and allege their causes of action against the Defendants as
follows:

## PARTIES

1. Veronica Sommerville is a citizen of the State of Wyoming, residing in Park
County.

2. William Sommerville is a citizen of the State of Wyoming, residing in Park
County. Veronica and William Sommerville are husband and wife.

3. A.L.S. is the minor child of William and Veronica Sommerville.

4. HealthTech Management Services, Inc. (HealthTech), is an Oregon Corporation
with its business headquarters and principal place of business in the State of
Tennessee, and it is doing business in the State of Wyoming. The name and
address of its registered agent in Wyoming is Corporation Service Company,
1821 Logan Ave., Cheyenne, Wyoming 82001.

5. Under the doctrine of *respondeat superior*, HealthTech is vicariously liable for
any act or omission of an officer, agent, servant or employee made while acting in
the scope of authority delegated by the company, or within the scope of the duties
of the employee, which were the direct and proximate cause of the injuries and
the resulting damages alleged herein.

6. Jeffrey Hansen, M.D., is a citizen of the State of Wyoming, residing in Park
County, Wyoming.

7. Defendant Powell Valley Health Care, Inc. (PVHC) is a Wyoming corporation
with its principal place of business located at 777 Avenue H, Powell, Wyoming,
82435, in Park County, Wyoming.

2

8.  Under the doctrine of *respondeat superior*, PVHC is vicariously liable for any act

    or omission of an officer, agent, servant or employee made while acting in the

    scope of authority delegated by the company, or within the scope of the duties of

    the employee, which were the direct and proximate cause of Plaintiff's injuries

    and resulting damages.

9.  Because at the time and place of the events described herein, Dr. Hansen was

    acting as an employee of PVHC, PVHC is vicariously liable for Dr. Hansen's

    negligent acts and omissions.

10. Plaintiffs do not believe that the claims against HealthTech asserted herein are

    subject to the Wyoming Medical Review Panel Act of 2005, Wyo. Stat. Ann. §§

    9-2-1513 through 9-2-1523, in that HealthTech is not a "health care provider" as

    that term is defined in Wyo. Stat. Ann. § 9-2-1515(a).

11. Nevertheless, to the extent they were required to do so, on September 8, 2014,

    Plaintiffs filed an Application for Claim Review with the Wyoming Medical

    Review Panel (MRP) for claims against HealthTech.

12. On the same day, Plaintiffs filed an Application for Claim Review with the MRP

    for claims against Dr. Jeffrey Hansen and PVHC.

13. Defendants, Dr. Hansen and HealthTech waived review by the MRP on

    December 19, 2014.  PVHC waived review on December 23, 2014.  Thereafter,

    the Director of the MRP issued an order of dismissal on December 23, 2014.

## JURISDICTION AND VENUE

14. The Court has subject matter jurisdiction over this action pursuant to Article 5,

    Section 10 of the Constitution of the State of Wyoming.

3

15. The facts and circumstances giving rise to this Complaint occurred in Park County, Wyoming, and therefore this Court has personal jurisdiction over the Defendants.

16. Pursuant to Wyo. Stat. Ann. § 1-5-109, the proper venue for this cause of action is the Fifth Judicial District Court in and for Park County, Wyoming, because the cause of action arose in this judicial district.

17. The amount in controversy for this matter exceeds that required for filing in the District Courts of Wyoming.

18. Plaintiffs do not believe that PVHC is a governmental entity or that Dr. Hansen was an employee of a governmental entity within the meaning of the Wyoming Governmental Claims Act (WGCA).

19. Nevertheless this Court has jurisdiction as Plaintiffs, in the event they were required to comply with the WGCA, have presented a WGCA Notice of Claim to: Mark Wurzel (President of PVHC); William Patten (CEO of PVHC); Powell Hospital District Board of Trustees; Secretary of Powell Hospital District; Jim Carlson (Secretary of Powell Hospital District); Eide Bailly LLP (Auditor of PVHC); Stine, Buss, Wolff, Wilson & Associates, PC (Auditor of Powell Hospital District); and Scott Kolpitcke (Registered agent of PVHC) (collectively, "entities"). Plaintiffs' Notice of Claim, including Plaintiffs' signature and certification under penalty of false swearing, is attached hereto as Exhibit A.

20. The Notice of Claim was signed and certified under penalty of false swearing by Plaintiffs pursuant to Wyo. Stat. Ann. § 1-39-113 (d) & (e).

4

21. The Notice of Claim, sent by registered mail, return receipt requested, was received by the following entities on the following dates: Mark Wurzel, William Patten, Powell Hospital District Board of Trustees, Secretary of Powell Hospital District, Jim Carlson and Scott Kolpitcke, and Stine, Buss, Wolff, Wilson & Associates, PC on September 2, 2014.  The Notice of Claim was also sent by registered mail to Eide Bailly LLP and a return receipt was received, however, no date was marked.

22. Plaintiffs also complied with the Wyoming Constitution, to the extent they were required to do so.  The claim was in compliance with the signature and certification requirements of Article16, section 7 of the Wyoming Constitution because Plaintiffs provided the entities with an itemized statement in writing, certified to under penalty of perjury, on August 27, 2014.

23. Plaintiffs complied with Wyo. Stat. Ann. § 1-39-113 because Plaintiffs provided the entities with an itemized statement and claim stating the amount of compensation or other relief demanded.  The claim required under § 1-39-113, to the extent that it was required, was filed in accordance with the statute.

24. Plaintiffs complied with all statutory filing provisions of the WGCA and Plaintiffs complied with the Wyoming Constitution, including all signature and certification requirements.  Through the date of this filing, no action, response or notification of any kind, by any person or entity provided with and/or served with Plaintiffs' Notice of Claim, has been received by Plaintiffs.

## STATEMENT OF FACTS

25. On October 11, 2011, Veronica Sommerville saw Dr. Jeffery Hansen of PVHC for bunion correction surgery on her left foot.

26. Veronica hoped that this surgery would improve her ability to run.

27. Prior to the surgery, Veronica consented to have Dr. Hansen perform a lapidus bunionectomy and a gastroc lengthening.

28. During the surgery, Dr. Hansen identified what he believed to be a Lisfranc's-type arch collapse.

29. Without Veronica's informed consent, Dr. Hansen made the decision to expand the scope of the procedure to include a medial column fusion in order to address Veronica's alleged arch deformity.

30. Following the surgery, Veronica experienced extreme pain and a burning sensation, which she likened to having fire ants constantly biting her left foot.

31. On December 28, 2011, Dr. Hansen performed an exploratory surgery of Veronica's sural nerve in order to determine the source of her extreme pain.

32. During this surgery, Dr. Hansen discovered a severe nerve adhesion and performed an excision of the neuroma incontinuity and a sural nerve repair using a nerve wrap conduit.

33. Dr. Hansen also discovered an infection in Veronica's left foot, which lab results later confirmed to be a staph infection.

34. He removed all of the hardware from the October 11, 2011 surgery from Veronica's foot, with the exception of two screws. This included removing the medial column foot plate.

6

35. Lastly, Dr. Hansen debrided Veronica's foot.

36. This second surgery did not end Veronica's intense pain.

37. On May 21, 2012, Veronica went to Billings, Montana for a second opinion.
    There, Dr. Terrence Cahill diagnosed her with complex regional pain syndrome
    (CRPS).

38. On November 6, 2012, still in immense pain, Veronica underwent a third surgery
    by Dr. Hansen, after Dr. Hansen determined that the medial column fusion was
    incomplete.

39. Dr. Hansen performed a re-do of the metatarsal fusion of the first tarsotatarsal
    joint and naviculocuneiform joining with supplementation of the second
    tarsometatarsal joint fusion to improve the fusion mass.

40. Veronica continued to treat with Angela Redder at PVHC.  In January of 2014,
    Redder reported "[w]e have tried different pain creams as well as Lidoderm
    patches, bone stimulator, different pain medications, and we have not really found
    anything that alleviates her discomfort."

41. In January 2014, Angela Redder referred Veronica to Dr. Lael Beachler at the Big
    Horn Foot Clinic in Cody, for a second opinion.

42. On January 23, 2014, Dr. Beachler discussed four possible treatment options for
    Veronica's condition: amputation (below the knee); other topical agents; repeat
    sympathetic nerve injections and possibly sclerosing injections; and removal of
    hardware (which could make her CRPS worse).

43. Dr. Hansen's negligence occurred at the facilities of PVHC, in Powell, Wyoming.

44. Dr. Hansen became employed by PVHC in 2006.

45. In 2006, PVHC had a management services contract with Brim Healthcare, Inc. (Brim) under which Brim provided a CEO, along with management and other services described in the contract to assist PVHC in operating PVHC's facilities.

46. Under that contract, Brim agreed to provide, and did provide, a CEO to oversee the recruitment, hiring, discharge, supervision, discipline and management of PVHC employees, including employed physicians such as Dr. Hansen.

47. In 2006, at the time Dr. Hansen became employed by PVHC and received medical staff privileges at PVHC, Rod Barton was the CEO of PVHC.

48. In 2006, PVHC's facilities were operated by PVHC, and also by Brim.

49. On information and belief, HealthTech purchased Brim in 2010.

50. On information and belief, HealthTech assumed liability for Brim, its agents, employees or servants such that HealthTech is liable for the acts and omissions of Brim's agents, employees or servants who worked at or provided any services to PVHC.

51. As of 2010, PVHC's facilities were operated by PVHC, and also by HealthTech.

52. In 2010, PVHC entered into a management services contract with HealthTech, under which HealthTech provided a CEO, along with management and other services described in the contract to assist PVHC in operating PVHC's facilities.

53. HealthTech agreed to provide, and did provide, a CEO to oversee the recruitment, hiring, discharge, supervision, discipline and management of PVHC employees, including employed physicians such as Dr. Hansen.

54. Paul Cardwell was the CEO of PVHC from March to September of 2011.

8

55. Paul Cardwell resigned on September 23, 2011 and shortly thereafter, Neil
Todhunter, HealthTech's Regional Vice President, became interim CEO of
PVHC.

56. On October 10, 2011 Mike Lieb became interim CEO of PVHC.

57. In February 2012, William Patten became the CEO of PVHC.

58. At all times material to this action, Rod Barton, Paul Cardwell, Neil Todhunter,
Mike Lieb and William Patten were acting as agents, servants and employees of
HealthTech and HealthTech is responsible for their negligent acts and omissions.

59. Prior to the events giving rise to this case, HealthTech and PVHC became aware
of complaints that Dr. Hansen was not competent to perform the procedures for
which he was granted privileges.

60. Prior to the events giving rise to this case, HealthTech and PVHC were aware of
complaints made by patients and other health care providers about Dr. Hansen's
competency.

61. Prior to the events giving rise to this case, HealthTech and PVHC were aware of
Dr. Hansen's rate of surgical complications, infection rate and his failure to
conform to the standards of care applicable to orthopedic surgeons.

62. Nevertheless, on information and belief, HealthTech and PVHC either failed to
take steps, or took insufficient steps, to investigate, oversee and monitor Dr.
Hansen's performance to ensure patient safety.

63. As a direct and proximate result of the acts and omissions of HealthTech, PVHC
and Dr. Hansen, Veronica Sommerville sustained serious physical and emotional
injuries, including, but not limited to, severe nerve damage during surgery.

9

64. As a direct and proximate result of the acts and omissions of HealthTech, PVHC
and Dr. Hansen, William Sommerville suffered the loss of consortium of his wife,
Veronica Sommerville.

65. As a direct and proximate result of the acts and omissions of HealthTech, PVHC
and Dr. Hansen, A.L.S. suffered the loss of consortium of her mother, Veronica
Sommerville.

**FIRST CAUSE OF ACTION**
**NEGLIGENCE OF DR. HANSEN AND VICARIOUS LIABILITY OF**
**PVHC**

66. Plaintiffs incorporate and adopt by reference all of the facts and allegations above
as though fully set forth herein.

67. At the time and place of the events described herein, Dr. Hansen owed a duty of
reasonable care to medical patients, including Veronica Sommerville, to fully and
properly investigate, examine, diagnose and treat, or in the alternative, to properly
refer and secure qualified and competent medical specialists to investigate,
examine, diagnoses and treat such patients.

68. Dr. Hansen's duty of care owed to Veronica Sommerville was breached through
Dr. Hansen's negligent acts and omissions, including:

    a.  Failing to protect the sural nerve during the October 11, 2011 surgery;

    b.  Failing to obtain the appropriate and necessary consent to expand the scope of
the surgery on October 11, 2011;

    c.  During the December 28, 2011 surgery, negligently removing the fixation
from the prior surgery, resulting in the failure of the prior fusion mass and
requiring a re-do of the medial column fusion;

10

    d.   Negligently failing to maintain a safe environment for patient treatment;

    e.   Negligently failing to fully and properly examine, diagnose, evaluate and treat, or in the alternative, to properly refer and secure qualified and competent medical specialists to examine, diagnose, evaluate and treat Sommerville;

    f.   Negligently failing to monitor and assess Sommerville;

    g.   Negligently failing to properly evaluate and diagnose the condition of Sommerville and negligently failing to take appropriate steps based thereon;

    h.   Negligently failing to comply with the standard of care requisite in the industry for orthopedic surgeons; and

    i.   Negligently failing to exercise reasonable care under the circumstances.

69. As a direct and proximate result of Dr. Hansen's negligent acts and omissions, Veronica Sommerville sustained the serious physical and emotional injuries set forth above and in the "Damages" section of this Complaint.

### SECOND CAUSE OF ACTION
### NEGLIGENCE OF PVHC

70. Plaintiffs incorporate and adopt by reference all the facts and allegations above as though fully set forth herein.

71. At the time and place of the events herein, PVHC owed a duty of reasonable care to medical patients, including Veronica Sommerville, to avoid causing them injury.

11

72. At the time and the place of the events described herein, PVHC owed a duty of
reasonable care to medical patients, including Veronica Sommerville, to properly
grant, extend, and continue medical staff privileges to physicians, including Dr.
Hansen.

73. At the time and the place of the events described herein, PVHC owed a duty of
reasonable care to medical patients, including Veronica Sommerville, to maintain
adequate supervision, oversight and review of the treatment rendered by Dr.
Hansen.

74. PVHC was negligent in credentialing, hiring, supervising, disciplining,
monitoring, reviewing, training, and extending privileges to Dr. Hansen, and such
negligence breached the duties of care owed by PVHC to Veronica Sommerville.

75. The negligence of PVHC includes, but is not limited to, the following:

    a.    Negligently failing to properly exercise its authority in granting, extending
and continuing medical staff privileges to Dr. Hansen;

    b.    Negligently failing to supervise and review Dr. Hansen's exercise of his
medical staff privileges;

    c.    Negligently misleading patients, including Veronica Sommerville, into
believing that Dr. Hansen was a suitable and competent physician;

    d.    Negligently failing to modify and/or terminate the medical staff privileges
granted to Dr. Hansen based upon his failure to provide appropriate patient
care;

e.    Negligently failing to protect patients, including Veronica Sommerville,

from obtaining care from Dr. Hansen based upon information known to it

about his credentials, training, experience, suitability and abilities;

f.    Negligently failing to investigate Dr. Hansen's surgical practices and post-

surgical care;

g.    Negligently failing to adopt and enforce bylaws, policies and procedures

sufficient for providing quality and safe health care to patients; and

h.    Negligently failing to act reasonably under the circumstances.

76. As a direct and proximate result of the negligence of PVHC, Veronica

Sommerville suffered the serious injuries set forth above and in the "Damages"

section of this Complaint.

### THIRD CAUSE OF ACTION
### NEGLIGENCE OF HEALTHTECH

77. Plaintiffs incorporate and adopt by reference all the facts and allegations above as

though fully set forth herein.

78. At the time and the place of the events herein, HealthTech owed a duty of

reasonable care to medical patients, including Veronica Sommerville, to avoid

causing injury.

79. At the time and the place of the events described herein, HealthTech owed a duty

of reasonable care to medical patients, including Veronica Sommerville, to

properly grant, extend and continue medical staff privileges to physicians, or deny

medical staff privileges when appropriate, including Dr. Hansen.

80. At the time and the place of the events described herein, HealthTech owed a duty of reasonable care to medical patients, including Veronica Sommerville, to maintain adequate supervision, oversight and review of the treatment rendered by Dr. Hansen.

81. HealthTech was negligent in credentialing, hiring, supervising, disciplining, monitoring, reviewing, training and extending privileges to Dr. Hansen, and such negligence breached the duties of care owed by HealthTech to Veronica Sommerville.

82. The negligence of HealthTech includes, but is not limited to, the following:

    a. Negligently failing to properly exercise its authority in granting, extending and continuing medical staff privileges to Dr. Hansen;

    b. Negligently failing to supervise and review Dr. Hansen's exercise of his medical staff privileges;

    c. Negligently misleading patients, including Veronica Sommerville, into believing that Dr. Hansen was a suitable and competent physician;

    d. Negligently failing to modify and/or terminate the medical staff privileges granted to Dr. Hansen based upon his failure to provide appropriate patient care;

    e. Negligently failing to protect patients, including Veronica Sommerville, from obtaining care from Dr. Hansen based upon information known to it about his credentials, training, experience, suitability and abilities;

    f. Negligently failing to investigate Dr. Hansen's surgical practices and post-surgical care;

14

g.   Negligently failing to adopt and enforce bylaws, policies and procedures

sufficient for providing quality and safe health care to patients; and

h.   Negligently failing to act reasonably under the circumstances.

83. As a direct and proximate result of the negligence of HealthTech, Veronica

Sommerville suffered the serious injuries set forth above, and in the "Damages"

section of this Complaint.

## FOURTH CAUSE OF ACTION
## LOSS OF CONSORTIUM: WILLIAM SOMMERVILLE

84. Plaintiffs incorporate and adopt by reference all the facts and allegations above as

though fully set forth herein.

85. At the time and place of the events described herein, Defendants breached their

duties of reasonable care to Plaintiffs that resulted in damages.

86. Prior to the physical and emotional injuries Plaintiff Veronica Sommerville

sustained, she was able to perform her duties as a wife by providing emotional

support, physical intimacy and guidance to her husband, William, and providing

care, maintenance and management of their family home.

87. As a direct and proximate result of the Defendants' negligent acts and omissions,

Veronica Sommerville is no longer able to adequately perform her duties as a

wife by providing emotional support, physical intimacy and guidance to her

husband, William, and she is no longer able to adequately provide the care,

maintenance and management of their family home that she previously provided.

88. The nature and character of the relationship between Veronica and William

changed as a direct and proximate result of the injuries sustained by Veronica. As

a direct and proximate result thereof, William has been deprived of the care,

15

comfort, society, companionship, physical intimacy, physical assistance and consortium of his wife.

89. As a direct and proximate cause and result of Defendants' negligence, Plaintiff William Sommerville suffered damages for loss of consortium for which Defendant is liable; such injuries are more particularly set forth below in the section of this Complaint entitled "Damages."

### FIFTH CAUSE OF ACTION
### LOSS OF CONSORTIUM: A.L.S.

90. Plaintiffs incorporate and adopt by reference all the facts and allegations above as though fully set forth herein.

91. At the time and place of the events described herein, Defendants breached their duties of reasonable care to Plaintiffs that resulted in damages.

92. Prior to the physical and emotional injuries Plaintiff Veronica Sommerville sustained, she was able to perform her duties as a mother by providing emotional support, care and guidance to her minor child, A.L.S., and providing care, maintenance and management of the family home.

93. As a direct and proximate result of the Defendants' negligent acts and omissions, Veronica Sommerville is no longer able to adequately perform her duties as a mother by providing emotional support, care and guidance to A.L.S., and she is no longer able to adequately provide the care, maintenance and management of the family home that she previously provided.

94. The nature and character of the relationship between Veronica and A.L.S. changed as a direct and proximate result of the injuries sustained by Veronica. As a direct and proximate result thereof, A.L.S has been deprived of the care,

16

comfort, society, companionship, physical assistance and consortium of her
mother.

95. As a direct and proximate cause and result of Defendants' negligence, Plaintiff
A.L.S. suffered damages for loss of consortium for which Defendant is liable;
such injuries are more particularly set forth below in the section of this Complaint
entitled "Damages."

## DAMAGES

96. Plaintiffs incorporate and adopt by reference all the facts and allegations above as
though fully set forth herein.

97. As a direct result of the negligent acts and omissions set forth herein, Plaintiffs
are entitled to be compensated and to recover the following damages:

   a.   Past and future physical pain and suffering in an amount to be proven at
        trial;

   b.   Past and future emotional pain and suffering in an amount to be proven at
        trial;

   c.   Past and future loss of enjoyment of life in an amount to be proven at trial;

   d.   Past and future disability in and amount to be proven at trial;

   e.   Past and future loss of wages, income and earning capacity in an amount
        to be proven at trial;

   f.   Other past and future pecuniary loss in an amount to be proven at trial;

   g.   Past and future medical and related expenses in an amount to be proven at
        trial;

   h.   Loss of consortium, past and future, in an amount to be proven at trial;

i.      All allowable costs, expenses and fees associated with this litigation; and

j.      Plaintiffs reserve the right, if demonstrated by the evidence, to assert a

claim for punitive damages as is fair and just.

WHEREFORE, Plaintiffs pray that the Court enter judgment against the

Defendants in an amount supported by the allegations of this Complaint, as follows:

1.      Judgment against the Defendants for general damages in an amount consistent

with the allegations contained herein and to be proven at trial; and

2.      Judgment against the Defendants for special damages in an amount consistent

with the allegations contained herein and to be proven at trial; and

3.      Judgment for costs, interests, and such other and further relief as this Court deems

just and equitable.

DATED 16th day of January, 2015.

Robert A. Krause, WSB # 5-2824
Mel C. Orchard, III, WSB # 5-2894
Sarah A. Kellogg, WSB # 7-5355
THE SPENCE LAW FIRM, LLC
15 S. Jackson Street, P.O. Box 548
Jackson, Wyoming 83001
(307) 733-7290

William L. Simpson, WSB # 5-2189
BURG, SIMPSON, ELDREDGE, HERSH
& JARDINE, PC
1135 14th Street, P.O. Box 490
Cody, Wyoming 82414
(307) 527-7891


*Attorneys for the Plaintiffs*

## DEMAND FOR JURY TRIAL

Plaintiffs, by and through counsel and pursuant to Wyoming Rule of Civil

Procedure 38, hereby requests that this matter be tried to a jury of six.


DATED this 16th day of January, 2015.

Robert A. Krause, WSB # 5-2824
Mel C. Orchard, III, WSB # 5-2894
Sarah A. Kellogg, WSB # 7-5355
THE SPENCE LAW FIRM, LLC
15 S. Jackson Street, P.O. Box 548
Jackson, Wyoming 83001
(307) 733-7290

William L. Simpson, WSB # 5-2189
BURG, SIMPSON, ELDREDGE, HERSH
& JARDINE, PC
1135 14th Street, P.O. Box 490
Cody, Wyoming 82414
(307) 527-7891


*Attorneys for the Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was served upon the following, as indicated below on this 16th day of January, 2015, and addressed as follows:

| | |
|---|---|
| Paul Kapp<br>George E. Powers, Jr.<br>Sundahl, Powers, Kapp & Martin, LLC<br>1725 Carey Avenue<br>P.O. Box 328<br>Cheyenne, Wyoming 82003<br><br>*Attorneys for Defendant HealthTech* | _X_ U.S. Mail, Postage Prepaid<br>___ Hand Delivery<br>___ Overnight Mail<br>___ Facsimile<br>___ CM/ECF Electronic Filing |
| Christopher Voigt<br>Eric Peterson<br>Crowley Fleck, P.L.L.P<br>Transwestern Plaza II, Suite 500<br>490 North 31st St<br>P.O. Box 2529<br>Billings, MT 59103<br><br>*Attorney for Jeffrey Hansen, M.D.* | _X_ U.S. Mail, Postage Prepaid<br>___ Hand Delivery<br>___ Overnight Mail<br>___ Facsimile<br>___ CM/ECF Electronic Filing |
| Brian J, Marvel<br>Scott E. Ortiz<br>Williams, Porter Day & Neville, P.C.<br>P.O. Box 10700<br>Casper, WY 82602<br><br>*Attorneys for Powell Valley Health Care, Inc.* | _X_ U.S. Mail, Postage Prepaid<br>___ Hand Delivery<br>___ Overnight Mail<br>___ Facsimile<br>___ CM/ECF Electronic Filing |

Robert A. Krause

*Attorney for the Plaintiffs*

20

Robert A. Krause; krause@spencelawyers.com (WSB # 5-2824)
Mel C. Orchard, III; orchard@spencelawyers.com (WSB # 5-2894)
Sarah A. Kellogg; kellogg@spencelawyers.com (WSB # 7-5355)
THE SPENCE LAW FIRM, LLC
15 S. Jackson Street, P.O. Box 548
Jackson, Wyoming 83001
(307) 733-7290
(307) 733-5248 Fax

William L. Simpson; bsimpson@skelaw.com (WSB # 5-2189)
BURG, SIMPSON, ELDREDGE, HERSH & JARDINE, PC
1135 14th Street, P.O. Box 490
Cody, Wyoming 82414
(307) 527-7891
(307) 527-7897 Fax

*Attorneys for Plaintiffs*

PATRA LINDENTHAL
Clerk of District Court

FILED **MAR 2 7 2015**
PATRA LINDENTHAL
Clerk


EXHIBIT
E

**IN THE DISTRICT COURT OF PARK COUNTY, WYOMING,
FIFTH JUDICIAL DISTRICT**

| | |
|---|---|
| MARTHA MCMILLEN and RICHARD MCMILLEN, <br><br> Plaintiffs, <br><br> v. <br><br> HEALTHTECH MANAGEMENT SERVICES, INC., WILLIAM D. PATTEN, JEFFREY HANSEN, M.D., and POWELL VALLEY HEALTH CARE, INC. <br><br> Defendants. | Civil No. 27948 <br><br> **FIRST AMENDED COMPLAINT & JURY DEMAND** |

Plaintiffs, Martha McMillen and Richard McMillen, by and through their

attorneys, Robert A. Krause, Mel C. Orchard, III, and Sarah A. Kellogg of THE SPENCE

LAW FIRM, LLC and William L. Simpson of BURG, SIMPSON, ELDREDGE, HERSH &

JARDINE, PC, plead and allege their causes of action against the Defendants as follows:

## PARTIES

1.  Martha McMillen is a citizen of the State of Wyoming, residing in Big Horn
    County.

2.  Richard McMillen is a citizen of the State of Wyoming, residing in Big Horn
    County.  Martha and Richard McMillen are husband and wife.

3.  William Patten is a citizen of the State of Wyoming, residing in Park County.

4.  HealthTech Management Services, Inc. (HealthTech), is an Oregon Corporation
    with its business headquarters and principal place of business in the State of
    Tennessee, and it is doing business in the State of Wyoming.  The name and
    address of its registered agent in Wyoming is Corporation Service Company,
    1821 Logan Ave., Cheyenne, Wyoming 82001.

5.  Under the doctrine of *respondeat superior*, HealthTech is vicariously liable for
    any act or omission of an officer, agent, servant or employee made while acting in
    the scope of authority delegated by the company, or within the scope of the duties
    of the employee, which were the direct and proximate cause of the injuries and
    the resulting damages alleged herein.

6.  Because for at least a portion of the time and place of the events described herein
    William Patten was, on information and belief, acting as an officer, agent, servant
    and/or employee of HealthTech, working within the scope of his employment or
    agency, to further the interests of HealthTech, HealthTech is vicariously liable for
    William Patten's negligent acts and omissions.

2

7. Upon information and belief, Jeffrey Hansen, M.D., is a citizen of the state of Wyoming, temporarily residing in Montana.

8. Defendant Powell Valley Health Care, Inc. (PVHC) is a Wyoming corporation with its principal place of business located at 777 Avenue H, Powell, Wyoming, 82435, in Park County, Wyoming.

9. Under the doctrine of *respondeat superior*, PVHC is vicariously liable for any act or omission of an officer, agent, servant or employee made while acting in the scope of authority delegated by the company, or within the scope of the duties of the employee, which were the direct and proximate cause of Plaintiffs' injuries and resulting damages.

10. Because at the time and place of the events described herein, Dr. Hansen was, on information and belief, acting as an employee of PVHC, PVHC is vicariously liable for Dr. Hansen's negligent acts and omissions.

11. Plaintiffs do not believe that the claims against HealthTech asserted herein are subject to the Wyoming Medical Review Panel Act of 2005, Wyo. Stat. Ann. §§ 9-2-1513 through 9-2-1523, in that HealthTech is not a "health care provider" and Plaintiffs are not asserting claims for "malpractice" against Defendants, as those terms are defined in Wyo. Stat. Ann. § 9-2-1515(a).

12. Nevertheless, to the extent that they were required to do so, out of an abundance of caution, on January 15, 2015, Plaintiffs filed an Application for Claim Review with the Wyoming Medical Review Panel (MRP) for claims against HealthTech and other individuals and entities.

3

13. On the same day, Plaintiffs filed an Application for Claim review with the MRP
    for claims against Dr. Hansen and PVHC.

14. Dr. Hansen waived review by the MRP on March 12, 2015. PVHC waived
    review by the MRP on March 23, 2015. HealthTech waived review by the MRP
    on March 16, 2015. Thereafter, the Director of the MRP issued an order of
    dismissal.

## JURISDICTION AND VENUE

15. The Court has subject matter jurisdiction over this action pursuant to Article 5,
    Section 10 of the Constitution of the State of Wyoming.

16. The facts and circumstances giving rise to this Complaint occurred in Park
    County, Wyoming, and therefore this Court has personal jurisdiction over the
    Defendants.

17. Pursuant to Wyo. Stat. Ann. § 1-5-109, the proper venue for this cause of action is
    the Fifth Judicial District Court in and for Park County, Wyoming, because the
    cause of action arose in this judicial district.

18. The amount in controversy for this matter exceeds that required for filing in the
    District Courts of Wyoming.

19. Plaintiffs do not believe that PVHC is a governmental entity or that Dr. Hansen
    was an employee of a governmental entity within the meaning of the Wyoming
    Governmental Claims Act (WGCA).

20. Nevertheless this Court has jurisdiction as Plaintiffs, in the event they were
    required to comply with the WGCA, have presented a WGCA Notice of Claim to:
    Mark Wurzel (President of PVHC); William Patten (CEO of PVHC); Powell

4

Hospital District Board of Trustees; Secretary of Powell Hospital District; Jim

Carlson (Secretary of Powell Hospital District); Eide Bailly LLP (Auditor of

PVHC); Stine, Buss, Wolff, Wilson & Associates, PC (Auditor of Powell

Hospital District); and Scott Kolpitcke (Registered agent of PVHC) (collectively,

"entities"). Plaintiffs' Notice of Claim, including Plaintiffs' signature and

certification under penalty of false swearing, is attached hereto as Exhibit A.

21. The Notice of Claim was signed and certified under penalty of false swearing by

Plaintiffs pursuant to Wyo. Stat. Ann. § 1-39-113 (d) & (e).

22. The Notice of Claim, sent by registered mail, return receipt requested, was

received by Mark Wurzel, William Patten, Powell Hospital District Board of

Trustees, Secretary of Powell Hospital District, Jim Carlson, and Eide Bailly LLP

on December 29, 2014. The Notice of Claim was also sent on the same date and

received by Scott Kolpitcke, Stine, Buss, Wolff, Wilson & Associates, PC,

however, no date was indicated on the return receipt.

23. Plaintiffs also complied with the Wyoming Constitution, to the extent they were

required to do so. The claim was in compliance with the signature and

certification requirements of Article16, section 7 of the Wyoming Constitution

because Plaintiffs provided the entities with an itemized statement in writing,

certified to under penalty of perjury, on December 19, 2014.

24. Plaintiffs complied with Wyo. Stat. Ann. § 1-39-113 because Plaintiffs provided

the entities with an itemized statement and claim stating the amount of

compensation or other relief demanded. The claim required under § 1-39-113, to

the extent that it was required, was filed in accordance with the statute.

5

25. Plaintiffs complied with all statutory filing provisions of the WGCA and Plaintiffs

complied with the Wyoming Constitution, including all signature and certification

requirements.  Through the date of this filing, no action, response or notification

of any kind, by any person or entity provided with and/or served with Plaintiffs'

Notice of Claim, has been received by Plaintiffs.

26. The Court has jurisdiction because Plaintiffs complied with the Wyoming

Medical Review Panel Act of 2005.

## STATEMENT OF FACTS

27. On June 27, 2012, Mrs. McMillen saw Dr. Hansen for a shoulder injury.

28. During the visit, Dr. Hansen also evaluated Mrs. McMillen's knee, which she had

recently injured when she twisted it.

29. Dr. Hansen ordered an MRI, which revealed a partial sprain of the MCL and a

medial meniscus tear.

30. On July 17, 2012, Dr. Hansen operated on Mrs. McMillen's shoulder and knee.

He performed a left knee arthroscopy with: partial medial meniscectomy; limited

chondroplasty; and a lateral retinacular release of the patella.

31. In his operative note, Dr. Hansen noted that the lateral compartment looked

normal.

32. Roughly three months later, on October 8, 2012, Mrs. McMillen's knee was still

painful.

33. Dr. Hansen noted that her knee was more arthritic than the previous MRI had

indicated and decided that she would need a total knee replacement.

6

34. On November 13, 2012, Dr. Hansen performed a left knee total arthroscopy.

35. Contrary to his earlier report, Dr. Hansen's operative note states that one indication for the total knee replacement surgery was that the lateral compartment surface was "quite irregular."

36. On January 28, 2013, Dr. Hansen concluded that Mrs. McMillen's knee was fibrotic and that aggressive intervention was necessary.

37. On February 21, 2013, Dr. Hansen performed a manipulation of Mrs. McMillen's knee.

38. During the manipulation, Dr. Hansen fractured Mrs. McMillen's distal femur.

39. On March 29, 2013, Dr. Hansen performed an open reduction internal fixation of the distal femur fracture with an intramedullary rod device as well as a total knee revision.

40. Mrs. McMillen has continued to suffer from constant pain in and around her knee and has only a limited range of motion in her knee.

41. Mrs. McMillen's injuries were caused by the negligent conduct of Dr. Hansen.

42. Dr. Hansen's negligence occurred at the facilities of PVHC, in Powell, Wyoming.

43. In 2006, PVHC had a management services contract with Brim Healthcare, Inc. (Brim) under which Brim provided a CEO, along with management and other services described in the contract to assist PVHC in operating PVHC's facilities.

44. Brim agreed to provide, and did provide, a CEO to oversee the recruitment, hiring, discharge, supervision, discipline and management of PVHC employees, including employed physicians such as Dr. Hansen.

45. In 2006, at the time Dr. Hansen became employed by PVHC and received medical staff privileges at PVHC, Rod Barton was the CEO of PVHC.

7

46. In 2006, PVHC's facilities were operated by PVHC, and also by Brim.

47. On information and belief, HealthTech purchased Brim in 2010.

48. On information and belief, HealthTech assumed liability for Brim, its agents, employees or servants such that HealthTech is liable for the acts and omissions of Brim's agents, employees or servants who worked at or provided any services to PVHC.

49. As of 2010, PVHC's facilities were operated by PVHC and also by HealthTech.

50. In 2010, PVHC entered into a management services contract with HealthTech, under which HealthTech provided a CEO, along with management and other services described in the contract to assist PVHC in operating PVHC's facilities.

51. HealthTech agreed to provide, and did provide, a CEO to oversee the recruitment, hiring, discharge, supervision, discipline and management of PVHC employees, including employed physicians such as Dr. Hansen.

52. Paul Cardwell was the CEO of PVHC from March to September of 2011.

53. Paul Cardwell resigned on September 23, 2011 and shortly thereafter, Neil Todhunter, HealthTech's Regional Vice President, became interim CEO of PVHC.

54. On October 10, 2011, Mike Lieb became interim CEO of PVHC.

55. In February 2012, William Patten became the CEO of PVHC.

56. At all times material to this action, Rod Barton, Paul Cardwell, Neil Todhunter, Mike Lieb and William Patten were acting as agents, servants and employees of HealthTech and HealthTech is responsible for their negligent acts and omissions.

8

57. Prior to the events giving rise to this case, PVHC, HealthTech and Patten became aware of complaints that Dr. Hansen was not competent to perform the procedures for which he was granted privileges.

58. Prior to the events giving rise to this case, PVHC, HealthTech and Mr. Patten were aware of complaints made by patients and other health care providers about Dr. Hansen's competency.

59. Prior to the events giving rise to this case, PVHC, HealthTech and Mr. Patten were aware of Dr. Hansen's rate of surgical complications, infection rate and his failure to conform to the standards of care applicable to orthopedic surgeons.

60. Mr. Patten fielded these complaints, which related directly to patient care and patient safety, and represented that he was an appropriate authority to do so.

61. As CEO of PVHC, Mr. Patten had the power and authority to terminate Dr. Hansen's employment.

62. Mr. Patten should have exercised that authority and terminated Dr. Hansen's employment.

63. Nevertheless, on information and belief, PVHC, HealthTech and Mr. Patten either failed to take steps, or took insufficient steps, to investigate, oversee and monitor Dr. Hansen's performance to ensure patient safety.

64. As a direct and proximate result of the acts and omissions of the Defendants, Martha McMillen sustained serious physical and emotional injuries and Richard McMillen suffered the loss of consortium of his wife, Martha McMillen.

## FIRST CAUSE OF ACTION
## NEGLIGENCE OF DR. HANSEN AND VICARIOUS LIABILITY OF PVHC

9

65. Plaintiffs incorporate and adopt by reference all of the facts and allegations above as though fully set forth herein.

66. Dr. Hansen's duty of care owed to Mrs. McMillen was breached through his negligent acts and omissions, including, but not limited to, the following:

   a. Negligently failing to seek a conservative course of treatment before performing a lateral release;

   b. Negligently and hastily recommending a total knee replacement;

   c. Negligently failing to arthroscopically debride Mrs. McMillen's knee prior to performing a manipulation;

   d. Negligently failing to maintain a safe environment for patient treatment;

   e. Negligently failing to fully and properly examine, diagnose, evaluate and treat, or in the alternative, to properly refer and secure qualified and competent medical specialists to examine, diagnose, evaluate and treat Mrs. McMillen;

   f. Negligently failing to monitor and assess the condition of Mrs. McMillen;

   g. Negligently failing to properly evaluate and diagnose the condition of Mrs. McMillen, and negligently failing to take appropriate steps based thereon;

   h. Negligently failing to comply with the standard of care requisite in the industry for orthopedic surgeons; and

   i. Negligently failing to exercise reasonable care under the circumstances.

67. As a direct and proximate result of Dr. Hansen's negligent acts and omissions, Martha McMillen sustained serious physical and emotional injuries and Richard McMillen has suffered the loss of consortium of his wife, Martha McMillen.

10

## SECOND CAUSE OF ACTION
## NEGLIGENCE OF PVHC

68. Plaintiffs incorporate and adopt by reference all the facts and allegations above as though fully set forth herein.

69. At the time and place of the events herein, PVHC owed a duty of reasonable care to medical patients, including Martha McMillen, to avoid causing them injury.

70. At the time and the place of the events described herein, PVHC owed a duty of reasonable care to medical patients, including Martha McMillen, to properly grant, extend, and continue medical staff privileges to physicians, including Dr. Hansen.

71. At the time and the place of the events described herein, PVHC owed a duty of reasonable care to medical patients, including Martha McMillen, to maintain adequate supervision, oversight and review of the treatment rendered by Dr. Hansen.

72. PVHC was negligent in credentialing, hiring, supervising, disciplining, monitoring, reviewing, training, and extending privileges to Dr. Hansen, and such negligence breached the duties of care owed by PVHC to Martha McMillen.

73. The negligence of PVHC includes, but is not limited to, the following:

    a.    Negligently failing to properly exercise its authority in granting, extending and continuing medical staff privileges to Dr. Hansen;

    b.    Negligently failing to supervise and review Dr. Hansen's exercise of his medical staff privileges;

11

c.    Negligently misleading patients, including Martha McMillen, into believing that Dr. Hansen was a suitable and competent physician;

d.    Negligently failing to modify and/or terminate the medical staff privileges granted to Dr. Hansen based upon his failure to provide appropriate patient care;

e.    Negligently failing to protect patients, including Martha McMillen, from obtaining care from Dr. Hansen based upon information known to it about his credentials, training, experience, suitability and abilities;

f.    Negligently failing to investigate Dr. Hansen's surgical practices and post-surgical care;

g.    Negligently failing to adopt and enforce bylaws, policies and procedures sufficient for providing quality and safe health care to patients; and

h.    Negligently failing to act reasonably under the circumstances.

74. As a direct and proximate result of the negligence of PVHC, Martha McMillen and Richard McMillen suffered the serious injuries set forth above and in the "Damages" section of this Complaint.

### THIRD CAUSE OF ACTION
### NEGLIGENCE OF PATTEN AND HEALTHTECH

75. Plaintiffs incorporate and adopt by reference all the facts and allegations above as though fully set forth herein.

76. At the time and the place of the events herein, HealthTech and Mr. Patten owed a duty of reasonable care to medical patients, including Martha McMillen, to avoid causing injury.

12

77. At the time and the place of the events described herein, HealthTech and Mr. Patten owed a duty of reasonable care to medical patients, including Martha McMillen, to properly grant, extend and continue medical staff privileges to physicians or, when appropriate, to deny medical staff privileges to physicians, including Dr. Hansen.

78. At the time and the place of the events described herein, HealthTech and Mr. Patten owed a duty of reasonable care to medical patients, including Martha McMillen, to maintain adequate supervision, oversight and review of the treatment rendered by Dr. Hansen.

79. HealthTech and Mr. Patten were negligent in credentialing, hiring, supervising, disciplining, monitoring, reviewing, training and extending privileges to Dr. Hansen, and such negligence breached the duties of care owed by HealthTech and Mr. Patten to Martha McMillen.

80. The negligence of HealthTech and Mr. Patten includes, but is not limited to, the following:

   a. Negligently failing to properly exercise its authority in granting, extending and continuing medical staff privileges to Dr. Hansen;

   b. Negligently failing to supervise and review Dr. Hansen's exercise of his medical staff privileges;

   c. Negligently misleading patients, including Martha McMillen, into believing that Dr. Hansen was a suitable and competent physician;

13

    d.   Negligently failing to modify and/or terminate the medical staff privileges granted to Dr. Hansen based upon his failure to provide appropriate patient care;

    e.   Negligently failing to protect patients, including Martha McMillen, from obtaining care from Dr. Hansen based upon information known to them about his credentials, training, experience, suitability and abilities;

    f.   Negligently failing to investigate Dr. Hansen's surgical practices and post-surgical care;

    g.   Negligently failing to adopt and enforce bylaws, policies and procedures sufficient for providing quality and safe health care to patients; and

    h.   Negligently failing to act reasonably under the circumstances.

81. As a direct and proximate result of the negligence of HealthTech and Mr. Patten, Martha McMillen and Richard McMillen suffered the serious injuries set forth above, and in the "Damages" section of this Complaint.

### FOURTH CAUSE OF ACTION
### LOSS OF CONSORTIUM

82. Plaintiffs incorporate and adopt by reference all the facts and allegations above as though fully set forth herein.

83. At the time and place of the events described herein, Defendants breached their duty of reasonable care to Plaintiffs that resulted in damages.

84. Prior to the physical and emotional injuries Plaintiff Martha McMillen sustained, she was able to perform her duties as a wife by providing emotional support, physical intimacy and guidance to her husband, Richard McMillen, and providing care, maintenance, and management of their family home.

14

85. As a direct and proximate result of the Defendants' negligent acts and omissions,
Martha McMillen is no longer able to adequately perform her duties as a wife by
providing emotional support, physical intimacy and guidance to her husband,
Richard, and she is no longer able to adequately provide the care, maintenance,
and management of their family home that she previously provided.

86. The nature and character of the relationship between Martha and Richard
McMillen changed as a direct and proximate result of the injuries sustained by
Martha McMillen. As a direct and proximate result thereof, Richard McMillen
has been deprived of the care, comfort, society, companionship, physical
intimacy, physical assistance and consortium of his wife.

87. As a direct and proximate cause and result of Defendants' negligence, Plaintiff
Richard McMillen suffered damages for loss of consortium for which Defendants
are liable; such injuries are more particularly set forth below, in the section of the
Complaint entitled "Damages."

## DAMAGES

88. Plaintiffs incorporate and adopt by reference all the facts and allegations above as
though fully set forth herein.

89. As a direct result of the negligent acts and omissions set forth herein, Plaintiffs
are entitled to be compensated and to recover the following damages:

a. Past and future physical pain and suffering in an amount to be proven at trial;

b. Past and future emotional pain and suffering in an amount to be proven at
trial;

c. Past and future loss of enjoyment of life in an amount to be proven at trial;

15

d. Past and future disability in and amount to be proven at trial;

e. Past and future loss of wages, income and earning capacity in an amount to be proven at trial;

f. Other past and future pecuniary loss in an amount to be proven at trial;

g. Past and future medical and related expenses in an amount to be proven at trial;

h. Loss of consortium, past and future, in an amount to be proven at trial;

i. All allowable costs, expenses and fees associated with this litigation; and

j. Plaintiffs reserve the right, if demonstrated by the evidence, to assert a claim for punitive damages as is fair and just.

WHEREFORE, Plaintiffs pray that the Court enter judgment against the Defendants in an amount supported by the allegations of this Complaint, as follows:

1. Judgment against the Defendants for general damages in an amount consistent with the allegations contained herein and to be proven at trial; and

2. Judgment against the Defendants for special damages in an amount consistent with the allegations contained herein and to be proven at trial; and

3. Judgment for costs, interests, and such other and further relief as this Court deems just and equitable.

DATED this 25th day of March, 2015.

Mel C. Orchard, III, WSB # 5-2894
Robert A. Krause, WSB # 5-2824
Sarah A. Kellogg, WSB # 7-5355
THE SPENCE LAW FIRM, LLC
15 S. Jackson Street, P.O. Box 548

16

Jackson, Wyoming 83001
(307) 733-7290

William L. Simpson, WSB # 5-2189
BURG, SIMPSON, ELDREDGE, HERSH
& JARDINE, PC
1135 14th Street, P.O. Box 490
Cody, Wyoming 82414
(307) 527-7891

*Attorneys for the Plaintiffs*

17

## DEMAND FOR JURY TRIAL

Plaintiffs, by and through counsel and pursuant to Wyoming Rule of Civil

Procedure 38, hereby request that this matter be tried to a jury of six.

DATED this 25th day of March, 2015.

Mel C. Orchard, III, WSB # 5-2894
Robert A. Krause, WSB # 5-2824
Sarah A. Kellogg, WSB #7-5355
THE SPENCE LAW FIRM, LLC
15 S. Jackson Street, P.O. Box 548
Jackson, Wyoming 83001
(307) 733-7290

William L. Simpson, WSB # 5-2189
BURG, SIMPSON, ELDREDGE, HERSH
& JARDINE, PC
1135 14th Street, P.O. Box 490
Cody, Wyoming 82414
(307) 527-7891

*Attorneys for the Plaintiffs*

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of the above of was served upon the following, as indicated below on this 25th day of March 2015, and addressed as follows:

George Powers                     __x__U.S. Mail
Paul A. Kapp
SUNDAHL, POWERS, KAPP & MARTIN, LLC
P.O. Box 328
Cheyenne, WY 82003

*Attorneys for HealthTech Management
Services Inc. and William Patten*

W. Henry Combs, III               __x__U.S. Mail
MURANE & BOSTWICK, LLC
201 North Wolcott Street
Casper, WY 82601

*Attorney for Jeffrey Hansen, M.D.*

Brian J, Marvel                   __x__U.S. Mail
Scott E. Ortiz
Williams, Porter Day & Neville, P.C.
P.O. Box 10700
Casper, WY 82602

*Attorneys for Powell Valley Health Care,
Inc.*

Mel C. Orchard, III
*Attorney for Plaintiffs*

19

U.S. Bankruptcy Appellate Panel
of the Tenth Circuit

June 27, 2003

Barbara A. Schermerhorn
Clerk

<u>NOT FOR PUBLICATION</u>

## UNITED STATES BANKRUPTCY APPELLATE PANEL

## OF THE TENTH CIRCUIT

---

| | |
|---|---|
| IN RE MEDICAL MANAGEMENT GROUP, INC., <br><br> Debtor. | BAP No.    WO-03-004 |
| STATE OF OKLAHOMA EX REL. THE OKLAHOMA STATE DEPARTMENT OF HEALTH, <br><br> Appellant, <br><br> v. <br><br> MEDICAL MANAGEMENT GROUP, INC.; OKLAHOMA EMPLOYMENT SECURITY COMMISSION; KITT WAKELEY; and JOEL C. HALL, Trustee, <br><br> Appellees. | Bankr. No.  01-14494-WV <br> Chapter   7 <br><br><br> ORDER AND JUDGMENT* |



---

### Appeal from the United States Bankruptcy Court
### for the Western District of Oklahoma

---

Before CLARK, NUGENT, and STARZYNSKI[1], Bankruptcy Judges.

STARZYNSKI, Bankruptcy Judge.

The parties did not request oral argument, and after examining the briefs and appellate record, the Court has determined unanimously that oral argument

---

\*    This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel.  10th Cir. BAP L.R. 8018-6(a).

[1]    The Honorable James S. Starzynski, Bankruptcy Judge for the District of New Mexico, sitting by designation.

would not materially assist in the determination of this appeal. Fed. R. Bankr. P. 8012. The case is therefore ordered submitted without oral argument.

Appellant Oklahoma State Department of Health ("OSDH") appeals the Order of the United States Bankruptcy Court for the Western District of Oklahoma denying OSDH's motion for relief from automatic stay as to Kitt Wakeley, a former officer of the Chapter 7 debtor Medical Management Group, Inc. ("MMGI" or "Debtor") to allow it to continue an administrative action (final accounting) against Mr. Wakeley in state court. For the reasons discussed below, we conclude that the bankruptcy court abused its discretion in denying OSDH's motion for relief from stay as to Mr. Wakeley and, therefore, we REVERSE.

## APPELLATE JURISDICTION

This court, with the consent of the parties, has jurisdiction to hear timely-filed appeals from "final judgments, orders, and decrees" of bankruptcy courts within the Tenth Circuit. 28 U.S.C. § 158(a)(1), (b)(1), and (c)(1). The parties have consented to this court's jurisdiction in that they have not opted to have the appeal heard by the United States District Court for the Western District of Oklahoma. *Id.* § 158(c); 10th Cir. BAP L.R. 8001-1.

Before reaching the merits of this appeal, we must make an initial determination of whether we have jurisdiction. *Bender v. Williamsport Area Sch. Dist.*, 475 U.S. 534, 541 (1986) (a federal appellate court must determine whether it has jurisdiction over an appeal).

"The circuit courts consistently hold that orders granting or denying relief from the automatic stay are appealable final orders." *Eddleman v. United States Dep't of Labor*, 923 F.2d 782, 784 (10th Cir. 1991), *overruled in part on other grounds, Temex Energy, Inc. v. Underwood, Wilson, Berry, Stein & Johnson*, 968 F.2d 1003 (10th Cir.1992). *See also United States v. Fleet Bank (In re Calore Express Co., Inc.)*, 288 F.3d 22, 34 (1st Cir. 2002) (the denial of a stay motion may be a final order if it decides the relevant dispute between the parties.); *FDIC*

*v. Niagara Mohawk Power Corp. (In re Megan-Racine Assocs., Inc.)*, 102 F.3d 671, 675 (2d Cir. 1996) (denial of stay motion is final in 2d circuit); *Crocker Nat'l Bank v. American Mariner Indus., Inc (In re American Mariner Indus., Inc.)*, 734 F.2d 426, 429 (9th Cir. 1984) (BAP order affirming an order that denies stay relief is a final order), *overruled in part on other grounds, United Sav. Ass'n v. Timbers of Inwood Forest Assocs., Ltd.*, 484 U.S. 365, 368 (1988); *Grundy Nat'l Bank v. Tandem Mining Corp.*, 754 F.2d 1436, 1439 (4th Cir. 1985) (an order denying relief from the automatic stay is a final appealable order), *overruled in part on other grounds, Timbers*, 484 U.S. at 368; *Aetna Life Ins. Co. v. Leimer (In re Leimer)*, 724 F.2d 744, 745 (8th Cir. 1984) (order denying relief from stay is a final order).

> The grant of relief from the automatic stay is the equivalent of the lifting of a preliminary injunction; the denial of such relief is the opposite. Congress has specifically directed that orders granting or denying preliminary injunctions be deemed final for purposes of appellate review of district court orders. *See* 28 U.S.C. § 1292(a). The grant or denial of relief from the automatic stay implicates the same factors. In either case, important rights of the parties may be preserved or dissipated. . . . Most important, as in other instances where orders have been deemed final, it is fair to say that with respect to the issues before the court, nothing remains to be done.

*Banc of America Commercial Fin. Corp. v. CGE Shattuck, LLC (In re CGE Shattuck, LLC)*, 255 B.R. 334, 336 (1st Cir. BAP 2000). In our case, nothing remains to be done by the court on the Stay motion.

The *American Mariner* case provides additional support for finding that stay orders deserve special consideration as final orders:

> A threshold issue presented by this case . . . is whether a decision of the appellate panel affirming an order that denies relief from the automatic stay is final for the purpose of this court's jurisdiction. We think it is. In reaching this conclusion, we adopt the reasoning of the court in *In re Regency Woods Apartments, LTD*, 686 F.2d 899, 902 (11th Cir. 1982). In *Regency*, the court initially observed that the collateral order doctrine and *Forgay-Conrad* rule appeared to apply to a district court order granting relief from the automatic stay. More important, the court also noted the provisions of the Bankruptcy Code for expedited and ex parte proceedings on complaints for relief from the automatic stay. From these provisions the court concluded, and we agree, that Congress intended the courts

> to conclusively and expeditiously adjudicate, apart from the
> bankruptcy proceedings as a whole, complaints for relief from the
> automatic stay. Immediate appeal from decisions of the bankruptcy
> appellate panel is plainly necessary to fulfill such congressional
> intent. We hold, therefore, that decisions of the bankruptcy courts
> granting or denying relief from the automatic stay under section
> 362(d) are final decisions reviewable by this court.

*American Mariner*, 734 F.2d at 429 (citations omitted). We agree with this

reasoning. We therefore find that the bankruptcy court's denial of the Stay

motion was a final order over which we have jurisdiction.

Furthermore, as discussed in more detail below, to the extent that the

bankruptcy court's Order imposed an injunction under 11 U.S.C. § 105(a)[2]

preventing OSDH from proceeding against Mr. Wakeley in state court, such an

order is also a final order, or an interlocutory order over which it is appropriate to

grant leave to appeal. 28 U.S.C. §§ 158(a)(1) & (3) & 1292(a)(1); Fed. R. Bankr.

P. 8003.

## BACKGROUND[3]

In 1999, Mr. Wakeley was appointed as a temporary manager for three

Oklahoma nursing homes. At the time he was associated with the Debtor, an

Oklahoma corporation.[4] In May 2000, an Order was entered by the state court

removing him as the temporary manager. Under Oklahoma statutes, a temporary

manager must render an accounting within 30 days of being removed.[5] Wakeley

---

[2]     Unless otherwise stated, all future statutory references are to title 11 of the
United States Code.

[3]     OSDH's statement of facts generally does not cite to the record. This
makes the job of the reviewing court much more difficult than it needs to be. *See,
e.g.*, Brief of Appellant at 6-7 (Only one reference to the record on each page).
The Court therefore had to search the appendix to find the sources of some of
OSDH's factual claims.

[4]     The parties dispute whether the appointment of Mr. Wakeley was in his
individual capacity or as the agent of the Debtor. We do not need to resolve that
dispute in order to decide this appeal.

[5]     Okla. Stat. tit. 63, § 1-1914.2(L) provides:

                                                            (continued...)

submitted an accounting on June 5, 2000, but it failed to satisfy OSDH's requirements. On October 26, 2000 an Administrative Law Judge ordered Wakeley "to immediately turn over the funds in his possession derived from the operation of Cyril and Rosewood to Rex Hodges, the current temporary manager of Rosewood and Cyril." (Appellant's App. at 0048.) Wakeley did not comply with this order. On December 22, 2000, the Administrative Law Judge entered Findings of Fact and ordered:

> IT IS THEREFORE ORDERED, ADJUDGED AND DECREED that Kitt Wakely [sic] has not properly accounted for all of the funds that came into his possession and control as temporary manager and that he has not shown that all expenditures were reasonable and proper.

> IT IS FURTHER ORDERED, ADJUDGED AND DECREED that Kitt Wakely's [sic] request for management fees is denied.

> IT IS ADDITIONALLY ORDERED, ADJUDGED AND DECREED that the Applicants[6] are authorized to proceed with an action in the District Court against Kitt Wakely [sic] and Medical Management Group, Inc. for contempt of court for willfully violating the lawful orders of the Oklahoma State Department of Health, and for damages for breach of fiduciary duty and gross negligence.

(Appellant's App. at 0052.)

The Debtor filed its Chapter 11 petition on May 1, 2001. On that date, the

---

[5]     (...continued)
(2) Within thirty (30) days after release, the temporary manager shall give the Department a complete accounting of all property of which the temporary manager has taken possession, or all funds collected, and of the expenses of the temporary managership.
(3) After a complete accounting, and payment of reasonable expenses incurred as a result of the temporary managership, the Commissioner shall order payment of the surplus to the owner. If funds are insufficient to pay reasonable expenses incurred as a result of the temporary managership, the owner shall be liable for the deficiency. Any funds recovered from the owner shall be used to reimburse any unpaid expenses due and owing as a result of the temporary managership.

[6]     The Order defines the "Applicants" as the OSDH, No-More Associates, L.P., O.K. Properties, L.P. and Rex Hodges (Temporary Manager for Cyril Nursing Homes and Rosewood Manor Nursing Home). No-More Associates, L.P. and O.K. Properties, L.P. are owners/lessors of the real property at Rosewood and Cyril.

-5-

Debtor held $642,000 in its bank accounts, and it listed these funds in its Schedules as assets. Almost all the funds were derived from Mr. Wakeley's operation of the nursing homes.

The bankruptcy court granted the Debtor's motion to appoint a trustee, and Joel Hall was appointed trustee on May 10, 2001. Mr. Hall filed a motion to convert the bankruptcy case from Chapter 11 to Chapter 7. This motion was granted, and Mr. Hall was appointed Chapter 7 trustee.

On October 2, 2001, OSDH filed its "Motion to Dismiss Certain Fiduciary Funds from the Bankruptcy Estate for Lack of Jurisdiction" ("Fiduciary motion"). The Trustee, and creditors Rex Hodges (successor temporary manager to Kitt Wakeley), Internal Revenue Service, and Kitt Wakeley objected. The legal theory for the Fiduciary motion was that the funds on deposit were trust funds and not part of the bankruptcy estate. The bankruptcy court heard oral argument on the motion, and took the matter under advisement. On March 13, 2002, the Court entered an order concluding that the funds were property of the bankruptcy estate and denied the Fiduciary motion.

On March 25, 2002, OSDH filed its "Motion to Dismiss Proceeding, or in the Alternative, for a Rehearing of the Order Denying Abandonment with Memorandum Brief in Support" ("Dismissal motion"). OSDH alleged that there was newly discovered evidence that justified either dismissal of the Chapter 7 case, or a granting of the relief sought in the Fiduciary motion. The trustee and Kitt Wakeley objected. The bankruptcy court denied the Dismissal motion. OSDH appealed that order to the United States District Court for the Western District of Oklahoma, where it is still pending. The parties are stayed from proceeding against the funds pending further orders of the District Court.

On August 30, 2002, OSDH filed its "Motion for Relief from the Automatic Stay as to Kit Wakely [sic]" ("Stay motion") seeking to proceed with a pending regulatory action in the Oklahoma State District Court. OSDH asked the court to

-6-

lift the automatic stay as to Mr. Wakeley, or declare that the automatic stay did not apply to regulatory actions against him in regard to his role as a temporary manager of the nursing homes. Specifically, the Stay motion only sought relief against "Wakely [sic] in regard to his role as a temporary manager of the Cyril and Rosewood nursing homes . . . ." (Appellant's App. at 0176.) The Stay motion alleges that "additional regulatory proceedings against Wakely [sic] alone will not create a conflict with MMGI's bankruptcy as those proceedings will not involve a determination of the validity of any debt held by a creditor of MMGI" and "Movant is not attempting to bring any claims against Wakely [sic] which it might file against MMGI's debtor estate – it seeks only a conclusion of its regulatory obligation to complete the accounting mandated by law." (Appellant's App. at 0177, 0179.) Both Kitt Wakeley and the Trustee filed objections to the Stay motion.

Mr. Wakeley claimed that the Stay motion is a third attempt by OSDH to get issues adjudicated in state court and, basically, argues that despite OSDH's claims to the contrary, what it really is doing is attempting to obtain possession of the funds. He also argued that the accounting OSDH seeks will impermissibly impact on his[7] and other claims in the bankruptcy. He acknowledges that normally the automatic stay would not protect him, but in this case he claims that the real party in interest is the Debtor.

The Trustee agreed that normally Mr. Wakeley would not be protected by MMGI's automatic stay, but claimed that this is a situation in which it would be appropriate to extend the stay to a non-debtor. He stated that if OSDH were allowed to proceed against Mr. Wakeley it would adversely affect the administration of the estate and possibly permit OSDH to do indirectly that which

---

[7]    Okla. Stat. tit. 63, § 1-1914.2(H) provides that "The Commissioner shall set the compensation of the temporary manager, who shall be paid by the facility."

the bankruptcy court has already ruled it cannot do. The Trustee alternatively requested that, if the court did lift the automatic stay, that its order be narrowly drawn so as to preclude OSDH from having a carte blanche opportunity to interfere with the bankruptcy court's jurisdiction over property of the estate. He also maintained that the order should "make clear that the stay is not lifted with respect to any property of the bankruptcy estate or property from the estate or exercising control over property of the estate, including but not limited to the funds held by the Trustee or the books and records of the Debtor, or any act which may otherwise interfere with the Trustee's administration of the bankruptcy estate." (Appellant's App. at 0203.)

The bankruptcy court heard the Stay motion on October 16, 2002 and orally ruled:

> The facts in the present case, of course, are unusual in that the ultimate issue, it seems to this Court, is the issue that's on appeal to the District Court at this time; and, that is, whether the funds which are included in the schedules of this debtor MMGI do, in fact, constitute property of the estate or whether they do not. . . .
>
> . . . .
>
> . . . [T]he essence of the state court proceeding appears to be, of the regulatory proceeding, appears to be to this Court at least that the state's seeking accounting from Mr. Wakely [sic]. . . .
>
> . . . .
>
> Now, it seems to this Court that in order for Wakely [sic] to render an accounting, the records of MMGI will have to be utilized. . . . [T]hose records all are property of the debtor. . . . And it does seem to the Court that in order to render an accounting, the records of this debtor would have to be utilized. . . .
>
> . . . But it is very difficult to separate what this Court views as being the objective of the state court, that of rendering an accounting, from the claims process in this court and the administration of the estate in this court, assuming, of course, that the funds are ultimately determined by the District Court as being funds of the estate. The *Continental* case does allow the extension of the automatic stay to non-debtor parties where there is an identity of interests. And it seems to this Court that the ultimate issue still is whose funds are those in question, who do they belong to. . . .
>
> And so the Court at the present time has concluded to deny the state's motion without prejudice to reasserting that motion or a similar motion after the appeal is decided. Now, if the appeal is

decided in favor of the state, then that issue, I'm sure, won't come back here. But if it's not, then the Court would suggest that the state seek a, if it determines to seek relief that it do so in a narrow manner so as to ensure that there will be no interference with the bankruptcy process and also so that there would not be a determination of claims in the state court proceeding that ought to be decided in this proceeding.

(Appellant's App. at 0237-41.)

## STANDARD OF REVIEW

The Bankruptcy Appellate Panel may affirm, modify, or reverse a bankruptcy court's judgment, order, or decree, or remand with instructions for further proceedings. Fed. R. Bankr. P. 8013. "For purposes of standard of review, decisions by judges are traditionally divided into three categories, denominated questions of law (reviewable de novo), questions of fact (reviewable for clear error), and matters of discretion (reviewable for 'abuse of discretion')." *Pierce v. Underwood*, 487 U.S. 552, 558 (1988). *See* Fed. R. Bankr. P. 8013. "However, when a court's factual findings are premised on improper legal standards or on proper ones improperly applied, they are not entitled to the protection of the clearly erroneous standard, but are subject to *de novo* review." *Osborn v. Durant Bank & Trust Co. (In re Osborn)*, 24 F.3d 1199, 1203 (10th Cir. 1994).

The denial of a motion for relief from automatic stay is reviewed for abuse of discretion. *Franklin Sav. Ass'n v. Office of Thrift Supervision*, 31 F.3d 1020, 1023 (10th Cir. 1994) (*citing Pursifull v. Eakin*, 814 F.2d 1501, 1504 (10th Cir. 1987)). The denial or imposition of an injunction also is reviewed for abuse of discretion. *See, e.g., Hawkins v. City & County of Denver*, 170 F.3d 1281, 1292 (10th Cir. 1999).

A court abuses its discretion when it relies upon clearly erroneous findings of fact or when it improperly applies the law or uses an erroneous legal standard. *In re Marvel Entm't Group, Inc.*, 140 F.3d 463, 470 (3rd Cir. 1998); *Mapother & Mapother, P.S.C. v. Cooper (In re Downs)*, 103 F.3d 472, 480-81 (6th Cir. 1996).

"Under this standard, we will not disturb a bankruptcy court's decision unless we have a definite and firm conviction that the bankruptcy court made a clear error of judgment or exceeded the bounds of permissible choice under the circumstances." *United States v. Berger (In re Tanaka Bros. Farms, Inc.)*, 36 F.3d 996, 998 (10th Cir. 1994).

## DISCUSSION

The issue before the Court is whether the bankruptcy court abused its discretion in denying OSHA's Stay motion, thus enjoining proceedings against Mr. Wakeley. We conclude that the bankruptcy court erred in denying the Stay motion, because Mr. Wakeley is not entitled to a stay of the state court proceedings as a result of the Debtor's Chapter 7 case as a matter of law and the record in this case.

When a debtor files bankruptcy, it is automatically entitled, subject to certain express exceptions, to the protection of the automatic stay set forth in section 362(a). This section provides, in relevant part, that:

> Except as provided in subsection (b) of this section, a petition filed under section 301 . . . operates as a stay, applicable to all entities, of–
>
> (1) the commencement or continuation, including the issuance or employment of process, of a judicial, administrative, or other action or proceeding against the debtor that was or could have been commenced before the commencement of the case under this title, or to recover a claim against the debtor that arose before the commencement of the case under this title;
> . . .
>
> (3) any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate; . . . .

11 U.S.C. § 362(a). Although the scope of the automatic stay set forth in this section is broad, the clear language of the statute only protects debtors. *Otoe County Nat'l Bank v. W & P Trucking, Inc.*, 754 F.2d 881, 883 (10th Cir. 1985). The stay in section 362(a) may not be invoked by nondebtors who are related to the Debtor in some way. *McCartney v. Integra Nat'l Bank North*, 106 F.3d 506,

-10-

509-10 (3rd Cir. 1997); *Teachers Ins. and Annuity Ass'n of Am. v. Butler*, 803
F.2d 61, 65 (2nd Cir. 1986); *Fortier v. Dona Anna Plaza Partners*, 747 F.2d
1324, 1329-30 (10th Cir. 1984). *See also Provincetown Boston Airline, Inc. v.
Miller (In re Provincetown Boston Airline, Inc.)*, 52 B.R. 620, 624 (Bankr. M.D.
Fla. 1985) (The protection afforded by § 362 of the Bankruptcy Code is not
available to non-debtors even if they are affiliated with a debtor.); *In re Arrow
Huss, Inc.*, 51 B.R. 853, 856 (Bankr. D. Utah 1985) ("It is well settled that
Section 362 of the Bankruptcy Code, which stays actions against the debtor and
against property of the estate, does not forbid actions against its nondebtor
principals, partners, officers, employees, co-obligors, guarantors, or sureties.").
*Cf.* 11 U.S.C. §§ 1201 and 1301 (affirmatively providing stay protection for co-
debtors in Chapters 12 and 13). Therefore, the automatic stay does not apply to
actions by OSDH against Mr. Wakeley, a nondebtor, and any injunction
thereunder resulting from the bankruptcy court's denial of the Stay motion was in
error.[8]

In certain circumstances, however, bankruptcy courts have enjoined actions
against non-debtors through application of section 105(a), which provides: "The
court may issue any order, process, or judgment that is necessary or appropriate to
carry out the provisions of this title." 11 U.S.C. § 105(a); *see, e.g., Landsing
Diversified Properties-II v. First Nat'l Bank & Trust Co. (In re Western Real
Estate Fund, Inc.)*, 922 F.2d 592, 599 (10th Cir.) ("'[s]ection 105(a) has been
widely utilized in attempts to enjoin court proceedings against nondebtor parties
that allegedly will have an impact on the debtor's bankruptcy case.'") (quoting 2
*Collier on Bankruptcy* ¶ 105.02 (15th ed. 1990)), *modified on other grounds, Abel
v. West*, 932 F.2d 898 (10th Cir. 1991); *accord A.H. Robins Co., Inc. v. Piccinin*

---

[8]    Because the automatic stay of § 362(a) does not apply, we need not discuss
the exceptions of § 362(b), or OSDH's claim that the bankruptcy court failed to
apply *Eddleman v. United States Dep't of Labor*, 923 F.2d 782 (10th Cir. 1991).

-11-

*(In re A.H. Robins Co., Inc.)*, 788 F.2d 994, 1002 (4th Cir. 1986); *TRS, Inc. v. Peterson Grain & Brokerage Co., Inc. (In re TRS, Inc.)*, 76 B.R. 805, 809 (Bankr. D. Kan. 1987); *Otero Mills, Inc. v Security Bank & Trust (In re Otero Mills)*, 25 B.R. 1018, 1020 (D. N.M. 1982). Although the language of section 105 is broad, relief under this section is "extraordinary." *Arrow Huss*, 51 B.R. at 857. Furthermore, section 105 may only be used to protect a debtor's interests: "unless this extension [of the automatic stay] is designed to protect the debtor's interests, it cannot be granted." *GAF Corp. v. Johns-Manville Corp. (In re Johns-Manville Corp.)*, 26 B.R. 405, 415 (Bankr. S.D.N.Y. 1983), *aff'd*, 40 B.R. 219 (S.D.N.Y. 1984); *accord Western Real Estate Fund*, 922 F.2d at 599. "[T]he pivotal question is whether the *debtor* will suffer irreparable harm if the proceedings against the nondebtor go forward. It is the debtor's interests, and not the interests of nondebtors, which the extraordinary powers of § 105 are designed to protect." *Glassman v. Electronic Theatre Restaurants Corp. (In re Electronic Theatre Restaurants Corp.)*, 53 B.R. 458, 462 (N.D. Ohio 1985) (emphasis in original); *accord Western Real Estate Fund*, 922 F.2d at 599; *see also Celotex Corp. v. Edwards*, 514 U.S. 300, 308 (1995) (bankruptcy court has no jurisdiction over actions that have no effect on the debtor).

The relief available under section 105 is in the nature of an injunction and is governed by the principles that govern injunctions in general. *Western Real Estate Fund*, 922 F.2d at 599; *Provincetown Boston Airline, Inc.*, 52 B.R. at 624. The United States Court of Appeals for the Tenth Circuit has established that the party seeking an injunction must prove:

> "(1) a substantial likelihood of prevailing on the merits; (2) irreparable harm unless the injunction is issued; (3) [that] the threatened injury outweighs the harm that the preliminary injunction may cause the opposing party; and (4) [that] the injunction, if issued, will not adversely affect the public interest."

*Greater Yellowstone Coalition v. Flowers*, 321 F.3d 1250, 1255 (10th Cir. 2003) (quoting *Fed. Lands Legal Consortium ex rel. Robart Estate v. United States*, 195

-12-

F.3d 1190, 1194 (10th Cir. 1999)). *See also Commonwealth Oil Refining Co.,
Inc. v. United States Envtl. Prot. Agency (In re Commonwealth Oil Refining Co.,
Inc.)*, 805 F.2d 1175, 1189 (5th Cir. 1986) (same four factors needed to issue
§ 105 stay.)

 The record before this Court indicates that Mr. Wakeley did not meet his
burden of proving that he was entitled to a § 105(a) injunction. Indeed, it does
not appear that he presented any evidence needed to make such findings. And,
presumably this could only be done in an adversary proceeding. *See* Fed. R.
Bankr. P. 7001(7); S*tate Bank v. Gledhill (In re Gledhill)*, 76 F.3d 1070, 1077
(10th Cir. 1996).

 The bankruptcy court expressed its concern that the administrative
proceeding would impact administration of the estate. This concern cannot
override the general rule that the automatic stay does not protect non-debtors, and
that a section 105(a) injunction cannot be issued based on a record such as the
one in this case. Furthermore, as the Trustee suggests in his brief, any order can
be tailored to ensure that the estate is minimally impacted. Thus, for instance,
nothing prevents creditors from obtaining the Debtor's records pursuant to valid
discovery requests not made for the purpose of collecting from the debtor or
property of the estate. *In re Hillsborough Holdings Corp.*, 130 B.R. 603, 605
(Bankr. M.D. Fla. 1991).

 The Court finds that the bankruptcy court's reliance on *Gillman v.
Continental Airlines, Inc. (In re Continental Airlines)*, 177 B.R. 475 (D. Del.
1993) was misplaced. First, *Continental* involved an ongoing reorganization
under Chapter 11, unlike the liquidation in this case. *See Celotex*, 514 U.S. at
310 (bankruptcy court's jurisdiction in context of § 105 injunction is more limited
in Chapter 7 cases than in Chapter 11 cases). Second, the *Continental* court found
not only that there was an "identity of interest" between the debtor and the non-
debtor such that the debtor was the real party in interest, but also that the

-13-

litigation would "directly affect the debtor and, more particularly, the debtor's assets or its ability to pursue a successful plan of reorganization." *Continental*, 177 B.R. at 479. In our case the accounting would affect Mr. Wakeley but not the funds, which are under the control and supervision of the Chapter 7 trustee. Finally, the *Continental* court found that the allegations were that Continental itself was the alleged wrongdoer. In our case, OSDH seeks an accounting from Mr. Wakeley and a review of his actions. OSDH does not claim that the Debtor owed or breached any fiduciary duties.

## CONCLUSION

For the reasons stated above, the bankruptcy court abused its discretion in enjoining OSDH's litigation against Mr. Wakeley. Accordingly, the bankruptcy court's Order is REVERSED.

FILED

2:45 pm, 10/17/11

Tim J. Ellis
Clerk of Court

## IN THE UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF WYOMING

| | | |
|---|---|---|
| In re | ) | |
| | ) | |
| RED EAGLE OIL, INC., | ) | Case No.   11-20857 |
| | ) | Chapter 11 |
| Debtor. | ) | |

**EXHIBIT**

G

## ORDER DENYING DEBTOR'S MOTION TO EXTEND AUTOMATIC STAY OR GRANT PRELIMINARY INJUNCTION TO THE SHAREHOLDERS/OFFICERS

On October 4, 2011, this matter came before the court for an evidentiary hearing

on the Motion to Extend Automatic Stay or Grant Preliminary Injunction filed by Red

Eagle Oil, Inc. ("Debtor"), and the objections filed by CHS, Inc. ("CHS"), DATS

Trucking ("DATS"), Equitable Oil Purchasing Company ("Equitable"), Wyoming

Refining Company ("WRC"), Wells Fargo Equipment Finance ("Wells Fargo"), and the

limited objection filed by ExxonMobil Oil Corp. (ExxonMobil").  After opening

statements, the parties stipulated to a continuance for the purpose of resolving the matter.

The court rescheduled the hearing to October 13, 2011 where it heard testimony and

received evidence.  At the conclusion of the hearing, the court took the matter under

advisement.  Upon reviewing the record, testimony and evidence, the court denies the

motion.

The Debtor requests that the court extend the automatic stay to include its

shareholders/officers ("Officers"): Dale Hinze, Judith Hinze, Bryan Hinze, Brad Hinze

and Scott Hinze.  Alternately, the Debtor requests that the court grant an injunction to

halt all civil litigation against the Officers for guarantees that each signed on behalf of the

Debtor.

**Facts:**

  The Debtor filed for Chapter 11 bankruptcy protection on August 1, 2011. Prior to

filing, the following civil litigation was pending:

1.  DATS Trucking, Inc. v. Red Eagle Oil, Inc., A Wyoming corporation; Bryan Hinze, individually...and Dale Hinze, individually, filed on May 18, 2011 in the United States District Court for the District of Wyoming;

2.  Equitable Oil Purchasing Company, vs. Dale Hinze, individually, Hinze, Inc., a Wyoming Corporation and Red Eagle Oil, Inc., A Wyoming Corporation f/k/a Hinze Inc., filed on May 18, 2011 in the Fifth Judicial District Court, County of Park, State of Wyoming;

3.  Hermes Consolidated Inc., a Delaware corporation, d/b/a Wyoming Refining Company vs. Red Eagle Oil, Inc., A Wyoming corporation, f/k/a Hinze, Inc. d/b/a Hinze Oil Company and Brad Hinze, an individual, filed on June 7, 2011 in the United States District Court for the District of Colorado; and,

4.  Sapp Bros., Inc. and Sapp Bros. Travel Centers, Inc. vs. Red Eagle Oil Inc. and Dale Hinze, filed on June 15, 2011 in the Fifth Judicial District Court, County of Park, State of Wyoming.

  Subsequent to the Debtor filing its bankruptcy petition, the following civil cases

were filed:

5.  Big D Oil Co., ...vs. Dale A. Hinze, Bradley A. Hinze, and Bryan A. Hinze, filed on August 10, 2011 in the Fifth Judicial District Court, County of Park, State of Wyoming; and,

6.  CHS Inc.,...vs. Brad Hinze, Bryan A. Hinze, Dale A Hinze and Scott A. Hinze, filed on September 6, 2011 in the United States District Court for the District of Wyoming.

  At the initiation of the Debtor's bankruptcy filing, the automatic stay became

effective regarding the litigation against the Debtor. Certain officers were named as co-

defendants, due to their capacities as "guarantors" in the separate cases. Judgments have

been entered in some of the cases against these guarantors. The other cases are in various

stages of litigation.

Mr. Bryan Hinze ("Bryan") is the vice president, a shareholder and an employee of

the Debtor. He testified that the Officers each signed numerous guarantees to vendors

that provided goods and services to the Debtor. If the individual Officers are not granted

the protection of the automatic stay upon the Debtor filing for bankruptcy, litigation is

and will be pursued against the Officers.

Bryan testified about what he considered the vital and crucial roles that each

Officer has in the Debtor's business operation. He testified that the operation of the

Debtor's business and compliance with the requirements of the chapter 11 bankruptcy

case is consuming and requires all his time and the time of the other Officers' and that the

pending litigations are a distraction and take his and the other Officers attention away

from the operation of the Debtor and its reorganization. Bryan testified that Dale Hinze,

his father, was recently hospitalized, and not able to work as much as in the past. Judy

Hinze, married to Dale, has also signed numerous guarantees. Bryan testified that she has

a vital role in the Debtor's operations as she prepares tax reports and supervises drivers'

compliance with the regulations. However, Mrs. Hinze was not involved in any pending

litigation at the time of the hearing.

Bryan testified that the Debtor intends to sell the convenience store operation,

continue the transportation operation, and pay creditors. He also testified that Officers

are shareholders of other entities related to the Debtor. It is Bryan's intent that the

Page 3

transfer or sale of the other entities' assets, would be used to fund a proposed plan of reorganization for the Debtor. Bryan testified that he does not have the personal assets to pay the claims incurred by the Debtor, for which he signed guarantees.

Bryan admitted upon cross examination that he has been able to perform his job duties since the bankruptcy was filed and as the litigation has proceeded. Bryan testified that the Debtor has a motion pending before the court to employ Matrix[1] for the purpose of selling the Debtor's convenience store operations as part of its attempt to reorganize. The time frame for the potential sale was from 18 weeks to five or six months. Bryan testified regarding the Debtor's financial projections for October to December, 2011. Based largely upon the expanding business operations in North Dakota, the Debtor projects that it will have a net profit for that three-month period in the total amount of $211,249.50.[2] Bryan did not provide Debtor's financial projections beyond the end of 2011.

Brad Hinze, ("Brad") testified that the operations in North Dakota, of which he has the major responsibility, is expected to continue to be a stable source of revenue for the Debtor, even in inclement weather. Brad testified that he executed 16 guarantees on behalf of the Debtor and that the pending litigation is disturbing and embarrassing and has affected his family. Brad testified that he has worked for and intends to continue

---

[1] Application to Employ Matrix Private Equities Inc. as Financial Adviser, filing on October 3, 2011 by the Debtor.

[2] Projections include net monthly profits of:

| | |
|---|---|
| October 2011 | $120,058.05 |
| November 2011 | $62,987.71 |
| December 2011 | $28,203.74. |

Page 4

work as an employee of the Debtor. Both Bryan and Brad admitted that Dale Hinze, in spite of the recent medical issues, is working at least part time.

<u>Extending the automatic stay under §362</u>

The Bankruptcy Code stays actions against the debtor and against property of the estate but does not forbid actions against its non-debtor principals, partners, officers, employees, co-obligors, guarantors or sureties.[3] The stay in §362(a) may not be invoked by non-debtors who are related to the debtor in some way.[4] The court finds that the automatic stay of §362(a) does not apply to the non-debtors of this case.

<u>Granting an injunction under §105</u>

Bankruptcy courts have enjoined actions against non-debtors through the application of §105(a), which states, "The court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."[5]  A court may rely upon its equitable power under 11 U.S.C. §105(a) for specific injunctive relief. Section 105(a) has been widely utilized in attempts to enjoin court proceedings against non-debtor parties that allegedly will have an impact on the debtor's bankruptcy case. Such attempts require a case-by-case determination as to whether any particular action excepted from the automatic stay will result in sufficient harm or interference with

---

[3] *In re Arrow Huss, Inc.*, 51 B.R. 853 (Bankr. Utah 1985).

[4] *In re Medical Management Group, Inc.*, BAP No. WO-03-004, 2003 Bankr. LEXIS 678 (10th Cir. B.A.P 2003).

[5] 11 U.S.C. § 105(a).

the bankruptcy case to warrant the issuance of a specific injunction.[6]  Relief under this

section is "extraordinary" and may only be used to protect debtor's interests.  Unless the

extension of the automatic stay is designed to protect the debtor's interest, it cannot be

granted.  The pivotal question is whether the debtor will suffer irreparable harm if the

proceedings against the non-debtor go forward.  It is the Debtor's interests, not the

interests of non-debtors that § 105 is designed to protect.[7]  The party seeking an

injunction must prove: (1) substantial likelihood of prevailing on the merits; (2)

irreparable harm unless the injunction is issued; (3) the threatened injury outweighs the

harm that the preliminary injunction may cause the opposing party; and (4) the injunction

if issued, will not adversely affect the public interest."[8]

The record before this court indicates that the Officers did not meet the burden of

proving that they were entitled to an injunction.  The testimony presented does not

establish a substantial likelihood of prevailing on the merits.  Both witnesses testified

regarding the Debtor's intent to sell portions of its operations and pay creditors.  The

financial projects were only presented through the end of this year.  Bryan testified about

his concerns of a drop in revenue in the early months of next year based upon the cyclical

business of the convenience stores.  The court finds that the retention of Matrix and the

---

[6] *In re TRS, Inc., 76 B.R. 805 (Bankr. D. Kan 1987) and, In re CCDC Financial Corporation et al, 135 B.R. 423, (Bankr. D.Kan. 1992).*

[7] *In re Medical Management Group, Inc.,* BAP NO WO-03-004, 2003 Bankr. LEXIS 678, (10th Cir. BAP, June 27, 2003).

[8] *Greater Yellowstone Coalition v. Flowers,* 321 F.3d 1250, 1255 (10th Cir. 2003) *(quoting Fed. Lands Legal Consortium ex rel. Robert Estate v. United States,* (195 F.3d 1190, 1194 (10th Cir. 1999).

sale of Debtor's assets was speculative and not supported by evidence of intended marketing efforts or plans.

The court does not find that the Debtor will suffer irreparable harm. The harm of litigation may be experienced by the individual guarantors, not the Debtor. The court concedes that the pending litigation on the individual Officers, is stressful. However, the witnesses' testimony indicates that the Officers are working to reorganize the Debtor. As the court finds that the threatened harm is not directed at the Debtor, but toward the Officers that signed the guarantees, there is not any need to analyze the balancing of harms. The court also finds that the public interest will not be adversely affected. Contrarily, the court is concerned about granting injunctive relief to individuals with assets, that are not under the jurisdiction and control of the court's reach.

Section 105 jurisdiction:

Creditors objected to the court's jurisdiction of this matter as the Debtor brought it to the court by motion rather than by filing an adversary proceeding. The Fed. R. Bankr. P. 7001(7) provides that a proceeding "to obtain an injunction or request other equitable relief" is an adversary proceeding governed by Part VII of the Bankruptcy Rules and must be commenced by filing a complaint. The Debtor argued that the purpose of requiring an adversary proceeding to obtain injunctive relief is to provide due process safe-guards to all the parties. The Debtor argues that the court should waive the requirement that the request for injunctive relief be brought by an adversary as, in reality, all the due process requirements were provided as evidenced by the objections filed and the participation of

the creditors at the hearing. The court in *Riding*, which was a proceeding to compel turnover of property, held that the Chapter 11 debtor's motion to enjoin action against its officers failed to properly invoke the jurisdiction of the bankruptcy court. The Bankruptcy Court's powers, although very broad, must be exercised in accordance with the procedural requirements of the Code and Rules.[9] Therefore, the court finds that the Debtor's motion is improperly before this court.

The court finding that the provisions of the automatic stay under §362(a) are not applicable to the Officers; that the request for injunctive relief could only be brought before the court by an adversary proceeding; and, that the non-debtors did not meet the burden of proving that they were entitled to a §105 injunction, denies the motion.

THEREFORE IT IS ORDERED that the Motion to Extend Automatic Stay or Grant Preliminary Injunction is DENIED.

DATED this __17__ day of October, 2011.

By the Court

HONORABLE PETER J. MCNIFF
United States Bankruptcy Judge

cc:
Brad Hunsicker
John Coppede
Tim Stubson
Craig Silva
Andrew Petri
Francis Lawall
Isaac Sutphin
Jeffrey Boldt
Ethan Birnberg

---

[9] *In re Riding*, 44 B.R. 846 (Bankr. Utah, 1984).

Page 8