Bradley T. Hunsicker (Wyo. Bar 7-4579)
**MARKUS WILLIAMS YOUNG & ZIMMERMANN LLC**
106 East Lincolnway, Suite 300
Cheyenne, WY  82001
Telephone: 307-778-8178
bhunsicker@markuswilliams.com

# UNITED STATES BANKRUPTCY COURT
# DISTRICT OF WYOMING

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| POWELL VALLEY HEALTH CARE, INC., | ) | Case No. 16-20326 |
| | ) | |
| Debtor-in-Possession. | ) | |

## MOTION OF THE DEBTOR FOR AUTHORIZATION
## TO CONDUCT RULE 2004 EXAMINATION OF THE
## MALPRACTICE INSURANCE COMPANIES

Powell Valley Health Care, Inc. ("**PVHC**", or the "**Debtor**"), the debtor and debtor in possession in the above captioned case, hereby moves (the "**Motion**") for an order pursuant to Rule 2004 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**") and Rule 2004-1 of the Local Bankruptcy Rules (the "**Local Rules**") authorizing issuance and service of a subpoena *duces tecum* upon UMIA Insurance, Inc. ("**UMIA**"), Lexington Insurance Company ("**Lexington**"), and Homeland Insurance Company of New York ("**Homeland**") (collectively, the "**Insurance Companies**") and authorizing PVHC to examine various officials within the Insurance Companies or any other designated representative(s) of the Insurance Companies. In support hereof, PVHC states as follows:

## I.  INTRODUCTION

1. PVHC needs to obtain information that will enable it to better assess its past, current, and potential liabilities and potential recoveries on malpractice insurance policies issued by the Insurance Companies. The Insurance Companies have issued liability policies, including for professional responsibility as described below (hereafter called the "**Malpractice Policies**"). In order to formulate a plan of reorganization and to adequately prepare a disclosure statement PVHC needs to better understand its ability to recover on the Malpractice Policies issued by the Insurance Companies and the funds which may be available to pay its current and future claimants attached hereto (hereafter the "**Tort Claimants**").

2. For certain claims, the Insurance Companies have failed to comply with the provisions of the Insurance Policies, leaving PVHC to defend against numerous malpractice claims made by the Tort Claimants. The Tort Claimants have made claims against PVHC totaling approximately $80 million. The Insurance Companies have taken positions contrary to Wyoming law and may also be liable for bad faith denial on the Insurance Policies. While a declaratory judgment action has been commenced, in which the Insurance Companies seek the blessing of the U.S. District Court for the District of Wyoming to deny liability on the Insurance Policies, PVHC seeks information that will enable it to provide this Bankruptcy Court and the creditors with sufficient and adequate information regarding the Insurance Companies' denial of liability and the basis for allocating the potential recoveries in PVHC's plan of reorganization for payments to

current and potential Tort Claimants. To obtain the information necessary, PVHC proposes the issuance of subpoenas, interrogatories, request for production of documents, and depositions as described on Exhibit B attached hereto.

3. Attached hereto as **Exhibit A** is a list of the categories of documents PVHC intends to request from the Insurance Companies and **Exhibit B** lists the topics for examination, as well as the phases of the Rule 2004 discovery plan.

4. Consistent with Local Rule 2004-1, if this Motion is granted, the Debtor will issue written interrogatories, request for production of documents or subpoena *duces tecum* for documents listed in Exhibit A no sooner than fourteen (14) days after an order is entered granting this Motion. Further, the Debtor will allow each Insurance Company thirty-five (35) days to response thereto. Within ten (10) days after receipt of responses to the written discovery and documents identified above, the Debtor will coordinate the setting of depositions with each Insurance Company. In the event that the parties cannot agree on the time and place for the examination, the Debtor will provide the Insurance Company with fourteen (14) days notice of the time and place for the examination.

## II. JURISDICTION AND VENUE

5. The Court has jurisdiction over PVHC, its estate, and this matter pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2). Venue in this Court is proper pursuant to 28 U.S.C. §§ 1408 and 1409. The statutory basis for the relief requested herein is Rule 2004 of the Federal

Rules of Bankruptcy Procedure. This Motion is also brought pursuant to Local Rule 2004-1. Pursuant to Local Rule 2004-1, PVHC attempted to obtain a voluntary agreement from the Insurance Companies for the information requested, but none of the Insurance Companies has to date voluntarily agreed to discovery under Rule 2004.

### III. BACKGROUND INFORMATION

6. On May 16, 2016 (the "**Petition Date**"), PVHC filed its voluntary petition (the "**Petition**") under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**"), thereby commencing the above-captioned bankruptcy case (the "**Bankruptcy Case**" or the "**Chapter 11 Case**"). PVHC is authorized to operate its business and manage its properties as a debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

7. PVHC is qualified to do business pursuant to section 501(c)(3) of the United States Internal Revenue Code as a public charity. Its mission is to improve quality of life through excellent healthcare services to the greater-Powell, Wyoming community. In fulfilling its mission statement, PVHC serves a total population of approximately 7,500 people with the highest concentration of the population in Powell, with over 7,000 residents.

8. PVHC operates one of two acute healthcare facilities in Park County, Wyoming (the "**Hospital**") and is over 25 miles driving distance from the closest comparable facility. The Hospital features, among other things, diagnostic imaging

4

services (*i.e.*, MRI, and CT scan), cardiopulmonary services, an intensive care unit, and a maternal child unit. It is also designated as a Community Designated Trauma Hospital.

9. A significant volume of patients make use of the Hospital services each year. In 2014 and 2015 the Hospital had the following activity:

| Type of Patient Care | 2014 | 2015 |
|---|---|---|
| Inpatient Admissions | 596 | 579 |
| Obstetrical Deliveries | 149 | 185 |
| Surgeries | 721 | 570 |
| Emergency Room Patients | 4,402 | 4,329 |
| Outpatient Registrations | 31,017 | 30,143 |
| Laboratory Tests | 65,147 | 49,048 |

10. PVHC relies upon a workforce of approximately 403 employees, including approximately 313 full-time employees, 38 part-time employees and 52 PRN or as-needed employees. In fiscal year 2015, PVHC paid approximately $28,988,000 in salaries and benefits to its employees.

11. In addition to core healthcare services, PVHC provides many goodwill services for the community throughout the year that PVHC believes serve a bona fide community health need. PVHC also conducts health fairs and health screening clinics for cholesterol, diabetes, blood pressure and blood type, and seminars in order to foster better health awareness. PVHC additionally serves as an educational training site for physicians, registered nurses, x-ray technologists, medical technologists, physical

5

therapists, emergency medical technicians, and nursing assistants. PVHC participates in health fairs in order to foster better health awareness in the community. Finally, PVHC directly engages in many other health-related community activities, such as Lamaze, breast feeding, new baby and sibling classes, and CPR training to members of the community.

12. PVHC's contributions to community health are not limited to direct provision of services. It also partners with Heritage Health Center to support and fund the provision of medical services to patient populations with limited/underserved access to the Hospital. PVHC provides further support, both directly and indirectly, to community health and wellness programs, such as: access to mental health services, access to preventive health services, and public transportation.

13. Through its numerous facilities, programs, and projects, PVHC is directly or indirectly responsible for nearly all of Powell's healthcare infrastructure. One of PVHC's most fundamental and critical functions in maintaining Powell's healthcare infrastructure is its active recruitment of healthcare providers, especially physicians, to meet specifically identified community needs. Over the past two years, PVHC has been responsible for bringing approximately ten health providers to the community, including practitioners of emergency medicine, hospitalist services, radiology, obstetrics, family medicine, and orthopedics. Offering direct employment to physicians has become an increasingly important practice tool for hospitals throughout the country. As a result, physicians will often only agree to come to the community if employed directly by PVHC.

## IV.  EVENTS GIVING RISE TO THE BANKRUPTCY FILING

14. Since 2011, PVHC, along with a number of other defendants, has been subject to an onslaught of personal injury lawsuits stemming from a series of procedures performed at the Hospital (the "**Lawsuits**") between 2011 and 2014. Approximately twenty individuals who underwent such procedures have filed the Lawsuits against the PVHC and their treating physician, Dr. Hansen, who is no longer employed at PVHC. It is believed that three additional personal injury lawsuits have been filed against PVHC unrelated to Dr. Hansen (collectively, the above-referenced tort claimants shall be referred to herein as the "**Tort Claimants**").

15. The Lawsuits are being brought by former patients of Dr. Hansen for services rendered in 2013 and prior years. Dr. Hansen has not provided services at the Hospital since 2013. The Lawsuits have nothing to do with the current medical staff nor are they in any way indicative of the quality of care currently being provided by the medical staff and PVHC to its patients.

16. The costs, fees and work needed to litigate the Lawsuits have and will continue to consume considerable time from staff at PVHC and have forced PVHC to consider various alternatives for managing and resolving these lawsuits. This burden is amplified by the fact PVHC's insurers have also commenced litigation against PVHC (the "**Carrier Litigation**"), claiming they have no obligation to defend or cover the underlying Lawsuits notwithstanding that they issued insurance policies which were in force and effect when the underlying claims were filed.

7

17. Although the physician whose work was the subject of the underlying litigation matters is no longer with PVHC, PVHC's potential exposure in connection with the Lawsuits remains and poses a significant threat to its ability to effectively carry out its mission. As the sole community acute care provider in Powell, the pendency of the Lawsuits has affected PVHC's ability to raise the funds necessary to continue to meet the current and future healthcare needs of the community.

18. PVHC faces significant uncertainty as well as administrative and financial burdens in defending the Lawsuits and addressing the Carrier Litigation. PVHC voluntarily filed its Petition with the objective of dealing with the Carrier Litigation and resolving the Lawsuits in a fair, reasonable, and efficient manner while ensuring its long-term stability for the benefit of the community it serves.

19. The following policies were issued by the Insurance Companies and constitute property of PVHC's estate:

    a. Policy Number 6793042 issued by Lexington. The policy period began August 1, 2012 and had a stated expiration date of August 1, 2013 (with potential for extension). The policy had a limitation of $1 million per claim and aggregate of $3 million. In addition, there is excess policy coverage of $10 million per claim and $10 million aggregate.

    b. Policy Number: MPP-5514-13 issued by Homeland. The policy period began August 1, 2013 and had a stated expiration date of August 1, 2014 (with potential for extension thereof). The policy had a limitation of $1 million

per claim and aggregate of $3 million. In addition, there is excess policy coverage of $12 million per claim and aggregate of $12 million.

      c.      Policy Number WY920017 issued by UMIA. The policy period began August 1, 2014 to August 1, 2015 (with potential for extension thereof). The policy had a limit of $1 million per claim and aggregate of $5 million. In addition there is excess policy coverage of $12 million per claim and aggregate of $12 million.

      d.      Policy Number WY920017 issued by UMIA. The policy period began August 1, 2015 to August 1, 2016 (with potential for extension thereof). The policy has a limit of $1 million per claim and aggregate of $5 million. In addition there is excess policy coverage of $12 million per claim and aggregate of $12 million.

20. As indicated in PVHC's schedules, PVHC believes that as of the Petition Date unsecured claims totaled approximately $350,000.00. The total of the Tort Claimants' Claims asserted against the Debtor is approximately $80 Million. There are potential additional tort claims that could be asserted against PVHC. PVHC currently is attempting to determine the amount of potential additional tort claims that could be asserted.

21. PVHC commenced this Chapter 11 Case to provide a framework for the fair and expeditious resolution of the Lawsuits. Once the Lawsuits are resolved, PVHC will be able to refocus its attention on fulfilling its mission to provide quality healthcare services to its community.

9

## V.     BASIS FOR RELIEF REQUESTED

### A. Legal Standard

20. Rule 2004 of the Bankruptcy Rules authorizes investigation of the acts, conduct, property, liabilities, and financial condition of a debtor, or any matter that may affect the administration of the estate. "As a general rule, examinations under Rule 2004 are allowed for the purpose of discovering assets, examining transactions, and determining whether wrongdoing has occurred." *In re Strecker*, 251 B.R. 878, 882 (Bankr. D. Colo. 2000) (internal citations and quotations omitted). "Necessarily, the scope of Fed. R. Bankr. P. 2004 is extremely broad." *Id.*

21. To that end, Rule 2004 affords the examining party "great latitude." *In re Roman Catholic Church of the Diocese of Gallup*, 513 B.R. 761, 764 (Bankr. D. N.M. 2014) (quoting *In re Handy Andy Home Improvement Ctrs., Inc.*, 199 B.R. 376, 378 (Bankr. N.D. Ill. 1996)). Examination under Rule 2004 "is designed to be a quick 'fishing expedition' into general matters and issues regarding the administration of the bankruptcy case." *Id.* (quoting *In re French*, 145 B.R. 991, 992 (Bankr. D.S.D. 1992)). "Any third party who has a relationship with a debtor may be made subject to a Rule 2004 investigation." *In re Recoton Corp.*, 307 B.R. 751, 755 (Bankr. S.D.N.Y. 2004). The scope of a Rule 2004 examination is broader than what is normally permitted under the discovery rules. *In re Ionosphere Clubs, Inc.*, 156 B.R. 414 (S.D.N.Y 1993) aff'd 17 F.3d 600 (2nd Cir. 1994).

22.     Rule 2004 is also intended to allow the party in interest to determine "the source of any money or property acquired or to be acquired by the debtor for purposes of consummating a plan [of organization]." See Rule 2004(b).

23.     When an adversary proceeding or contested matter is pending, the bankruptcy court may require the examiner to utilize the Federal Rues Civil Procedure. *In re Enron*, 281 B.R. 836, 842-43 (Bankr. S.D.N.Y. 2002). However, if otherwise proper under the circumstances, a discovery request made pursuant to Rule 2004 for the purpose of examining an entity or obtaining information notwithstanding a pending adversary proceeding or contested matter is not automatically precluded. See *In re Buick,* 174 B.R. 299, 305 (Bankr. D. Colo. 1994). Further, a bankruptcy court may allow the 2004 examination for pending collateral litigation where necessary to develop information essential to the administration of the estate – particularly where the collateral litigation has been stayed. *In re Analytical Systems, Inc*. 71 B.R. 408, 413 (Bankr. N.D. Ga. 1987) (Rule 30(b)(6) notice is appropriate procedure under Rule 2004); see also *In re Table Talk*, 51 B.R. 143, 145 (Bkrtcy. D. Mass. 1985).

**B. Basis for Examination of the Insurance Companies**

24.     Again, attached hereto as Exhibit A is a list of the categories of documents PVHC intends to request from the Insurance Companies and Exhibit B lists the topics for examination, as well as the phases of the Rule 2004 discovery plan.

25.     These topics fit squarely within the plain language and purpose of Rule 2004 because they relate to "matter[s] which may affect the administration of the debtor's estate." The validity of the declaration of lack of coverage on the Insurance Policies

11

bears on the ability of PVHC to propose a plan of reorganization to pay creditors including, but not limited to, the Tort Claimants. The nature of the denial of coverage by the insurance carriers is central to determining the pool of resources available to pay the Tort Claimants.

26. Rule 2004 examinations have been allowed for many purposes under the bankruptcy rules. See, e.g., *In re Sutera*, 141 B.R. 539, 541-42 (Bankr. D. Conn. 1992) (permitting trustee to use Rule 2004 to examine creditor regarding its claim); *In re Fearn*, 96 B.R. 135, 138 (Bankr. S.D. Ohio 1989) (noting that Rule 2004 "may properly extend to creditors and third parties who have had dealings with the debtor"). In this instance, PVHC seeks to determine property that may be available for its plan and used to pay Tort Claimants, as well as the extent of PVHC's bad faith insurance denial claim against the Insurance Companies. PVHC is also seeking information from the Insurance Companies which will be necessary to adequately explain to creditors in a disclosure statement the risks and benefits of continued litigation with the Insurance Companies. It is appropriate for a debtor to use Rule 2004 to investigate such matters. See, e.g., *In re Recoton Corp.*, 307 B.R. 751, 756 (Bankr. S.D.N.Y. 2004) (noting that one of the "purposes" of Rule 2004 is to allow parties "to obtain information necessary to determine whether claims beneficial to the estates exist and whether to pursue such claims").

**WHEREFORE**, PVHC respectfully requests entry of an order authorizing, but not directing, PVHC to serve upon the Insurance Companies a subpoena *duces tecum,* to issue the interrogatories, to take the appropriate depositions of witnesses including but not limited to the Rule 30(b)(6) designees on the topics set out in Exhibit B, and to

request production of documents in the categories set forth in Exhibit A attached hereto, and for such other and further relief as is just and proper.

Dated: October 31, 2016.

**MARKUS WILLIAMS YOUNG & ZIMMERMANN LLC**

By: */s/ Bradley T. Hunsicker*
Bradley T. Hunsicker (WY Bar No 7-4579)
John F. Young (Pro Hac Vice)
106 East Lincolnway, Suite 300
Cheyenne, WY 82001
Telephone: 307-778-8178
Facsimile: 307-638-1975
Email: bhunsicker@markuswilliams.com

Counsel for the Debtor and Debtor-in-Possession

## CERTIFICATE OF SERVICE

The undersigned certifies that on October 31, 2016, a copy of the foregoing was served via U.S. Mail, postage prepaid, upon those parties indicated below:

**UMIA Insurance, Inc.**

c/o James T. Burghardt
Timothy M. Swanson
Moye White LLP
1400 16th St., 6th Floor
Denver, CO 80202

**UMIA Insurance, Inc.**

c/o Julie Nye Tiedeken
McKellar, Tiedeken & Scoggin, LLC
702 Randall Avenue
P.O. Box 748
Cheyenne, WY 82003

**Homeland Insurance Company of NY**
c/o Patrick T. Holscher
141 South Center, Suite 500
Casper, WY  82601

**Lexington Insurance Company, Inc.**
Deborah M. Kellam
Lance E. Shurtleff
Hall & Evans, L.L.C.
2015 Central Ave., Suite C
Cheyenne, WY 82001

*/s/Jenny F. Tokuoka*
Jenny F. Tokuoka