Bradley T. Hunsicker (Wyo. Bar 7-4579)
Jennifer Salisbury (Wyo. Bar 7-5218)
**Markus Williams Young & Zimmermann LLC**
106 East Lincolnway, Suite 300
Cheyenne, WY 82001
Telephone: 307-778-8178
bhunsicker@markuswilliams.com

### UNITED STATES BANKRUPTCY COURT
### DISTRICT OF WYOMING

| | |
|---|---|
| In re: | ) Case No. 16-20326 |
| | ) |
| POWELL VALLEY HEALTH CARE, INC. | ) Chapter 11 |
| | ) |
| Debtor-in-Possession. | ) |
| | ) |

### DEBTOR'S OBJECTION TO INSURANCE COMPANIES'
### JOINT MOTION FOR RELIEF FROM STAY

Powell Valley Health Care, Inc. (the "Debtor"), through its undersigned counsel, hereby submits its objection to the *Insurance Companies' Joint Motion for Relief from Automatic Stay to Permit Prepetition Litigation to Continue in the United States District Court for the District of Wyoming, and Notice of Opportunity to Object* [Doc. 354] filed by UMIA Insurance, Inc. ("UMIA"), Lexington Insurance Company, and Homeland Insurance Company of New York (collectively, the "**Insurance Companies**"). In support thereof, the Debtor states as follows:

### BACKGROUND

Since 2011, the Debtor, along with a number of other defendants, has been subject to an onslaught of personal injury lawsuits stemming from a series of procedures performed at the Hospital between 2011 and 2014 (the "**Lawsuits**"). Approximately

{Z0142461/1 }

twenty individuals who underwent such procedures have filed the Lawsuits against the Debtor and their treating physician, Dr. Hansen, who is no longer employed with the Debtor (collectively, the plaintiffs in the Lawsuits shall be referred to herein as the "**Tort Claimants**").  The burden on the Debtor was greatly amplified by the fact the Insurance Companies commenced litigation against the Debtor (the "**Carrier Litigation**") in the United States District Court for the District of Wyoming (the "**District Court**"), claiming they have no obligation to defend or cover the underlying Lawsuits notwithstanding the fact that they issued insurance policies which were in force and effect when the underlying claims were filed.

The District Court designated the Carrier Litigation a "complex case" based upon "the number of parties, the number of issues, the sensitive discovery problems, and the diversity of claims asserted in the pleadings."  Indeed the reasons that the Insurance Companies denied coverage vary from claim to claim; and the Insurance Companies disagree amongst each other whether one or the other should ultimately be responsible for various claims related to the Lawsuits.

No trial has been set in the Carrier Litigation, and it is unlikely that a trial would have been set prior to 2018 *even if the Debtor had not filed bankruptcy*.  Per the Scheduling Order entered by the District Court, the parties anticipated that it would take over nine months to complete fact discovery in the first half of the bifurcated Carrier Litigation.  Expert discovery in the first half of the bifurcated proceeding was not to be concluded until May of 2017.  The deadline to file dispositive motions (for only the first half of the bifurcated proceeding) was also May 2017.  Once the District Court decided

the dispositive motions, the parties were to determine what issues, if any, remained for trial, including the issue of bad faith, and what further discovery would be needed. Based upon the Scheduling Order, the Debtor did not anticipate that a trial would be set in the Carrier Litigation until sometime in 2018 (at the earliest).

Although the Debtor had served its first set of discovery on the Insurance Companies, the Insurance Companies refused to answer even the most basic interrogatories and did not produce any documents showing reasons why they refused coverage on individual claims. It was at the beginning of this already expensive and contentious discovery process that on May 16, 2016, the Debtor filed for relief under Chapter 11 of the Bankruptcy Code. It is undisputed that the commencement of this bankruptcy case stayed the Carrier Litigation as to the Debtor.

The Debtor voluntarily filed its Petition with the objective of dealing with the Carrier Litigation and resolving the Lawsuits in a fair, reasonable, and efficient manner while ensuring its long-term stability for the benefit of the community it serves. The Debtor anticipates filing its plan of reorganization within the next month in which it will establish its plan for restructuring its debts and resolving the Carrier Litigation. The basic outline of the proposed plan will be as follows:

- Debtor will establish a "Personal Injury Trust" for which the Tort Claimants will be the primary beneficiaries;

- Debtor will assign to the trustee of the Personal Injury Trust certain of its rights under the Insurance Policies, which would include the right to defend the Carrier Litigation and to prosecute the bad faith denial claims against the Insurance Companies;

- Following confirmation of the plan, the automatic stay will be lifted and the Tort Claimants will be free to pursue their assigned claims against the Insurance Companies and the other defendants, as well as liquidate their own claims;

- Once liability, if any, of each Tort Claimant against Debtor is determined via final judgment or settlement, the Tort Claimant shall receive its recovery from the pro rata share of funds available to it from the Personal Injury Trust, including his or her recovery, if any, under the Insurance Policies.

Although the details underlying this proposed plan are still being negotiated with the Committee, at least eight of the Tort Claimants (the "Interveners") have already indicated that they would prefer to have a direct stake in the Carrier Litigation as opposed to relying upon the Debtor to defend coverage under the Insurance Policies. These claimants filed a motion to intervene in the Carrier Litigation premised, among other things, on the fact that the Debtor was already in difficult financial straits, that the Debtor may not have sufficient financial resources to defend the Carrier Litigation, and that the Debtor may have to file bankruptcy. The Debtor did not oppose the Interveners' motion to intervene. Although the motion was denied, the Interveners were prescient. The Debtor does not have sufficient resources to defend the Carrier Litigation while at the same time effectively navigate through the oftentimes complex chapter 11 administrative process and negotiate and propose a plan of reorganization.

The Insurance Companies have now filed a motion to lift stay to force the Debtor to continue its defense of the Carrier Litigation. For the reasons stated below, this motion should be denied so that the Debtor can focus its efforts and energy on filing a plan of reorganization with the provisions described above.

**OBJECTION**

A.     **Introduction**

The automatic stay affords "one of the fundamental debtor protections provided by the bankruptcy laws." *Midlantic Nat'l Bank v. New Jersey Dep't of Evntl. Protection*, 474 U.S. 494, 503 (1986).  It maintains the status quo and protects the debtor's ability to formulate a plan for the sale or other disposition of property of the estate. COLLIER ON BANKRUPTCY ¶ 362.03 (16th ed. rev. 2012).  The stay "promot[es] equal creditor treatment and giv[es] the debtor a breathing spell." *In re Pioneer Commercial Funding Corp.*, 114 B.R. 45, 48 (Bankr. S.D.N.Y. 1990).

"The overriding theme in determining whether to grant relief from the stay to permit litigation against Debtor in another forum is the effect of such litigation on the administration of the estate." *In re Danzik*, 549 B.R. 804, 810 (Bankr. D. Wyo. 2016).  Even "slight interference with the administration of the estate may be enough to preclude relief in the absence of a commensurate benefit." *In re Curtis*, 40 B.R. 795, 806 (Bankr. D. Utah 1984).  Thus, in cases in which permitting litigation to go forward would "involve an expenditure or energy and money and detract from the reorganization effort," bankruptcy courts deny requests for relief from the stay.  *Id.*  "Interference by creditors in the administration of the estate, no matter how small, through the continuance of a preliminary skirmish in a suit outside the Bankruptcy Court is prohibited." *In re Penn-Dixie Inds., Inc.*, 6 B.R. 832, 836 (Bankr. S.D.N.Y. 1980); *see also In re Mego Int'l Inc.,*

28 B.R. 324, 326 (Bankr. S.D.N.Y. 1983) (denying motion to lift the automatic stay where the action impacted the "property and administration of [the debtor's] estate.")[1]

The Debtor agrees that the *Curtis* factors are the relevant factors for this Court's determination, but disagrees with the Insurance Companies' analysis of those factors to the facts at issue in this dispute. As an initial matter, the Debtor agrees that the District Court is the proper forum to resolve the Carrier Litigation; however, this factor must be balanced against the harm that would occur if the Court were to lift the stay to allow the Carrier Litigation to go forward in the District Court at this juncture in the case.

The proper application of the *Curtis* factors is as follows:

---

[1] The Insurance Companies claim that "other bankruptcy courts have granted relief from the stay to permit pending pre-peptition coverage litigation to continue." (Motion at 7.) However, the cases cited by the Insurance Companies do not stand for that proposition. First, in *Marlin Leasing Corp. v. Hill (In re Burr Wolff)*, 2007 WL 2964835 *1 (S.D.Tex. 2007), the bankruptcy court *denied* a motion to lift the stay to permit a declaratory judgment action to determine the extent of coverage under an insurance policy to proceed. *Id*. Although the movant appealed the bankruptcy court's decision, the district court vacated the underlying order on other grounds and did not consider the issue of whether the automatic stay should have been lifted or not. *Burr Wolff* does not support the Insurance Companies' position.

Indeed, bankruptcy courts have denied motions to lift stay filed by insurance companies in which they seek to have a prepetition declaratory judgment action to continue in order to determine the company's rights to deny cover under the policy. For example, one bankruptcy court that considered this issue determined that the insurer's suit impacted the property and the administration of the debtor's estate, and that thus the continuance of the stay was proper. *See City Ins. Co. v. Mego Intern'l, Inc. (In re Mego Intern'l Inc.)*, 28 B.R. 324, 326 (Bankr. S.D.N.Y. 1983).

**B.     Application of the *Curtis* Factors**

*1.     Allowing the Carrier Litigation to Proceed in District Court Will Not Resolve Any Issues Within the Debtor's Bankruptcy and Relief from the Stay Will Not Resolve Any Issues in the Carrier Litigation.*

With respect to the first *Curtis* factor, the Insurance Companies claim that the resolution of insurance coverage issues "directly bears on the ability of the Debtor to propose a confirmable plan of reorganization." (Motion at 8.) The Insurance Companies are wrong. As has been the case since the petition date, the Debtor intends to file a plan of reorganization which establishes a trust for the benefit of the Tort Claimants. The Debtor will fund the trust with a certain amount of funds (the amount of which is the basis of current negotiations with the Committee) and will assign to the trustee of the trust certain of its rights under the Insurance Policies. The litigation will then be the responsibility of the trustee and he or she would proceed with the defense and claims in the Carrier Litigation once the Debtor's plan has been confirmed.[2]

Furthermore, as discussed above, the Carrier Litigation has only just begun: no depositions have been taken, experts have not yet been retained, motions for summary judgment are not on file, and trial has not been set. As a practical matter, the Debtor does not have sufficient financial resources to delay filing a plan of reorganization while

---

[2] This type of litigation trust is a typical plan confirmation vehicle that debtors across the country use in a situation such as this one. *See Holywell Corp. v. Smith*, 503 U.S. 47, 55 (1992) (recognizing that the Bankruptcy Code specifically permits a plan of reorganization to create a trust to hold property of the estate and to give a trustee control of the property); *Whyte v. Pricewaterhouse Coopers LLP*, 2011 WL 1104527 (N.D.Okla. 2011) (discussing a federal court's "related to" jurisdiction over post-confirmation actions brought by a litigation trustee); *see also* THE LITIGATION TRUSTEE: A MAJOR NEW TOOL FOR CREDITORS' COMMITTEES, Martin R. Pollner and Brian R. Socolow, 20 MAR. Am. Bank.Inst.J. 14 (2001).

awaiting a resolution to the Carrier Litigation. Based upon the District Court's Scheduling Order, the parties anticipated that it may take years for the Carrier Litigation to ultimately be resolved.[3] Accordingly, lifting the automatic stay to permit the Carrier Litigation to proceed would not result in a resolution of the issues in the Carrier Litigation; it would instead simply restart a contentious, complicated and costly process with no resolution in sight. The first *Curtis* factor thus weighs against lifting the stay.

**2. The Outcome of the Carrier Litigation is Not Directly Connected to the Issues in Debtor's Chapter 11 Case, however, Allowing the Proceeding to Go Forward Will Interfere with the Bankruptcy Case.**

The second *Curtis* factor weighs against lifting the stay as well. The Debtor admits that it *filed* bankruptcy due to the tsunami of tort claims asserted against it and because the Insurance Companies *denied* coverage of those claims. However, the outcome of this bankruptcy case is not dependent upon the resolution of the Carrier Litigation even if at the end of the day there is no insurance coverage for any of the Tort Claimants. The Debtor's unsecured creditors (all of its creditors, not simply the Tort Claimants) are entitled to receive value under a plan "not less than the amount that such holder would so receive or retain if the debtor were liquidated under chapter 7." 11 U.S.C. § 1129(a)(7)(A)(ii). The Debtor plans to propose a plan that provides at least this amount to its creditors *regardless* of the outcome of the Carrier Litigation. Thus, the Tort Claimants will receive their pro rata share of the amounts required to be provided to them

---

[3] Furthermore, even if the District Court were to issue a ruling on coverage, it is very likely given the positions of the parties and the amounts in controversy that the losing party would appeal the District Court's judgment, further delaying an ultimate resolution of the issues of coverage and bad faith.

{Z0142461/1}  8

under the Bankruptcy Code and, *in addition*, they will receive the proceeds that exist, if any, under the Insurance Policies.

However, lifting the stay will interfere with this bankruptcy case. As discussed above, the Debtor is in the process of drafting and negotiating a plan of reorganization. It anticipates filing its plan within the next month. The Debtor has been working with its financial advisor and the Committee on an almost daily basis trying to resolve all issues between the parties. Accordingly, it is absolutely critical that the Debtor's resources, its management and its counsel be laser focused on its plan of reorganization. There is simply no reason to divert any of the Debtor's resources to engaging in complex litigation, including contentious discovery, at this time. Importantly, the Carrier Litigation is not ready for trial; there are no motions that have already been briefed with the parties only waiting for a judicial determination. Indeed, the Debtor filed its Amended Answer to the Complaint approximately a week before it filed its bankruptcy petition. The second *Curtis* factor weighs against lifting the automatic stay.[4]

### 3. *Whether the Debtor's Insurance Carrier Has Assumed Full Financial Responsibility for Defending the Litigation*

The fifth *Curtis* factor is one of the most critical factors for a bankruptcy court. If an insurance carrier has assumed full financial responsibility for defending the litigation, the harm to the estate in permitting the litigation to go forward would be minimal. Of course, in this case, the Insurance Companies have not only failed to assume full financial

---

[4] The third *Curtis* factor – whether the debtor is a fiduciary – does not apply in this case. With regard to the fourth *Curtis* factor - the District Court is not a specialized tribunal, but the Debtor agrees that the District Court should ultimately decide the Carrier Litigation.

{Z0142461/1}  9

responsibility for defending the Litigation, they are actively denying any financial responsibility to the Debtor under the Insurance Policies. This factor strongly weighs *against* lifting the automatic stay.

### 4. Whether the Action Essentially Involves Third Parties, And the Debtor Functions Only as a Bailee or Conduit for the Goods or Proceeds in Question.

The Carrier Litigation does not involve third parties, as the Debtor is the only party with standing and the ability to defend the Carrier Litigation. As discussed earlier, several of the Tort Claimants attempted to intervene in the action in order to better protect their interest in the proceeds under the Insurance Policies; the District Court denied their motion. Although at the conclusion of the Carrier Litigation the Debtor would simply be a conduit for the proceeds to the Tort Claimants, it is the Debtor who has the responsibility and obligation to defend the Carrier Litigation at this time. Accordingly, the Debtor is not simply a nominal party to the litigation, and the sixth *Curtis* factor weighs against lifting the automatic stay.

### 5. Whether Litigation in Another Forum Would Prejudice the Interests of Other Creditors, the Creditors' Committee, and Other Interested Parties.

Although no party is prejudiced by having the District Court decide the Carrier Litigation, it would prejudice the Debtor's creditors to have the Debtor proceed with the Carrier Litigation at this time. First, all of the Debtor's creditors have an interest in having the Debtor devote all of its energy and efforts to confirming a plan of reorganization. The majority of the Debtor's creditors have no interest in the outcome of Carrier Litigation; its resolution only benefits the Tort Claimants and the other parties to that action. Accordingly, if the stay were lifted, the dollars spent by the Debtor in the

Carrier Litigation could only benefit the Tort Claimants; there would be no concomitant benefit to the creditors of the Debtor's estate as a whole.

Second, given that the Debtor plans to turn over responsibility for the Carrier Litigation to the proposed trust, the Tort Claimants have an interest in exercising control of the Carrier Litigation going forward. They most likely will want to employ their own counsel to control discovery, motion practice, scheduling and litigation strategy.

Further, it is highly conceivable that the Tort Claimants will want the District Court to reconsider the entire posture of the case. Specifically, the Debtor is extremely unsettled with the current bifurcated posture of the Carrier Litigation considering that the bifurcation is based upon a fundamental misunderstanding of Wyoming law. To wit, under Wyoming law, a bad faith claim for the denial of insurance coverage can exist independent of the fact that no coverage exists under a policy. *See Hatch v. State Farm Fire and Cas. Co.*, 842 P.2d 1089 (Wyo. 1992) (reaffirming previous holding that a plaintiff may bring both an action for breach of contract and for bad faith, and need not prevail on the contract claim in order to prevail on the bad faith claim – the claims are independent of one another). Notwithstanding the clear holding of *Hatch*, the District Court has determined, even though the matter was not argued or briefed, that a finding of coverage is a prerequisite for a finding of bad faith.[5] Nothing could possibly be more contrary to well-established law. If this flaw in the Carrier Litigation is not "unwound",

---

[5] Not surprising, the Insurance Companies have used the bifurcation of the issues as a mechanism for refusing to answer interrogatories or provide documents – asserting that said discovery requests are only related to bad faith and therefore irrelevant until such time as there is a finding of coverage.

the Debtor (and likewise, the Tort Claimants) could be stripped of bad faith claims against the Insurance Companies long before it is even given an opportunity to make its case. While uncertain, it is highly conceivable that the Insurance Companies are eager to continue the Carrier Litigation to further their attempt to take advantage of a gross misapplication, or at least a gross oversight, of well-established law. At a minimum, this Court should question why the Insurance Companies are so enthusiastic to litigate. These important issues should be addressed by those parties that stand to benefit from the Carrier Litigation – the Tort Claimants, not the Debtor.

Again, once a plan is confirmed and the Debtor has assigned rights in the Insurance Policies to the Personal Injury Trust, the Tort Claimants will have the opportunity to pursue their own defense of the Carrier Litigation and the Carrier Litigation can move forward. The Debtor should not be forced to essentially "pinch hit" until such time as an assignment of the claims to the Tort Claimants can be effectuated through a plan. If the stay is lifted at this time, the Tort Claimants could be prejudiced by not having their own professionals representing their interests. For the foregoing reasons, permitting the Carrier Litigation to continue at this time could prejudice the interests of the Debtor's creditors.[6] The Insurance Companies will surely have their day in court, but allowing them to proceed at this juncture could surely defeat the entire purpose of this bankruptcy case.

---

[6] The eighth and ninth *Curtis* factors also do not apply in this case. Neither equitable subordination or lien avoidance under 11 U.S.C. § 522(f) is at issue in a declaratory judgment action or with respect to the Debtor's claims against the Insurance Companies for denying coverage in bad faith.

**6.    *The Interests of Judicial Economy and the Expeditious and Economical Determination of Litigation for the Parties.***

The interests of judicial economy also support keeping the stay in place. As discussed above, the stay should remain in place until the Tort Claimants (as the ultimate parties in interest in the Insurance Policies) have been assigned the Debtor's rights through the trust. If the stay is lifted, the Debtor will be forced to devote resources to responding to discovery, attending depositions, filing motions to compel, etc. Because the Tort Claimants know that the Debtor plans to assign certain of its rights under the Insurance Policies to them, the Tort Claimants and their counsel will be forced to essentially "babysit" the Debtor's counsel in the Carrier Litigation resulting in the incurrence of duplicative and unnecessary legal fees.

Further, judicial economy is not at issue; whether the stay is lifted now or following plan confirmation, the judicial resources devoted to the litigation will remain the same. As for the expeditious determination of litigation, per the District Court's Scheduling Order, that case is not poised for an expeditious determination; the Carrier Litigation is currently bifurcated in a two phase process which will result in two separate phases of discovery, two separate sets of expert reports, etc. Indeed, the dispositive motion deadline for the first phase of discovery was not set until the summer of 2017. Only after the District Court rules on the first phase dispositive motions will the case be set for a trial to occur *after* the second phase of discovery, motion practice, etc. Accordingly, this *Curtis* factor weighs against lifting the stay.

### 7. Whether the Carrier Litigation has Progressed to the Point of Trial.

The Carrier Litigation is in its infancy. No trial has been set; and it is unlikely that a trial have would have been set prior to 2018 *even if the Debtor had not filed bankruptcy.* Per the Scheduling Order entered by the District Court, the parties anticipated that it would take over nine months to complete fact discovery in the first half of the bifurcated Carrier Litigation. Expert discovery was not to be concluded until May of 2017. The deadline to file dispositive motions (in only the first half of the bifurcated proceeding) was not until May 2017. Once the District Court decided the summary judgment motions, the parties were to determine what issues, if any, remained for trial, including the issue of bad faith, and what further discovery would be needed. In other words, the parties to the Carrier Litigation have a long road to travel prior to the entry of judgment. This factor supports denying the Insurance Companies' motion.

### 8. The Impact of the Stay on the Parties and the Balance of the Hurt.

The last *Curtis* factor weighs in favor of maintaining the stay because the time, cost, and attention that would be necessary to defend the Debtor in the Carrier Litigation would detract from the resources directed to the chapter 11 proceedings. *See, e.g., In re Northwest Airlines Corp.*, No. 05–17930, 2006 WL 694727, at *2 (Bankr. S.D.N.Y. Mar. 3, 2006) (stating that "[t]o allow the automatic stay to be lifted with respect to this action at this time would prompt similar motions and ... [t]he distraction and expense of defending such litigation would interfere with judicial economy and the Debtors' process of reorganization") (*citing Shugrue v. Air Lines Pilots Assn. (In re Ionosphere Clubs, Inc.)*, 922 F.2d 984, 989 (2nd Cir. 1990)); *In re Bally Total Fitness of Greater New York,*

*Inc.*, 402 B.R. 616, 623 (stating that "allowing the actions to proceed would distract the Debtors' management from the bankruptcy proceeding ... thereby affecting the interests of other creditors").

The Insurance Companies allege the continued litigation will have minimal effect on the Debtor or its estate. The Debtor disagrees. The continuation of the Carrier Litigation will thwart the Chapter 11 process and negatively impact the Debtor and its estate by diminishing the estate's resources. Certainly, the continuation of this litigation could deprive the Debtor of the opportunity to propose and achieve a plan of reorganization to provide a meaningful distribution to its unsecured creditors. Rather than permit the Carrier Litigation to go forward, the Debtor believes that allowing the Debtor time to propose and file a plan within the time period approved by this Court is reasonable. Further, and most importantly, the Insurance Companies *admit* that they will not be harmed in any way, form or fashion if the stay continues. Accordingly, the last *Curtis* factor weighs heavily against lifting the stay.

## CONCLUSION

In summary, as this Court recognized in the *Danzik* case, the concern overriding all of the *Curtis* factors is the effect that lifting the stay will have on the administration of the Debtor's estate. If lifting the stay would be beneficial to the estate or would have no negative effect on the estate, bankruptcy courts routinely permit the litigation to go forward in the alternate forum. However, bankruptcy courts do not lift the stay if allowing the litigation to proceed would negatively impact the estate. In the instant case, where the Debtor, the creditors, and the Debtor's estate would be harmed by permitting

the litigation to go forward, and where the proponents of lifting the stay would suffer no harm if the stay remains in place, there is simply no reason to deprive the Debtor of one of the fundamental protections provided by the Bankruptcy Code, *ie*., the breathing room from litigation afforded by the automatic stay.

**WHEREFORE**, the Debtor requests that the Court deny the Insurance Companies' motion and for such other and further relief to which it is entitled.

Dated:   Cheyenne, Wyoming
November 17, 2016

    MARKUS WILLIAMS YOUNG AND
    ZIMMERMANN LLC

    By:  /s/ *Jennifer Salisbury*
    Bradley T. Hunsicker (WY Bar No. 7-4579)
    Jennifer Salisbury (WY Bar No. 7-5218)
    106 East Lincolnway Suite 300
    Cheyenne, WY 82001
    Telephone: 307-778-8178
    Facsimile: 307-638-1975
    Email: bhunsicker@markuswilliams.com;
        jsalisbury@markuswilliams.com

    Counsel for the Debtor and Debtor-in-Possession

## CERTIFICATE OF SERVICE

The undersigned certifies that on November 17, 2016, a copy of the foregoing was served via U.S. Mail, postage prepaid, upon those parties indicated below:

**UMIA Insurance, Inc.**

c/o James T. Burghardt
Timothy M. Swanson
Moye White LLP
1400 16th St., 6th Floor
Denver, CO 80202

**UMIA Insurance, Inc.**

c/o Julie Nye Tiedeken
McKellar, Tiedeken & Scoggin, LLC
702 Randall Avenue
P.O. Box 748
Cheyenne, WY 82003

**Homeland Insurance Company of NY:**

Judith Studer
Patrick T. Holscher
Schwartz, Bon, Walker & Studer, LLC
141 S. Center St., Suite 500
Casper, WY 82601
(307) 235-6681
(307) 234-5099 Fax
jstuder@schwartzon.com
pat@schwartzbon.com

Michael S. Davis
Bryan D. Leinbach
**ZEICHNER ELLMAN & KRAUSE LLP**
1211 Avenue of the Americas
New York, NY 10036
Tel: (212) 223-0400
Fax: (212) 753-0396
mdavis@zeklaw.com
bleinbach@zeklaw.com

Charles E. Spevacek
Tiffany M. Brown
Meagher & Geer, P.L.L.P.
33 S. Sixth Street, Suite 4400
Minneapolis, MN 55402
Ph: (612) 371-1324
Fax: (612) 877-3015
cspevacek@meagher.com
tbrown@meagher.com

    /s/Jessica Anderson
    Jessica Anderson

**Lexington Insurance Company, Inc.:**

Deborah M. Kellam
Lance E. Shurtleff
Hall & Evans, L.L.C.
2015 Central Ave., Suite C
Cheyenne, WY 820014