Bradley T. Hunsicker (WY Bar No. 7-4579)
Jennifer Salisbury (WY Bar No. 7-5218)
John F. Young (Pro Hac Vice)
Markus Williams Young & Zimmermann LLC
106 E. Lincolnway, Suite 300
Cheyenne, WY  82001
Telephone (307) 778-8178
Facsimile (307) 778-8953
bhunsicker@MarkusWilliams.com
jsalisbury@MarkusWilliams.com
jyoung@MarkusWilliams.com
*Attorneys for Debtor*

# UNITED STATES BANKRUPTCY COURT
# DISTRICT OF WYOMING

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| POWELL VALLEY HEALTH CARE, INC. | ) |
| | ) Case No. 16-20326 |
| Debtor-in-Possession. | ) |
| | ) |
| | ) |

## DISCLOSURE STATEMENT IN SUPPORT OF CHAPTER 11 PLAN OF REORGANIZATION DATED APRIL 24, 2017 FOR POWELL VALLEY HEALTH CARE, INC.

**THE DEADLINE TO ACCEPT OR REJECT THE PLAN IS 5:00 P.M. (PREVAILING MOUNTAIN TIME) ON _____, 2017, UNLESS EXTENDED BY ORDER OF THE BANKRUPTCY COURT.**

# I.

## INTRODUCTION

THIS DISCLOSURE STATEMENT (THE "DISCLOSURE STATEMENT") INCLUDES AND DESCRIBES THE CHAPTER 11 PLAN OF REORGANIZATION PROPOSED BY POWELL VALLEY HEALTH CARE, INC. (THE "DEBTOR"), DATED APRIL 24, 2017 (THE "PLAN"), A COPY OF WHICH IS ATTACHED HERETO AS EXHIBIT A. OTHER THAN CLASS 1, WHICH IS UNIMPAIRED UNDER THE PLAN, AND ARE THEREFORE DEEMED TO HAVE ACCEPTED THE PLAN, AND CLASSES 5 AND 6, WHICH ARE DEEMED TO HAVE REJECTED THE PLAN, ALL CLASSES ARE ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN. ACCORDINGLY, EXCEPT FOR THE FOREGOING UNIMPAIRED OR REJECTING CLASSES OF CLAIMS, THE DEBTOR IS SOLICITING ACCEPTANCES OF THE PLAN FROM HOLDERS OF ALL CLAIMS.

The Debtor is a Wyoming non-profit corporation qualified to do business pursuant to section 501(c)(3) of the United States Internal Revenue Code as a public charity. Its mission is to provide healthcare services to the greater-Powell, Wyoming community. In fulfilling its mission statement, the Debtor operates an acute-care hospital that serves a total population of approximately 7,500 people, with the highest concentration of the population in Powell, Wyoming, with over 7,000 residents.

The Debtor commenced this Chapter 11 Case to resolve a series of lawsuits and other claims (the "Trust Personal Injury Claims") arising from certain procedures that were performed at the Debtor's hospital principally by one doctor who is no longer with the Debtor. The Debtor believes that resolving such lawsuits and claims outside of the bankruptcy process would have taken too much time, been too costly and jeopardized the Debtor's ability to continue to provide medical care to Powell, Wyoming and its surrounding communities.

Shortly after the Debtor commenced this Chapter 11 Case, it began negotiating with holders of Trust Personal Injury Claims, represented by a group of attorneys identified in the Plan. Holders of Trust Personal Injury Claims are referred to herein as the "Tort Claimants." The Debtor also negotiated with the Official Committee of Unsecured Creditors (the "Creditors Committee") and the Powell Hospital District (the "District") in order to reach a global resolution to resolve the Trust Personal Injury Claims.

Ultimately, the Debtor has reached an agreement with the Creditors Committee, the Tort Claimants and the District that will allow the Debtor to be reorganized in an efficient and expedited manner. The terms of that agreement are embodied in the Plan. The Debtor believes that the Plan is the single best mechanism for providing recoveries to the Tort Claimants, protecting the rights of third parties, such as the District, and providing payment in full to the vast majority of the Debtor's remaining creditors. The Debtor urges all creditors entitled to vote to accept the Plan.

The Plan has three main features: In general, first, the Plan resolves the Debtor's exposure to the Tort Claimants in a consensual manner, which was the Debtor's primary goal in commencing this Chapter 11 Case. The Claims of the Tort Claimants are classified under the Plan as the "Trust Personal Injury Claims." Under the Plan, the Debtor will:

- Establish a trust for the benefit of the holders of the Trust Personal Injury Claims (the "Personal Injury Trust"). The Personal Injury Trust will receive an initial lump-sum payment of $500,000 (the "Initial Plan Payment") from the Debtor upon the Effective Date of the Plan. In addition, the Debtor shall make monthly payments to the Personal Injury Trust of $30,000 beginning on the first day of the first month following the Effective Date of the Plan (the "Initial Monthly Distributions"). The Initial Monthly Distributions shall be made for a period of sixty months (60 months). Last, the Debtor shall make monthly payments to the Personal Injury Trust of $20,000 beginning on the first day of the sixty-first month following the Effective Date of the Plan (the "Subsequent Monthly Distributions"). The Subsequent Monthly Distributions shall be made for a period of thirty-five months (35 months). The payments to the Personal Injury Trust (*i.e.*, the Initial Monthly Distributions and the Subsequent Monthly Distributions, totaling $2,500,000.00) shall be secured by a second position perfected security interest in the Debtor's accounts receivable (the Debtor's pre-petition lender, First Bank of Wyoming, will continue to have a first position perfected security interest in the Debtor's accounts receivable).

- Transfer to the Personal Injury Trust, to the extent assignable by applicable bankruptcy and non-bankruptcy law, all rights regarding claims of the Debtor against or relating to the following (the "Transferred Causes of Action"):

  o D&O insurance which may cover claims incurred prior to the Petition Date relating to trustees, officers and directors of the Debtor or District. For the avoidance of doubt: (i) recovery is limited to any available insurance proceeds from any insurance policy that covers said claims; and (ii) all D&O claims, if any, are retained and not released, to the extent of any insurance coverage against the Debtor's and/or District's directors, officers and/or trustees, including but not limited to breach of fiduciary duty claims, breach of the duty of loyalty claims and/or negligence claims. In addition, the Proofs of Claim of the District, Jim Carlson, R. J. Kost, Mark Olson, Beth Gilb, Nathaniel M. Reib, William J. Jarvis, Bonita Katz, Michael Tracy, M.D. and Deb Kleinfeldt shall be withdrawn with prejudice and they shall not be entitled to any distribution, nor share in any distribution under the Plan.

  o HealthTech Management Services, Inc. ("HealthTech"), its officers, directors, employees, and agents, including but not limited to any insurance obtained by HealthTech relating to the Debtor.

o      Dr. Jeffrey N. Hansen ("Hansen").

o      William D. Patten ("Patten").

o      Malpractice insurance which may cover claims asserted by the Tort Claimants and incurred prior to the Petition Date, including but not limited to all rights of the Debtor regarding the Declaratory Judgment Action, insurance obtained by the Debtor relating thereto, including but not limited to all rights regarding claims of the Debtor against the Debtor's insurance brokers and agents, to the extent assignable by law, relating to the alleged negligence of Debtor's insurance brokers and agents for, among other things, failing to properly advise the Debtor on proper claims notification practice, and including any extra-contractual claims including bad faith claims relating to the claims asserted by the Tort Claimants, if any, whether arising or relating to pre- or post-petition time periods.

o      All rights are assigned notwithstanding any anti-assignment provisions, if any, in any policies of insurance.

o      Any pre-petition legal malpractice claims to the extent permitted by applicable bankruptcy and non-bankruptcy law (excluding, however, Debtor's bankruptcy counsel who shall receive a release under the Plan), subject to the following conditions which must be met before the Personal Injury Trustee may pursue any such claims: (i) there is a determination by a court of competent jurisdiction that medical malpractice insurance coverage does not exist for the Tort Claimants; and (ii) the Personal Injury Trustee has been advised in writing by counsel that a legal malpractice claim exists subject, however, to a right of the Debtor to file an objection to the pursuit of any such claim (on notice given by the Personal Injury Trustee to the Debtor through the Debtor's member on the Personal Injury Claims Committee (as described herein), for which the Parties agree that the Bankruptcy Court shall retain exclusive jurisdiction.

o      For the avoidance of doubt, the applicable policies of insurance referenced above may include, but are not limited to, the policies of insurance listed below:

| Insurer | Policy No. |
|---|---|
| **D&O Policies** | |
| (Chubb) Executive Risk Indemnity Inc. | 8166-7248 |

| | |
|---|---|
| (Allied World) Darwin National Assurance Company | 0309-7656 |
| Travelers Casualty and Surety Company of America | 106097144 |

**Medical Malpractice**

| | |
|---|---|
| Homeland Insurance Company of New York, a member of the OneBeacon Insurance Group (PHD) (HealthTech add'l insured) Hospital Professional Liability | MPP-5514-13 |
| Homeland Insurance Company of New York, a member of the OneBeacon Insurance Group (PVHC) (PHD) Healthcare Excess Indemnity | MPX-3502-13 |
| UMIA Insurance Inc. (PHD) (PVHC) Professional Liability and Excess coverage | WY920017 |
| Lexington Insurance Company (PVHC) | 6793042 |
| | 6793044 |

**D&O / E&O -- HealthTech**

| | |
|---|---|
| Lexington Insurance Company (HTMS) | 6796764 |
| | 6797081 |

- The Personal Injury Trust will liquidate the Transferred Causes of Action and any net proceeds will be available for holders of the Trust Personal Injury Claims. As discussed below, it is unclear what the value of such Transferred Causes of Action might be, however, it may be substantial.  Collectively, the Initial Plan Payment, the Personal Injury Trust Note, the Initial Monthly Distributions, the Subsequent Monthly Distributions and the Transferred Causes of Action shall be referred to herein as the "Personal Injury Trust Assets."

- The Tort Claimants will receive the right to liquidate their Trust Personal Injury Claims in any court of their choice in a manner consistent with applicable law, but will only be allowed to recover damages and be paid on account of such Claims from the Personal Injury Trust Assets.

- The Tort Claimants can continue to pursue their claims against any third parties, with the exception of the District, and such third parties will retain all of their defenses to such Claims.

- Notwithstanding anything to the contrary in the Plan, the Plan Documents or the Personal Injury Trust, under no circumstances shall a holder of a Trust Personal Injury Claim receive, on account of their respective Allowed Trust Personal

Injury Claim, from any source, including, but not limited to, from the Debtor, the Personal Injury Trust Assets or other source, an amount or distribution greater than 100% of their Allowed Trust Personal Injury Claim. Accordingly, in the event that the total amount of all liquidated Allowed Trust Personal Injury Claims, along with interest at the judgment rate provided under Wyoming law which shall begin accruing from the date that each Allowed Trust Personal Injury Claim is liquidated, is less than the sum of: (i) the total net recovery from the Personal Injury Trust Assets after payment of all fees, costs and attorneys' fees (including recoveries for bad faith related to insurance claims) plus (ii) the amount of the Initial Plan Payment that is paid into the Personal Injury Trust for the benefit of the holders of Trust Personal Injury Claims; plus (iii) any previously paid Initial Monthly Distributions and Subsequent Monthly Distributions, then the excess recovery from the assets identified in (i)-(iii) above shall immediately be turned over to the Debtor, the Personal Injury Trust Note shall be cancelled and the Debtor shall no longer be obligated to make additional Initial Monthly Distributions and/or Subsequent Monthly Distributions, and the security interest identified in Section 7.2 of the Plan shall be released.

As noted above, the foregoing represents a negotiated solution to the Trust Personal Injury Claims, which the Debtor believes is fair, equitable and in the best interests of all parties in interest.

Second, detailed projections showing the feasibility of the Plan are attached hereto as Exhibit B. The Debtor has estimated that it has sufficient funds from the Debtor's operations to fund the Plan.

Third, the Plan provides for payment in full of all trade creditors with Allowed Claims over a one year period and permits the Debtor to emerge from chapter 11 with its trade relationships intact and in a financially viable form.

In short, the Plan will resolve the Trust Personal Injury Claims on a consensual basis, provide for payment of trade debt, and allow the Debtor to emerge from chapter 11 in a strong position and with the ability to satisfy the medical needs of Powell, Wyoming.

THE DEBTOR, THE CREDITORS COMMITTEE AND THE TORT CLAIMANTS BELIEVE THAT THE PLAN IS IN THE BEST INTEREST OF AND PROVIDES THE HIGHEST AND MOST EXPEDITIOUS RECOVERIES TO HOLDERS OF ALL CLAIMS. THE DEBTOR, THE CREDITORS COMMITTEE, AND THE TORT CLAIMANTS URGE ALL HOLDERS OF CLAIMS ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN TO VOTE IN FAVOR OF THE PLAN.

VOTING INSTRUCTIONS ARE CONTAINED IN THE DISCLOSURE STATEMENT ORDER, A TRUE AND CORRECT COPY OF WHICH IS ATTACHED HERETO AS EXHIBIT C. IN ADDITION, THE SOLICITATION PACKAGE ACCOMPANYING EACH OF THE BALLOTS CONTAINS APPLICABLE VOTING INSTRUCTIONS. **TO BE COUNTED, YOUR BALLOT MUST BE DULY COMPLETED, EXECUTED AND**

**ACTUALLY RECEIVED BY COUNSEL FOR THE DEBTOR, BRADLEY T. HUNSICKER OF MARKUS WILLIAMS YOUNG & ZIMMERMANN, LLC, BY \_:\_\_ \_.M., MOUNTAIN STANDARD TIME, ON _____, 2017 (THE "VOTING DEADLINE").**

**All capitalized terms used in this Disclosure Statement and not defined herein shall have the meanings ascribed thereto in the Plan (*see* Exhibit A to the Plan, Glossary of Defined Terms). Unless otherwise stated, all references herein to "Schedules" and "Exhibits" are references to schedules and exhibits to this Disclosure Statement, respectively.**

## II.

## SUMMARY OF DISTRIBUTIONS UNDER THE PLAN

The following is a summary of the distributions to be made under the Plan. It is qualified in its entirety by reference to the full text of the Plan, which is attached to this Disclosure Statement as Exhibit A. In addition, for a more detailed description of the terms and provisions of the Plan, *see* "The Chapter 11 Plan" section of this Disclosure Statement.

The Claim amounts set forth below are based on information contained in the Debtor's Schedules and filed proofs of claim, and reflect what the Debtor believes to be reasonable estimates of the likely resolution of currently outstanding disputed Claims. The amounts utilized may differ materially from the outstanding filed Claim amounts. As discussed below, the Debtor or, in some instances, the Personal Injury Trust, or its representative, will file objections to disputed Claims. *See* "Claims and Litigation."

The following chart summarizes the estimated Plan distributions (each a "Plan Distribution") to each category or class:[1]

---

[1] There can be no assurance that the estimated Claim amounts set forth herein are correct, and the actual amount of Allowed Claims may differ from the estimates. The estimated amounts are subject to certain risks, uncertainties and assumptions. Should one or more of these risks or uncertainties materialize, or should underlying assumptions prove incorrect, the actual amount of Allowed Claims may vary from those estimated herein.

| Administrative and Tax Claims[2] | |
|---|---|
| **Description of Unclassified Claims** | **Treatment of Unclassified Claims** |
| Administrative Claims<br>Estimated Allowed Claims: $165,000.00 | Within thirty (30) days after the Effective Date, each holder of an Allowed Administrative Claim shall receive (i) the amount of such holder's Allowed Claim in one Cash payment; or (ii) such other treatment as may be agreed upon in writing by the Debtor and such holder; provided, however, that such treatment shall not provide a return to such holder having a present value as of the Effective Date in excess of such holder's Allowed Administrative Claim; and provided further that an Administrative Claim representing a liability incurred and payable in the ordinary course of business of the Debtor may be paid at the Debtor's election in the ordinary course of business.<br><br>**Estimated Recovery: 100% of Allowed Claim** |
| Tax Claims<br>Estimated Allowed Claims: $0 | At the election of the Debtor, in full satisfaction of such Allowed Tax Claim, each holder of an Allowed Tax Claim will receive (i) payments in Cash, in regular installments over a period ending not later that five (5) years after the Petition Date, of a total value, as of the Effective Date, equal to the Allowed amount of such Claim; (ii) a lesser amount in one Cash payment as may be agreed upon in writing by such holder; or (iii) such other treatment as may be agreed upon in writing by such holder; provided, however, that such agreed upon treatment may not provide such holder with a return having a present value as of the Effective Date that is greater than the amount of such holder's Allowed Tax Claim.<br><br>**Estimated Recovery: 100% of Allowed Claim** |

---

[2]       Administrative Claims and Tax Claims are treated in accordance with section 1129(a)(9)(A) and 1129(a)(9)(C) of the Bankruptcy Code, respectively. Such Claims are not designated as classes of Claims for the purposes of this Plan or for the purposes of sections 1123, 1124, 1125, 1126 or 1129 of the Bankruptcy Code.

| Classified Claims | |
|---|---|
| **Classes of Claims** | **Treatment of Classes of Claims** |
| Class 1 – Priority Claims<br>Estimated Allowed Claims: $29,000.00<br><br>Unimpaired | Each holder of an Allowed Priority Claim against the Debtor shall receive, on the later to occur of thirty (30) days after Effective Date (or as soon as reasonably practicable thereafter) and the date upon which such Claim becomes an Allowed Claim, either (i) Cash in the amount of such holder's Allowed Priority Claim; or (ii) such other treatment as may be agreed upon by the Debtor and such holder; provided, however, that such treatment shall not provide a return to such holder having a present value as of the Effective Date in excess of the amount of such holder's Allowed Priority Claim.<br><br>**Estimated Recovery: 100% of Allowed Claim** |
| Class 2 – Fist Bank of Wyoming Secured Claims<br>Estimated Allowed Claims: $1,160,505.86<br><br>Impaired | First Bank of Wyoming, as a holder of Allowed Secured Claims against the Debtor, shall receive, in full satisfaction of its Allowed Secured Claims, deferred Cash payments in accordance with the following terms:<br><br>Loan # 120000084, with a current balance of approximately $260,505.86, shall continue to bear interest at the interest rate of 4.24%. The monthly payments due thereunder shall equal $12,207.26. The maturity date of this loan shall be May 10, 2019;<br><br>Loan # 920120181, with a current balance of $900,000.00, shall continue to bear interest at the interest rate of 4.00% (fully variable at prime rate (currently 3.75%) with a floor of 4.00%). The monthly (interest only) payments due thereunder shall equal $3,000.00. The maturity date of this loan shall be May 10, 2019, at which time this loan will be fully amortized at an approximate monthly payment of $15,237.74, until the loan is paid in full (approximately November, 2024); and,<br><br>First Bank of Wyoming and the Debtor shall execute agreed upon loan documents prior the |

| | |
|---|---|
| | Effective Date to memorialize the terms above. The loan documents shall include, but not be limited to, language indicating that: (i) First Bank of Wyoming's security position as it existed prior to the Petition Date in certain of the Debtor's Assets shall remain unaffected and unimpaired, it being the intent of the parties that First Bank of Wyoming shall remain in first priority position on the Debtor's Accounts (as that term is defined in the Uniform Commercial Code) until the loans of First Bank of Wyoming are paid in full; (ii) First Bank of Wyoming shall be notified by the Debtor and the Personal Injury Trustee within five (5) days of any default by the Debtor under the Personal Injury Trust Note, or any loan documents related thereto; and (iii)  any event of default under the Personal Injury Trust Note, or any loan documents related thereto, shall also be an event of default under the loan documents to be executed with First Bank of Wyoming.<br><br>**Estimated Recovery: 100% of Allowed Claims** |
| Class 3 – Trust Personal Injury Claims<br><br>Impaired | Treated pursuant to a consensual settlement with the Tort Claimants. Each holder of an Allowed Trust Personal Injury Claim shall receive, in full satisfaction of its Trust Personal Injury Claim, each of the following: (i) its allocation of the Personal Injury Trust Assets in accordance with Section 7.2 of the Plan; (ii) the Debtor shall release any claims for outstanding medical bills owed as of the Petition Date by the individual Tort Claimants to the Debtor, and/or over which the Debtor has control; (iii) the Debtor shall release any claims for outstanding medical bills owed as of the Effective Date by the individual Tort Claimants to the Debtor and/or any person or entity over which the Debtor has control relating to medical services provided to a Tort Claimant by Hansen (for the avoidance of doubt, subsections (ii) and (iii) shall not apply to any family members of the individual Tort |

| | |
|---|---|
| | Claimants); and, (iv) the Debtor shall support the Trust Personal Injury Claimants' motion regarding remand of the HealthTech related cases so they may be tried in a forum of the Trust Personal Injury Claimants' choosing. |
| | For Plan voting purposes only, the total Claims of the Tort Claimants shall be valued at $19,000,000.00, and each Tort Claimant's collective claim (including claims of spouses, parents, and natural guardians) is $1,000,000.00 for such purposes. There shall be no preclusive, collateral estoppel or res judicata effect to this valuation – $19,000,000.00 is chosen because there are 19 collective Claims held by the Tort Claimants. |
| | **Estimated Recovery: Unknown** |
| Class 4 – Trade Claims<br>Estimated Allowed Trade Claims: $500,000.00<br><br>Impaired | Each holder of an Allowed Trade Claim against the Debtor will receive its Allowed Trade Claim, in full, and in Cash without interest, in four (4) equal quarterly payments beginning the later of thirty (30) days after the Effective Date or the date such Trade Claim becomes an Allowed Claim; provided, that prior to the Debtor making any such payments, the amount of such holder's Allowed Trade Claim shall be reduced by applying the full amount of any postpetition deposit paid by the Debtor to such holder as adequate assurance of future performance to such holder's Allowed Trade Claim. The Debtor may elect, at its option, to pay Allowed Trade Claims over a shorter period of time than required herein.<br><br>**Estimated Recovery: 100% of Allowed Claim** |
| Class 5 – Reimbursement, Contribution and Indemnity Claims<br><br>Estimated Allowed Claims: Unliquidated<br><br>Impaired | Debtor does not believe that there are any Allowed Reimbursement, Contribution and Indemnity Claims. As to any such Claim, however, Debtor and the Personal Injury Trustee reserve any and all rights to assert, among other things, objections under 11 U.S.C. § 502(e)(1)(B) and 553 of the Bankruptcy Code. Any such Claim shall be entitled to any rights, if any, as an additional |

| | insured, under any policies of insurance, to which any such Claim may be entitled. Other than as set forth herein, each holder of an Allowed Reimbursement, Contribution and Indemnity Claim shall neither receive nor retain under the Plan any property of any kind or nature whatsoever, including, without limitation, Cash, or any interest in any of the Personal Injury Trust Assets.<br><br>**Estimated Recovery: 0% of Allowed Claim** |
|---|---|
| Class 6 – Subordinated Claims<br><br>Estimated Allowed Claims:  Unliquidated<br><br>Impaired | Each holder of an Allowed Subordinated Claim shall neither receive nor retain under the Plan any property of any kind or nature whatsoever, including, without limitation, Cash, or any interest in any of the Personal Injury Trust Assets, on account of such holder's Allowed Subordinated Claim.<br><br>**Estimated Recovery: 0% of Allowed Claim** |
| Class 7 – Non-Hansen Personal Injury Claims<br>Estimated Allowed Claims:  Unliquidated<br><br>Impaired | Each holder of an Allowed Non-Hansen Personal Injury Claim shall retain his or her Claims against any applicable insurance policy covering such Claims, but shall neither receive nor retain under the Plan any other property of any kind or nature whatsoever, including, without limitation, Cash, or any interest in any of the Personal Injury Trust Assets.  Recovery for the Non-Hansen Personal Injury Claims shall be limited to any insurance coverage available to satisfy any Allowed Claims of the Non-Hansen Personal Injury Claimants.  The Debtor shall cooperate with the Class 7 claimants to determine if there is insurance coverage.<br><br>**Estimated Recovery from the Debtor: 0% of Allowed Claim; Estimated Recovery from Insurance Coverage: Unknown but Potentially 100% of Allowed Claim** |
| Class 8 – Other Unsecured Claims<br>Estimated Allowed Unsecured Claims: $0<br><br>Impaired | Each holder of an Allowed Other Unsecured Claim shall receive its pro rata share of $10,000 in Cash within thirty (30) days after final adjudication of all contested Other Unsecured Claims. |

| | |
|---|---|
| | **Estimated Recovery: Unknown** |

**III.**

**NOTICE TO HOLDERS OF CLAIMS**

The purpose of this Disclosure Statement is to enable each holder of a Claim that is impaired under the Plan to make an informed decision in exercising its right to vote on the Plan. More information on voting on the Plan is contained in this Disclosure Statement in the article entitled "Confirmation and Consummation Procedures."

**THIS DISCLOSURE STATEMENT CONTAINS IMPORTANT INFORMATION THAT MAY BEAR UPON YOUR DECISION TO ACCEPT OR REJECT THE PLAN. PLEASE READ THIS DOCUMENT WITH CARE.**

**PLAN SUMMARIES AND STATEMENTS MADE IN THIS DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN AND THE EXHIBITS ANNEXED TO THE PLAN AND TO THE EXHIBITS AND SCHEDULES ANNEXED TO THIS DISCLOSURE STATEMENT. THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE ONLY AS OF THE DATE HEREOF, AND THERE CAN BE NO ASSURANCE THAT THE STATEMENTS CONTAINED HEREIN WILL BE CORRECT AT ANY TIME AFTER THE DATE HEREOF. IN THE EVENT OF ANY CONFLICT BETWEEN THE DESCRIPTIONS SET FORTH IN THIS DISCLOSURE STATEMENT AND THE TERMS OF THE PLAN, THE TERMS OF THE PLAN SHALL GOVERN.**

**THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF TITLE 11 OF THE UNITED STATES CODE (THE "BANKRUPTCY CODE") AND RULE 3016(b) OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE (THE "BANKRUPTCY RULES") AND NOT NECESSARILY IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAW OR OTHER NON-BANKRUPTCY LAW.**

**AS TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS AND OTHER ACTIONS OR THREATENED ACTIONS, THIS DISCLOSURE STATEMENT SHALL NOT CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY, STIPULATION, OR WAIVER, BUT RATHER AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS SUBJECT TO RULE 408 OF THE FEDERAL RULES OF EVIDENCE AND OTHER SIMILAR RULES. ACCORDINGLY, THIS DISCLOSURE STATEMENT SHALL NOT BE ADMISSIBLE IN ANY NON-BANKRUPTCY PROCEEDING NOR SHALL IT BE CONSTRUED TO BE CONCLUSIVE ADVICE ON THE TAX OR OTHER LEGAL EFFECTS OF THE PLAN AS TO HOLDERS OF CLAIMS AGAINST THE DEBTOR.**

On _____, 2017, after notice and a hearing, the Bankruptcy Court entered the order approving the Disclosure Statement (the "Disclosure Statement Order") pursuant to section 1125 of the Bankruptcy Code, finding that this Disclosure Statement contains information of a kind, and in sufficient detail, adequate to enable a hypothetical, reasonable investor typical of the solicited holders of Claims against the Debtor to make an informed judgment with respect to the acceptance or rejection of the Plan.

Each holder of a Claim entitled to vote to accept or reject the Plan should read both this Disclosure Statement and the Plan in their entirety before voting. No solicitation of votes to accept or reject the Plan may be made except pursuant to this Disclosure Statement and section 1125 of the Bankruptcy Code.  Except for the Debtor and certain of the professionals it has retained, no person has been authorized to use or promulgate any information concerning the Debtor, its businesses, or the Plan other than the information contained in this Disclosure Statement, and if other information is given or made, such information may not be relied upon as having been authorized by the Debtor. **YOU SHOULD NOT RELY ON ANY INFORMATION RELATING TO THE DEBTOR, ITS BUSINESSES OR THE PLAN OTHER THAN THAT CONTAINED IN THIS DISCLOSURE STATEMENT AND THE SCHEDULES AND EXHIBITS ANNEXED HERETO.**

After carefully reviewing this Disclosure Statement, including the attached Schedules and Exhibits, please indicate your acceptance or rejection of the Plan by voting in favor of or against the Plan on the enclosed ballot, and return the completed ballot to the address set forth on the ballot in the enclosed postage prepaid return envelope so that it will be actually received by counsel for Debtor, Bradley T. Hunsicker of Markus Williams Young & Zimmermann LLC, no later than the Voting Deadline. Parties entitled to vote to accept or reject the Plan are specified herein and in the Disclosure Statement Order. All votes to accept or reject the Plan must be cast by using the appropriate ballot. Votes which are cast in any other manner will not be counted. **All ballots must be actually received by the no later than the Voting Deadline: _____, 2017 at __:__ _.m., Prevailing Mountain Time. For detailed voting instructions and the name, address and phone number of the person you may contact if you have questions regarding the voting procedures,** *see* **the Disclosure Statement Order attached hereto as Exhibit C.**

**DO NOT RETURN ANY OTHER DOCUMENTS WITH YOUR BALLOT.**

You will be bound by the Plan if it is accepted by the requisite holders of Claims and confirmed by the Bankruptcy Court, even if you do not vote to accept the Plan or if you are the holder of an unimpaired Claim or a rejecting Claim that is not entitled to vote on the Plan.

**Pursuant to section 1128 of the Bankruptcy Code, the Bankruptcy Court has scheduled a hearing to consider confirmation of the Plan (the "Confirmation Hearing") on _____, 2017, at __:___ _.m., Prevailing Mountain Time, before the Honorable Cathleen Parker, United States Bankruptcy Judge. The Bankruptcy Court has directed that objections, if any, to confirmation of the Plan be filed and served on or before**

_____, 2017, in the manner described in the Disclosure Statement Order attached hereto as Exhibit C.

**THE DEBTOR, THE CREDITORS COMMITTEE, AND THE TORT CLAIMANTS SUPPORT CONFIRMATION OF THE PLAN AND URGE ALL HOLDERS OF IMPAIRED CLAIMS TO ACCEPT THE PLAN.**

## IV.

## EXPLANATION OF CHAPTER 11

### A.    Overview of Chapter 11

Chapter 11 is the principal reorganization chapter of the Bankruptcy Code pursuant to which a debtor may reorganize its business for the benefit of its creditors, equity interest holders, and other parties in interest. The Debtor commenced its Chapter 11 Case (the "Chapter 11 Case") with the filing of a petition (the "Petition") for voluntary protection under chapter 11 of the Bankruptcy Code on May 16, 2016 (the "Petition Date"). The Chapter 11 Case is administered as Case No. 16-20326. *See* "The Chapter 11 Case – Commencement of the Chapter 11 Case."

The commencement of a chapter 11 case creates an estate comprising all of a debtor's legal and equitable interests as of the date the petition is filed. Sections 1101, 1107, and 1108 of the Bankruptcy Code provide that a debtor may continue to operate its business and remain in possession of its property as a "debtor in possession" unless the bankruptcy court orders the appointment of a trustee. In its Chapter 11 Case, the Debtor remains in possession of its property and continues to operate its businesses as a debtor in possession.

The formulation and ultimate consummation of a plan of reorganization is the principal purpose of a chapter 11 case. The plan sets forth the means for satisfying claims against and interests in a debtor's estate. Unless a trustee is appointed, only a debtor may file a plan during the first 120 days of a chapter 11 case (the "Exclusive Filing Period"), and the debtor will have 180 days to solicit acceptance of such plan (the "Exclusive Solicitation Period"). However, section 1121(d) of the Bankruptcy Code permits the bankruptcy court to extend or reduce the Exclusive Filing Period and Exclusive Solicitation Period upon a showing of "cause." As set forth below in "The Chapter 11 Case – Exclusive Periods," the Debtor's Exclusive Filing Period and Exclusive Solicitation Period were extended to April 10, 2017 and June 10, 2017, respectively.  Prior to April 10, 2017, the Debtor requested an extension of the exclusivity periods until April 24, 2017. The Debtor filed the Plan on or before April 24, 2017.  As the Debtor filed the Plan within the applicable Exclusive Filing Period, no other creditor or party in interest may file a plan until the expiration of the Exclusive Solicitation Period. *See* "The Chapter 11 Case – Exclusive Periods."

### B.    Plan of Reorganization

Although referred to simply as a plan of reorganization, a plan may provide for anything from a comprehensive restructuring of a debtor's business and its related obligations to a simple

liquidation of a debtor's assets. Upon confirmation of a plan, the plan becomes binding on the debtor and all of its creditors and the prior obligations owed by the debtor to such parties are compromised and exchanged for the obligations specified in the plan. For a description of key components of the Plan, refer to the article of this Disclosure Statement entitled "The Chapter 11 Plan."

After a plan of reorganization has been filed, the holders of impaired claims against a debtor are permitted to vote to accept or reject the plan. Before soliciting acceptances of the proposed plan, section 1125 of the Bankruptcy Code requires the debtor to prepare and file a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment about the plan. This Disclosure Statement is presented to holders of Claims against the Debtor to satisfy the requirements of section 1125 of the Bankruptcy Code in connection with the Debtor's solicitation of votes on the Plan.

## C.      Confirmation of a Plan of Reorganization

If all classes of claims accept a plan of reorganization, a bankruptcy court may confirm the plan if the bankruptcy court independently determines that the requirements of section 1129(a) of the Bankruptcy Code have been satisfied. These requirements are discussed in this Disclosure Statement in the article entitled "Confirmation and Consummation Procedures."  The Debtor believes that the Plan satisfies all of the applicable requirements of section 1129(a) of the Bankruptcy Code.

Chapter 11 of the Bankruptcy Code does not require that each holder of a claim or interest in a particular class vote in favor of a plan for the bankruptcy court to determine that the class has accepted the plan.  Further information concerning minimum thresholds required to constitute acceptance of the Plan for the purposes of confirmation is contained in this Disclosure Statement in the article entitled "Confirmation and Consummation Procedures."

Classes of claims that are not "impaired" under a plan of reorganization are conclusively presumed to have accepted or rejected the plan and thus are not entitled to vote. Thus, acceptances of a plan will generally be solicited only from those persons who hold claims in an impaired class.  Under the Plan, all classes of claims are entitled to vote on the Plan except Class 1.

**V.**

**<u>GENERAL INFORMATION</u>**

The discussion below briefly describes the Debtor and its business as it exists as of the date of this Disclosure Statement.

## A.      The Debtor's Background and the Operation of the Hospital

In fulfilling its mission statement, the Debtor operates Powell Valley Healthcare (the "Hospital"). The Debtor is managed by a volunteer board of community leaders who are each committed to the Hospital's long-term success.

The Hospital is the successor to the first hospital in Powell, Wyoming which was constructed by Dr. J.R.A. Whitlock in 1919 and had 18 beds. Dr. Whitlock owned and operated the hospital as a private institution for nearly 20 years. The hospital became a tax-supported facility with the establishment of the District in September 1949. The District is a special governmental hospital district.

In 1983, the decision was made to build a new hospital. A bond issue of $8.5 million was passed by the voters, and the Hospital was dedicated in April 1986. The old hospital was then renovated to provide additional nursing home capacity. In the 1980s, four medical office buildings were constructed. A new nursing home facility (located at 777 Avenue H) was constructed and dedicated in February 1997. The facilities now include a 25-bed hospital, a 100-bed long-term care facility, four medical office buildings, a 24-unit assisted living facility and five emergency medical vehicles with equipment (collectively the "Facilities"). The District owns the Facilities and leases them to the Debtor.

In 1992, members of the District's board of directors formed a not-for-profit corporation called Powell Valley Health Care, Inc. (*i.e.*, the Debtor, or PVHC) for the purpose of operating the Facilities. It should be noted that PVHC does not share any revenues with the District (apart from satisfying its obligations to the District under various leasehold interests), and no losses of PVHC are borne by the District.

The District is governed by seven elected members of the board of trustees. All tax monies received by the District are dedicated to capital expenditures, including equipment, and are not utilized for operating expenses of the Debtor. The seven district board members, as well as three additional members (typically medical staff), serve as the board of directors for the Debtor.

The Debtor is one of two acute healthcare facilities in Park County, Wyoming and is over 25 miles driving distance from the closest comparable facility. The services the Debtor provides at the Hospital are too numerous to list. The Hospital features, among other things, diagnostic imaging services (*i.e.*, MRI, and CT scan), cardiopulmonary services, an intensive care unit, and a maternal child unit. The Hospital is also designated as a Community Designated Trauma Hospital.

A significant volume of patients make use of the Hospital services each year. In 2014 and 2015 the hospital had the following activity:

| Type of Patient Care | 2014 | 2015 |
|---|---|---|
| Inpatient Admissions | 596 | 579 |

| Obstetrical Deliveries | 149 | 185 |
| Surgeries | 721 | 570 |
| Emergency Room Patients | 4,402 | 4,329 |
| Outpatient Registrations | 31,017 | 30,143 |
| Laboratory Tests | 65,147 | 49,048 |

The Debtor's operation of the Facilities is critical to the greater Powell, Wyoming community, not only as a healthcare provider, but also as an economic engine. The Debtor relies upon a workforce of approximately 400 full and part time employees, who earn on an annual basis, nearly $29 million in wages, salaries and benefits. The Debtor's sizeable staff makes it one of Powell's largest non-governmental employers.

**B.     The Debtor's Commitment to Healthcare in Powell**

The Debtor's efforts to meet the healthcare needs of its community go well beyond the direct provision of care at the Hospital. In addition to its core healthcare services, the Debtor provides many goodwill services for the community throughout the year that the Debtor believes serve a bona fide community health need. For example, the Debtor provides direct support to diabetic, hepatitis C, sign language, and cardiac and stroke patient support groups. The Debtor also conducts health fairs and health screening clinics for cholesterol, diabetes, blood pressure and blood type, and seminars in order to foster better health awareness. The Debtor additionally serves as an educational training site for physicians, registered nurses, x-ray technologists, medical technologists, physical therapists, emergency medical technicians, and nursing assistants. The Debtor participates in health fairs in order to foster better health awareness in the community. Finally, the Debtor directly engages in many other health-related community activities, such as Lamaze, breast feeding, new baby and sibling classes, and CPR training to members of the community.

The Debtor's contributions to community health are not limited to direct provision of services. It also partners with Heritage Health Center to support and fund the provision of medical services to patient populations with limited/underserved access to the Hospital.

The Debtor provides further support, both directly and indirectly, to community health and wellness programs, such as access to mental health services, preventive health services and public transportation. Through its numerous facilities, programs, and projects, PVHC is directly or indirectly responsible for nearly all of Powell's healthcare infrastructure.

One of the Debtor's most fundamental and critical functions in maintaining Powell's healthcare infrastructure is its active recruitment of healthcare providers, especially physicians, to meet specifically identified community needs. Over the past two years, PVHC has been responsible for bringing approximately ten health providers to the community, including

practitioners of emergency medicine, hospitalist services, radiology, obstetrics, and family medicine.   Offering direct employment to physicians has become an increasingly important practice tool for hospitals throughout the country.  As a result, physicians will often only agree to come to the community if employed directly by the Debtor.

## C.    The Hospital's Management Company

In 1992, PVHC entered into a management contract with HealthTech (f/k/a Brim Healthcare).  Pursuant to its current contract, HealthTech provides the Debtor with, among other things, managers at the chief executive officer position, group purchasing privileges, and access to training opportunities and administrative resources.  However, the ultimate decision-making authority of the Debtor rests with a board of trustees comprised of ten (10) volunteer community leaders.

The Debtor would like to retain HealthTech as its management company after the Debtor emerges from chapter 11 and believes that both the Debtor and HealthTech can continue to have a fruitful relationship on a going-forward basis notwithstanding the existence of potential Causes of Action against HealthTech. Nevertheless, HealthTech has not agreed to the terms of the Plan and could decide to terminate its relationship with the Debtor. In those circumstances, the Debtor will replace HealthTech with appropriate new management in a professional manner and does not anticipate any material disruptions in service or operations.

## D.    The Debtor's Capital Structure

The Debtor requires capital in order to, among other things, establish and maintain an income stream so that equipment may be purchased to grow and sustain operations of the facility.

The Debtor has entered into certain lease agreements with the District whereby the District leases the Facilities to the Debtor in exchange for lease payments.   The Creditors Committee has conducted an investigation of the Debtor's potential Causes of Action against the District. The Plan represents a global resolution and settlement of any and all claims against the District by the Debtor, the Creditors Committee, and the Tort Claimants. A key component of the resolution and settlement is a restructure of the Debtor's obligations to the District under its lease agreement.

The Debtor also has incurred debt in the form of a line of credit with First Bank of Wyoming. As of the Petition Date the amount outstanding on the line of credit is $900,000.00, with interest only payments of $3,000.00 per month for a thirty day month.  The Debtor is also the borrower under a second loan from First Bank of Wyoming in the outstanding amount of approximately $260,505.00, with monthly payments of $12,207.00.

## E.    Events Giving Rise to the Bankruptcy Filing

Since 2011, the Debtor, along with HealthTech and a number of other defendants (including the District), has been subject to personal injury lawsuits stemming from a series of

procedures performed at the Hospital between 2011 and 2013 (the "Lawsuits").  In total, nineteen individuals who underwent such procedures (collectively, the "Tort Claimants") have filed the Lawsuits against PVHC and their treating physician, Hansen, who is no longer employed at PVHC.  The claims asserted against the Debtor in the Lawsuits have previously been collectively referred to herein as the "Trust Personal Injury Claims."  No determination of liability has been made with respect to the Trust Personal Injury Claims.

The Lawsuits are being brought by former patients of Hansen, or their family members, for services rendered in 2013 and prior years.  Hansen has not provided services at the Hospital since 2013. There are other claims being made against other former or current members of the Debtor as well.  The Debtor does not believe that the Lawsuits have anything to do with the current medical staff nor are they in any way indicative of the quality of care currently being provided by the medical staff and the Debtor to its patients.

The costs, fees and work needed to litigate the Lawsuits have and will continue to consume considerable time from the Debtor's staff and have forced the Debtor to consider various alternatives for managing and resolving the Lawsuits.  This burden is amplified by the fact the Debtor's insurers have also commenced litigation against the Debtor (the "Carrier Litigation"), claiming they have no obligation to defend or cover the underlying Lawsuits notwithstanding that they issued insurance policies which were in force and effect when the underlying claims were filed.

Although the physician whose work was the subject of the underlying Lawsuits is no longer with the Debtor, the Debtor's potential exposure in connection with the Lawsuits remains and poses a significant threat to its ability to effectively carry out its mission.  As the sole community acute care provider in Powell, the pendency of the Lawsuits has affected the Debtor's ability to raise the funds necessary to continue to meet the current and future healthcare needs of the community.

The Debtor faces significant uncertainty as well as administrative and financial burdens in defending the Lawsuits and addressing the Carrier Litigation.  The Debtor voluntarily filed its Petition with the objective of dealing with the Carrier Litigation and resolving the Lawsuits in a fair, reasonable, and efficient manner while ensuring its long-term stability for the benefit of the community it serves.

The Debtor's efforts in this regard resulted in the proposed Plan described in this Disclosure Statement.  **Through negotiations with the Tort Claimants during the Chapter 11 Case, all of whom were plaintiffs in the Lawsuits filed prior to the Petition Date, the Debtor has secured their support for the Plan**. If confirmed, the Plan will allow the Debtor to finally resolve such Claims and the Debtor believes it will enable the Debtor to emerge from chapter 11 as a strong and stable organization.

## VI.

## THE CHAPTER 11 CASE

### A.      Commencement of the Chapter 11 Case

On May 16, 2016, the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Wyoming, the Honorable Cathleen Parker presiding.

### B.      Continuation of Business after the Petition Date

Since the Petition Date, the Debtor has continued to operate its business and manage the Hospital as Debtor in Possession. In addition, the Debtor has filed various motions and other pleadings to preserve value for creditors and efficiently administer its Chapter 11 Case. Below is a description of some of the most material filings made by the Debtor.

#### 1.      Stipulation with First Bank of Wyoming

As described above, the Debtor has incurred debt in connection with a revolving line of credit and a loan with First Bank of Wyoming. In connection with the issuance of that debt, the Debtor has granted to First Bank of Wyoming a valid and perfected first priority lien and security interest in, among other things, the Debtor's accounts receivable. Prior to the filing of its Petition, the Debtor negotiated with First Bank of Wyoming for the use of cash collateral during the case. As with any large chapter 11 case, the use of cash collateral is essential to the Debtor's ability to continue its business operations and to preserve and maximize the value of its assets as its transitions into chapter 11. First Bank of Wyoming consented to the Debtor's use of cash collateral, subject to and agreed upon budget and certain customary events that could cause an earlier termination. For more information, see *Debtor's Motion for Expedited Entry of an Interim and Final Order (I) Authorizing Use of Chas Collateral; (II) Providing for Adequate Protection Payments; and, (III) Granting Related Relief* [Docket No. 16] and *Final Stipulated Order Authorizing Use of Cash Collateral and Providing Adequate Protection Payments* [Docket No. 324].

#### 2.      Business Operations

##### a.      Cash Management

As is typical with most corporate enterprises, the Debtor has a variety of financial accounts that it wished to maintain during the pendency of the Chapter 11 Case including nine operating accounts and several small petty cash accounts (the "Cash Management System"). The Debtor uses the Cash Management System for the collection of receipts and the disbursement of funds in connection with its operations.

On June 30, 2016, the Bankruptcy Court authorized the Debtor to continue to use its existing Cash Management System, bank accounts, and business forms, but, the Debtor was also required to set up a new debtor in possession account for postpetition receipts and disbursements See [Docket No. 166]. Additionally, the Bankruptcy Court granted the Debtor a waiver of certain investment and deposit requirements imposed by section 345 of the Bankruptcy Code.

### b.    Maintenance of Utility Service

Prior to the Petition Date, in connection with the operation of its businesses and the Hospital, the Debtor obtained a wide range of utility services (collectively, the "Utility Services") from certain utility companies (the "Utility Companies"), including electricity, gas, and water for which no alternative service could be expected. It was essential that the Utility Services continued uninterrupted after the Petition Date particularly in light of the critical services provided by the Debtor at the Hospital. As such, upon the Debtor's motion, the Bankruptcy Court issued an interim order on May 26, 2016, and then a final June 30, 2016, (i) prohibiting the Utility Companies from discontinuing, altering, or refusing service to the Debtor, (ii) deeming the Utility Companies adequately assured of future payment; and, (iii) establishing procedures for determining requests for additional adequate assurances of payment.  See [Docket Nos. 37, 168].

### 3.    Employee and Medical Provider Related Matters

Of critical importance to the Debtor's efforts to continue its operations uninterrupted was its ability to maintain the support and cooperation of its employees. Accordingly, on May 16, 2016, the Debtor filed two motions relating to employees, one pertaining to medical providers, including doctors, certified nurse midwives, and certified nurse practitioners, and a second pertaining to non-medical provider employees, including managers, directors, and hourly employees [Docket Nos. 11 and 12].  The purpose of those motions was to ensure that employees continued to receive wages and benefits in the ordinary course of business. The Bankruptcy Court granted the relief requested by the Debtor and entered several orders authorizing the Debtor to pay certain prepetition obligations owing to the employees, including, but not limited to: (i) amounts owed to employees for wages, salaries, and contractual obligations, (ii) maintenance and continuance of employee benefit plans and programs in effect prior to filing the Chapter 11 Case, (iii) reimbursement of employee business and educational expenses incurred in the ordinary course; and, (iv) other miscellaneous employee expenses and benefits.  See [Docket Nos. 74, 75, 167, and 169].

### 4.    Procedural Matters

### a.    Limited Notice

Because the mailing matrix in the Chapter 11 Case contained more than four hundred (400) parties, the Bankruptcy Court established certain guidelines regarding limiting the notice of and hearings on motions and other matters. The Bankruptcy Court entered an order approving such procedures on May 17, 2016. See [Docket No. 72].

### b.    Confidentiality of Patient Information

Federal and Wyoming law mandate that the Debtor maintain the confidentiality of patient information.  The Bankruptcy Code, however, requires that certain information (such as the names and claims of creditors) be publicly disclosed.  In order to balance the needs for confidentiality under federal and state law while at the same time providing the requisite

bankruptcy disclosures, the Debtor filed a motion requesting the Court to approve certain procedures to reconcile the Debtor's obligations under the law.  The Bankruptcy Court entered an order on May 26, 2016 permitting the Debtor to omit the names of patient/creditors from the lists of creditors and to instead identify those patient/creditors solely by a code number.  See [Docket No. 78].

## C.      Representation of the Debtor

In early 2016, the Debtor retained Markus Williams Young & Zimmermann LLC ("MWYZ") to provide legal advice with respect to a variety of issues, including restructuring and bankruptcy advice, and preparation of the requisite petition, pleadings, exhibits, lists and schedules in connection with the commencement of the Chapter 11 Case. Bradley Hunsicker, John F. Young, and Jennifer Salisbury have been acting as lead counsel for the Debtor in this Chapter 11 Case.

Prior to the Petition Date, the Debtor employed certain professionals, in the ordinary course of business, to render services to its Estate (collectively, the "Ordinary Course Professionals"), including legal services and certain accounting, tax, and consulting services, which were necessary to the day-to-day continuation of the Debtor's operations.  On August 24, 2016, the Bankruptcy Court granted, in part, and denied, in part, the Debtor's motion asking for authority to employ Ordinary Course Professionals.  See [Docket No. 257].  The Bankruptcy Court authorized the employment of legal counsel to provide advice on employment and labor law issues as well as healthcare regulatory matter; the Court also authorized employment of Casey Peterson for accounting services so long as the services provided were limited to service provided to the Debtor in the ordinary course of its business.

On October 3, 2016, the Court authorized the Debtor to employ Hammond Hanlon Camp, LLC as financial advisor to provide financial advisory and investment services to the Debtor in connection with the Chapter 11 Case. See [Docket No. 334].

## D.      Formation and Representation of the Creditors' Committee

On June 21, 2016, the United States Trustee for Region 19 (the "U.S. Trustee") appointed the Official Committee of Unsecured Creditors (the "Creditors Committee").  The Creditors Committee retained as counsel the law firm of Spencer Fane Britt & Brown, LLP, 1000 Walnut St., Suite 1400, Kansas City, Mo 64106.  Scott Goldstein, Philip Pearlman and Jamie Cotter have been acting as lead counsel for the Creditors' Committee.

The Creditors Committee is currently comprised of the following members:

| Larry Heiser | Veronica Sommerville |
|---|---|
| Michele Oliver | Joetta Johnson |
| Shane Wilson | Susan Stambaugh |

**E.      Matters Relating to Unexpired Leases and Executory Contracts**

Section 365 of the Bankruptcy Code grants the Debtor the power, subject to the approval of the Bankruptcy Court, to assume or reject executory contracts and unexpired leases. If an executory contract or unexpired lease is assumed, the rights of the debtor party to such agreement continue as property of the debtor's estate. A subsequent breach of an assumed lease or executory contract creates an administrative claim in favor of the non-debtor counterparty, entitling it to an administrative claim for the prepetition obligations as well as postpetition obligations arising as a result of the breach. If an executory contract or unexpired lease is rejected, the non-debtor counterparty to the agreement may file a claim for damages incurred by reason of the rejection, which is treated as a prepetition claim. In the case of rejection of leases of real property, such damage claims are subject to certain claim amount limitations imposed by the Bankruptcy Code.

Generally, debtors have until the confirmation date of the chapter 11 plan to assume executory contracts and unexpired leases to which they are party. An exception to the foregoing is set forth in section 365(d)(4) of the Bankruptcy Code, which provides that if a debtor does not assume or reject an unexpired lease of nonresidential real property under which a debtor is the lessee (i) within 120 days after the petition date (the "365(d)(4) Deadline"), (ii) within a 90-day additional period as the Bankruptcy Court, for cause, fixes, or (iii) within such additional time as the Bankruptcy Court, for cause, fixes with the consent of the landlord of the leased premises, then such lease is deemed rejected.

As explained above, the Debtor leases the Facilities (the "Hospital Leases") from the District. On August 18, 2016, the Debtor filed a timely motion requesting that the Bankruptcy Court authorize it to assume the Hospital Leases. See [Docket No. 248]. The Creditors Committee has objected to the motion to assume the Hospital Leases. The Debtor, the District and the Creditors Committee have reached a global resolution regarding the assumption of the Hospital Leases and the settlement of any and all claims by and among the Debtor, the Creditors Committee, the Tort Claimants, and the District.

In exchange for a release and injunction in the Plan from the pursuit of any and all claims by the Debtor, the Committee, and creditors, including the Tort Claimants, against the District, the District shall refund to the Debtor $250,000 prior to the Effective Date, and the District shall renegotiate its current lease with the Debtor that currently requires monthly payments of $67,500 as follows:

- The monthly rent due thereunder shall be equal to $0.00 per month for the first twelve months (12 months) following the Effective Date of the Plan;

- The monthly rent due thereunder shall be equal to $37,500 per month beginning the thirteenth month following the Effective Date of the Plan, and continuing thereafter for forty eight (48) months;

- The monthly rent due thereunder shall be equal to $47,500 beginning the sixty-first month following the Effective Date of the Plan, and shall remain $47,500 per month for a period of thirty-five months (35 months);

- On a monthly basis, the District shall agree that the Debtor is obligated to satisfy each Initial Monthly Distribution or Subsequent Monthly Distribution prior to satisfying its rental obligation for each applicable month until such time as the Initial Monthly Distributions and Subsequent Monthly Distributions are paid in full (i.e., payments to the Personal Injury Trust shall be satisfied each month prior to rent payments to the District);

- The District shall agree that so long as the Debtor is current on its Initial Monthly Distributions and/or Subsequent Monthly Distributions or has cured any default thereunder, the District may not terminate any lease between the District and the Debtor that was effective on the Petition Date;

- The Debtor may not purposely default on any Initial Monthly Distribution or Subsequent Monthly Distribution for the purposes of creating a default under any lease between the District and the Debtor that was effective on the Petition Date. In the event that the Debtor believes it may default on any Initial Monthly Distribution or Subsequent Monthly Distribution, the Debtor shall immediately notify the Personal Injury Trustee and First Bank of Wyoming in writing, and provide financial documentation, such as a bank statement, to the Personal Injury Trustee and First Bank of Wyoming demonstrating that the Debtor is unable to make said payment(s);

- The District shall agree that so long as the Debtor is current on its Initial Monthly Distributions and/or Subsequent Monthly Distributions or has cured any default thereunder, the District may not terminate any of the Hospital Leases; and,

- All other provisions of the Hospital Leases shall remain intact and shall be assumed by the Debtor.

In regard to the executory contracts to which the Debtor is a party, and as further set forth in the Plan, it is the Debtor's intention to assume all of its executory contracts except those contracts specifically rejected pursuant to the terms of the Plan. As provided in the Plan, any counter party having a Claim arising from such rejection shall have until on or before thirty (30) days after the Confirmation Date in which to file a proof of claim asserting a claim arising from such rejection.

## F.  Exclusive Periods

Pursuant to sections 1121(b) and (c)(3) of the Bankruptcy Code, the Debtor has (i) the Exclusive Filing Period within which to file the Plan and (ii) the Exclusive Solicitation Period to solicit acceptances of the timely filed Plan before other parties in interest are permitted to file plans. The initial Exclusive Filing Period and the initial Exclusive Solicitation Period expired on September 14, 2016 and November 14, 2016, respectively.

On April 5, 2017, the Bankruptcy Court entered an order extending the Exclusive Filing Period and the Exclusive Solicitation Period through April 10, 2017 and June 10, 2017, respectively.  On April 10, 2017, the Debtor requested that the Exclusive Filing Period and the Exclusive Solicitation Period be extended through April 24, 2017 and June 24, 2017, respectively.

## G.     The Automatic Stay

The automatic stay under section 362 of the Bankruptcy Code provides that, as of the Petition Date, most pending litigation is stayed, and absent further order of the Bankruptcy Court, most actions to recover on prepetition Claims against the Debtor are prohibited.

During the Chapter 11 Case, the Debtor filed a motion to extend the automatic stay to all defendants in the Lawsuits; in addition to the Debtor, the defendants in the Lawsuits include Hansen, HealthTech, Patten, and the District.  In other words, while the automatic stay generally only applies to claims asserted against a debtor, and not third parties, in certain instances, bankruptcy courts will extend the automatic stay to cover third-party defendants in litigation to which the debtor is a party.  The Tort Claimants objected to the Debtor's efforts to extend the automatic stay.  At present, the issue of the extension of the automatic stay is pending in Adversary Case No. 16-02033, *Powell Valley Health Care, Inc. v. Nathaniel Bases, Sheena Bates and I.S.B., a minor child, et al.*  If the Plan is confirmed, the stay will be lifted, the issue as to the extension of the stay will become moot, and the Debtor will dismiss this adversary proceeding.

During the Chapter 11 Case, one motion was filed seeking relief from the automatic stay.  The motion was filed by Lexington Insurance Company ("Lexington"), UMIA Insurance, Inc. ("UMIA") and Homeland Insurance Companies of New York ("Homeland") (collectively, the "Insurance Companies") requesting that the stay be lifted to permit the Carrier Litigation against the Debtor to proceed.  In the Carrier Litigation, the Insurance Companies claim that they have no obligation to defend or cover the Lawsuits notwithstanding the fact that they issued insurance policies to the Debtor that were in force and effect when the underlying claims were filed (the "Insurance Policies").  The Debtor and the Creditors Committee opposed the motion by the Insurance Companies to lift the automatic stay.  The initial hearing on the motion was held on November 30, 2016, and a final hearing on the motion is still pending.

## VII.

## CLAIMS AND LITIGATION

No Person may rely on the absence of a specific reference in the Plan or the Disclosure Statement to any Cause of Action against them as any indication that the Debtor will not pursue any and all available Causes of Action against them. The Debtor and its Estate expressly reserve all rights to prosecute any and all Causes of Action against any Person, except as otherwise provided in the Plan. Unless any Causes of Action against a Person are expressly waived, relinquished, exculpated, released, compromised or settled in the Plan or a Final Order, the

Debtor expressly reserves all Causes of Action for later adjudication, and, therefore, no preclusion doctrine, including without limitation, the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise) or laches, shall apply to such Causes of Action upon or after the confirmation or consummation of the Plan.

Without limiting the generality of the foregoing, the Transferred Causes of Action are fully preserved under the Plan and shall be transferred to the Personal Injury Trust.  The Personal Injury Trust shall be the Estate representative for the purpose of pursuing the Transferred Causes of Action and nothing in the Plan or this Disclosure Statement shall in any manner waive, release or modify the Transferred Causes of Action. The Transferred Causes of Action include the Debtor's claims against the Insurance Companies.

In addition to the foregoing, the Debtor and the Personal Injury Trust are fully expected to object to each Reimbursement, Contribution and Indemnity Claim and the holders of such Claims, including, without limitation, HealthTech, Hansen and Patten, should expect to litigate such objections after the Effective Date and will not obtain an Allowed Claim without prevailing with respect to such objections.

Further, except as otherwise set forth in the Plan, the Debtor will only pay Claims that are deemed "Allowed" Claims and reserves all rights to object to any and all Claims, unless the Plan expressly provides otherwise.

## A.    Bar Date and Claims

On June 6, 2016, the Debtor timely filed its schedules of Assets and liabilities [Docket Nos. 110-117] (collectively, the "Debtor's Schedules").  The aggregate scheduled liabilities of the Debtor were $1,640,000.00.

In its Notice of Chapter 11 Bankruptcy Case dated May 17, 2016, the Bankruptcy Court fixed September 7, 2016, 2016 (the "Bar Date") as the deadline for holders of alleged Claims against the Debtor to file proofs of claim against the Debtor.  *See* [Docket No. 7].  As mentioned previously and as specifically provided for in the Plan, the deadline for creditors holding Claims arising from the rejection of an executory contract or unexpired lease shall have until thirty (30) days following the Confirmation Date to file a proof of claim arising from such rejection and such claims shall be treated as falling within Class 8 – Other Unsecured Claims.

The Debtor intends to seek an order from the Bankruptcy Court to address Claims filed after the Bar Date (a "Tardy Claim"). Specifically, the Debtor will seek an order setting a future deadline for the filing of Tardy Claims, and approving a notice of such date.  **As part of such Notice, the Debtor will be asking the Court to disallow any Tardy Claim unless:  (i) the creditor that holds such Claim did not have notice or actual knowledge of this Chapter 11 Case in time for timely filing of a proof of claim prior to the Bar Date; and (ii) proof of such Tardy Claim is filed on or before _____, 2017.**  The notice will be included in the Solicitation Package.  If you believe you have a Claim against the Debtor, and have not yet filed a Claim, the Debtor urges you to contact an attorney immediately.

To date, approximately 91 proofs of claim have been filed against the Debtor in this Chapter 11 Case in an amount exceeding $154 million. While the Claims resolution process is in its early stages, the Debtor believes that certain Claims are overstated or misclassified and will object to such Claims post-Effective Date.

## B.    Procedures for Resolving Claims

In the ordinary course of business, the Debtor maintains books and records (the "Books and Records") that reflect, among other things, the Debtor's liabilities and the amounts owed to its creditors in connection with such liabilities. The Debtor and its professionals have been in the process of conducting a review of the proofs of claim submitted in this Chapter 11 Case, including any supporting documentation, and comparing the Claims asserted in the proofs of claim with the Books and Records to determine the validity of such Claims. Based upon such review to date, the Debtor intends to bring substantive and non-substantive motions to disallow and expunge certain proofs of claim, reclassify and reassign additional proofs of claim, and reduce in its Books and Records other proofs of claim as well as scheduled Claims that had been satisfied postpetition pursuant to orders of the Bankruptcy Court.

In addition, each Tardy Claim filed shall only become an Allowed Tardy Claim if the holder of the Tardy Claim proves it did not have notice or actual knowledge of this Chapter 11 Case in time to file its claim prior to the Bar Date.

The Debtor (independently and/or in conjunction with the trustee assigned to manage the Personal Injury Trust (the "Personal Injury Trustee")) shall object to and support the disallowance of any and all claims made by HealthTech, Hansen and Patten for indemnification, reimbursement or contribution.

Notwithstanding the foregoing, under the Plan, the Personal Injury Trustee and the Tort Claimants shall be responsible for determining distributions in respect of the Trust Personal Injury Claims.

## C.    Material Litigation

### 1.    The Lawsuits

As described above, as of the Petition Date, there were approximately 19 Lawsuits asserting Claims related to certain procedures performed by Hansen.  Such Claims will be channeled into the Personal Injury Trust and resolved pursuant to the Plan.  In addition to the Lawsuits involving Hansen, several other individuals filed lawsuits against the Debtor, or may have Claims against the Debtor, for alleged medical malpractice unrelated to Hansen (the "Non-Hansen Personal Injury Claimants").  The Non-Hansen Personal Injury Claimants shall neither receive nor retain under the Plan any property of any kind or nature whatsoever, including, without limitation, Cash, or any interest in any of the Personal Injury Trust Assets.  Rather, recovery for the Non-Hansen Personal Injury Claimants will be limited to any insurance coverage available to satisfy any Allowed Claims of the Non-Hansen Personal Injury Claimants.

### 2.      The Carrier Litigation

On February 27, 2015, Homeland initiated the Carrier Litigation.  In the Carrier Litigation, Homeland and UMIA seek a declaration that no coverage exists for the claims of certain of the Tort Claimants under their respective insurance policies with the Debtor.  The Debtor disputes the allegations contained in the Carrier Litigation and believes that coverage under the Insurance Policies exists for the Tort Claimants.  Further, the Debtor brought counterclaims against Homeland and UMIA for breach of contract and for bad faith breach of insurance contract based upon Homeland's and UMIA's refusal to provide coverage of certain of the Tort Claimant's claims.

Pursuant to the Plan, on the Effective Date, the Personal Injury Trustee, in its capacity as the Estate representative, shall be substituted into the Carrier Litigation in lieu of the Debtor and shall be responsible for representing the interests of the Debtor in such action at the Personal Injury Trust's own cost and expense.  In conjunction with the Personal Injury Trust's defense of the Carrier Litigation, pursuant to the Plan, the Debtor will cooperate in a commercially reasonable manner and in good faith with the Personal Injury Trustee to assure that the Personal Injury Trust has full and complete access to the Debtor's books and records in connection with its duty to defend against the Carrier Litigation, all as set forth in the Personal Injury Trust.  The Debtor believes that the claims made by the Carrier Litigation are meritless and that the Personal Injury Trust will be successful in its defense of such action and will be successful in its prosecution of the claims for bad faith breach of contract against the Insurance Companies; nevertheless, if the Insurance Companies are successful, the holders of Trust Personal Injury Claims will be unable to recover the potential proceeds under the Insurance Policies, which could total more than $25 million.

### 3.      The Tort Claimants' Claims Estimation Procedures

The Bankruptcy Code provides that unliquidated, disputed claims such as those of the Tort Claimants may be "estimated" by the Bankruptcy Court for purposes of voting on a plan of reorganization.  As a part of their global resolution, the Debtor, the Creditors Committee and the Tort Claimants have agreed that there shall be no estimation proceeding needed for Plan purposes, such as for voting and/or feasibility purposes. The Debtor, the Committee and the Tort Claimants shall agree, strictly for purposes of voting on a Plan, that the total claims are $19,000,000 and each Tort Claimant's collective claim (including claims of spouses, parents, and natural guardians) is $1,000,000 for such purposes. There shall be no preclusive, collateral estoppel or res judicata effect to such agreement ($19,000,000 is chosen because it is assumed there are nineteen (19) collective Tort Claimants – it is the number of collective Tort Claimants times $1,000,000). In addition, each collective Non-Hansen Personal Injury Claim shall have a claim for voting and feasibility purposes of $1,000,000. In other words, neither the Tort Claimants or the Debtor are agreeing that this is the correct or proper amount of each Tort Claimants' claim against the Debtor and neither the Tort Claimants or the Debtor will be bound by this estimation when liquidating the Tort Claimants' Claims.

### D.      Contingent, Unliquidated and/or Disputed Claims

Exclusive of the Tort Claimants, prior to the Confirmation Hearing, the Debtor may seek approval of procedures for voting on the Plan, including the temporary allowance of some Claims that are contingent, unliquidated and/or disputed for voting purposes. Specifically, if the Debtor has not reached an agreement with a claimant of a contingent, unliquidated and/or disputed Claim to allow such Claim only for purposes of voting and such claimant seeks to challenge the allowance or disallowance of its Claim for voting purposes, such claimant must serve on the Debtor and the Creditors Committee and file with the Bankruptcy Court a motion seeking entry of an order pursuant to Bankruptcy Rule 3018(a) temporarily allowing such Claim only for purposes of voting to accept or reject the Plan. The Debtor and the Tort Claimants have entered into an agreement for the allowance of the Trust Personal Injury Claims for the limited purpose of voting on the Plan. All other contingent, unliquidated and/or disputed Claims must abide by the procedures to be approved by the Bankruptcy Court.

## VIII.

## THE CHAPTER 11 PLAN

### A.      Introduction

As a result of the chapter 11 process and through the Plan, the Debtor expects that creditors will obtain a substantially greater recovery from the Estate than the recovery that would be available if the Assets had been liquidated under chapter 7 of the Bankruptcy Code. The Plan is annexed hereto as Exhibit A and forms part of this Disclosure Statement. The summary of the Plan set forth below is qualified in its entirety by the more detailed provisions set forth in the Plan.

### B.      General Description of the Treatment of Claims

#### 1.      Treatment of Unclassified Claims

As provided by section 1123(a)(1) of the Bankruptcy Code, Administrative Claims and Tax Claims shall not be classified under the Plan, and shall instead be treated separately as unclassified Claims and in accordance with sections 1129(a)(9)(A) and 1129(a)(9)(C) of the Bankruptcy Code, respectively. Such Claims are not designated as classes of Claims for the purposes of the Plan or for purposes of sections 1123, 1124, 1125, 1126, or 1129 of the Bankruptcy Code.

### a.    Treatment of Administrative Claims

The Debtor intends to pay all Allowed Administrative Claims in full. The holder of an Administrative Claim, other than (i) a Fee Claim; (ii) a liability incurred and payable in the ordinary course of business by the Debtor (and not past due); or (iii) an Administrative Claim that has been Allowed on or before the Effective Date, must file with the Bankruptcy Court and serve on the Debtor and the U.S. Trustee, notice of such Administrative Claim within thirty (30) days after service of Notice of Confirmation. Such notice must include at a minimum (A) the name of the holder of the Claim; (B) the amount of the Claim; and (C) the basis of the Claim. **Failure to file and serve such notice timely and properly shall result in the Administrative Claim being forever barred and discharged.**

Each Professional Person who holds or asserts a Fee Claim shall be required to file with the Bankruptcy Court, and serve on all parties required to receive notice, a Fee Application within thirty (30) days after the Effective Date. **The failure to timely file and serve such Fee Application shall result in the Fee Claim being forever barred and discharged.**

An Administrative Claim with respect to which notice has been properly filed and served pursuant to Section 5.2(a) of the Plan shall become an Allowed Administrative Claim if no objection is filed within sixty (60) days after the later of (i) the Effective Date; and (ii) the date of service of the applicable notice of Administrative Claim or such later date as may be approved by the Bankruptcy Court on motion of a party in interest, without notice or a hearing.  If an objection is filed within such 60-day period (or any extension thereof), the Administrative Claim shall become an Allowed Administrative Claim only to the extent Allowed by Final Order.  A Fee Claim in respect of which a Fee Application has been properly filed and served pursuant to Section 5.2(b) of the Plan shall become an Allowed Administrative Claim only to the extent Allowed by order of the Bankruptcy Court.

Within thirty (30) days after the Effective Date, or within thirty (30) days after becoming an Allowed Claim, whichever is later, each holder of an Allowed Administrative Claim shall receive (i) the amount of such holder's Allowed Claim in one Cash payment; or (ii) such other treatment as may be agreed upon in writing by the Debtor and such holder; provided, however, that such treatment shall not provide a return to such holder having a present value as of the Effective Date in excess of such holder's Allowed Administrative Claim; and provided further that an Administrative Claim representing a liability incurred and payable in the ordinary course of business of the Debtor may be paid at the Debtor's election in the ordinary course of business.

The Debtor believes that it will have sufficient Cash to satisfy all Allowed Administrative Claims, including Section 503(b)(9) Claims.

### b.    Treatment of Allowed Tax Claims

At the election of the Debtor, each holder of an Allowed Tax Claim will receive in full satisfaction of such Allowed Tax Claim (a) payments in Cash, in regular installments over a period ending not later that five (5) years after the Petition Date, of a total value, as of the Effective Date, equal to the Allowed amount of such Claim; (b) a lesser amount in one Cash

payment as may be agreed upon in writing by such holder; or (c) such other treatment as may be agreed upon in writing by such holder; provided, however, that such agreed upon treatment may not provide such holder with a return having a present value as of the Effective Date that is greater than the amount of such holder's Allowed Tax Claim. The Confirmation Order shall enjoin any holder of an Allowed Tax Claim from commencing or continuing any action or proceeding against any responsible person, officer or director of the Debtor that otherwise would be liable to such holder for payment of a Tax Claim so long as the Debtor is in compliance with Section 5.3 of the Plan. So long as the holder of an Allowed Tax Claim is enjoined from commencing or continuing any action or proceeding against any responsible person, officer or director under Section 5.3 of the Plan or pursuant to the Confirmation Order, the statute of limitations for commencing or continuing any such action or proceeding shall be tolled.

The Debtor is current on its taxes and does not believe there will be any Allowed Tax Claims.

**2.      Treatment of Classified Claims**

The classes of Claims against the Debtor shall be treated under the Plan as follows:

**a.      Class 1 – Priority Claims**

Class 1 shall consist of all Priority Claims against the Debtor. Each holder of an Allowed Priority Claim against the Debtor shall receive, on the later to occur of the Effective Date (or as soon as reasonably practicable thereafter) and the date upon which such Claim becomes an Allowed Claim, either (i) Cash in the amount of such holder's Allowed Priority Claim; or (ii) such other treatment as may be agreed upon by the Debtor and such holder; provided, however, that such treatment shall not provide a return to such holder having a present value as of the Effective Date in excess of the amount of such holder's Allowed Priority Claim. Class 1 – Priority Claims are unimpaired under the Plan and holders of such Claims are, therefore, deemed to accept the Plan and are not entitled to vote to accept or reject the Plan.

The Debtor does not believe that there is a material amount of Priority Claims.

**b.      Class 2 – First Bank of Wyoming Secured Claims**

Class 2 shall consist of the Secured Claims of First Bank of Wyoming.  As noted above, First Bank of Wyoming, as a holder of Allowed Secured Claims against the Debtor, shall receive, in full satisfaction of its Allowed Secured Claims, deferred Cash payments in accordance with the following terms:

- Loan # 120000084, with a current balance of approximately $260,505.86, shall continue to bear interest at the interest rate of 4.24%.  The monthly payments due thereunder shall equal $12,207.26.  The maturity date of this loan shall be May 10, 2019.

- Loan # 920120181, with a current balance of $900,000.00, shall continue to bear interest at the interest rate of 4.00% (fully variable at prime rate (currently 3.75%) with a floor of 4.00%). The monthly (interest only) payments due thereunder shall equal $3,000.00. The maturity date of this loan shall be May 10, 2019, at which time this loan will be fully amortized at an approximate monthly payment of $15,237.74, until the loan is paid in full (approximately November, 2024).

The Debtor believes that the only Secured Claims are the Claims of First Bank of Wyoming which the Debtor estimates are, in the aggregate, approximately $1,160,505.00.

### c.    Class 3 – Trust Personal Injury Claims

Class 3 shall consist of holders of Allowed Trust Personal Injury Claims. Each holder of a Trust Personal Injury Claim shall receive, in full satisfaction of its Trust Personal Injury Claim, each of the following: (i) its allocation of the Personal Injury Trust Assets in accordance with Section 7.2 of the Plan; (ii) the Debtor shall release any claims for outstanding medical bills owed as of the Petition Date by the individual Tort Claimants to the Debtor, and/or over which the Debtor has control; (iii) the Debtor shall release any claims for outstanding medical bills owed as of the Effective Date by the individual Tort Claimants to the Debtor and/or any person or entity over which the Debtor has control relating to medical services provided to a Tort Claimant by Hansen (for the avoidance of doubt, (ii) and (iii) shall not apply to any family members of the individual Tort Claimants); and, (iv) the Debtor shall support the Trust Personal Injury Claimants' motion regarding remand of the HealthTech related cases so they may be tried in a forum of the Trust Personal Injury Claimants' choosing.

### d.    Class 4 – Trade Claims

Class 4 shall consist of all Claims against the Debtor other than (i) Administrative Claims, (ii) Priority Claims, (iii) Tax Claims, (iv) First Bank of Wyoming Secured Claims, (v) Trust Personal Injury Claims, (vi) Reimbursement, Contribution and Indemnity Claims, (vii) Non-Hansen Personal Injury Claims, (vii) Tardy Claims and/or (viii) Rejection Claims. Each holder of an Allowed Trade Claim against the Debtor will receive its Allowed Trade Claim, in full, and in Cash without interest, in four (4) equal quarterly payments beginning the later of thirty (30) days after the Effective Date or the date such Trade Claim becomes an Allowed Claim; provided, that prior to the Debtor making any such payments, the amount of such holder's Allowed Trade Claim shall be reduced by applying the full amount of any postpetition deposit paid by the Debtor to such holder as adequate assurance of future performance to such holder's Allowed Trade Claim. The Debtor may elect, at its option, to pay Allowed Trade Claims over a shorter period of time than required herein.

The Debtor estimates that the total amount of Trade Claims is approximately $500,000.00.

### e.    Class 5 – Reimbursement, Contribution and Indemnity Claims

Class 5 shall consist of the Third Party Reimbursement, Contribution and Indemnity Claims. The Debtor does not believe that there are any Allowed Reimbursement, Contribution and Indemnity Claims. As to any such Claim, however, Debtor and the Personal Injury Trustee reserve any and all rights to assert, among other things, objections under 11 U.S.C. § 502(e)(1)(B) and 553 of the Bankruptcy Code. Any such Claim shall be entitled to any rights, if any, as an additional insured, under any policies of insurance, to which any such Claim may be entitled. Other than as set forth herein, each holder of an Allowed Reimbursement, Contribution and Indemnity Claim shall neither receive nor retain under the Plan any property of any kind or nature whatsoever, including, without limitation, Cash, or any interest in any of the Personal Injury Trust Assets. Class 5 Claims are impaired under the Plan and the holders of such Claims are, therefore, entitled to vote to accept or reject the Plan.

**Importantly, the Debtor is expected to object to all Reimbursement, Contribution and Indemnity Claims, including, without limitation, those of HealthTech, Patten and Hansen, and might seek to reclassify such Claims as Subordinated Claims. Also, nothing the Plan alters or in any way effects the ability of the holders of the Reimbursement, Contribution and Indemnity Claims to seek payment of those claims from the Insurance Companies under the Insurance Policies.**

### f.    Class 6 – Subordinated Claims

Class 6 shall consist of all Claims that have been subordinated to Other Unsecured Claims pursuant to section 510(c) of the Bankruptcy Code by a Final Order. Each holder of an Allowed Subordinated Claim shall neither receive nor retain under the Plan any property of any kind or nature whatsoever, including, without limitation, Cash, or any interest in any of the Personal Injury Trust Assets, on account of such holder's Allowed Subordinated Claim. Class 6 Claims are not retaining or receiving any property under the Plan and, therefore, Class 6 is not entitled to vote and is deemed to have rejected the Plan.

**The Debtor reserves the right to attempt to subordinate all Reimbursement, Contribution and Indemnity Claims..**

### g.    Class 7 – Non-Hansen Personal Injury Claims

Class 7 shall consist of all Claims held by Non-Hansen Personal Injury Claimants (each a "Non-Hansen Personal Injury Claim"). Each holder of a Non-Hansen Personal Injury Claim shall retain his or her Claims against any applicable insurance policy belonging to the Debtor and covering such Claims, but shall neither receive nor retain under the Plan any other property of any kind or nature whatsoever, including, without limitation, Cash, or any interest in any of the Personal Injury Trust Assets. Rather, recovery for the Non-Hansen Personal Injury Claimants will be limited to any insurance coverage available to satisfy any Allowed Claims of the Non-Hansen Personal Injury Claimants. The Debtor shall cooperate with the Class 7 claimants to determine if there is insurance coverage.

### h.    Class 8 – Other Unsecured Claims

Class 8 shall consist of all Allowed Tardy Claims and Allowed Rejection Claims. Each holder of an Allowed Tardy Claim and/or an Allowed Rejection Claim falling within Class 8 shall receive under the Plan its pro-rata share of $10,000 in Cash within thirty (30) days after final adjudication of all contested Tardy Claims and Rejection Claims, but will not receive any interest in any of the Personal Injury Trust Assets (unless the Court after notice and a hearing specifically orders otherwise prior to or on the Confirmation Date).

## C.    Means of Implementation of the Plan

### 1.    Operation between the Confirmation Date and the Effective Date

During the period from the Confirmation Date through and until the Effective Date, the Debtor shall continue to operate its business as Debtor in Possession, subject to the oversight of the Bankruptcy Court as provided in the Bankruptcy Code, the Bankruptcy Rules, and all orders of the Bankruptcy Court that are then in full force and effect.

### 2.    Continued Corporate Existence of the Debtor

Post-Effective Date, the Debtor will be reorganized pursuant to the Plan and continue to exist as Powell Valley Health Care, Inc.

### 3.    Re-vesting of Assets

Upon the occurrence of the Effective Date, except as otherwise expressly provided in the Plan, title to all of the Assets of the Debtor shall vest in the Debtor free and clear of all liens, Claims, interests, security interests and other encumbrances and without further order of the Bankruptcy Court. On and after the occurrence of the Effective Date, except as otherwise provided in the Plan, the Debtor may operate its business and may use, acquire and dispose of its Assets free of any restrictions of the Bankruptcy Code.

### 4.    Management and Officers

The Debtor's current board of directors and officers are as follows:

- Deb Kleinfeldt
- Jim Carlson
- Larry Parker
- Bonni Katz
- RJ Kost
- Beth Glib
- Gerri Ackley
- Dr. William Jarvis
- Dr. Nathaniel Rieb
- Dr. Jacob Merrell

- Terry Odom, CEO

The board of directors and officers of the Debtor shall continue to serve in their current capacity on and after the Effective Date. The Debtor anticipates employing a new, or interim, Chief Financial Officer prior to the Effective Date.  Subject to applicable law, from and after the Effective Date, the officers of the Debtor shall be selected and appointed, in accordance with, and pursuant to, the provisions of applicable law and the Debtor's constituent documents.

The Debtor has requested and will continue to request that HealthTech remain as the Debtor's management company on a post-Effective Date basis and that HealthTech continue to provide the Debtor with a Chief Executive Officer.  If, however, HealthTech elects to terminate its relationship with the Debtor, the Debtor will replace its Chief Executive Officer in a professional manner.

### 5.      Employees

Nothing in the Plan shall constitute an assumption by the Debtor of any Claims or obligations to its employees other than ordinary course employee benefit and compensation obligations.

### 6.      Director and Officer Liability Insurance

The Debtor's tail coverage under its director and officer liability insurance policies shall remain in full force and effect after the Effective Date for the term provided under such policies.

### 7.      Causes of Action

Without limiting anything in Article VII of the Plan, except for the Transferred Causes of Action and as otherwise set forth in the Plan, all Causes of Action of the Debtor and its Estate shall, upon the occurrence of the Effective Date, be vested in the Debtor. Except as otherwise provided in the Plan, the rights of the Debtor to commence, prosecute or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date. Further, the rights of the Personal Injury Trustee to pursue the Transferred Causes of Action and the Carrier Litigation shall be fully preserved notwithstanding the occurrence of the Effective Date.

**Note that each of the Transferred Causes of Action and the Carrier Litigation are expressly preserved and the Debtor fully expects that such Causes of Action will be pursued after the Effective Date by the Personal Injury Trustee. Further, the Debtor expects to object to each Reimbursement, Contribution and Indemnity Claims and Plan preserves the Debtor's right to do so.**

### D.      Appointment of the Disbursing Agent

Upon the occurrence of the Effective Date, (a) the Debtor shall be appointed to serve as the Disbursing Agent with respect to all Allowed Claims other than Trust Personal Injury Claims; and (b) the Personal Injury Trustee shall be appointed to serve as the Disbursing Agent

with respect to Trust Personal Injury Claims. Each of the Debtor and the Personal Injury Trustee, in its respective capacity a Disbursing Agent, shall have all powers, rights, duties and protections afforded the Disbursing Agent under the Plan and/or Personal Injury Trust.

1.    **Powers and Duties of the Disbursing Agent**

Pursuant to the terms and provisions of the Plan and/or Personal Injury Trust, the Disbursing Agent shall be empowered and directed to (a) take all steps and execute all instruments and documents necessary to make Plan Distributions to holders of Allowed Claims or Trust Personal Injury Claims; (b) comply with the Plan and/or Personal Injury Trust and the obligations thereunder; (c) employ, retain, or replace professionals to represent it with respect to its responsibilities; (d) object to Claims as specified in the Plan, and prosecute such objections; (e) compromise and settle any issue or dispute regarding the amount, validity, priority, treatment, or Allowance of any Claim as provided in the Plan and/or Personal Injury Trust; (f) make annual and other periodic reports regarding the status of distributions under the Plan and/or Personal Injury Trust to the holders of Allowed Claims or Trust Personal Injury Claims that are outstanding at such time, with such reports to be made available upon request to the holder of any Contested Claim; and (g) exercise such other powers as may be vested in the Disbursing Agent pursuant to the Plan, the Plan Documents, the Personal Injury Trust or an order of the Bankruptcy Court.

2.    **Sources of Cash for Plan Distributions**

All Cash necessary for the Debtor to make payments and Plan Distributions in its capacity as Disbursing Agent shall be obtained from the Debtor's existing Cash balances, and its operations. The Debtor has attached detailed projections, as Exhibit B to this Disclosure Statement that establish the Debtor's ability to satisfy its obligations hereunder.  All Cash necessary for the Personal Injury Trustee to make payments and Plan Distributions in its capacity as Disbursing Agent shall be obtained from the Personal Injury Trust Assets in accordance with the terms of the Personal Injury Trust.

3.    **Plan Distributions**

Pursuant to the terms and provisions of the Plan, the Disbursing Agent shall make the required Plan Distributions on the dates specified therefore.

4.    **Exculpation of the Disbursing Agent**

**Except as otherwise provided in Section 8.3 of the Plan, the Disbursing Agent, together with its officers, directors, employees, agents, attorneys and representatives, are exculpated pursuant to the Plan by all Persons, holders of Claims and all other parties in interest, from any and all Causes of Action arising out of the discharge of the powers and duties conferred upon the Disbursing Agent (and each of its respective paying agents), by the Plan, any Final Order of the Bankruptcy Court entered pursuant to or in the furtherance of the Plan, or applicable law, except solely for actions or omissions arising out of the Disbursing Agent's willful misconduct, gross negligence or breach of fiduciary duty.**

**No holder of a Claim or representative thereof, shall have or pursue any Cause of Action (a) against the Disbursing Agent or its respective officers, directors, employees, agents, and representatives for making Plan Distributions in accordance with the Plan and/or Personal Injury Trust; or (b) against any holder of a Claim for receiving or retaining Plan Distributions as provided for by the Plan and/or Personal Injury Trust. Nothing contained in Section 8.3 of the Plan shall preclude or impair any holder of an Allowed Claim from bringing an action in the Bankruptcy Court against any Disbursing Agent to compel the making of Plan Distributions contemplated by the Plan on account of such Claim.**

## E.    The Personal Injury Trust

### 1.    Formation of the Personal Injury Trust

On the Effective Date, pursuant to section 1123(a)(5) of the Bankruptcy Code, a trust (*i.e.*, the "Personal Injury Trust") will be created for the benefit of the holders of Trust Personal Injury Claims. The Personal Injury Trust shall be administered by the "Personal Injury Trustee," which shall be selected by the Tort Claimants and shall be identified prior to the commencement of the Confirmation Hearing. The appointment of the initial Personal Injury Trustee and the terms of its compensation shall be subject to the approval of the Bankruptcy Court.

On the Effective Date, the Debtor shall make an initial lump sum distribution to the Personal Injury Trust of $500,000 (the "Initial Plan Payment"). In addition, the Debtor shall make initial monthly payments to the Personal Injury Trust of $30,000 per month beginning on the first day of the first month following the Effective Date, and continuing thereafter for sixty months (the "Initial Monthly Distributions"), and subsequent monthly payments of $20,000 per month beginning on the first day of the sixty-first (61st) month following the Effective Date, and continuing thereafter for a period of thirty-five months (the "Subsequent Monthly Distributions"). The Initial Monthly Distributions and the Subsequent Monthly Distributions to the Personal Injury Trust shall be secured by a perfected security interest in the Debtor's account receivables. In addition, on the Effective Date, the Debtor shall transfer the Transferred Causes of Action to the Personal Injury Trust, which includes all of the Debtor's Causes of Action against HealthTech, Hansen and Patten. Such transfers shall be free and clear of liens, Claims and other encumbrances and shall be administered for the benefit of the holders of Trust Personal Injury Claims on the terms and conditions set forth in the Plan and the Personal Injury Trust.

### 2.    Purpose of the Personal Injury Trust

The Personal Injury Trust shall be established for the primary purpose of liquidating its assets in accordance with Treas. Reg. § 301.7701-4(d) with no objective to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to, and consistent with, the liquidating purpose of the Personal Injury Trust. Accordingly, the Personal Injury Trustee shall, in an expeditious but orderly manner, liquidate and convert to Cash the non-Cash Personal Injury Trust Assets, make timely distributions to the holders of Trust Personal Injury Claims, and not unduly prolong the duration of the Personal Injury Trust.

### 3.    Property of the Personal Injury Trust

The property of the Personal Injury Trust shall be comprised of the following:

- All rights regarding claims of the Debtor, to the extent assignable by applicable bankruptcy and non-bankruptcy law, against or relating to the following:

  o D&O insurance which may cover claims incurred prior to the Petition Date relating to trustees, officers and directors of the Debtor or District. For the avoidance of doubt: (i) recovery is limited to any available insurance proceeds from any insurance policy that covers said claims; and (ii) all D&O claims, if any, are retained and not released, to the extent of any insurance coverage against the Debtor's and/or District's directors, officers and/or trustees, including but not limited to breach of fiduciary duty claims, breach of the duty of loyalty claims and/or negligence claims. In addition, the Proofs of Claim of the District, Jim Carlson, R. J. Kost, Mark Olson, Beth Gilb, Nathaniel M. Reib, William J. Jarvis, Bonita Katz, Michael Tracy, M.D. and Deb Kleinfeldt shall be withdrawn with prejudice and they shall not be entitled to any distribution, nor share in any distribution under the Plan.

  o HealthTech Management Services, Inc. ("HealthTech"), its officers, directors, employees, and agents, including but not limited to any insurance obtained by HealthTech relating to the Debtor.

  o Dr. Jeffrey N. Hansen ("Hansen").

  o William D. Patten ("Patten").

  o Malpractice insurance which may cover claims asserted by the Tort Claimants and incurred prior to the Petition Date, including but not limited to all rights of the Debtor regarding the Declaratory Judgment Action, insurance obtained by the Debtor relating thereto, including but not limited to all rights regarding claims of the Debtor against the Debtor's insurance brokers and agents, to the extent assignable by law, relating to the alleged negligence of Debtor's insurance brokers and agents for, among other things, failing to properly advise the Debtor on proper claims notification practice, and including any extra-contractual claims including bad faith claims relating to the claims asserted by the Tort Claimants, if any, whether arising or relating to pre- or post-petition time periods.

  o All rights are assigned notwithstanding any anti-assignment provisions, if any, in any policies of insurance.

o   Any pre-petition legal malpractice claims to the extent permitted by applicable bankruptcy and non-bankruptcy law (excluding, however, Debtor's bankruptcy counsel who shall receive a release under the Plan), subject to the following conditions which must be met before the Personal Injury Trustee may pursue any such claims: (i) there is a determination by a court of competent jurisdiction that medical malpractice insurance coverage does not exist for the Tort Claimants; and (ii) the Personal Injury Trustee has been advised in writing by counsel that a legal malpractice claim exists subject, however, to a right of the Debtor to file an objection to the pursuit of any such claim (on notice given by the Personal Injury Trustee to the Debtor through the Debtor's member on the Personal Injury Claims Committee (as described herein), for which the Parties agree that the Bankruptcy Court shall retain exclusive jurisdiction.

o   For the avoidance of doubt, the applicable policies of insurance referenced above may include, but are not limited to, the policies of insurance listed below:

| Insurer | Policy No. |
|---|---|
| **D&O Policies** | |
| (Chubb) Executive Risk Indemnity Inc. | 8166-7248 |
| (Allied World) Darwin National Assurance Company | 0309-7656 |
| Travelers Casualty and Surety Company of America | 106097144 |
| **Medical Malpractice** | |
| Homeland Insurance Company of New York, a member of the OneBeacon Insurance Group (PHD) (HealthTech add'l insured) Hospital Professional Liability | MPP-5514-13 |
| Homeland Insurance Company of New York, a member of the OneBeacon Insurance Group (PVHC) (PHD) Healthcare Excess Indemnity | MPX-3502-13 |
| UMIA Insurance Inc. (PHD) (PVHC) Professional Liability and Excess coverage | WY920017 |

| Lexington Insurance Company (PVHC) | 6793042 |
| | 6793044 |

**D&O / E&O -- HealthTech**

| Lexington Insurance Company (HTMS) | 6796764 |
| | 6797081 |

- All rights under Class 3 of the Plan, and the Assets described in Section 7.2 of the Plan, including but not limited to those set forth below:

  o    The Personal Injury Trust Note, payable through the Initial Monthly Distributions and Subsequent Monthly Distributions. The Initial Monthly Distributions and the Subsequent Monthly Distributions shall be secured by a perfected security interest in the Debtor's Accounts (as defined under the Uniform Commercial Code in Wyoming (the "UCC")). Said security interest shall include the following: (i) a security agreement granting the Personal Injury Trust a security interest in the Debtor's Accounts to secure the Personal Injury Trust Note and the payments of the Initial Monthly Distributions and the Subsequent Monthly Distributions; (ii) a provision and acknowledgement in the security agreement that upon a payment default in regard to the Initial Monthly Distributions and/or the Subsequent Monthly Distributions, the Personal Injury Trust, through the Personal Injury Trustee, may exercise the default remedies available to a secured creditor under Article 9 of the UCC; and, (iii) allow for the filing of a UCC-1 financing statement evidencing the Personal Injury Trust's security interest in the Debtor's Accounts to secure the payment of the Personal Injury Trust Note and the Initial Monthly Distributions and the Subsequent Monthly Distributions. For the avoidance of doubt, the security interest granted to the Personal Injury Trustee shall be second only to First Bank of Wyoming (the "Bank"). Said agreements, financing statements and other documents evidencing the security agreement shall be acceptable to the Bank, it being the intent of the Parties to not interfere with the Bank's collateral position or enforcement rights; and,

  o    The Initial Plan Payment.

**4.        Certain Obligations of the Personal Injury Trust**

On the Effective Date, the Personal Injury Trustee, in its capacity as the Estate representative, shall be substituted into the Carrier Litigation in lieu of the Debtor and shall be

responsible for representing the interests of the Debtor in such action at the Personal Injury Trust's own cost and expense. In addition, the Personal Injury Trust shall be solely responsible for paying from the Personal Injury Trust Assets any and all costs and expenses of the Personal Injury Trustee and the Personal Injury Claims Committee (defined below).

### 5.      Power and Duties of the Personal Injury Trustee

The Personal Injury Trustee shall have the power to administer the assets of the Personal Injury Trust in a manner consistent with the Personal Injury Trust and the Personal Injury Trustee shall be the Estate representative designated to prosecute any and all Transferred Causes of Actions, which are each expressly preserved by the Plan.

### 6.      Termination of Personal Injury Trust

The Personal Injury Trust will terminate as soon as practicable, but not later than the eighth (5th) anniversary of the Effective Date; provided, however, that, on or prior to the eighth (5th) anniversary of the Effective Date (or such later date as may be permitted by order of the Bankruptcy Court), the Bankruptcy Court, upon motion by a party in interest, may extend the term of the Personal Injury Trust for a finite period, if such an extension is necessary to liquidate the assets of the Personal Injury Trust or for other good cause. Multiple extensions of the termination of the Personal Injury Trust may be obtained so long as Bankruptcy Court approval is obtained prior to the expiration of each extended term and the Personal Injury Trustee receives an opinion of counsel or a favorable ruling from the Internal Revenue Service that any further extension would not adversely affect the status of the Personal Injury Trust as a grantor trust for federal income tax purposes.

### 7.      Determination of Personal Injury Trust Assets

For distribution purposes, each Tort Claimant's Claim shall be subject to a procedure agreed upon by the Debtor, the Creditors Committee and the Tort Claimants in accordance with the Personal Injury Trust. Said procedure will be approved by the Bankruptcy Court. However, per the Plan, each Tort Claimant will only receive payment of Claims from the assets of the Personal Injury Trust (*i.e.*, the Personal Injury Trust Assets).

### 8.      Certain Obligations of the Debtor

The Debtor shall cooperate in a commercially reasonable manner and in good faith with the Personal Injury Trustee to assure that the Personal Injury Trust has full and complete access to the Debtor's records and documents in connection with its duty to prosecute the Transferred Causes of Action and defend against the Carrier Litigation. Without limiting the generality of the foregoing, the Debtor shall (i) preserve all records and documents (including any electronic records and documents) related to the Transferred Causes of Action until the fifth (5th) anniversary of the Effective Date, or if actions related to the Transferred Causes of Action remain pending as of such date, until the Personal Injury Trustee notifies the Debtor that such

records are no longer required to be preserved; and, (ii) provide the Personal Injury Trustee with reasonable access to review and copy such records and documents.

### 9.      Certain Provisions Concerning Trust Personal Injury Claims

The Personal Injury Trust shall permit the holders of Trust Personal Injury Claims to receive distributions from the Personal Injury Trust as directed by the Personal Injury Trustee in consultation with the Personal Injury Claims Committee.

Notwithstanding anything to the contrary in the Plan, the Plan Documents or the Personal Injury Trust, under no circumstances shall a holder of a Trust Personal Injury Claim receive, on account of their respective Allowed Trust Personal Injury Claim, from any source, including, but not limited to, from the Debtor, the Personal Injury Trust Assets or other source, an amount or distribution greater than 100% of their Allowed Trust Personal Injury Claim. Accordingly, in the event that the total amount of all liquidated Allowed Trust Personal Injury Claims, along with interest at the judgment rate provided under Wyoming law which shall begin accruing from the date that each Allowed Trust Personal Injury Claim is liquidated, is less than the sum of: (i) the total net recovery from the Personal Injury Trust Assets after payment of all fees, costs and attorneys' fees (including recoveries for bad faith related to insurance claims) plus (ii) the amount of the Initial Plan Payment that is paid into the Personal Injury Trust for the benefit of the holders of Trust Personal Injury Claims; plus (iii) any previously paid Initial Monthly Distributions and Subsequent Monthly Distributions, then the excess recovery from the assets identified in (i)-(iii) above shall immediately be turned over to the Debtor, the Personal Injury Trust Note shall be cancelled and the Debtor shall no longer be obligated to make additional Initial Monthly Distributions and/or Subsequent Monthly Distributions, and the security interest identified in Section 7.2 of the Plan shall be released.

The holders of Trust Personal Injury Claims may enforce their security interest in Debtor's account receivables if the Debtor fails to make any Initial Monthly Distribution or Subsequent Monthly Distribution, and such failure is not cured within thirty (30) days of the receipt of a written notice issued by the Personal Injury Trustee that such failure has occurred.

Nothing in Section 7.2 of the Plan shall affect, modify, impair or waive the ability of the holders of Trust Personal Injury Claims to obtain recoveries from any other Person, including, without limitation, any Insurance Carrier, HealthTech, Hansen and/or Patten.

The Debtor believes that more than $25,000,000.00 in the aggregate, is available for distribution from the Insurance Policies. The Transferred Causes of Action are unliquidated and of uncertain value, but could provide additional resources if successfully prosecuted.

On the Effective Date, the Personal Injury Trust shall establish a committee of representatives of holders of Trust Personal Injury Claims and a representative from the Debtor to act as the "Personal Injury Claims Committee" under the Personal Injury Trust. The Personal Injury Claims Committee shall serve as a liaison between the holders of Trust Personal Injury Claims and the Personal Injury Trustee, shall have standing to object to any action taken or omission by the Personal Injury Trustee, and shall have all of the other rights and responsibilities

set forth in the Personal Injury Trust. The Debtor shall have no responsibly for any costs and expenses incurred by the Personal Injury Claims Committee, other than the costs associated with the Debtor's representative.

Nothing in the Plan shall modify, impair or release the obligations of the Insurance Companies under the Insurance Policies, including, without limitation, the duty to defend the Debtor or any other insured with respect to the Trust Personal Injury Claims and the Insurance Companies shall fund all litigation expenses of the Debtor as and to the extent required by the Insurance Policies.

**10.    Certain Provisions Concerning Other Personal Injury Claims**

The Plan also includes provisions concerning personal injury claims not related to the Lawsuits.  Such Claims are referred to in the Plan as "Non-Hansen Personal Injury Claims." Notwithstanding anything else set forth in the Plan, the Plan Documents, or the Personal Injury Trust, on the Effective Date, all Non-Hansen Personal Injury Claims shall not become Allowed Claims for purposes of receiving a distribution under the Plan, the Plan Documents, or the Personal Injury Trust.  Rather, notwithstanding the automatic stay (to the extent applicable), the discharge provided for in section 1141(d) of the Bankruptcy Code and in the Plan, or any other injunction provided for in the Plan, the holders of Non-Hansen Personal Injury Claims that filed a timely proof of claim in respect of such Claims shall be entitled to liquidate such Claims against the Debtor in the court of their choice, provided, that any such Non-Hansen Personal Injury Claims that result in judgment or are determined pursuant to an agreement with the Debtor shall only be satisfied and/or paid from any applicable insurance proceeds available to satisfy said Claims.  Holders of Non-Hansen Personal Injury Claims shall not receive any distribution from the Personal Injury Trust.  Holders of Non-Hansen Personal Injury Claims that failed to file a timely proof of claim shall, on the Effective Date, have their Claims disallowed in their entirety and shall be fully subject to the automatic stay (to the extent applicable), the discharge provided for in section 1141(d) of the Bankruptcy Code and in the Plan, and any other injunctions set forth in the Plan.

**F.    Plan Distribution Provisions**

**1.    Plan Distributions**

The Disbursing Agent shall make all Plan Distributions in accordance with the terms of the Plan or Personal Injury Trust. In the event a Plan Distribution shall be payable on a day other than a Business Day, such Plan Distribution shall instead be paid on the immediately succeeding Business Day, but shall be deemed to have been made on the date otherwise due. For federal income tax purposes, except to the extent a Plan Distribution is made in connection with reinstatement of an obligation pursuant to section 1124 of the Bankruptcy Code, a Plan Distribution will be allocated first to the principal amount of a Claim and then, to the extent the Plan Distribution exceeds the principal amount of the Claim, to the portion of the Claim representing accrued but unpaid interest.

**2.    Timing of Plan Distributions**

Each Plan Distribution shall be made on the relevant date therefore and shall be deemed to have been timely made if made on such date or within ten (10) days thereafter.

### 3.     Address for Delivery of Plan Distributions

Subject to Bankruptcy Rule 9010, any Plan Distribution or delivery to a holder of an Allowed Claim shall be made at the address of such holder as set forth (a) in the Debtor's Schedules; (b) on the proof of Claim filed by such holder; (c) in any notice of assignment filed with the Bankruptcy Court with respect to such Claim pursuant to Bankruptcy Rule 3001(e); or, (d) in any notice served by such holder giving details of a change of address. If any Plan Distribution is returned to the Disbursing Agent as undeliverable, no Plan Distributions shall be made to such holder unless the Disbursing Agent is notified of such holder's then current address within ninety (90) days after such Plan Distribution was returned. After such date, if such notice was not provided, a holder shall have forfeited its right to such Plan Distribution, and the undeliverable Plan Distribution shall be returned to the Debtor, or if the Disbursing Agent for the applicable Plan Distribution is the Personal Injury Trustee, to the Personal Injury Trust.

### 4.     De Minimis Distributions

No Plan Distribution of less than fifty dollars ($50.00) shall be made by the Disbursing Agent to the holder of any Claim unless a request therefore is made in writing to the Disbursing Agent within thirty (30) days of the Effective Date. Each Plan Distribution of less than fifty dollars ($50.00) shall automatically revert to the Debtor.

### 5.     Time Bar to Cash Payments

Checks issued by the Debtor in respect of Allowed Claims shall be null and void if not negotiated within one hundred and eighty (180) days after the date of issuance thereof. Requests for reissuance of any voided check shall be made directly to the Disbursing Agent by the holder of the Allowed Claim to whom such check was originally issued. Any Claim in respect of such a voided check shall be made within thirty days (30) days after the date upon which such check was deemed void. If no request is made as provided in the preceding sentence, any Claims in respect of such voided check shall be discharged and forever barred and such unclaimed Plan Distribution shall revert to the Debtor.  This provision shall only apply to the Disbursing Agent for the Debtor.

### 6.     Manner of Payment under the Plan

Unless the Person receiving a Plan Distribution agrees otherwise, any Plan Distribution to be made in Cash under the Plan shall be made, at the election of the Disbursing Agent, by check drawn on a domestic bank or by wire transfer from a domestic bank. Cash payments to foreign creditors may, in addition to the foregoing, be made at the option of the Disbursing Agent in such funds and by such means as are necessary or customary in a particular foreign jurisdiction.

### 7.     Fractional Plan Distributions

Notwithstanding anything to the contrary contained herein, no Plan Distributions of fractions of dollars (whether in Cash or notes) will be made. Fractions of dollars (whether in Cash or notes) shall be rounded to the nearest whole unit (with any amount equal to or less than one-half dollar to be rounded down).

### 8.    Surrender and Cancellation of Instruments

As a condition to receiving any Plan Distribution, the holder of an Allowed Claim evidenced by a certificate, instrument or note other than any such certificate, instrument or note that is being reinstated or being left unimpaired under the Plan, shall (a) surrender such certificate, instrument or note representing such Claim, except to the extent assumed by the Debtor; and (b) execute and deliver such other documents as may be necessary to effectuate the Plan. Such certificate, instrument or note shall thereafter be cancelled and extinguished. The Disbursing Agent shall have the right to withhold any Plan Distribution to be made to or on behalf of any holder of such Claims unless and until (1) such certificates, instruments or notes are surrendered; or, (2) any relevant holder provides to the Disbursing Agent an affidavit of loss or such other documents as may be required by the Disbursing Agent together with an appropriate indemnity in the customary form. Any such holder who fails to surrender such certificates, instruments or notes or otherwise fails to deliver an affidavit of loss and indemnity within ninety (90) days after the Effective Date, shall be deemed to have forfeited its Claims and shall not participate in any Plan Distribution. All property in respect of such forfeited Claims shall revert to the Debtor.

## G.    Procedures for Resolving and Treating Contested Claims

### 1.    Certain Claims Resolved Pursuant to Special Procedures

All Trust Personal Injury Claims shall be resolved as provided in Section 7.2 of the Plan and not pursuant to the procedures set forth in Article X of the Plan. All Non-Hansen Personal Injury Claims shall be liquidated as set forth in Section 7.4 of the Plan and not pursuant to the procedures set forth in Article X of the Plan. On the Effective Date, the following Claims shall be deemed withdrawn with prejudice: the District, Jim Carlson, R.J. Kost, Mark Olson, Beth Gilb, Nathaniel M. Reib, William J. Jarvis, Bonita Katz, Michael Tracy, M.D. and Deb Kleinfeldt, and they shall not be entitled to any distribution, or share in any distribution under the Plan.  All other Claims shall be subject to the procedures set forth in this Article X.

### 2.    Objection Deadline

The Disbursing Agent shall file objections to Claims, if any, with the Bankruptcy Court as soon as practicable, but not later than (a) the date that is one hundred and eighty (180) days after the Effective Date; or (b) such later date as may be established by order of the Bankruptcy Court upon motion of the Disbursing Agent without notice or a hearing. The Disbursing Agent shall serve any objection to a Claim upon the holder of the Claim to which the Debtor objects.

### 3.    Prosecution of Contested Claims

The Debtor, in its capacity as Disbursing Agent, may object to the allowance of Claims filed with the Bankruptcy Court with respect to which liability is disputed in whole or in part. All objections that are filed and prosecuted as provided herein shall be litigated to Final Order or compromised and settled in accordance with Section 10.4 of the Plan; provided, however, that the Personal Injury Trustee and the Debtor shall jointly have the power and authority to make, prosecute and settle objections to any Claims of insurance companies, Hansen, Patten and/or HealthTech, and assert such rights regarding said objections, including but not limited to rights of set-off under 11 U.S.C. § 553 of the Bankruptcy Code, and including claims for disallowance and/or equitable subordination of such Claims under 11 U.S.C. § 510(c) of the Bankruptcy Code. Any settlement of Claims asserted by an insurance company, Hansen, Patten or HealthTech shall be agreed upon by the Debtor and the Personal Injury Trustee, and approved by the Bankruptcy Court after notice and hearing.

### 4.  Claims Settlement

Notwithstanding any requirements that may be imposed pursuant to Bankruptcy Rule 9019, from and after the Effective Date, the Debtor, in its capacity as Disbursing Agent, shall have authority to settle or compromise all Claims and Causes of Action (except the Transferred Causes of Action) without further review of approval of the Bankruptcy Court; subject, however, to the limitations set forth in Section G.3. above regarding any Claims of insurance companies, Hansen, Patten and/or HealthTech.

### 5.  Entitlement to Plan Distributions upon Allowances

Notwithstanding any other provision of the Plan, no Plan Distribution shall be made with respect to any Claim to the extent it is a Contested Claim, unless and until such Contested Claim becomes an Allowed Claim. When a Claim that is not an Allowed Claim as of the Effective Date becomes an Allowed Claim (regardless of when) the holder of such Allowed Claim shall thereupon become entitled to receive the Plan Distributions in respect of such Claim, the same as though such Claim had been an Allowed Claim on the Effective Date.

### 6.  Estimations of Claims

The Disbursing Agent may, at any time, request that the Bankruptcy Court estimate any Contested Claim pursuant to section 502(c) of the Bankruptcy Code regardless of whether the Disbursing Agent has previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court will retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including during the pendency of any appeal relating to any such objection. In the event the Bankruptcy Court estimates a Contested Claim, that estimated amount will constitute the Allowed amount of such Claim for all purposes under the Plan. All of the objection, estimation, settlement, and resolution procedures set forth in the Plan are cumulative and not necessarily exclusive of one another. Claims may be estimated and subsequently compromised, settled, withdrawn, or resolved by any mechanism approved by the Bankruptcy Court. In the interest of clarity, this provision shall not apply to Trust Personal Injury Claims.

**H.  Conditions Precedent to Confirmation of the Plan and the Occurrence of the Effective Date**

**1.  Conditions Precedent to Confirmation of the Plan**

The following are conditions precedent to confirmation of the Plan:

(a)  The clerk of the Bankruptcy Court shall have entered an order or orders (i) approving the Disclosure Statement as containing "adequate information" pursuant to section 1125 of the Bankruptcy Code; (ii) finding that due and proper notice of the Plan was given to all holders of a Claim; (iii) authorizing the solicitation of votes with respect to the Plan; (iv) determining that all votes are binding and have been properly tabulated as acceptances or rejections of the Plan; (v) confirming and giving effect to the terms and provisions of the Plan; (vi) determining that all applicable tests, standards and burdens in connection with the Plan have been duly satisfied and met by the Debtor and the Plan; (vii) approving the Plan Documents; and (viii) authorizing the Debtor to execute, enter into, and deliver the Plan Documents and to execute, implement, and to take all actions otherwise necessary or appropriate to give effect to, the transactions and transfer of Assets contemplated by the Plan and the Plan Documents; and,

(b)  The Confirmation Order, the Plan Documents and the Plan are each in a form reasonably satisfactory to the Debtor.

**2.  Conditions Precedent to the Occurrence of the Effective Date**

The following are conditions precedent to the occurrence of the Effective Date:

(a)  The Confirmation Order shall have been entered by the clerk of the Bankruptcy Court in a form and substance reasonably satisfactory to the Debtor, and shall be in full force and effect and not be subject to any stay or injunction;

(b)  The Debtor shall have executed the Personal Injury Trust Note;

(c)  The Debtor shall have received the District Refund (which shall be paid to the Personal Injury Trust on the Effective Date);

(d)  All necessary consents, authorizations and approvals shall have been given for the transfers of property and the payments provided for or contemplated by the Plan, including, without limitation, satisfaction or waiver of all conditions to the obligations of the Debtor under the Plan and the Plan Documents; and,

(e)  The Personal Injury Trust shall have become effective.

**3.  Waiver of Conditions Precedent**

The Debtor may waive any one or more of the conditions set forth in Sections 11.1 or 11.2 of the Plan without notice or order of the Bankruptcy Court and without notice to any parties in interest.

### 4.      Effect of Non-Occurrence of the Effective Date

If the Effective Date shall not occur, the Plan shall be null and void and nothing contained in the Plan shall: (a) constitute a waiver or release of any Claims against the Debtor; (b) prejudice in any manner the rights of the Debtor, including, without limitation, any right to seek a further extension of the exclusivity periods under section 1121(d) of the Bankruptcy Code; or (c) constitute an admission, acknowledgement, offer or undertaking by the Debtor.

### 5.      Right to Revoke or Withdraw Plan

The Debtor reserves the right to revoke or withdraw the Plan at any time prior to the Confirmation Date and to file subsequent plans of reorganization.  If the Debtor revokes or withdraws the Plan, or if Confirmation or consummation does not occur, then (a) the Plan shall be null and void in all respects, (b) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain any Claim or Class of Claims), assumption or rejection of Executory Contracts affected by the Plan, and any document or agreement executed pursuant to the Plan shall be deemed null and void, and (c) nothing contained in the Plan, and no acts taken in preparation for consummation of the Plan, shall (i) constitute or be deemed to constitute a waiver or release of any Claims by or against, or any Interests in, any Debtor or any other Person, (ii) prejudice in any manner the rights of the Debtor or any Person in any further proceedings involving the Debtor, or (iii) constitute an admission of any sort by the Debtor or any other Person.

## I.      Executory Contracts and Unexpired Leases

### 1.      Assumption and Rejection of Executory Contracts and Unexpired Leases

On the Effective Date, all executory contracts and unexpired leases of the Debtor shall be assumed pursuant to the provisions of section 365 of the Bankruptcy Code, except:  (i) any executory contracts and unexpired leases that are the subject of separate motions to reject, assume, or assume and assign filed pursuant to section 365 of the Bankruptcy Code by the Debtor before the Effective Date; (ii) each contract and lease listed in the Schedule of Rejected Executory Contracts and Unexpired Leases; (iii) all other executory contracts and unexpired leases rejected under this Plan or by order of the Bankruptcy Court entered before the Effective Date; (iv) any executory contract or unexpired lease that is  the subject of a dispute over the amount or manner of cure pursuant to Section 12.2 hereof and for which the Debtor makes a motion to reject such contract or lease based upon the existence of such dispute filed at any time; (v) any agreement, obligation, security interest, transaction or similar undertaking that the Debtor believes is not executory; and, (vi) any and all agreements executed between the Debtor and Hansen prior to the Petition Date.  The Debtor shall file the Schedule of Assumed Executory Contracts and Unexpired Leases at least twenty (20) days prior to the Confirmation Hearing.

The Debtor shall use commercially reasonable efforts to identify all executory contracts and unexpired leases subject to assumption in the Schedule of Assumed Executory Contracts and Unexpired Leases. If an executory contract or unexpired lease is omitted from the Schedule of Assumed Executory Contracts and Unexpired Leases (an "Omitted Assumed Contract") and is not included in the Schedule of Rejected Executory Contracts and Unexpired Leases, such executory contract or unexpired lease shall, nonetheless be deemed assumed pursuant to the terms of this Article XII.

Any non-Debtor counterparty to an agreement not listed on the Schedule of Rejected Executory Contracts or Unexpired Leases that disputes (i) the amount of any cure payments; (ii) the Debtor's ability to provide adequate assurance of future performance; or (iii) any other matter pertaining to the assumption or assignment of such agreement must file with the Bankruptcy Court, and serve upon the Debtor, a written objection (an "Assumption Objection"), which objection shall set forth the basis for the dispute by no later than ten (10) Business Days prior to the Confirmation Hearing (the "Assumption Objection Deadline"). If a non-Debtor counterparty fails to file and serve an Assumption Objection by the Assumption Objection Deadline, the non-Debtor counterparty shall be deemed to have waived any and all objections to the assumption of the relevant agreement as proposed by the Debtor, including the lack of any cure obligations. Notwithstanding any of the forgoing, if an assumed executory contract or unexpired lease constitutes an Omitted Assumed Contract at any time after the commencement of the Confirmation Hearing, the Debtor shall, promptly upon the discovery of such Omitted Assumed Contract, provide written notice of such Omitted Assumed Contract to the non-Debtor counterparty identifying the Omitted Assumed Contract and detailing the proposed cure amount. Thereafter, such non-Debtor counterparty shall have twenty (20) days from the issuance of such notice to object to the assumption of such Omitted Assumed Contract or the proposed cure amount. Any objections that are not resolved by agreement shall be resolved by the Bankruptcy Court. If you believe that you are a party to an Omitted Assumed Contract, you should immediately advise the Debtor of your position so that the matter may be resolved in a timely fashion.

Entry of the Confirmation Order by the clerk of the Bankruptcy Court shall constitute approval of the assumption of executory contracts and unexpired leases as set forth in Section 12.1(a) of the Plan pursuant to sections 365(a) and (b) of the Bankruptcy Code without further order of the Bankruptcy Court.

The Debtor estimates that it will owe approximately $0 in cure payments, after deductions for security deposits paid to secure the postpetition provision of goods and/or services. The Debtor will fund all cure payments from its existing Cash.

The Plan shall constitute a motion to reject such executory contracts and unexpired leases set forth in the Schedule of Rejected Executory Contracts and Unexpired Leases, and the Debtor shall have no liability thereunder except as is specifically provided in the Plan. The Debtor reserves the right to amend the Schedule of Rejected Executory Contracts and Unexpired Leases on or prior to the Confirmation Date to delete any executory contract or unexpired lease therefrom or add any executory contract or unexpired lease thereto, in which event such executory contract(s) and unexpired lease(s) shall be deemed to be, respectively, assumed or rejected by the Debtor pursuant to Article XII of the Plan. The Debtor shall provide notice of any

amendments to the Schedule of Rejected Executory Contracts and Unexpired Leases to the parties to the executory contracts or unexpired lease affected thereby. The listing of a document on the Schedule of Rejected Executory Contracts and Unexpired Leases shall not constitute an admission by the Debtor that such document is an executory contract or that the Debtor has any liability thereunder. Entry of the Confirmation Order by the clerk of the Bankruptcy Court shall constitute approval of rejections under Section 12.1 of the Plan pursuant to section 365(a) of the Bankruptcy Code and a finding by the Bankruptcy Court that each such rejected agreement, executory contract or unexpired lease is burdensome and that the rejection thereof is in the best interests of the Debtor and its Estate.

Inclusion of a contract, lease or other agreement on the Schedule of Rejected Executory Contracts and Unexpired Leases shall constitute adequate and sufficient notice that (i) any Claims arising thereunder or related thereto shall be treated as an Unsecured Claim under the Plan; and (ii) the Debtor is no longer bound by, or otherwise obligated to perform, any such obligations, transactions, or undertakings relating thereto or arising thereunder.

**2.      Cure**

Any monetary defaults under each executory contract and unexpired lease to be assumed under the Plan shall be satisfied pursuant to section 365(b)(1) of the Bankruptcy Code: (a) by payment of the cure amount listed on the Schedule of Assumed Executory Contracts and Unexpired Leases in Cash on the Effective Date; or (b) on such other terms as agreed to by the parties to such executory contract or unexpired lease. In the event a non-Debtor counterparty files an Assumption Objection, the cure payments required by section 365(b)(1) of the Bankruptcy Code to such non-Debtor counterparty shall be made following the entry of a Final Order resolving the dispute and approving assumption or assignment, as applicable. The Debtor reserves the right to reject any executory contract or unexpired lease that is the subject of an Assumption Objection.

**3.      HealthTech Management Contract**

Notwithstanding anything else set forth in the Plan, on the Effective Date, the Debtor, with the consent of HealthTech, shall assume the HealthTech Management Contract pursuant to section 365(a) of the Bankruptcy Code, but there shall be no cure amounts required pursuant to section 365(b)(1) of the Bankruptcy Code.   Further, any HealthTech Reimbursement, Contribution and Indemnity Claim shall be treated as provided in Section 4.1(e) of the Plan. For the avoidance of doubt, there shall be no payment to HealthTech under Section 4.1(e) of the Plan, and the Debtor shall have no obligation to pay any cure payments to HealthTech notwithstanding the assumption of the HealthTech Management Contract.  If HealthTech shall not consent to the assumption of the HealthTech Management Contract as set forth herein, the HealthTech Management Contract shall be deemed rejected and HealthTech shall be required to file a proof of Claim for rejection damages as set forth in Section 12.3 of the Plan.  All Rejection Claims of HealthTech shall be treated the same as Other Unsecured Claims.

The Debtor will request that HealthTech agree to the assumption of the HealthTech Management Contract as provided in the Plan and remain as the Debtor's management company.

However, the Debtor may be forced to reject the HealthTech Management Contract if HealthTech does not wish to continue as the Debtor's management company. Under those circumstances, the Debtor's board of directors will obtain new management in a professional manner and without disruption to the Debtor or its operations.

### 4.    Claims Arising from Rejection, Expiration or Termination

Claims created by the rejection of executory contracts and unexpired leases or the expiration or termination of any executory contract or unexpired lease prior to the Confirmation Date ("Rejection Claims") must be filed with the Bankruptcy Court and served on the Debtor: (a) in the case of an executory contract or unexpired lease rejected by the Debtor prior to the Confirmation Date, in accordance with the order rejecting such executory contract or unexpired lease; or (b) in the case of an executory contract or unexpired lease that (i) was terminated or expired by its terms prior to the Confirmation Date; or (ii) is rejected pursuant to Article XII of the Plan, no later than thirty (30) days after the Confirmation Date (the "Rejection Claims Deadline"). Any Rejection Claims for which a proof of claim is not filed and served by the Rejection Claims Deadline will be forever barred from assertion and shall not be enforceable against the Debtor or its Estate. Unless otherwise ordered by the Bankruptcy Court, all such Allowed Rejection Claims that are timely filed as provided herein shall be treated as Other Unsecured Claims under the Plan subject to objection by the Disbursing Agent.

### J.    Retention of Jurisdiction

Pursuant to sections 105(a) and 1142 of the Bankruptcy Code, the Bankruptcy Court shall, unless it orders otherwise, retain and shall have exclusive jurisdiction over any matter (a) arising under the Bankruptcy Code; or (b) arising in or related to the Chapter 11 Case or the Plan, including, without limitation, the following:

(a)    To hear and determine any and all motions or applications pending on the Confirmation Date or thereafter brought in accordance with Article XII of the Plan for the assumption, assumption and assignment or rejection of executory contracts or unexpired leases to which the Debtor is a party or with respect to which the Debtor may be liable, and to hear and determine any and all Claims and any related disputes (including, without limitation, the exercise or enforcement of setoff or recoupment rights, or rights against any third party or the property of any third party resulting therefrom or from the expiration, termination or liquidation of any executory contract or unexpired lease);

(b)    To determine any and all adversary proceedings, applications, motions, and contested or litigated matters that may be pending on the Effective Date or that, pursuant to the Plan, may be instituted by the Disbursing Agent, the Personal Injury Trustee or the Debtor, as applicable, after the Effective Date;

(c)    Except as provided for in the Plan, to hear and determine any objections to the allowance of Claims, whether filed, asserted, or made before or after the Effective Date, including, without express or implied limitation, to hear and determine any objections to the

classification of any Claim and to allow, disallow or estimate any Contested Claim in whole or in part;

(d)     To issue such orders in aid of execution of the Plan to the extent authorized or contemplated by section 1142 of the Bankruptcy Code;

(e)     To consider any modifications of the Plan, remedy any defect or omission, or reconcile any inconsistency in any order of the Bankruptcy Court, including, without limitation, the Confirmation Order;

(f)     To hear and determine all Fee Applications and applications for allowances of compensation and reimbursement of any other fees and expenses authorized to be paid or reimbursed under the Plan or the Bankruptcy Code;

(g)     To hear and determine all controversies, suits, and disputes that may relate to, impact upon, or arise in connection with the Plan, the Debtor's rights under the Personal Injury Trust and the Plan Documents or their interpretation, implementation, enforcement, or consummation;

(h)     To hear and determine all controversies, suits, and disputes that may relate to, impact upon, or arise in connection with the Confirmation Order (and all exhibits to the Plan) or its interpretation, implementation, enforcement, or consummation;

(i)     To the extent that Bankruptcy Court approval is required, to consider and act on the compromise and settlement of any Claim or Cause of Action by, on behalf of, or against the Estate;

(j)     To determine such other matters that may be set forth in the Plan, or the Confirmation Order, or that may arise in connection with the Plan, or the Confirmation Order;

(k)     To hear and determine matters concerning state, local, and federal taxes, fines, penalties, or additions to taxes for which the Debtor, the Debtor in Possession, Personal Injury Trustee or the Disbursing Agent may be liable, directly or indirectly, in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

(l)     To hear and determine all controversies, suits, and disputes that may relate to, impact upon, or arise in connection with any setoff and/or recoupment rights of the Debtor or any Person under the Plan;

(m)     To hear and determine all controversies, suits, and disputes that may relate to, impact upon, or arise in connection with Causes of Action of the Debtor (including Avoidance Actions) commenced by the Disbursing Agent, the Personal Injury Trustee, the Debtor or any third parties, as applicable, before or after the Effective Date;

(n)     To hear and determine all controversies, suits, and disputes that may relate to the Debtor's ability, under applicable bankruptcy and non-bankruptcy law, to transfer the Transferred Causes of Action to the Personal Injury Trust;

(o)     To enter an order or final decree closing the Chapter 11 Case;

(p)     To issue injunctions, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any Person with consummation, implementation or enforcement of the Plan or the Confirmation Order; and

(q)     To hear and determine any other matters related hereto and not inconsistent with chapter 11 of the Bankruptcy Code.

## K.     Failure of the Bankruptcy Court to Exercise Jurisdiction

If the Bankruptcy Court abstains from exercising, or declines to exercise, jurisdiction or is otherwise without jurisdiction over any matter arising in, arising under, or related to the Chapter 11 Case, including the matters set forth in Section 13.1 of the Plan, the provisions of Article XIII of the Plan shall have no effect upon and shall not control, prohibit, or limit the exercise of jurisdiction by any other court having jurisdiction with respect to such matter.

## L.     Other Material Provisions of the Plan

### 1.     Payment of Statutory Fees

All fees payable pursuant to section 1930 of title 28 of the United States Code, as determined by the Bankruptcy Court at the Confirmation Hearing, shall be paid by the Debtor on or before the Effective Date.

### 2.     Satisfaction of Claims

The rights afforded in the Plan and the treatment of all Claims herein shall be in exchange for and in complete satisfaction, discharge, and release of all Claims of any nature whatsoever against the Debtor, the Estate, the Debtor in Possession or any of their Assets. Except as otherwise provided herein, on the Effective Date, all Claims against the Debtor and the Debtor in Possession shall be satisfied, discharged, and released in full. Except as otherwise provided herein, all Persons shall be precluded and forever barred from asserting against the Debtor, the Estate and its Assets any event, occurrence, condition, thing, or other or further Claims or Causes of Action based upon any act, omission, transaction, or other activity of any kind or nature that occurred or came into existence prior to the Effective Date, whether or not the facts of or legal bases therefore were known or existed prior to the Effective Date.

3.      **Exculpation**

**None of the Debtor, the Creditors Committee, the Personal Injury Claims Committee or their respective members (in their capacity as such), the Tort Claimants, or any of their respective officers, directors, members, employees, agents, representatives, advisors, attorneys or successors and assigns will have or incur any liability to any Person for any act or omission in connection with, or arising out of, the pursuit of confirmation of the Plan, the consummation of the Plan, or the implementation or administration of the Plan or the property to be distributed under the Plan, except for willful misconduct, breach of fiduciary duty or gross negligence as finally determined by the Bankruptcy Court, and, in all respects shall be entitled to rely upon the advice of counsel and all information provided by other exculpated persons herein without any duty to investigate the veracity or accuracy of such information with respect to their duties and responsibilities under the Plan.**

4.      **Discharge of Liabilities**

Except as otherwise provided in the Plan, upon the occurrence of the Effective Date, the Debtor shall be discharged from all Claims and Causes of Action to the fullest extent permitted by section 1141 of the Bankruptcy Code, and all holders of Claims shall be precluded and enjoined from asserting against the Debtor, its Assets, or any property dealt with under the Plan, any further or other Cause of Action based upon any act or omission, transaction, event, thing, or other activity of any kind or nature that occurred or came into existence prior to the Effective Date.

5.      **Discharge of Debtor**

Except as otherwise provided in the Plan or the Confirmation Order, on the Effective Date, without further notice or order, all Claims of any nature whatsoever shall be automatically discharged forever. Except as otherwise provided in the Plan or the Confirmation Order, on the Effective Date, the Debtor and its Estate shall be deemed fully discharged and released from any and all Claims, including, but not limited to, demands and liabilities that arose before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), and 502(i) of the Bankruptcy Code, whether or not (a) a proof of Claim based upon such debt is filed or deemed filed under section 501 of the Bankruptcy Code; (b) a Claim based upon such debt is allowed under section 502 of the Bankruptcy Code; or (c) the holder of a Claim based upon such debt has accepted the Plan. The Confirmation Order shall be a judicial determination of discharge of all liabilities of the Debtor and its Estate. As provided in section 524 of the Bankruptcy Code, such discharge shall void any judgment against the Debtor and its Estate to the extent it relates to a discharged Claim, and operates as an injunction against the prosecution of any action against the Debtor, its Estate or its Assets to the extent it relates to a discharged Claim.

6.      **Release of the District**

In consideration of its renegotiation of the Hospital Leases and the provision of new value to the Debtor pursuant to which the Debtor anticipates that it will have sufficient liquidity

to make the requisite payments to the Personal Injury Trust for the benefit of the Tort Claimants, on the Effective Date, all claims against the District of any nature whatsoever related to the Debtor, including but not limited to alter-ego, piercing the corporate veil, fraudulent transfer, any avoidance claims under Chapter 5, Title 11 of the U.S. Bankruptcy Code or otherwise, substantive consolidation or any other claims which would or could seek to impose liability on the District for creditor claims against the Debtor, including the claims of any Tort Claimants, shall be deemed fully released by the Debtor, in its individual capacity and as Debtor-in-Possession, the Tort Claimants, the Creditors Committee and all other Persons holding Claims against the Debtor, whether filed or unfiled, asserted or unasserted.

### 7.    Governing Law

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and the Bankruptcy Rules), the laws of the State of Wyoming, without giving effect to the conflicts of laws principles thereof, shall govern the construction of the Plan and any agreements, documents, and instruments executed in connection with the Plan, except as otherwise expressly provided in such instruments, agreements or documents.

### 8.    Expedited Determination

The Disbursing Agent is hereby authorized to file a request for expedited determination under section 505(b) of the Bankruptcy Code for all tax returns filed with respect to the Debtor.

### 9.    Exemption from Transfer Taxes

Pursuant to section 1146 of the Bankruptcy Code, the issuance, transfer, or exchange of notes or equity securities under the Plan, the creation of any mortgage, deed of trust, lien, pledge or other security interest, the making or assignment of any lease or sublease, or the making or delivery of any deed or other instrument of transfer under, in furtherance of, or in connection with the Plan, shall not be subject to any stamp, real estate transfer, mortgage recording, or other similar tax.

### 10.    Notice of Entry of Confirmation Order and Relevant Dates

Promptly upon entry of the Confirmation Order, the Debtor shall publish as directed by the Bankruptcy Court and serve on all known parties in interest and holders of Claims, notice of the entry of the Confirmation Order and all relevant deadlines and dates under the Plan, including, but not limited to, the deadline for filing notice of Administrative Claims, and the deadline for filing rejection damage Claims.

### 11.    Interest and Attorneys' Fees

Interest accrued after the Petition Date will accrue and be paid on Claims only to the extent specifically provided for in the Plan, the Confirmation Order or as otherwise required by the Bankruptcy Court or by applicable law. No award or reimbursement of attorneys' fees or

related expenses or disbursements shall be allowed on, or in connection with, any Claim, except as set forth in the Plan or as ordered by the Bankruptcy Court.

## 12.    Modification of the Plan

As provided in section 1127 of the Bankruptcy Code, modification of the Plan may be proposed in writing by the Debtor at any time before confirmation, provided that the Plan, as modified, meets the requirements of sections 1122 and 1123 of the Bankruptcy Code, and the Debtor shall have complied with section 1125 of the Bankruptcy Code. The Debtor may modify the Plan at any time after confirmation and before substantial consummation, provided that the Plan, as modified, meets the requirements of sections 1122 and 1123 of the Bankruptcy Code and the Bankruptcy Court, after notice and a hearing, confirms the Plan as modified, under section 1129 of the Bankruptcy Code, and the circumstances warrant such modifications. A holder of a Claim that has accepted the Plan shall be deemed to have accepted such Plan as modified if the proposed alteration, amendment or modification does not materially and adversely change the treatment of the Claim of such holder.

## 13.    Setoff Rights

In the event that the Debtor and/or the Personal Injury Trustee has a Claim of any nature whatsoever against the holder of a Claim against the Debtor, then the Debtor and/or the Personal Injury Trustee may, but is not required to, set off against the Claim (and any payments or other Plan Distributions to be made in respect of such Claim hereunder) against the Debtor's and/or the Personal Injury Trustee's claim against such holder, subject to the provisions of sections 553, 556 and 560 of the Bankruptcy Code. Neither the failure to set off nor the allowance of any Claim under the Plan shall constitute a waiver or release of any Claims that the Debtor and/or the Personal Injury Trustee may have against the holder of any Claim.

## 14.    Compliance with Tax Requirements

In connection with the Plan, the Debtor and the Disbursing Agent, as applicable, shall comply with all withholding and reporting requirements imposed by federal, state, local, and foreign taxing authorities and all Plan Distributions hereunder shall be subject to such withholding and reporting requirements. Notwithstanding the above, each holder of an Allowed Claim that is to receive a Plan Distribution shall have the sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any government unit, including income, withholding and other tax obligations, on account of such Plan Distribution. The Disbursing Agent has the right, but not the obligation, to not make a Plan Distribution until such holder has made arrangements satisfactory to the Disbursing Agent for payment of any such tax obligations.

## 15.    Dissolution of the Creditors Committee

Upon the Effective Date, the Creditors Committee shall dissolve automatically, whereupon its members, professionals, and agents shall be released from any further duties and responsibilities in the Chapter 11 Case and under the Bankruptcy Code, except with respect to (a)

Fee Applications for Fee Claims or reimbursement of expenses incurred as a member of the Creditors' Committee, and (b) any motions or other actions seeking enforcement or implementation of the provisions of the Plan or Confirmation Order or pending appeals of orders entered in the Chapter 11 Case.

### 16.    Releases by the Debtor

As of the Effective Date, for good and valuable consideration, the Debtor, in its individual capacity and as Debtor in Possession, will be deemed to release and forever waive and discharge all claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action and liabilities, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity or otherwise that are based in whole or part on any act, omission, transaction, event or other occurrence taking place on or prior to the Effective Date in any way relating to the Debtor, the Chapter 11 Case, the Plan or the Disclosure Statement, and that could have been asserted by or on behalf of the Debtor or its Estate against (i) the Debtor's present and former officers and directors and any of its employees; and (ii) the attorneys, accountants, investment bankers, restructuring consultants and financial advisors of the Debtor; provided that nothing in Section 14.16 of the Plan shall be construed to release any party or entity from (A) willful misconduct or gross negligence as determined by a Final Order; or (B) any Transferred Causes of Action, each of which is preserved as otherwise set forth in the Plan.  For the avoidance of doubt, there shall be no release by the Debtor with respect to all D&O claims, if any, to the extent of any insurance coverage against the Debtor's and/or District's directors, officers, and/or trustees, including but not limited to breach of fiduciary duty claims, breach of the duty of loyalty claims and/or negligence claims which shall not be released.

### 17.    Injunctions

On the Effective Date and except as otherwise provided in the Plan, all Persons who have been, are, or may be holders of Claims against the Debtor shall be permanently enjoined from taking any of the following actions against or affecting the Debtor and/or the District, as determined by the Debtor and/or District in the Debtor's and/or District's sole discretion (as applicable), the Estate, the Assets or the Disbursing Agent, or any of their current or former respective members, directors, managers, officers, employees, agents, and professionals, affiliates, providers, contractors, successors and assigns or their respective assets and property with respect to such Claims (other than actions brought to enforce any rights or obligations under the Plan):

- **commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding of any kind (including, without limitation, all suits, actions and proceedings that are pending as of the Effective Date, which must be withdrawn or dismissed with prejudice);**

- **enforcing, levying, attaching, collecting or otherwise recovering by any manner or means, whether directly or indirectly, any judgment, award, decree or order;**

- **creating, perfecting or otherwise enforcing in any manner, directly or indirectly, any encumbrance; and**

- **asserting any setoff, right of subrogation or recoupment of any kind; provided, that any defenses, offsets or counterclaims which the Debtor may have or assert in respect of the above referenced Claims are fully preserved in accordance with the preservation of the Debtor's right of setoff set forth in the Plan; ; provided, however, that nothing shall prevent the Trust Personal Injury Claimants from obtaining a judgment as provided by the Personal Injury Trust, nor shall it prevent the Personal Injury Trustee from pursuing the Transferred Causes of Action, if any, against, but not limited to, Hansen, HealthTech or Patten.**

### 18.     Binding Effect

The Plan shall be binding upon the Debtor, the holders of all Claims and all parties in interest and their respective successors and assigns. To the extent any provision of the Disclosure Statement or any other solicitation document may be inconsistent with the terms of the Plan, the terms of the Plan shall be binding and conclusive.

### 19.     Severability

**IN THE EVENT THE BANKRUPTCY COURT DETERMINES THAT ANY PROVISION OF THE PLAN IS UNENFORCEABLE EITHER ON ITS FACE OR AS APPLIED TO ANY CLAIM OR TRANSACTION, THE DEBTOR MAY MODIFY THE PLAN IN ACCORDANCE WITH SECTION 14.13 OF THE PLAN SO THAT SUCH PROVISION SHALL NOT BE APPLICABLE TO THE HOLDER OF ANY SUCH CLAIM OR TRANSACTION. SUCH A DETERMINATION OF UNENFORCEABILITY SHALL NOT (A) LIMIT OR AFFECT THE ENFORCEABILITY AND OPERATIVE EFFECT OF ANY OTHER PROVISION OF THE PLAN; OR (B) REQUIRE THE RESOLICITATION OF ANY ACCEPTANCE OR REJECTION OF THE PLAN.**

### 20.     No Admissions

Neither the filing of the Plan nor the taking by the Debtor of any action with respect to the Plan nor any statement nor provision contained therein shall be or be deemed to be an admission by any such party against interest, or be or be deemed to be a waiver of any rights, claims or remedies that such parties may have, and all such rights and remedies are and shall be specifically reserved. In the event the Plan is not confirmed and the Confirmation Order is not entered, the Plan, this Disclosure Statement, and the Plan Documents, and any statement contained therein or herein, may not be used by any Person, party, or entity against the Debtor.

**AS TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS AND OTHER CAUSES OF ACTION OR THREATENED CAUSES OF ACTION, THE PLAN SHALL NOT CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR**

**LIABILITY, STIPULATION, OR WAIVER, BUT RATHER AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS. THE PLAN SHALL NOT BE ADMISSIBLE IN ANY NON-BANKRUPTCY PROCEEDING NOR SHALL IT BE CONSTRUED TO BE CONCLUSIVE ADVICE ON THE TAX, SECURITIES, AND OTHER LEGAL EFFECTS OF THE PLAN AS TO HOLDERS OF CLAIMS AGAINST THE DEBTOR AND DEBTOR IN POSSESSION IN THIS CHAPTER 11 CASE.**

21.   **Plan Controls**

Unless otherwise specified, all section, article, and exhibit references in the Plan are to the respective section in, article of, or exhibit to, the Plan, as the same may be amended, waived, or modified from time to time. Words denoting singular number shall include the plural number and vice-versa, and words denoting one gender shall include the other gender both in the Plan and the Disclosure Statement. The Disclosure Statement may be reformed for the purposes of interpretation to the extent any term or provision of the Plan is determined by the Bankruptcy Court to be ambiguous.

## IX.

## **PLAN FEASIBILITY AND OTHER FINANCIAL INFORMATION**

The Bankruptcy Code conditions confirmation of a plan of reorganization on, among other things, a finding that it is not likely to be followed by the liquidation or the need for further financial reorganization of a debtor. For purposes of determining whether the Plan satisfies this condition, the Debtor has analyzed its capacity to service its obligations under the Plan. Based upon the foregoing analysis, the Debtor believes that it will be able to meet all of its obligations as imposed by the Plan and that, therefore, the Plan is "feasible."

The Debtor has prepared the projections for the Debtor, through mid-fiscal year 2020 that support its contention that the Plan is feasible. Such projections show that the Debtor can satisfy all of its obligations under the Plan, maintain adequate cash reserves and continue to run its business in the ordinary course. The projections are attached to this Disclosure Statement as Exhibit B.

The projections should be read in conjunction with the assumptions, qualifications, and any footnotes to the tables containing the projections as well as Article XII of this Disclosure Statement. The projections show that the Debtor has a reasonable probability of being able to satisfy all of its obligations under the Plan.

In addition, the Debtor has attached as Exhibit D its unaudited financial statements as of 2016, demonstrating that the Debtor will be solvent and viable upon its emergence from chapter 11.

THE PROJECTIONS ARE PRESENTED SOLELY FOR THE PURPOSE OF PROVIDING "ADEQUATE INFORMATION" UNDER SECTION 1125 OF THE BANKRUPTCY CODE TO ENABLE THE HOLDERS OF CLAIMS ENTITLED TO VOTE

UNDER THE PLAN TO MAKE AN INFORMED JUDGMENT ABOUT THE PLAN AND SHOULD NOT BE USED OR RELIED UPON FOR ANY OTHER PURPOSE, INCLUDING THE PURCHASE OR SALE OF SECURITIES OF, OR CLAIMS IN THE DEBTOR.

THE ASSUMPTIONS AND RESULTANT PROJECTIONS AND SUBSEQUENTLY IDENTIFIED VARIANCES CONTAIN CERTAIN STATEMENTS THAT MAY BE CONSIDERED "FORWARD-LOOKING STATEMENTS" WITHIN THE MEANING OF THE PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995. THE PROJECTIONS HAVE BEEN PREPARED BY THE DEBTOR'S MANAGEMENT AND PROFESSIONALS. THESE PROJECTIONS AND SUBSEQUENTLY IDENTIFIED VARIANCES, WHILE PRESENTED WITH NUMERICAL SPECIFICITY, ARE BASED UPON A VARIETY OF ESTIMATES AND ASSUMPTIONS WHICH, THOUGH CONSIDERED REASONABLE BY MANAGEMENT, MAY NOT BE REALIZED OR MAY BE UNDERSTATED, AND ARE INHERENTLY SUBJECT TO SIGNIFICANT BUSINESS, ECONOMIC, AND COMPETITIVE UNCERTAINTIES AND CONTINGENCIES, MANY OF WHICH ARE BEYOND THE DEBTOR'S CONTROL. THE DEBTOR CAUTIONS THAT NO ASSURANCES CAN BE MADE AS TO THE ACCURACY OF THE ASSUMPTIONS AND RESULTANT PROJECTIONS OR THE ABILITY OF THE DEBTOR TO ACHIEVE THE PROJECTED RESULTS FOLLOWING THE EFFECTIVE DATE. SOME ASSUMPTIONS INEVITABLY WILL NOT MATERIALIZE, AND EVENTS AND CIRCUMSTANCES OCCURRING SUBSEQUENT TO THE DATE ON WHICH THE PROJECTIONS WERE PREPARED MAY BE DIFFERENT FROM THOSE ASSUMED, OR MAY BE UNANTICIPATED, AND THUS MAY AFFECT FINANCIAL RESULTS IN A MATERIAL AND POSSIBLY ADVERSE MANNER. THE PROJECTIONS, THEREFORE, MAY NOT BE RELIED UPON AS A GUARANTY OR OTHER ASSURANCE OF THE ACTUAL RESULTS THAT WILL OCCUR.

THE PROJECTIONS WERE NOT PREPARED WITH A VIEW TO COMPLYING WITH THE GUIDELINES FOR PROSPECTIVE FINANCIAL STATEMENTS PUBLISHED BY THE AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS NOR IN ACCORDANCE WITH U.S. GENERALLY ACCEPTED ACCOUNTING PRINCIPLES. THE DEBTOR'S INDEPENDENT ACCOUNTANTS HAVE NEITHER EXAMINED NOR COMPILED THE PROJECTIONS AND, ACCORDINGLY, DO NOT EXPRESS AN OPINION OR ANY OTHER FORM OF ASSURANCE WITH RESPECT THERETO.

THE DEBTOR DOES NOT, AS A MATTER OF COURSE, PUBLISH ITS BUSINESS PLANS AND STRATEGIES OR PROJECTIONS OF ITS ANTICIPATED FINANCIAL POSITION OR RESULTS OF OPERATIONS. ACCORDINGLY, THE DEBTOR DOES NOT INTEND, AND DISCLAIMS ANY OBLIGATION, TO: (1) FURNISH UPDATED BUSINESS PLANS OR PROJECTIONS TO HOLDERS OF CLAIMS PRIOR TO THE EFFECTIVE DATE OR ANY OTHER PARTY AFTER THE EFFECTIVE DATE OR (2) OTHERWISE MAKE SUCH UPDATED INFORMATION PUBLICLY AVAILABLE. HOWEVER, FROM TIME TO TIME, THE DEBTOR MAY PREPARE UPDATED PROJECTIONS IN CONNECTION WITH PURSUING FINANCING, CREDIT RATINGS AND OTHER PURPOSES. SUCH PROJECTIONS MAY DIFFER MATERIALLY FROM THE PROJECTIONS PRESENTED HEREIN.

# X.

## CONFIRMATION AND CONSUMMATION PROCEDURES

### A.    Overview

A plan of reorganization may provide anything from a complex restructuring of a debtor's business and its related obligations to a simple liquidation of the debtor's assets. In either event, upon confirmation of a plan, it becomes binding on the debtor and all of its creditors and equity holders, and the obligations owed by the debtor to such parties are compromised and exchanged for the obligations specified in the plan. Before soliciting acceptances of a proposed plan, section 1125 of the Bankruptcy Code requires the debtor to prepare and file a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment about the plan. This Disclosure Statement is presented to holders of Claims against the Debtor to satisfy the requirements of section 1125 of the Bankruptcy Code in connection with the Debtor's solicitation of votes on the Plan.

If all classes of claims accept a plan of reorganization, a bankruptcy court may confirm the plan if such bankruptcy court independently determines that the requirements of section 1129(a) of the Bankruptcy Code have been satisfied. Section 1129(a) sets forth the requirements for confirmation of a plan and, among other things, requires that a plan meet the "best interests of creditors" test and be "feasible." The "best interests of creditors" test generally requires that the value of the consideration to be distributed to the holders of claims under a plan may not be less than those parties would receive if the debtor were liquidated pursuant to a hypothetical liquidation occurring under chapter 7 of the Bankruptcy Code. Under the "feasibility" requirement, a bankruptcy court generally must find that there is a reasonable probability that a debtor will be able to meet its obligations under its plan without the need for further financial reorganization. **The Debtor believes that the Plan satisfies all the applicable requirements of section 1129(a) of the Bankruptcy Code, including, in particular, the best interests of creditors' test and the feasibility requirement.**

The Bankruptcy Code does not require that each holder of a claim or interest in a particular class vote in favor of a plan of reorganization for the bankruptcy court to determine that the class has accepted a plan. Rather, a class of creditors will be determined to have accepted the plan if the majority in number and two-thirds in amount of those claims entitled to vote and actually voting in such class vote in favor of the plan.

In addition, classes of claims that are not "impaired" under a plan of reorganization are conclusively presumed to have accepted the plan and thus are not entitled to vote. Furthermore, classes that are to receive no distribution under the plan are conclusively deemed to have rejected the plan. Accordingly, acceptances of a plan will generally be solicited only from those persons who hold claims in an impaired class. A class is "impaired" under a plan if the legal, equitable, or contractual rights associated with the claims of that class are modified in any way under the plan. Modification for purposes of determining impairment, however, does not include curing

defaults and reinstating maturity on the effective date of the plan. **Classes 2, 3, 4, 5, 6, 7 and 8 are impaired under the Plan. Accordingly, only holders of Claims in Classes 2, 3, 4, 5, 6, 7 and 8 are entitled to vote on the Plan.**

**B.      Confirmation of the Plan**

At the Confirmation Hearing, the Bankruptcy Court will confirm the Plan only if all of the conditions to confirmation under section 1129 of the Bankruptcy Code are satisfied.

Such conditions include the following:

(a)      The Plan complies with the applicable provisions of the Bankruptcy Code.

(b)      The Debtor has complied with the applicable provisions of the Bankruptcy Code.

(c)      The Plan has been proposed in good faith and not by any means proscribed by law.

(d)      Any payment made or promised by the Debtor or by a person issuing securities or acquiring property under the Plan for services or for costs and expenses in, or in connection with, the Debtor's Chapter 11 Case, or in connection with the Plan and incident to the Debtor's Chapter 11 Case, has been approved by, or is subject to the approval of, the Bankruptcy Court as reasonable.

(e)      The Debtor has disclosed the identity and affiliations of any individual proposed to serve, after confirmation of the Plan, as a director, officer or voting trustee of the Debtor or a successor to the Debtor under the Plan and the appointment to, or continuance in, such office of such individual is consistent with the interests of creditors and with public policy, and the Debtor has disclosed the identity of any insider that will be employed or retained by the Debtor, and the nature of any compensation for such insider.

(f)      The impaired classes of Claims under the Plan, Classes 2, 3, 4, 5, 6, 7 and 8 have accepted the Plan and each holder of an Allowed Unsecured Claim has either accepted the Plan or will receive or retain under the Plan property of a value, as of the Effective Date, that is not less than the amount that such holder would receive or retain on account of such Claim if the Debtor were liquidated on such date under chapter 7 of the Bankruptcy Code.

(g)      Each class of Claims has either accepted the Plan or is not impaired under the Plan.

(h)      Except to the extent that the holder of a particular Claim has agreed to a different treatment of such Claim, the Plan provides that Administrative Claims and Priority Claims, including Tax Claims, will be paid in full, in Cash, on the later to occur of (i) the Effective Date (or as soon as reasonably practicable thereafter) and (ii) the date on which such Claim becomes an Allowed Claim.

(i)      At least one impaired class of Claims has accepted the Plan, determined without including any acceptance of the Plan by any insider holding a Claim in such class.

(j)      Confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtor or any other successor to the Debtor under the Plan, except to the extent proposed in the Plan.

(k)      All fees payable under 28 U.S.C. § 1930, as determined by the Bankruptcy Court at the Confirmation Hearing, have been paid or the Plan provides for the payment of all such fees on the Effective Date of the Plan.

**The Debtor believes that the Plan will satisfy all the statutory provisions of chapter 11 of the Bankruptcy Code, that it has complied or will have complied with all of the provisions of the Bankruptcy Code, and that the Plan is being proposed and submitted to the Bankruptcy Court in good faith.**

**1.      Acceptance**

A class of Claims will have accepted the Plan if the Plan is accepted, with reference to a class of Claims, by at least two-thirds in amount and more than one-half in number of the Claims entitled to vote that actually vote in such class.

**2.      Best Interests of Creditors Test**

With respect to each impaired class of holders of Claims, confirmation of the Plan requires that each such holder either (a) accept the Plan or (b) receive or retain under the Plan property of a value, as of the applicable consummation date under the Plan, that is not less than the value such holder would receive or retain if the Debtor were liquidated under chapter 7 of the Bankruptcy Code.

To determine what holders of Allowed Claims in Classes 2, 3, 4, 5, 6, 7 and 8, the classes of impaired Claims under the Plan, would receive or retain if the Debtor were liquidated, the Bankruptcy Court must determine the proceeds that would be generated from the liquidation of the properties and interests in property of the Debtor in a chapter 7 liquidation case. The proceeds that would be available for satisfaction of Allowed Unsecured Claims against the Debtor would consist of the proceeds generated by disposition of the unencumbered equity in the properties and interests in property of the Debtor and the Cash held by the Debtor at the time of the commencement of the liquidation case. Such proceeds would be reduced by the costs and expenses of the liquidation and by such additional Administration and Priority Claims that may result from the termination of the business of the Debtor and the use of chapter 7 for the purposes of liquidation. Further, under chapter 7 of the Bankruptcy Code, holders of Allowed Secured Claims against the Debtor would be entitled to all proceeds from the sale of their collateral (net of any costs of sale) or to the return of such collateral, and only the excess value of such collateral after satisfaction in full of such Allowed Secured Claims (including interest on such Allowed Secured Claims from and after the Petition Date until the date of payment) may be available for distribution to the holders of Allowed Unsecured Claims.

The costs of liquidation under chapter 7 of the Bankruptcy Code would include the fees payable to a trustee in bankruptcy, and the fees that would be payable to additional attorneys and other professionals that such a trustee may engage, plus any unpaid expenses incurred by the Debtor during its Chapter 11 Case, such as compensation of its attorneys, financial advisors, accountants and costs that are allowed in the chapter 7 case. In addition, Claims would arise by reason of the breach or rejection of obligations incurred and executory contracts entered into or assumed by the Debtor during the pendency of its Chapter 11 Case and potentially under the WARN Act.

The foregoing types of Claims and such other Claims which may arise in the liquidation or result from the Debtor's pending Chapter 11 Case would be paid in full from the liquidation proceeds before the balance of those proceeds would be made available to pay Unsecured Claims arising on or before the Petition Date.

To determine if the Plan is in the best interests of each impaired class, the value of the distributions from the proceeds of the liquidation of the properties and interests in property of the Debtor (net of the amounts attributable to the aforesaid Claims) is then compared with the value offered to such classes of Claims under the Plan.

After consideration of the effects that a chapter 7 liquidation would have on the ultimate proceeds available for distribution to creditors in the Debtor's Chapter 11 Case, including: (a) the increased costs and expenses of a liquidation under chapter 7 arising from fees payable to a trustee in bankruptcy and professional advisors to such trustee; (b) the erosion in value of Assets in a chapter 7 case in the context of the expeditious liquidation required under chapter 7 and the "forced sale" environment in which such a liquidation would likely occur; (c) the adverse effects on the saleability of business segments as a result of the likely departure of key employees and medical providers; and (d) the substantial increases in Claims which would be satisfied on a priority basis or on parity with creditors in the Debtor's Chapter 11 Case, the Debtor has determined that confirmation of the Plan will provide each holder of a Claim with a greater recovery than it would receive pursuant to liquidation of the Debtor under chapter 7 of the Bankruptcy Code. Among other things, unsecured creditors in Class 4 will be paid in full under the Plan, but will receive 0 cents on the dollar in a Chapter 7 liquidation, irrespective of the amount of the Allowed Claims of the Tort Claimants.

The liquidation analysis is attached hereto as Exhibit E and demonstrates that holders of Claims under the Plan will receive no less than they would receive in a chapter 7 liquidation.

### 3.      Feasibility

*See* Article IX of this Disclosure Statement.

## C.      Cramdown

### 1.      No Unfair Discrimination

A plan of reorganization "does not discriminate unfairly" if (i) the legal rights of a nonaccepting class are treated in a manner that is consistent with the treatment of other classes whose legal rights are similar to those of the non-accepting class, and (ii) no class receives payments in excess of that which it is legally entitled to receive for its Claims. The Debtor believes that under the Plan all impaired classes of Claims are treated in a manner that is consistent with the treatment of other classes of Claims that are similarly situated, if any, and no class of Claims will receive payments or property with an aggregate value greater than the aggregate value of the Allowed Claims in such class. Accordingly, the Debtor believes the Plan does not discriminate unfairly as to any impaired class of Claims.

### 2.        Fair and Equitable Test

The Bankruptcy Code establishes different "fair and equitable" tests for classes of secured claims and unsecured claims as follows:

(a)        **Secured Claims**.   Either (i) each holder of a claim in an impaired class of Secured Claims retains its liens securing its Secured Claim and it receives on account of its secured claim deferred cash payments having a present value equal to the amount of its allowed secured claim, (ii) each holder of a claim in an impaired class of secured claims realizes the indubitable equivalent of its allowed secured claim, or (iii) the property securing the claim is sold free and clear of liens, with such liens to attach to the proceeds and the treatment of such liens on proceeds as provided in clause (i) or (ii) of this paragraph.

(b)        **Unsecured Claims**.   Either (i) each holder of a claim in an impaired class of unsecured creditors receives or retains under the plan property of a value equal to the amount of its allowed claim or (ii) the holders of claims and interests that are junior to the claims of the dissenting class will not receive any property under the plan of reorganization, subject to the applicability of the judicial doctrine of contributing new value.

The Debtor believes that the Plan satisfies the test for cramdown for each class of creditors and will seek to cramdown any such class that rejects the Plan.

## D.        Effect of Confirmation

Under section 1141 of the Bankruptcy Code, the provisions of a confirmed plan bind the Debtor, any entity acquiring property under the Plan, and any creditor, whether or not the claim or interest of such creditor is impaired under the Plan and whether or not such creditor voted to accept the Plan. Further, after confirmation of the Plan, the property dealt with by the Plan is free and clear of all claims and interests of creditors, except as otherwise provided in the Plan or the Confirmation Order.

## XI.

## <u>CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES</u>

**THIS DISCLOSURE STATEMENT DOES NOT ADDRESS THE PARTICULAR FEDERAL INCOME TAX CONSEQUENCES THAT MAY BE RELEVANT TO TAXPAYERS UNDER THE FEDERAL INCOME TAX LAWS, NOR DOES IT DISCUSS ANY ASPECT OF FEDERAL, STATE, LOCAL OR FOREIGN TAX LAWS THAT MAY BE APPLICABLE TO PARTICULAR TAXPAYERS.  THE TAX CONSEQUENCES TO HOLDERS OF CLAIMS AND INTERESTS, INCLUDING THE AVAILABILITY OF WORTHLESS DEBT OR WORTHLESS STOCK DEDUCTIONS, IF ANY, MAY VARY BASED ON THE INDIVIDUAL CIRCUMSTANCES OF EACH HOLDER.  EACH CREDITOR AND INTEREST HOLDER TREATED BY THE PLAN IS STRONGLY URGED TO CONSULT WITH ITS OWN TAX ADVISOR REGARDING THE FEDERAL, STATE, LOCAL OR FOREIGN TAX CONSEQUENCES OF THE PLAN.**

**A.      General**

The following discussion is a summary of certain U.S. federal income tax consequences expected to result from the implementation of the Plan. The discussion is based on Internal Revenue Code of 1986, as amended, and any applicable rulings, regulations (including temporary and proposed regulations) promulgated thereunder, judicial decisions, and notices, announcements, and other releases of the United States Treasury Department or the IRS (the "Internal Revenue Code"), as in effect on the date of this Disclosure Statement, and on United States Treasury Regulations in effect (or in certain cases, proposed) on the date of this Disclosure Statement, as well as judicial and administrative interpretations thereof available on or before such date. All of the foregoing are subject to change, which change could apply retroactively and could affect the tax consequences described below. There can be no assurance that the IRS will not take a contrary view with respect to one or more of the issues discussed below, and no ruling from the IRS has been or will be sought with respect to any issues that may arise under the Plan.

The following summary is for general information only and does not purport to address all of the U.S. federal income tax consequences that may be applicable to any particular holder of an Allowed Claim. The tax treatment of a holder of an Allowed Claim may vary depending upon such holder's particular situation. The following discussion does not address state, local, or foreign tax considerations that may be applicable to the Debtor and holders of an Allowed Claim. This summary does not address tax considerations applicable to holders that may be subject to special tax rules, such as financial institutional, insurance companies, real estate investment trusts, regulated investment companies, grantor trusts, dealers or traders in securities or currencies, tax-exempt entities, persons that have "functional currency" other than the U.S. dollar, persons who acquired a security in the Debtor in connection with the performance of services, or persons who are not United States persons (as defined in the Internal Revenue Code).

EACH HOLDER OF AN ALLOWED CLAIM IS URGED TO CONSULT ITS OWN TAX ADVISOR WITH RESPECT TO THE U.S. FEDERAL, STATE, LOCAL, AND FOREIGN TAX CONSEQUENCES OF THE IMPLEMENTATION OF THE PLAN.

**Treasury Department Circular 230 Disclosure**

TO COMPLY WITH TREASURY DEPARTMENT CIRCULAR 230, TAXPAYERS ARE HEREBY NOTIFIED THAT (A) ANY DISCUSSION OF U.S. FEDERAL TAX ISSUES

CONTAINED OR REFERRED TO IN THIS DISCLOSURE STATEMENT (INCLUDING ANY ATTACHMENTS) IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, BY ANY TAXPAYER FOR THE PURPOSE OF AVOIDING PENALTIES THAT MAY BE IMPOSED ON A TAXPAYER UNDER THE INTERNAL REVENUE CODE, (B) ANY SUCH DISCUSSION IS WRITTEN IN CONNECTION WITH THE PROMOTION OR MARKETING OF THE TRANSACTIONS OR MATTERS ADDRESSED HEREIN, AND (C) TAXPAYERS SHOULD SEEK ADVICE BASED ON THEIR PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.

**B.**    **U.S. Federal Income Tax Consequences of Receipt of Plan Consideration to Holders of Allowed Claims**

**1.**    **General Tax Considerations for Holders of Allowed Claims**

The U.S. federal income tax consequences to holders of Allowed Claims arising from the distribution to be made in satisfaction of their Claims pursuant to the Plan may vary, depending upon, among other things: (a) the type of consideration received by the holder of the Claim in exchange for the interest it holds; (b) the nature of the indebtedness owed to it; (c) whether the holder has previously claimed a bad debt or worthless securities deduction in respect to its Claim against the Debtor; (d) whether such Claim constitutes a Security; (e) whether the holder of a Claim is a resident of the United States for tax purposes; (f) whether the holder of a Claim reports income on the accrual or cash basis; and (g) whether the holder of a Claim receives distributions under the Plan in more than one taxable year.

**2.**    **Tax Consequences to Certain Holders of Allowed Claims**

The following summary describes the material U.S. federal income tax consequences to certain holders of Allowed Claims against the Debtor. A holder's tax treatment may vary depending upon the holder's particular situation. **All holders of Allowed Claims against the Debtor are urged to consult their tax advisors concerning federal, state, local, and other tax consequences of the Plan.**

Holders of Allowed Claims will receive Cash under the Plan. If the amount of Cash received is insufficient to pay an Allowed Clam in full, the holder of such Claim may be able to deduct its losses from its income taxes. Your tax advisor will be able to advise you on whether such deductions are appropriate.

If a holder of an Allowed Claim receives the collateral that secures payment of such Allowed Claim or a single cash payment in an amount equal to such Allowed Claim, such holder will recognize gain or loss in an amount equal to the difference between (i) such holder's "amount realized" in respect of its Allowed Claim, which is the amount of cash and/or fair market value of such collateral that is received by such holder in satisfaction of its Allowed Claim (other than amounts that are in respect of any Allowed Claim for accrued but unpaid interest), and (ii) the holder's adjusted tax basis in its Allowed Claim (other than any Claim for accrued but unpaid interest).

### 3.     The Personal Injury Trust

The Personal Injury Trust is a litigation trust and is intended to qualify as a "grantor trust" for federal income tax purposes with the Tort Claimants treated as grantors and owners of the Personal Injury Trust, the effect of which is that the Personal Injury Trust itself does not pay taxes and recoveries will not be reduced by any applicable taxes. Beneficiaries of the Personal Injury Trust shall have the sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any government unit, including income, withholding and other tax obligations, on account of a distribution under the Personal Injury Trust and should consult their tax advisor. Additionally, beneficiaries of the Personal Injury Trust may be required to provide a W-9 or other similar tax information to be eligible to receive a distribution from the Personal Injury Trust.

THE FOREGOING DISCUSSION IS INTENDED ONLY AS A SUMMARY OF CERTAIN TAX CONSEQUENCES OF THE PLAN AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING WITH A TAX PROFESSIONAL. THE ABOVE DISCUSSION IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT TAX ADVICE. HOLDERS OF CLAIMS OR INTERESTS ARE STRONGLY ENCOURAGED TO CONSULT THEIR TAX ADVISORS ABOUT THE UNITED STATES FEDERAL, STATE AND LOCAL, AND ANY APPLICABLE FOREIGN, INCOME AND OTHER TAX CONSEQUENCES OF THE PLAN.

## XII.

## RISK FACTORS

The holder of a Claim against the Debtor should read and carefully consider the following factors, as well as the other information set forth in this Disclosure Statement (and the documents delivered together herewith and/or incorporated by reference herein), before deciding whether to vote to accept or reject the Plan.

### A.     General Considerations

The formulation of a reorganization plan is a principal purpose of a chapter 11 case. The Plan sets forth the means for satisfying the Claims against the Debtor. Reorganization of the Debtor's business and operations under the proposed Plan also avoids the potentially adverse impact of a protracted and costly reorganization or an unfeasible liquidation.

### B.     Certain Bankruptcy Considerations

The Plan requires the acceptance of a requisite number of holders of impaired Claims that are entitled to vote on the Plan, and the approval of the Bankruptcy Court, as described in the section hereof entitled "Confirmation and Consummation Procedures – Overview." There can be no assurance that such acceptance and approval will be obtained and therefore, that the Plan will be confirmed.

Furthermore, although the Debtor believes that the Plan will be confirmed and the Effective Date will occur reasonably soon after the Confirmation Date, there can be no assurance as to the timing or as to whether the Effective Date will occur. If the Plan is not confirmed or the Effective Date does not occur, there can be no assurance that any alternative plan of reorganization would be on terms as favorable to the holders of Claims as the terms of the Plan. In addition, if a protracted reorganization or liquidation were to occur, there is a substantial risk that holders of Claims would receive less than they would receive under the Plan.

If the Plan is confirmed but the Effective Date does not occur, it may become necessary to amend the Plan to provide for alternative treatment of Claims. There can be no assurance that any such alternative treatment would be on terms as favorable to the holders of Claims and as the treatment provided under the Plan. If any modifications to the Plan are material, it would be necessary to resolicit votes from holders of Claims adversely affected by the modifications with respect to such amended Plan.

## C.      Inherent Uncertainty of Financial Projections

The projections set forth in Exhibit B hereto cover the Debtor's operations through mid-fiscal Year 2020. Such projections establish the feasibility of the Plan. Nevertheless, these projections are based on numerous assumptions, including the timing, confirmation and consummation of the Plan in accordance with its terms, the anticipated future performance of the Debtor, industry performance and regulations, patient census, general business and economic conditions and other matters, many of which are beyond the control of the Debtor and some or all of which may not materialize. In addition, unanticipated events and circumstances occurring subsequent to the date that this Disclosure Statement is approved by the Bankruptcy Court may affect the actual financial results of the Debtor or the Debtor's operations. These variations may be material and may adversely affect the ability of the Debtor to make payments with respect to post-Effective Date indebtedness. Because the actual results achieved throughout the periods covered by the projections may vary from the projected results, the projections should not be relied upon as a guaranty, representation, or other assurance of the actual results that will occur.

Except with respect to the projections and except as otherwise specifically and expressly stated herein, this Disclosure Statement does not reflect any events that may occur subsequent to the date hereof and that may have a material impact on the information contained in this Disclosure Statement. The Debtor does not intend to update the projections for the purposes hereof; thus, the projections will not reflect the impact of any subsequent events not already accounted for in the assumptions underlying the projections.

## D.      Claims Estimations

There can be no assurance that the estimated aggregate Claim amounts set forth herein are correct, and the actual amount of Allowed Claims may differ from the estimates. The estimated amounts are subject to certain risks, uncertainties and assumptions. Should one or more of these risks or uncertainties materialize, or should underlying assumptions prove incorrect, the actual amount of Allowed Claims may vary from those estimated herein. If the Claims ultimately Allowed against the Debtor materially exceed the estimated amounts, the

Debtor may be unable to perform its obligations under the Plan and may require further restructuring.

**E.      Insurance Coverage Risk**

Pursuant to the Insurance Policies the Debtor has insurance coverage in excess of $25 million available to holders of Trust Personal Injury Claims. Under the Plan, recoveries available to holders of Trust Personal Injury Claims are limited to the proceeds of the Personal Injury Trust Assets and the proceeds of the Insurance Policies. The Insurance Companies have commenced the Carrier Litigation seeking a determination that the Insurance Policies do not cover the Trust Personal Injury Claims. The Debtor believes that the Carrier Litigation is without merit, however, should the Insurance Companies prevail, the holders of Trust Personal Injury Claims will be unable to recover from the Insurance Policies and will be unable to look to the Debtor to make up the difference.

The Debtor makes no representations or warranties concerning the availability of coverage and the risk of coverage is completely born by the Tort Claimants under the Plan.

**F.      The Transferred Causes of Action**

Under the Plan, the Debtor is transferring all of its potential Causes of Action related to the Trust Personal Injury Claims held by the Tort Claimants and arising against the Insurance Companies, HealthTech, Patten, Hansen and potentially any legal malpractice and director and officer claims to the Personal Injury Trust and expects the Personal Injury Trustee to pursue such Claims.  Litigation, however, is uncertain and there is no guarantee that the Personal Injury Trustee will succeed in obtaining recoveries from any of the Transferred Causes of Action. If the Transferred Causes of Action fail, the Debtor's exposure to the holders of the Trust Personal Injury Claims will be limited to the $500,000 lump sum payment, Initial Monthly Distributions and the Subsequent Monthly Distributions, less the costs and expenses associated with the Personal Injury Trustee (including, without limitation, the fees of the Personal Injury Trustee). The Debtor makes no representations concerning the validity of the Transferred Causes of Action.

**G.      Risks Related to Plan Installment Payments**

The Plan provides that certain classes of Claims will receive payments in installments. The payments to the holders of such Claims are subject to the ability of the Debtor to generate Cash from operations sufficient to fund its payments under the Plan. Although, the Debtor has sufficient Cash on hand, its Cash flow is variable. Therefore, the following non-exhaustive list of factors and potential occurrences, many of which are beyond the Debtor's control, that affect revenue and available Cash may influence the Debtor's ability to fulfill its funding obligations:

- A reduction in Medicare funding by state or federal governments;

- The extent to which Medicare reimbursements for capital costs are sufficient to cover the actual capital-related costs the Debtor incurs allocable to Medicare patients;

- Changes in Medicare risk based coverage plans;

- The occurrence of an audit under the Medicare Prescription Drug, Improvement, and Modernization Act of 2003 (Pub. L. 108-173), which could result in the withholding of payments to the Debtor or require substantial repayments by the Debtor;

- Any changes in Medicare reimbursements;

- Changes in the Children's Health Insurance Program, a federally funded insurance program for children whose families are ineligible for Medicaid, but cannot afford commercial health insurance;

- Levels of recovery from managed care organizations;

- Litigation, fines, losses, and administrative enforcement under healthcare fraud and abuse laws;

- Penalties or enforcement under the Emergency Medical Treatment Act, which requires hospitals with emergency rooms to provide appropriate medical screening when a person comes to the hospital;

- Penalties or enforcement under the Health Insurance Portability and Accountability Act of 1996, which prohibits, in any matter involving health benefits, the knowing and willful falsification or concealment of material fact or the making of a materially false fictitious or fraudulent statement in connection with the delivery of or payment for healthcare benefits;

- The impact of potential healthcare reform legislation, which could change the composition of those enrolled in health plans and potentially result in capacity strains or unanticipated service costs, or alter the reimbursements for the Debtor;

- Growth in excess capacity at the Debtor's facilities;

- Competition with other healthcare providers;

- The Debtor's ability to recruit and retain qualified physicians and staff;

- Penalties or enforcement under antitrust laws;

- Changes in technology and services that may render certain of the Debtor's services obsolete and that may require the Debtor to incur substantial upgrade costs;

- The Debtor's loss of tax exempt status;

- Wyoming reducing Medicaid reimbursement rates or imposing stricter Medicaid eligibility requirements;

- Medical malpractice claims in excess of insurance coverage; and,

- Penalties or enforcement under environmental liability laws.

## H.    Management Risk

HealthTech is currently the management company for the Debtor. HealthTech has not endorsed this Plan and may seek to withdraw as the Debtor's management company. Under such circumstances, the Debtor would either seek to retain a new management company or hire its own management. While the Debtor believes that it could do so without material disruption, such an outcome is not guaranteed.

## XIII.

## CONCLUSION

The Debtor believes that the Plan is in the best interest of all holders of Claims, and urges all holders of impaired Claims against the Debtor to vote to accept the Plan and to evidence such acceptance by returning their ballots in accordance with the instructions accompanying this Disclosure Statement.

**POWELL VALLEY HEALTH CARE, INC.**

By:_____

Name: _____

Its: _____

APPROVED AS TO FORM:


MARKUS WILLIAMS YOUNG & ZIMMERMANN LLC
Bradley T. Hunsicker (WY Bar No. 7-4579)
Jennifer Salisbury (WY Bar No. 7-5218)
John F. Young (Pro Hac Vice)
106 E. Lincolnway, Suite 300
Cheyenne, WY  82001
Telephone (307) 778-8178
Facsimile (307) 778-8953

bhunsicker@MarkusWilliams.com
jsalisbury@MarkusWilliams.com
jyoung@MarkusWilliams.com
*Attorneys for Debtor*