Jamie N. Cotter (Wyoming Bar No. 74721)
Philip A. Pearlman (Colorado Bar No. 11426)
Scott J. Goldstein (Missouri Bar No. 28698)
Spencer Fane LLP
1700 Lincoln Street, Suite 2000
Denver, Colorado 80203
Telephone: (303) 839-3800
Facsimile: (303) 839-3838
jcotter@spencerfane.com
*Counsel to the Official Committee of
Unsecured Creditors*

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF WYOMING**

| | | |
|---|---|---|
| **In Re:** | ) | **Chapter 11** |
| | ) | **Case No. 16-20326** |
| **POWELL VALLEY HEALTH CARE, INC.,** | ) | |
| | ) | |
| **Debtor-in-possession.** | ) | |

**OBJECTION TO LEXINGTON'S MOTION FOR RELIEF FROM STAY**

The Official Committee of Unsecured Creditors (the "Committee") for its Objection to Lexington Insurance Company's Motion For Relief From Stay (the "Motion"), states as follows:

1.      On May 16, 2016, Powell Valley Health Care, Inc., (the "Debtor") filed for Chapter 11 relief.

2.      On October 31, 2016, UMIA Insurance, Inc., Lexington Insurance Company ("Lexington") and Homeland Insurance Company of New York (collectively, the "Insurance Companies") filed their Insurance Companies' Joint Motion for Relief From Automatic Stay to Permit Prepetition Litigation to Continue in the United States District Court for the District of Wyoming (the "Coverage Litigation"), and Notice of Opportunity to Object (the "Insurance Companies' Motion").

3.      On November 17, 2016, the Debtor filed its Debtor's Objection to Insurance Companies' Joint Motion for Relief from Stay (the "Debtor's Objection"). The Committee fully

incorporates by reference the Debtor's Objection, as it relates directly to the latest effort by Lexington to obtain an unfair advantage in the Coverage Litigation.

4.      On November 17, 2016, the Committee filed its Motion to Join in the Debtor's Objection to Insurance Companies' Joint Motion for Relief from Stay (the "Motion to Join").

5.      This Court set a preliminary hearing on the Insurance Companies' Motion, the Debtor's Objection, and the Committee's Motion to Join for September 26, 2017.

6.      On September 1, 2017, Lexington filed this Motion, seeking to proceed with its piece of the Coverage Litigation in the District Court (the "Lexington Litigation").

7.      For the reasons stated herein, cause does not exist to lift the stay and the Committee urges this Court to deny the Motion.

## INTRODUCTION

In the Committee's earlier Motion to Join, the Committee pointed out that a premature lifting of the automatic stay was simply a litigation tactic to obtain an advantage in the Coverage Litigation.  As stated therein, "In reality, the Insurance Companies are merely attempting to benefit themselves by trying to force a lifting of the automatic stay before the Debtor and Committee and tort claimants are ready to proceed with the litigation."  As to Lexington, this is more true than ever, because the Debtor, Committee and Tort Claimants are now poised to proceed with confirmation of a Plan, the result of which will be that a Personal Injury Trustee will advance the Coverage Litigation as it sees fit including, as set forth herein, the potential for additional claims against Lexington.  Lexington merely seeks to unfairly preempt that process. Lexington should be required to wait and deal with the Personal Injury Trustee and its new counsel, as the Debtor's Plan contemplates.

2

WA 10136744.1

## OBJECTION

### Cause does not exist to lift stay under 11 U.S.C. § 362(d)(1)

8.      "The automatic stay has been described as one of the fundamental debtor protections provided under the Bankruptcy Code for the purpose of promoting equal creditor treatment and giving the debtor a breathing spell." *In re Pioneer Commercial Funding Corp*., 114 B.R. 45, 48 (Bankr. S.D.N.Y. 1990); *see also Midlantic Nat'l Bank v. N.J. Dep't of Envtl. Prot*., 474 U.S. 494, 503 (1986). Lexington's effort to lift the stay is an attempt to receive special treatment and encroach on the Debtor's breathing spell.

9.      Pursuant to 11 U.S.C. § 362(d)(1), after notice and a hearing, the court shall, for cause shown, grant relief from the stay. The partying seeking relief from stay must establish a legally sufficient basis for cause. *See In re Unioil*, 54 B.R. 192, 194 (Bankr. D. Colo. 1985) ("Once the party seeking relief from stay establishes a legally sufficient basis, i.e., 'cause,' for such relief, the burden then lies with the debtor to demonstrate that it is entitled to the stay."). Lexington has failed to demonstrate a legally sufficient basis for cause. More importantly, cause does not exist to lift the stay.

10.      Courts in the Tenth Circuit weigh twelve factors to determine whether to lift the stay for the purpose of allowing pending litigation to proceed in another tribunal. Those factors were enumerated in *In re Curtis*, 40 B.R. 795 (Bankr. D. Utah 1984), and are as follows:

> (1) Whether the relief will result in a partial or complete resolution of the issues; (2) The lack of any connection with or interference with the bankruptcy case; (3) Whether the foreign proceeding involves the debtor as a fiduciary; (4) Whether a specialized tribunal has been established to hear the particular cause of action and that tribunal has the expertise to hear such cases; (5) Whether the debtor's insurance carrier has assumed full financial responsibility for defending the litigation; (6) Whether the action essentially involves third parties, and the debtor functions only as a bailee or conduit for the goods or proceeds in question; (7) Whether litigation in another forum would prejudice the interests of other

3

creditors, the creditors' committee and other interested parties; (8) Whether the judgment claim arising from the foreign action is subject to equitable subordination under Section 510(c); (9) Whether movant's success in the foreign proceeding would result in a judicial lien avoidable by the debtor under Section 522(f); (10) The interest of judicial economy and the expeditious and economical determination of litigation for the parties; (11) Whether the foreign proceedings have progressed to the point where the parties are prepared for trial; (12) The impact of the stay on the parties and the 'balance of hurt.'

*Id*. at 800 (citations omitted). This Court has cited these factors with approval. *See In re Danzik*,

549 B.R. 804 (Bankr. D. Wyo. 2016).

11.     Application of the *Curtis* factors here reveals cause does not exist to lift the stay.

Analyzing each[1] in order, the *Curtis* factors weigh in favor of denying the Motion.

### A.      Whether the relief will result in a partial or complete resolution of the issues

12.     Allowing Lexington to proceed in the District Court will not result in a partial or

complete resolution of any issues in the Debtor's bankruptcy case. Lexington contends that the

"existence of insurance coverage directly bears on the ability of the Debtor to propose a

confirmable plan of reorganization to pay creditors." Motion at 8. Lexington is wrong.

13.     The Bankruptcy Code provides that all of the Debtor's unsecured creditors are

entitled to receive value under a confirmed Chapter 11 plan "not less than the amount that such

holder would receive or retain if the debtor were liquidated under chapter 7." 11 U.S.C.

§ 1129(a)(7)(A)(ii). Notwithstanding the outcome of the Lexington Litigation, the Debtor's Plan

provides at least this amount to unsecured creditors. Meaning, even if the Lexington Litigation

results in no recovery to the Debtor, the Debtor's plan is still confirmable pursuant to

---

[1] Factors not relevant to this case are not analyzed herein. Those factors include three (debtor as a fiduciary), eight (judgment claim subject to equitable subordination), and nine (judicial lien avoidable pursuant to § 522(f)). Further, the policies on which Lexington relies were not provided to the Court, but will be provided by the Committee on request. They, however, total $13,000,000.00 in coverage and are a critical part of the assets to be transferred by the Debtor to the Personal Injury Trust.

4

§ 1129(a)(7)(A)(ii). As such, the existence of insurance coverage as to Lexington does not determine the Debtor's ability to propose a confirmable plan of reorganization.

### B.    The lack of any connection with or interference with the bankruptcy case

14.    Allowing Lexington to proceed in the District Court will interfere with the bankruptcy case. "The overriding theme in determining whether to grant relief from the stay to permit litigation against Debtor in another forum is the effect of such litigation on the administration of the estate." *In re Danzik*, 549 B.R. at 810. "Even slight interference with the administration of the estate may be enough to preclude relief in the absence of a commensurate benefit." *In re Curtis*, 40 at 806.

15.    Lexington characterizes the Lexington Litigation as a discrete contract interpretation issue ripe for summary judgment. Again, Lexington is wrong. As developed further herein, the Lexington Litigation is far more complex than Lexington represents. Moreover, the Plan provides that the Debtor's rights and claims against the Insurance Companies will be assigned to a liquidating trust for the benefit of the Tort Claimants and pursuant to which they will hire counsel of their choosing and engage their own trial strategy—including exploring and pursuing any additional claims and defenses the Debtor did not initially plead in the Coverage Litigation, such as bad faith and conspiracy to commit bad faith, among others. To the extent Lexington argues there is no need for discovery because there are currently no bad faith claims pending against it in the Coverage Litigation, the Personal Injury Trustee will analyze whether it is appropriate to add bad faith claims against Lexington. The fact that Lexington has denied coverage and *a defense* to the Debtor in the Tort Claimants' underlying cases, strongly suggests the existence of a substantive bad faith claim.

WA 10136744.1

Case 16-20326   Doc 631   Filed 09/15/17   Entered 09/15/17 15:36:06   Desc Main
Document     Page 6 of 21

16.     Further, the coverage arguments under the Lexington policy cannot be resolved at this time.  First, Lexington's representation that relief from the stay will pave the way for a quick determination that there is no coverage simply because the claims were made outside of the Lexington policy period over-simplifies the coverage analysis.  Each of the Tort Claimants has alleged that the Debtor negligently hired, credentialed, and supervised Dr. Hansen (direct negligence claims)[2].  Although the Committee does not dispute that these claims were made outside of the Lexington policy period, the policy could be interpreted that notice of the "medical incident" giving rise to the claims was given to Lexington during the policy period when the Durose family made claims that the Debtor negligently hired, credentialed, and supervised Dr. Hansen.[3]  In fact, this is Homeland insurance's argument for denying coverage.  While the Tort Claimants have contested Homeland's position, if Homeland is correct, and the negligent credentialing claims relate back to the Durose claim, then that triggers coverage under Lexington's policy for all subsequent claims arising out of the negligent hiring, credentialing, and supervision of Dr. Hansen.

17.     The Lexington policy considers "any" claims arising from a "medical incident" to be made at the time when notice of that medical incident was first given to Lexington by the insured, *even if* the claims are eventually made *after* the Lexington policy period:

> If during the policy period, the **First Named Insured** shall become aware of *any medical incident* which may reasonably be expected to give rise to a **claim** being

---

[2]  The Tort Claimants also have claims for Dr. Hansen's medical negligence and the Debtor's vicarious liability. Those claims do not constitute a single medical incident — the single medical incident argument is limited to the direct negligence claims against the Debtor.

[3] The Durose claim was filed with the Wyoming Medical Review Panel on May 22, 2013 and the case was resolved entirely prior to the bankruptcy petition. While the Durose claim is unique and may be distinguishable from the Tort Claimants' cases, that issue is for the District Court to resolve, and yet another reason that Lexington's arguments cannot be summarily ruled upon.

WA 10136744.1

made against any **Insured**, the **First Named Insured** must notify us in writing as soon as practicable….

*Any **claim*** arising out of such **medical incident** which is subsequently made against any **Insured** and reported to **us,** shall be considered first made at the time such notice was given to **us**.

Lexington HPL policy, V(C) (bold in original, italics added). The policy further defines "medical incident" as "any act error or omission in the providing of or failure to provide **professional services**." Lexington HPL & HGL policy, I(N) (bold in original). The definition of "professional services" includes: "services by any person as a member of a formal accreditation, standards review or similar professional board or committee of any insured; or supervising, teaching, proctoring others at **your** request." *Id.* at I(V) (bold in original).

One court has previously found that negligent hiring, credentialing, and supervision claims brought by multiple different patients are a single "medical incident" under a similar Lexington insurance policy. *See CHS/ Cmty. Health Sys., Inc. v. Lexington Ins. Co.,* No. 3:11-cv-00449, 2013 U.S. Dist. LEXIS 175788 (M.D. Tenn. Dec. 9, 2013). Although that case was later vacated for lack of diversity jurisdiction, the analysis is instructive on some of the coverage issues relevant here. In *CHS/ Community Health Systems,* the insured was a hospital management company that was sued by seventy-one different patients for its negligent supervision and credentialing of two physicians. *Id.* at *1. The court reviewed Lexington's definition of "medical incident" for purposes of determining whether each patient's claim triggered a separate per "medical incident" self-insured retention payment in an errors and omissions policy. *Id.* at *9-10. The court explained, "the 'medical incident' triggering [the insured's] liability to pay the [tort claimants'] damages is premised on [the insured's] alleged acts of mismanagement, **not the individual medical procedures** performed at the Hospital." *Id.*

WA 10136744.1

at *11 (emphasis added).  Therefore, the court held that the definition of medical incident was

unambiguous and that all of the cases against Quorum were one "medical incident."[4]  *Id.* at *10.

Like in *CHS/ Community Health Systems*, the Tort Claimants' direct negligence claims against

the Debtor are premised not on the individual acts of malpractice by Dr. Hansen, but on the

Debtor's mismanagement of the hospital and the Debtor's negligence in hiring, credentialing,

and supervising Dr. Hansen.

18.     Even assuming that the Wyoming district court does not agree with the reasoning

of the Tennessee court in *CHS/Community Health Systems* that the policy unambiguously

characterizes all of the direct negligence claims against the Debtor as a single medical incident,

any ambiguity in the policy must be interpreted in favor of coverage.  To use the words of the

Wyoming Supreme Court, an ambiguous insurance policy "will be construed liberally in favor of

the insured and strictly against the insurer."  *Sinclair Oil Corp. v. Republic Ins. Co.,* 929 P.2d

---

[4] A similar issue arises under occurrence policies where the court must determine if multiple claims for similar negligent acts constitute a single occurrence.  The Tenth Circuit addressed this issue in *Business Interiors, Inc. v. Aetna Cas. & Sur. Co.,* 751 F.2d 361 (10th Cir. 1984).  In that case, an employee of the insured stole $53,000 from the company by writing forty fraudulent checks.  *Id.* at 362.  The Tenth Circuit adopted the causation rule, whereby "an occurrence is determined by the cause or causes of the resulting injury."  *Id.* at 363.  The court held that the cause of the loss was the "continued dishonesty of one employee" and that the fraudulent acts constituted a single occurrence.  *Id.; see Republic Underwriters Ins. Co. v. Moore,* 493 Fed.Appx. 907, 912 (10th Cir. 2012) (holding that the "continued preparation and service of food" was a single occurrence where hundreds of people were infected with E. coli after eating a contaminated batch of food).  *CHS/Community Health Systems* demonstrates that the district court will not be required to apply the causation rule because the language in Lexington's policy unambiguously characterizes the direct negligence claims against the Debtor as one medical incident.  No. 3:11-cv-00449, 2013 U.S. Dist. LEXIS 175788, at * 10 (refusing to apply Tennessee's "effects test" to determine if the direct negligence claims against Quorum were separate medical incidents).  Nevertheless, the Tenth Circuit cases demonstrate that even under the causation rule, the Debtor's negligent hiring, credentialing, and supervision of Dr. Hansen would be considered a continuous course of conduct constituting a single medical incident under the Lexington policy.

WA 10136744.1

535, 540 (Wyo. 1996) (citation omitted).   At the very least, *CHS/Community Health Systems* demonstrates that the definition of "medical incident" is fairly susceptible to the construction that some of the direct negligence claims against the Debtor are one medical incident under the terms of Lexington's policy and "if the contract is fairly susceptible of two constructions, the one favorable to the insured will be adopted." *Id.*

19.     Rather than address the relevant policy language and arguments set forth above, Lexington quotes language from the limits of liability section of its policy (not the conditions of coverage section) that states:

> All **claims** arising from one **medical incident** or a series of related **medical incidents** to any one **patient** shall be treated and shall be *deemed to have occurred* at the time of the first **medical incident** regardless of the number of claimants, or the number of **Insureds** against whom such **claims** are made.

Lexington HPL policy, IV (D) (bold in original, italics and underlining added). This language addresses when a medical incident is deemed to have **occurred** but has nothing to do with when a **claim** is deemed made.  The significance of this language is that a medical incident is covered by the policy only if it *occurs* on or after the retroactive date and before the end of the policy. Here the parties do not dispute that the medical incident occurred after the retroactive period and before the end of the Lexington policy, so this provision is irrelevant to the analysis.  The bottom line is that the coverage issues are far more complex than Lexington has represented and lifting the stay would not provide a path to quick resolution of these issues.  Rather Lexington is unlikely to be dismissed on summary judgment and the District Court is unlikely to even consider Lexington's summary judgment motion until discovery is complete.[5]

---

[5]   Lexington itself, in a responsive pleading in the District Court case, admitted as much when it stated, "THIRTEENTH AFFIRMATIVE DEFENSE – No determination of Lexington's liability if any, can be made until the liability of other insurers is determined and allocated, and Lexington's liability, if any, is subject to proper allocation to other insured, self-insured and uninsured periods. [Document 46 in the Coverage Litigation].

WA 10136744.1

20.     The Committee and the Debtor have devoted a significant amount of time and resources in negotiating a Plan that equitably resolves the circumstances precipitating this bankruptcy—i.e., dealing with the Coverage Litigation and resolving the Tort Claimant lawsuits in a fair, reasonable, and efficient manner while ensuring the long-term stability of the Debtor for the benefit of the community it serves. Lexington is merely attempting an end-around of the Plan and the Bankruptcy Code. Pivoting at this time and undoing the process proposed to deal with the Coverage Litigation and Tort Claimants, to defend the Lexington Litigation will not only encourage other creditors to move for stay relief—virtually nullifying the automatic stay and defeating the purpose of this bankruptcy—it will be very costly and time consuming, forcing the Debtor into extensive litigation costs that it cannot afford, including attorneys' and expert witness fees, among other things. These are resources the Debtor needs to devote to confirming the Plan. This course of action will substantially interfere with the bankruptcy case.

21.     Further, even if the Lexington Litigation were ripe for summary judgment (which it is not), lifting the stay would "necessitate a deviation from the Debtor's duties and responsibilities in this reorganization [and] that consideration cannot be shrugged off as *de minimis.*" *In re Penn-Dixie Indus., Inc.*, 6 B.R. 832, 836 (Bankr. S.D.N.Y. 1980). The automatic stay does not only stay a trial; it stays all litigation, including motions for summary judgment. *See* 11 U.S.C. § 362. Even mere discovery requests can sufficiently interfere with a bankruptcy case. *In re Penn-Dixie Indus., Inc.*, 6 B.R. at 836. Lexington's interference in the administration of this bankruptcy through the attempted continuance of the Lexington Litigation in the District Court is prohibited. *Id.* ("Interference by creditors in the administration of the estate, no matter

10

how small, through the continuance of a preliminary skirmish in a suit outside the Bankruptcy Court is prohibited.").

22.     Finally, prematurely lifting the automatic stay is simply a scheme by Lexington to obtain an advantage in the Lexington Litigation. Lexington is attempting to capitalize on this moment, attacking at a time when the Debtor, Committee and Tort Claimants are focused on confirmation. For all of these reasons, this factor weighs in favor of not lifting the stay.

**C.      Whether a specialized tribunal has been established to hear the particular cause of action and that tribunal has the expertise to hear such cases**

23.     The District Court is not a specialized tribunal, however, it certainly does have knowledge of the Lexington Litigation and the Committee agrees that the District Court shall ultimately decide the Lexington Litigation; albeit, at the appropriate time. Lexington's issue, however, is about impatience and/or frustration, neither of which are grounds for cause. Under the Plan, the District Court, not this Court, will decide the Lexington Litigation. Thus, this factor weighs in favor of not lifting the stay.

**D.      Whether the debtor's insurance carrier has assumed full financial responsibility for defending the litigation**

24.     The Coverage Litigation hinges on the Insurance Companies' failure to assume full financial responsibility for defending litigation. The reasoning behind this factor is that if an insurance carrier has assumed full financial responsibility for defending litigation, the harm to the estate in permitting the litigation to proceed would be minimal. Of course, that is the opposite of this case. As such, this factor weighs in favor of not lifting the stay.

**E.      Whether the action essentially involves third parties, and the debtor functions only as a bailee or conduit for the goods or proceeds in question**

11

25.     At the conclusion of the Lexington Litigation, the Debtor would in effect be a conduit for the proceeds to the Tort Claimants. At this juncture, however, only the Debtor has standing to defend the Lexington Litigation. Thus, this factor weighs in favor of not lifting the stay.

### F.      Whether litigation in another forum would prejudice the interests of other creditors, the creditors' committee and other interested parties

26.     All creditors would be prejudiced by this Court lifting the stay. No party is *per se* prejudiced by having the District Court decide the Lexington Litigation. The Plan provides that the Lexington Litigation will resume in the District Court at the appropriate time. The issue, however, is Lexington's frustration and impatience.

27.     As this time, the Committee, Tort Claimants, and other creditors have an interest in having the Debtor devote its resources to confirming the Plan and reorganizing. Any resources spent in defending the Lexington Litigation detracts from this effort. Any dollar spent defending the Lexington Litigation benefits no one.

28.     Further, the Plan assigns the Debtor's rights and claims against the Insurance Companies to a liquidating trust for the benefit of the Tort Claimants. The Personal Injury Trustee will hire counsel of its choosing and engage its own trial strategy—including exploring and pursuing any additional claims and defenses that the Debtor did not initially plead in the Coverage Litigation, such as bad faith and conspiracy to commit bad faith, among others. The Tort Claimants will be harmed if the Lexington Litigation proceeds before the Tort Claimants have a chance to assert these claims and defenses and protect their interests. Exposure to such claims may reveal the real reason behind Lexington's enthusiasm in filing two motions for relief from stay basically seeking the same relief.

12

29.     If the Court lifts the stay at this time, it will prejudice all creditors. It will deplete resources the Debtor needs to confirm the Plan and foreclose the Tort Claimants' ability to protect their interests. Lexington will have its day in the District Court. Allowing it to proceed now would violate basic principles of the automatic stay—equal creditor treatment and the Debtor's breathing spell—and surely defeat the entire purpose of this bankruptcy case— resolving the circumstances precipitating this bankruptcy in a fair, reasonable, and efficient manner. For all of these reasons, this factor weighs in favor of not lifting the stay.

### G.     *The interest of judicial economy and the expeditious and economical determination of litigation for the parties*

30.     Despite Lexington's heavy reliance on this factor for lifting the stay, stay relief here does not serve judicial economy and the expeditious and economical determination of the Lexington Litigation. If the Lexington Litigation truly is ripe for summary judgment, as Lexington contends, then the District Court will expend the same amount of judicial resources whether the stay is lifted now or following Plan confirmation.

31.     Lifting the stay to allow Lexington to file its summary judgment motion would not "provide all parties with the benefit of prompt resolution" of the Lexington policy dispute, as Lexington argues, because (1) the District Court is unlikely to rule on Lexington's summary judgment motion until discovery is complete; and (2) Lexington overstates the strength of its coverage arguments, which are unlikely to be resolved in Lexington's favor on a summary judgment motion.

32.     Lifting the stay would not promote judicial economy because the District Court is unlikely to rule on the motion until the close of the discovery period.  First, Rule 56 of the Federal Rules of Civil Procedure states that when a motion for summary judgment is presented

WA 10136744.1

before the opposition has had the opportunity to discover essential facts, the court may deny the motion or delay its decision until the parties have had an opportunity to conduct discovery.  Fed. R. Civ. P. 56(d).   Here, there are numerous "essential" facts that the Debtor has not yet discovered (or had an opportunity to discover).  For example, the Wyoming Supreme Court has been clear that the "intention of the parties is the **primary** consideration" in construing insurance contracts.  *Sinclair Oil Corp,* 929 P.2d at 539.   However, the Debtor never had the opportunity to take any discovery bearing on Lexington's intention in drafting its broad provisions.  Similarly, discovery is likely to illuminate whether Lexington's interpretation of its policy is reasonable.  If Lexington has previously taken the position that numerous negligent hiring, credentialing, and supervision claims by different patients are a single medical incident, then the District Court could find that the negligent hiring, credentialing and supervision claims relate back to the *Durose* case which was a claim under the Lexington policy. In order to fully and fairly respond to any summary judgment motion filed by Lexington, the Personal Injury Trustee must have the opportunity to discover key documents such as Lexington's claims files and underwriting files and decide whether it is necessary to depose any witnesses.

33.     Given the posture of this case, as a practical matter it is extremely unlikely that the District Court would rule on Lexington's summary judgment motion prior to any discovery. In addition to FRCP 56(d), when the District Court issued the scheduling order in the declaratory judgment action in January 2016, (prior to the bankruptcy) it allowed ten months for fact discovery, an additional seven months for expert witness designations and discovery, and did not set the dispositive motions deadline until May 2017.

34.     In the Coverage Litigation, the District Court will be analyzing not IF there is coverage but WHO has coverage.  To perform that analysis, the District Judge will be looking at

WA 10136744.1

all Insurance Companies to determine which claims fall under which policies, and addressing the
individual coverage denials.  The District Judge will no doubt want to perform this analysis at
the same time, and depending on how he rules, his conclusions on certain coverage denials may
trigger coverage under another policy.  For instance, should the District Court find that the
negligent credentialing claims "relate back" to the Durose claim as argued by Homeland, then
that would trigger coverage under the Lexington policy.  For these reasons, even if the stay is
lifted now, the District Court is unlikely to rule on Lexington's summary judgment motion for at
least a year and a half.

35.    The Lexington Litigation is not ripe for summary judgment, however. As detailed
extensively herein, the Lexington Litigation is far more complex than a simple contract
interpretation issue. Moreover, when the Tort Claimants can protect their interests in the
Coverage Litigation they will employ their own counsel to control discovery, motion practice,
scheduling, and litigation strategy. It may be in Lexington's interests to have the District Court
proceed with the Lexington Litigation at a time when the Debtor does not have the resources to
properly defend it, and the Tort Claimants cannot protect their interests, but that is not cause to
lift the stay.

36.    Moreover, bankruptcy courts typically consider this factor where there is an issue
of whether the underlying litigation should be determined in the bankruptcy case or the foreign
tribunal—i.e., avoiding duplicative proceedings. *See e.g., In re Pemberton Pub. Inc*., 16 B.R. 275
(Bankr. D. Mass. 1981) (lifting the stay to allow state court litigation to proceed because the
issue involved a landlord-tenant matter normally handled by state courts); *In re Ozai*, 34 B.R.
764 (B.A.P. 9th Cir. 1983) (lifting the stay to allow state court litigation to proceed because
underlying state court litigation was a prerequisite to dischargeability complaints in the

WA 10136744.1

bankruptcy case). That is not this case. There is no threat of duplicative proceedings. Lexington

will have its day in the District Court. For all of these reasons, this factor weighs in favor of not

lifting the stay.

**H.      Whether the foreign proceedings have progressed to the point where the parties are prepared for trial.**

37.      The bottom line is that the District Court has not even set the Lexington Litigation

for trial. A review of the docket reveals trial is well off in the future. The Debtor filed an

amended answer merely a week before filing this bankruptcy on May 16, 2016. The automatic

stay froze the litigation on May 16, 2016. In May 2016, the Lexington Litigation was over a year

away from dispositive motion deadlines. Only after resolution of discovery, motion practice, etc.

was the District Court going to set trial. The District Court had not progressed to the point of

trial, or resolution of any sort, when the Debtor filed this bankruptcy. As such, this factor weighs

in favor of not lifting the stay.

38.      In addition, the District Court entered its *own* stay order on May 25, 2016, stating,

"Due to the notice [of the Debtor's bankruptcy filing], the Court will stay this matter until the

stay is no longer warranted."  [Document 74 in the Coverage Litigation].  If stay relief were

granted by this Court, Lexington would still have to persuade the District Court that its own stay

should be lifted.  Further, it is reasonable to assume that the District Court did not contemplate

that this Court would grant stay relief on a piecemeal basis, and doing so would likely result in

confusion.

**I.      The impact of the stay on the parties and the 'balance of hurt'**

39.      Stay relief will harm the Debtor and all creditors. Any financial hardship to

Lexington "must, of course, be balanced against financial hardship to [the] Debtor." *In re*

WA 10136744.1

*Danzik*, 549 B.R. at 810. "The court should not shift the financial burden from another party to [the] Debtor. To do so would contravene the fundamental policy in favor of economic administration of [the] Debtor's estate[]." *Id.*

40.    In *In re Danzik*, the bankruptcy court found the balance of hurt factor weighed in favor of lifting the stay. The court reasoned that while the court was "mindful of [the] impacts on stay relief on [the] Debtor who must also devote time to his Chapter 11 case," the issues had already been determined in the foreign tribunal. *Id.* The court further explained that "allowing the New York Court to enter final judgment, following proceedings that have already taken place, will result in little to no cost to the Debtor. Maintaining the automatic stay, and requiring this Court to address the matter in this Court, would result in substantial financial hardship to both [the] Debtor and creditors." *Id.* That is not this case. The Lexington Litigation had months of discovery left and was more than a year away from the dispositive motion deadline when the Debtor filed bankruptcy. Further, the District Court was far from even setting a trial date.

41.    Any resources devoted to defending the Lexington Litigation will come at the expense of resources the Debtor needs to confirm the Plan and reorganize, harming the Debtor and all creditors, and threatening the long-term stability of the Debtor for the benefit of the community it serves. Moreover, the Tort Claimants will be harmed if this Court allows the Lexington Litigation to proceed before the Tort Claimants have a chance to protect their interests in the Lexington Litigation.

42.    Beyond impatience and/or frustration, Lexington has failed to allege *any* real injury that would result if it has to wait for its day in the District Court. Thus, Lexington has no financial hardship that this Court needs to balance against the clear financial hardship to the Debtor. *See In re Danzik*, 549 B.R. at 810. Only Lexington stands to gain from this scheme to

17

prematurely lift the stay; a gain at the expense of the Debtor, its creditors and the Tort Claimants. Playing by the same rules as everyone else and not capitalizing on this scheme are not examples of harm. As such, this factor weighs in favor of not lifting the stay.

Not a single factor weighs in favor of this Court lifting the stay. This Court should deny the Motion.

WHEREFORE, for the reasons set forth herein, the Committee respectfully requests that the Court deny Lexington's Motion and for other and further relief as may be just and proper under the circumstances.

Date:  September 15, 2017

Respectfully submitted,

SPENCER FANE LLP

/s/ Jamie N. Cotter
Jamie N. Cotter            WY #74721
1700 Lincoln Street, Suite 2000
Denver, CO 80203-4554
(303) 839-3800
(303) 839-3838—Fax
jcotter@spencerfane.com
ppearlman@spencerfane.com

Scott J. Goldstein            MO #28698
1000 Walnut, Suite 1400
Kansas City, MO 64106
(816) 474-8100
(816) 474-3216– Fax
sgoldstein@spencerfane.com

COUNSEL TO OFFICIAL COMMITTEE OF
UNSECURED CREDITORS

18

## **CERTIFICATE OF SERVICE**

I hereby certify that on this 15th day of September, 2017, the above and foregoing was served via electronic filing to all parties requesting/receiving electronic notice in this case and via U.S. Mail postage pre-paid upon the attached service list.

/s/ Jamie N. Cotter
Counsel to Official Committee of Unsecured Creditors

WA 10136744.1

# In re POWELL VALLEY HEALTH CARE, INC.
## Wyoming Bankruptcy Case No.16-20326

## LIMITED SERVICE LIST

Last Updated:  September 15, 2017

| Parties Who Have Entered Their Appearance ||
|---|---|
| **First Bank of Wyoming**<br>c/o Timothy L. Woznick<br>Gregory C. Dyekman<br>Dray, Dyekman, Reed & Healey, P.C.<br>204 East 22nd Street<br>Cheyenne, Wyoming 82001 | **US Trustee**<br>308 West 21st Street, 2nd Floor<br>Cheyenne, WY 82001 |
| **United States Trustee**<br>c/o Daniel J. Morse<br>308 W. 21st St., Ste. 203<br>Cheyenne, WY 82001 | **United States Trustee**<br>c/o Alan Motes<br>United States Trustee, Region 19<br>Byron G. Rogers Federal Building<br>1961 Stout Street, Suite 12-200<br>Denver, CO 80294 |
| *Darcy Ronne, Jan and Bart Brinkerhoff, Jody and Jerry Sessions, Joetta Johnson, Keela and Brock Meier, Lynn and Janet Snell, Martha and Richard McMillen, Michelle Oliver, Nathaniel and Sheena Bates, Shannon Eller, Veronica and William Sommerville, Anthony and Laurie DiPilla, Kalan Nicholson, Nancy and Earl Crawford, III, Nancy and Larry Heiser, Sheryl and Darin Henderson, Susan and Scot Stambaugh, Beverley Curtis, Harry and JoAnn Knopp, Mark Bonamarte, Shane and Jayme Wilson and Susan and Doug Scott, Nanette Nofzinger, Kelly Hatcher, William C. Haney*<br>c/o Randy L. Royal<br>P.O. Box 551<br>524 5th Ave. S. Greybull, WY 82426 | **Stryker Instruments, a Division of Stryker Corporation**<br>c/o Lori L. Purkey<br>Purkey & Associates, P.L.C.<br>5050 Cascade Road, SE, Suite A<br>Grand Rapids, MI 49546 |
| **UMIA Insurance, Inc.**<br>c/o James T. Burghardt<br>Timothy M. Swanson<br>Moye White LLP<br>1400 16th St., 6th Floor<br>Denver, CO 80202 | **UMIA Insurance, Inc.**<br>c/o Julie Nye Tiedeken<br>McKellar, Tiedeken & Scoggin, LLC<br>702 Randall Avenue<br>P.O. Box 748<br>Cheyenne, WY 82003 |

WA 8823870.2

| | |
|---|---|
| **Powell Hospital District**<br>c/o Chad S. Caby<br>Brent R. Cohen<br>Lewis Roca Rothgerber LLP<br>1200 17th Street, Suite 3000<br>Denver, CO 80202-5855 | **Homeland Insurance Company of NY**<br>c/o Patrick T. Holscher<br>141 South Center, Suite 500<br>Casper, WY 82601 |
| **HealthTech Management Services, Inc.**<br>George E. Powers, Jr.<br>1725 Carey Avenue<br>POBox328<br>Cheyenne, WY 82003-0328 | **William D. Patten**<br>George E. Powers, Jr.<br>1725 Carey Avenue<br>PO Box 328<br>Cheyenne, WY 82003-0328 |
| **HealthTech Management Services, Inc.**<br>c/o Ethan J. Birnberg<br>John C. Smiley<br>Lindquist & Vennum P.L.L.P.<br>600 17th Street Suite, 1800 South<br>Denver, CO 80202 | **Beckman Coulter, Inc.**<br>c/o Daniel R. Schimizzi<br>Bemstien-Burkley, P.C.<br>707 Grant Street, Suite 2200<br>Gulf Tower<br>Pittsburgh, PA 15219 |
| *Anthony and Laurie DiPilla; Darcy Ronne, Jan and Bart Brinkerhoff, Jody and Jerry Sessons, Joetta Johnson, Kalan Nicholson, Keela and Brock Meier, Lynn and Janet Snell, Martha and Richard McMillen, Michelle Oliver, Nancy and Earl Crawford, III, Nancy and Larry Heiser, Nathaniel and Sheena Bates, Shannon Eller, Sheryl and Darin Henderson, Veronica and William Sommerville*<br>c/o Sarah A. Kellogg<br>Robert A. Krause<br>Elizabeth Richards<br>The Spence Law Firm, LLC<br>P.O. Box 548<br>Jackson, WY 83001-0548 | **Lexington Insurance Company, Inc.**<br>Deborah M. Kellam<br>Hall & Evans, L.L.C.<br>866 N 4th Street, Suite 3<br>Laramie, WY 82072<br><br>Lance E. Shurtleff<br>Hall & Evans, L.L.C.<br>2015 Central Ave., Suite C<br>Cheyenne, WY 82001<br><br>Michael S. Davis<br>Zeichner Ellman & Krause LLP<br>1211 Avenue of the Americas<br>New York, New York 10036 |
| **Debtor** | |
| Bradley T. Hunsicker<br>Markus Williams Young & Zimmermann LLC<br>106 East Lincolnway, Suite 300<br>Cheyenne, WY 82001 | Donald D. Allen<br>Jennifer M. Salisbury<br>John F. Young<br>Markus Williams Young & Zimmermann, LLC<br>1700 Lincoln Street Suite 4550<br>Denver, CO 80203 |

WA 8823870.2