Bradley T. Hunsicker (Wyo. Bar 7-4579)
Jennifer Salisbury (Wyo. Bar 7-5218)
**Markus Williams Young & Zimmermann LLC**
106 East Lincolnway, Suite 300
Cheyenne, WY 82001
Telephone: 307-778-8178
bhunsicker@markuswilliams.com

**UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF WYOMING**

| | |
|---|---|
| In re: ) | |
| ) | Case No.: 16-20326 |
| POWELL VALLEY HEALTH CARE, INC., ) | Chapter 11 |
| ) | |
| Debtor-in-Possession. ) | |

---

**JOINT MOTION OF UMIA INSURANCE, INC., DEBTOR AND OFFICIAL COMMITTEE OF UNSECURED CREDITORS REQUESTING APPROVAL OF: (I) GLOBAL SETTLEMENT AGREEMENT PURSUANT TO FED. R. BANKR. P. 9019; AND (II) UMIA'S BUYBACK OF UMIA INSURANCE POLICIES FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES AND INTERESTS PURSUANT TO SECTIONS 363(B) AND (F) OF THE BANKRUPTCY CODE**

---

UMIA Insurance, Inc. ("**UMIA**"), Debtor Powell Valley Health Care, Inc. (the "**Debtor**"), and the Official Committee of Unsecured Creditors (the "**Committee**") (collectively, the "**Movants**" or "**Parties**"), for their Joint Motion Requesting Approval of: (I) Global Settlement Agreement (the "**Agreement**")[1] Pursuant to Fed. R. Bankr. P. 9019; and (II) UMIA's Buyback of UMIA Insurance Policies Free and Clear of Liens, Claims, Encumbrances and Interests Pursuant to Sections 363(b) and (f) of the Bankruptcy Code (this "**Motion**"), state as follows:

### I.   Introduction

1. Since 2015, UMIA, the Debtor and certain of the Insureds have been entangled in a complex declaratory judgment action (the "**Insurance Coverage Litigation**") in the United

---

[1] Capitalized terms not expressly defined herein shall have the meanings ascribed to them in the Agreement.

{Z0198086/1 }

States District Court for the District of Wyoming (the "**District Court**") regarding whether UMIA has any obligation to provide insurance coverage under the two separate insurance policies (the "**UMIA Policies**") it issued to the Debtor. In the Insurance Coverage Litigation, the Parties pursued their respective claims and defenses until the Debtor commenced this Bankruptcy Case, triggering the automatic stay of that litigation. Notwithstanding the litigious state of affairs among the Parties both inside and outside this Bankruptcy Case, the Parties recently have been able to reach a resolution of all of their respective Claims, as set forth in the Settlement Agreement attached hereto as Exhibit A (the "**Agreement**").

2. The Agreement provides that, in consideration for a cash payment of $3 million, UMIA will receive a release of all Claims arising under and/or covered by the UMIA Policies from, *inter alia*, the Debtor, Powell Hospital District (the "**District**"), HealthTech Management Services ("**HealthTech**"), Dr. Jeffrey Hansen ("**Hansen**"), William D. Patten ("**Patten**"), Dr. William Jarvis (the "**Jarvis**"), the Committee and the Tort Claimants[2]. To implement the terms of the Agreement, among other things UMIA would: (i) purchase the UMIA Policies free and clear of all liens, Claims, encumbrances and interests pursuant to Section 363(f) of the Bankruptcy Code, (ii) be granted a Channeling Injunction to the PIT for all Claims against UMIA asserted by any Person, and (iii) be granted a Supplemental Injunction against all Claims asserted any Person arising under or covered by the UMIA Policies. The Agreement will end substantial current and potential additional litigation between UMIA and the other Parties, both inside and outside this Bankruptcy Case.

3. The Agreement was negotiated at arms' length by the Parties who were effectively represented by competent counsel. Approval of the Agreement will not only help

---

[2] Tort Claimants shall mean those individuals identified on Exhibit A attached to the Powell Valley Health Care, Inc. Personal Injury Trust [Doc. 656-2] and attached to the Amended Plan.

pave the way for the Debtor's imminent exit from this Bankruptcy Case, but also provide an infusion of substantial cash to the PIT for ultimate distribution to the Tort Claimants.

## II.   Jurisdiction

4. This Court has jurisdiction over this Motion under 28 U.S.C. § 1334. Venue of this proceeding is proper pursuant to 28 U.S.C. § 1409. This is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2). The statutory and rule based predicates for relief are Sections 105(a), 363(b) and 363(f) of the Bankruptcy Code along with Rule 2002 and 9019 of the Bankruptcy Rules.

## III.   Background

**A.   Prepetition Background Regarding the UMIA Policies and the Insurance Coverage Litigation.**

5. UMIA is one of the Debtor's insurers. Prepetition, UMIA issued two separate "claims made" insurance policies to the Debtor, each identified as Policy No. WY 920017, for the two years commencing on August 2014 and ending on August 2016.

6. The Debtor, the District, HTMS, Patten, Hansen, Jarvis and numerous other professionals associated with the Debtor were all Insureds under the UMIA Policies.

7. In the many months preceding the Debtor's Bankruptcy Case, numerous Claims had been made, both formally through litigation and informally, by Tort Claimants against some or all of the Insureds regarding the nature and extent of medical procedures performed by Hansen and/or other Insureds.

8. UMIA, together with two of the Debtor's other insurance companies, is a party to that certain declaratory judgment action in the District Court against the Debtor, the District, HealthTech, Patten, and Hansen, styled as *Homeland Insurance Company of New York, et al., v. Powell Hospital District, et al.*, No. 15-CV-00031-ABJ, which primarily involves the issue of

what, if any, insurance coverage is available to the Debtor, the District, HealthTech, Patten, and Hansen for the Patient Claims.

9. In the Insurance Coverage Litigation, UMIA contends there is no insurance coverage for the Insureds regarding the Patient Claims under the UMIA Policies, and that the UMIA Policies should be rescinded as a matter of law. On the other hand, the Debtor, the District, HealthTech, Patten, and Hansen contend that UMIA is obligated to provide insurance coverage for the Patient Claims under the UMIA Policies, and that UMIA has acted in bad faith in connection with administering the UMIA Policies and denying the Patient Claims. Notwithstanding its allegation in the Insurance Coverage Litigation, UMIA agreed to defend certain of the Insureds regarding certain of the Patient Claims under a reservation of rights.

**B.     Background Regarding the Bankruptcy Case.**

10. On May 16, 2016, the Debtor filed its voluntary petition for relief under Chapter 11 of the Bankruptcy Code, thereby commencing this Bankruptcy Case. (Docket No. 1). The Debtor asserted that the purpose underlying its decision to file the Bankruptcy Case was to "provide a framework for the fair and expeditious resolutions of the Lawsuits" brought by Hansen's patients (Docket No. 9, at ¶¶ 28-33).

11. On August 16, 2016, the Debtor purchased from UMIA an Extended Reporting Period Coverage Endorsement which covers, according to its terms and conditions, any claims for acts occurring between August 1, 2003 through August 1, 2016, by any of the Insureds but which are reported at any time after August 1, 2016 (the "**UMIA Tail Policy**").

12. On October 31, 2016, the Debtor filed its *Motion for Authorization to Conduct Rule 2004 Examination of the Malpractice Insurance Companies* (Docket No. 353) which sought

{Z0198086/1 }                                              4

certain discovery from UMIA, Homeland Insurance Company of New York ("**Homeland**") and Lexington Insurance Company ("**Lexington**").

13. Also on October 31, 2016, UMIA, along with Homeland and Lexington, jointly filed a *Motion for Relief From Automatic Stay to Permit Prepetition Litigation to Continue in the United States District Court for the District of Wyoming, and Notice of Opportunity to Object* (Docket No. 354) which sought relief from the automatic stay to resume the Insurance Coverage Litigation.[3]

14. On June 28, 2017, the Bankruptcy Court entered its *Order Directing Mediation and Appointing the Honorable Mark L. Carman to Serve as Mediator* (Docket No. 585) (the "**Mediation Order**"). Pursuant to the Mediation Order, UMIA along with the Debtor, Committee and other parties in interest, engaged in a two-day mediation in the late summer of 2017. However, the mediation was ultimately unsuccessful as to the Parties' respective claims against each other.

15. On September 26, 2017, the Debtor filed its *Amended Disclosure Statement* (Docket No. 655) and its *Amended Chapter 11 Plan of Reorganization* (Docket No. 656). On October 25, 2017, this Court approved the Amended Disclosure Statement and has set the Confirmation Hearing for December 12, 2017. (Docket Nos. 713-714).

16. One critical feature of the Amended Plan is the creation of the PIT and implementation of the TDPs. The TDPs provide a mechanism for the resolution and liquidation of the Patient Claims asserted by the Tort Claimants against the Debtor. (Docket No. 656-3). The TDPs vest authority in the trustee of the PIT to resolve all claims made against the assets of the PIT and provide for the distribution of the PIT assets. Those assets consist of, *inter alia*, a

---

[3] Both the Rule 2004 Motion and Stay Relief Motion have been continued from time to time throughout this Bankruptcy Case, and presently are set for hearing on December 12, 2017.

promissory note to be paid by the Debtor, settlement proceeds to be contributed by the District and HTMS, and the proceeds (if any) from liquidation of numerous legal claims including any claims asserted in the Insurance Coverage Litigation. (*Id.*).

17. At the hearing on the adequacy of the Disclosure Statement, UMIA and the Debtor's other insurers opposed approval of the Disclosure Statement claiming that the implementation of the TDPs would violate their rights under Wyoming law and under their respective insurance policies. (Docket No. 700). This Court overruled those objections and approved the Amended Disclosure Statement, deferring several critical issues for the plan confirmation hearing or subsequent litigation.

C. **Background Regarding the Terms of the Agreement.**

18. Following the conclusion of the hearing on the adequacy of the Disclosure Statement, UMIA and the other Parties engaged in extensive good-faith negotiations, seeking a potential global resolution of all issues. As a result of those negotiations, the Parties reached the Agreement, which that paves the way for a resolution of all Claims by and between UMIA, Debtor, Committee, Tort Claimants, and the Insureds arising under and/or covered by the UMIA Policies.

19. Under the terms of the Agreement, in exchange for the payment of $3 million, the Debtor will agree to UMIA's Buyback of the UMIA Policies free and clear of all liens, Claims, encumbrances and interests pursuant to Sections 363(b) and (f) of the Bankruptcy Code.[4] Any Claims held by the Tort Claimants against any of the Insureds, UMIA, or the UMIA Policies arising under or covered by the UMIA Policies will be channeled to the PIT, and UMIA will be

---

[4] The terms of the Agreement summarized herein are qualified in their entirety by terms of the Agreement itself, and are provided here for the convenience of the Court and all parties in interest. All parties in interest are encouraged to read the Agreement in its entirety. In the event of any conflict between the terms of this Motion and Agreement, the terms of the Agreement and Settlement Order shall govern.

{Z0198086/1 } 6

granted both a Channeling Injunction and Supplemental Injunction to effectuate such relief.[5] In addition to the Buyback, the Parties will be granting each other—and the Tort Claimants will be granting the Insureds—a release of all Claims they hold against each other. Furthermore, the Parties will request, *inter alia*, findings from this Court that: (i) UMIA is a good-faith purchaser under Section 363(m) of the Bankruptcy Code; (ii) the Settlement Amount is fair, reasonable and provides reasonably equivalent value; (iii) the acceptance of the Settlement Amount represents a full and complete satisfaction of all of UMIA's obligations under the UMIA Policies as to any and all Claims for insurance coverage or policy benefits; (iv) the Agreement was negotiated and entered into by the Parties without collusion, in good faith, and from arms' length bargaining positions; (v) the Agreement and Settlement Order are binding in all respects on the Debtor, the Committee, the PIT (or any other entity formed pursuant to a confirmed plan), the Insureds, the Tort Claimants, all creditors, and all other parties in interest; (vi) the Buyback of the UMIA Policies shall constitute a rescission of such policies under applicable non-bankruptcy law but shall not otherwise affect the UMIA Tail Policy; and (vii) the terms of the Settlement Order be expressly incorporated into the Amended Plan and Confirmation Order.

20. Approval of the Agreement will resolve substantial pending and potential litigation between the Parties relating to the UMIA Policies, including: (i) all Claims between the Parties asserted in the Insurance Coverage Litigation; (ii) numerous pending state court lawsuits against the Insureds on account of the Patient Claims; (iii) UMIA's contesting confirmation of the Debtor's Amended Plan and all potential appeals related thereto; (iv) the Rule 2004 Motion as directed against UMIA; (v) the Stay Relief Motion as prosecuted by UMIA; (vi) any litigation between the Parties surrounding UMIA's Proof of Claim; and (vii) any litigation subsequent to

---

[5] The UMIA Tail Policy is *NOT* being purchased by UMIA pursuant to the Agreement. Instead, as set forth in the Agreement, the rights and the obligations of the Insureds and UMIA under the UMIA Tail Policy shall remain unchanged and unaffected with respect to any claims that are subject to or covered by the UMIA Tail Policy.

the Amended Plan being confirmed regarding the reasonableness of the TDPs. Approval of the Agreement will provide a substantial benefit to the Debtor's estate and the Tort Claimants and will augment the funds distributable to the Tort Claimants. Accordingly, approval of the Agreement will not only enhance the Debtor's estate but unburden the estate from substantial litigation.

### III.  Relief Requested

21. The Movants request that this Court: (i) approve the Agreement pursuant to Fed. R. Bankr. P. 9019; and (ii) authorize the Debtor sell the UMIA Policies to UMIA pursuant to Sections 363(b) and (f) of the Bankruptcy Code.

### IV.  Argument

**A.  The Court May Approve a 9019 Settlement in Conjunction with Section 363 Sale.**

The Bankruptcy Court may approve a 9019 settlement in conjunction with related section 363 sale. Indeed, this is hardly a novel concept. This structure has been used in other cases to resolve disputes and to sell the Debtor's assets free and clear of liens, claims and encumbrances. *See, for example, In re Sunland, Inc.*, 2014 Bankr. LEXIS 5000 *12 (Bankr. D. N.M. 2014); *Official Committee of Senior Unsecured Creditors, etc. v. First Republic Bank Corp.*, 106 B.R. 938 (N.D. Tex. 1989) (settlement of claims upheld in connection with sale of assets); *In re Eneco, Inc.*, 2008 Bankr. LEXIS 3398 (Bankr. D. Utah 2008) (approving settlement agreement and sale of assets). In such cases, the court must consider the sale and the settlement both under the standards of a sale under 11 U.S.C. § 363(b) and of a settlement under F.R.B.P. 9019. *See Goodwin v. Mickey Thompson Entm't Group, Inc. (In re Mickey Thompson Entm't, Inc.*, 292 B.R. 415, 421 (9th Cir. BAP 2003) (settlements which include a sale of estate assets implicate both section 363 and rule 9019); *Griffen v. Novastar Mortg. (In re Ramsey)*, 356 B.R. 217

(Bankr. D. Kan. 2006) (when settlement include sale of estate assets, the court must evaluate the transaction under standards of both section 363(b) and Rule 9019).

**B.     Legal Standard to Approve Settlement Agreements Under Fed. R. Bankr. P. 9019.**

22.     Rule 9019(a) of the Bankruptcy Rules, in relevant part, provides "[o]n motion by the trustee and after notice and a hearing, the court may approve a compromise or settlement." *See* Fed. R. Bankr. P. 9019(a).   "[A] court's general charge is 'to determine whether the settlement is fair and equitable and in the best interests of the estate.'" *In re US Bentonite, Inc.*, 536 B.R. 948, 960 (Bankr. D. Wyo. 2015).

23.     To determine whether a settlement agreement is "fair and equitable and in the best interests of the estate" Bankruptcy Courts in Wyoming consider the following factors: (1) the probability of success on the merits in the litigation; (2) the difficulties, if any, to be encountered in collection of any judgment that might be obtained; (3) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; and (4) the paramount interests of creditors and the proper deference to their reasonable views in the premises. *In re Rich Glob., LLC*, 2013 Bankr. LEXIS 2834, at *4 (Bankr. D. Wyo. 2013) (citing *In re Christie*, 2013 Bankr. LEXIS 2016 (Bankr. D. Kan. 2013)).

24.     In evaluating a proposed settlement, the Bankruptcy Court should not substitute its judgment for the Debtor's "but rather, should without conducting a trial or deciding the numerous questions of law and fact, canvass the issues and see whether the settlement fall(s) below the lowest point in the range of reasonableness." *In re Rich Glob.*, at *4-5 (internal quotations omitted).  Movants asserts that each of the *Rich Global* factors weighs in favor of approval of the Agreement.

       **i.**     **Probability of Success on the Merits of the Litigation.**

{Z0198086/1 }                                                  9

25. The Agreement provides a complete resolution of substantial pending litigation and contested matters between UMIA and the Debtor, the Committee, certain of the Insureds, the Tort Claimants, and the PIT, where the probability of success on the merits is unknown for the Debtor and each of Parties. Perhaps most important, the Agreement will resolve the Insurance Coverage Litigation between UMIA and the Debtor (under the terms of the Amended Plan, the PIT would step into the shoes of the Debtor in such litigation). UMIA contends, in both the Insurance Coverage Litigation and this Bankruptcy Case, that there is no coverage available for any of the Insureds under the UMIA Policies regarding any of the Patient Claims.[6] The Debtor disputes UMIA's contentions with respect to coverage under the UMIA Policies, and also has asserted an extra-contractual claim for bad faith against UMIA with respect to its denial of coverage.

26. At this juncture, while each of the Parties is confident in its respective position, none can be certain as to whether the District Court will ultimately rule in its favor. If UMIA were to prevail in the Insurance Coverage Litigation, *i.e.*, the District Court determines that no insurance coverage exists under the UMIA Policies, there would be no insurance proceeds available from UMIA for any Party to satisfy any Patient Claims. However, if the Debtor were to prevail, *i.e.*, the District Court determines that coverage does exist, the Debtor could then pursue its claims for extra-contractual bad faith against UMIA. Absent the Agreement, either of these scenarios would be extremely unfavorable for to the losing Party or Parties. In addition, given the complexity of the factual and legal issues involved, the Insurance Coverage Litigation will involve substantial delay before a decision of the District Court (not to mention appeals

---

[6] Notwithstanding this allegation, UMIA had agreed to defend many of the Patient Claims subject to a reservation of rights.

{Z0198086/1}                                          10

therefrom) becomes final. The Agreement provides a prompt and fair resolution of the Insurance Coverage Litigation.

27. Additionally, the Agreement resolves several other contested matters—as they relate to UMIA—along with several potential impending contested matters. Specifically, the Agreement requires that the Parties withdraw the Rule 2004 Motion against UMIA and that UMIA no longer prosecute the Stay Relief Motion. While each of those contested matters is likely to be moot if the Debtor's Amended Plan is confirmed, the Agreement nonetheless resolves these pending contested matters *in advance of* a potentially contested Confirmation Hearing. UMIA will not contest confirmation of the Amended Plan as modified by the terms of the Agreement. Lastly, UMIA will withdraw its protective Proof of Claim. Thus, the Agreement resolves several impending contested matters. Accordingly, the Movants submit that the first *Rich Global* factor favors approval of the Agreement.

        **ii.**     **The Difficulties, if any, to be Encountered in Collection of any Judgment That Might be Obtained.**

28. To the extent either Party in the Insurance Coverage Litigation is successful, it is likely that an appeal would follow, given the amount of money and Claims at issue. Collection of any amounts under a judgment would, therefore, be frustrated and delayed until all Claims are finally resolved. This could take years. Furthermore, with respect to the Tort Claimants, the Agreement provides an additional source of funds to recover on account of their Claims—clearly a more favorable outcome than needing to litigate with UMIA to a final judgment on all Claims. Thus, the second *Rich Global* factor weighs in favor of approval of the Agreement.

        **iii.**    **The Complexity of the Litigation Involved, and the Expense, Inconvenience and Delay Necessarily Attending it.**

29. The District Court designated the Carrier Litigation a "complex case" based upon the number of parties, the number of issues, the sensitive discovery problems, and the diversity of claims asserted in the pleadings. (D. Wyo., Case No. 15-0031-ABJ at Docket No. 57). Due to these complexities, the District Court bifurcated the issue of coverage from the issue of bad faith, ordering that the coverage issue would be litigated and decided first. Immediately before Petition Date, the Parties had been engaged, and were about to further engage, in substantial document production in order to proceed toward depositions. Furthermore, given the complex nature of the insurance issues, expert testimony would be required—for both sides—to determine liability and damages. Lastly, assuming confirmation of the Amended Plan incorporating all terms of the Agreement, the Agreement will resolve any future objections that UMIA will have—whether raised in the Bankruptcy Court or any other court—to the reasonableness of any valuations produced under the TDPs. Accordingly, the Parties submit the third *Rich Global* factor favors approval of the Agreement.

        **iv.** **The Paramount Interests of Creditors and the Proper Deference of Their Reasonable Views in the Premises.**

30. Perhaps most important, the Agreement calls for UMIA's payment of $3 million that will be transferred to the PIT upon confirmation of the plan of reorganization. This unquestionably provides a substantial benefit to the Tort Claimants in lieu of waiting out the future, and uncertain, results of the Insurance Coverage Litigation. The Committee, which represents the interests of all unsecured creditors of the Debtor's estate, is a Party to the Agreement, and clearly supports the approval thereof. Entering into this Agreement is a prudent exercise of the Parties' respective business judgments given the contested issues in the Insurance Coverage Litigation and the Bankruptcy Case. Furthermore, all Parties were represented by competent counsel in the negotiation of this Agreement, and the Agreement is a result of

extensive and protracted arms' length bargaining, including the efforts of the Court-appointed Mediator. Accordingly, the Movants submit that the fourth *Rich Global* factor weighs in favor of approval of the Agreement.

B. **Legal Standard to Effectuate the Buyback Under Sections 363(b), (f) and (m) of the Bankruptcy Code.**

    i. **The Debtor's Decision to Agree to the Buyback is Supported by a Sound Business Purpose, as Required Under Section 363(b) of the Bankruptcy Code.**

31. Section 363(b) of the Bankruptcy Code allows a debtor, "after notice and hearing [to] use, sell, or lease, other than in the ordinary course of business, property of the estate. . ." 11 U.S.C. § 363(b). A sale of the debtor's assets should be authorized pursuant to Section 363 of the Bankruptcy Code if a sound business purpose exists for the proposed transaction. *See*, *e.g.*, *In re Martin*, 91 F.3d 389, 395 (3d. Cir. 1996) ("Under Section 363, the debtor in possession can sell property of the estate . . . if he has an 'articulated business justification' . . . ."); *Prime Lending II, LLC v. Buerge (In re Buerge)*, 2014 Bankr. LEXIS 1264, at *61 (B.A.P. 10th Cir. Apr. 2, 2014) (same); *In re Schipper*, 933 F.2d 513, 515 (7th Cir. 1991) (same); C*omm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1070 (2d Cir. 1983); *In re Castre, Inc.*, 312 B.R. 426, 428 (Bankr. D. Colo. 2004).

32. Once the Debtor articulates a valid business justification, "[t]he business judgment rule 'is a presumption that in making the business decision the directors of a corporation acted on an informed basis, in good faith, and in the honest belief that the action was in the best interests of the company." *In re S.N.A. Nut Co.*, 186 B.R. 98, 102 (Bankr. N.D. Ill 1995) (citations omitted); *In re Filene's Basement, LLC*, 11-13511 (KJC), 2014 WL 1713416, at *12 (Bankr. D. Del. Apr. 29, 2014) ("If a valid business justification exists, then a strong presumption follows that the agreement at issue was negotiated in good faith and is in the best

interests of the estate") (citations omitted); *Integrated Res.*, 147 B.R. at 656; *In re JohnsManville Corp.*, 60 B.R. 612, 615–16 (Bankr. S.D.N.Y. 1986) ("a presumption of reasonableness attaches to a Debtor's management decisions.").

33. In this case, the Debtor has exercised sound business judgment in agreeing to the Buyback. The Buyback will provide an immediate infusion of $3 million to the PIT for the benefit of the Tort Claimants, *i.e.*, the very constituency for whom this Bankruptcy Case was filed. (Docket No. 9, at ¶¶ 28-33). Additionally, as set forth above, the Agreement consensually resolves substantial litigation both inside and outside of the Bankruptcy Court. The decision to agree to the Buyback removes major impediments to the Debtor's restructuring and helps facilitate its eventual exit from Chapter 11.

34. The Channeling Injunction and Supplemental Injunction (collectively, the "Injunctions") are necessary to implement the terms of the Agreement and are a valid exercise of the Debtor's business judgment. The Injunctions aid in carrying out the main purpose of the Agreement, which is to be a comprehensive global release as to any Persons who hold Claims arising under or covered by the UMIA Policies. The effect of the Channeling Injunction is to gather and streamline the resolution of Claims arising under or covered by the UMIA Policies in a single forum. The Supplemental Injunction further prevents any Persons from asserting additional Claims against UMIA arising under or covered by the UMIA Policies notwithstanding the operation of the Channeling Injunction—for example, a deficiency claim. The Injunctions are integral to effectuating the global purpose and intent of the Agreement. Absent the Injunctions, the Insureds and UMIA have no protection from Persons asserting additional Claims in the event the PIT is unable to fully satisfy all Claims. Section 105(a) of the Bankruptcy Code provides the Bankruptcy Court authority to grant the Injunctions in connection with a sale under

Section 363(f). "Such 'channeling,' 'supplemental,' or 'clarifying' injunctions are relatively common with § 363(f) sale orders." *In re Sunland, Inc.*, 2014 Bankr. LEXIS 5000 *12 (Bankr. D. N.M. 2014); *see, e.g., In re Johns-Manville*, 837 F.2d 89, 93-94 (2d Cir. 1988) (upholding the bankruptcy court's authority to restrict tort claimants' recovery to insurance proceeds); *In re Dow Corning Corp.*, 198 B.R. 214, 245 (Bankr. E.D. Mich. 1996) (approving a settlement that including a channeling injunction to carry out a §363(f) sale of insurance policies); *In re Peanut Corp. of America*, 2009 Bankr. LEXIS 5620 at *3 (Bankr. W.D. Va. 2009) (granting a channeling injunction under §§ 105(a) and 363(f) in an order approving settlement and buyback procedures of a Chapter 7 debtor's insurance policies). Without the Injunctions, UMIA would not have entered into the Agreement and the Debtor's estate would not be receiving $3 million. Accordingly, the granting of the Injunctions is an appropriate exercise of the Debtor's business judgment.

35. Furthermore, the releases contained in the Agreement are an appropriate exercise of the Debtor's business judgment. Absent the granting of the releases and the Injunctions, UMIA would not enter into the Agreement because its purpose for doing so - to obtain a comprehensive release of any and all Claims that have been or could be asserted against UMIA arising under or covered by the UMIA Policies – would not be accomplished. Accordingly, in connection with Section 105(a) and 363(b) of the Bankruptcy Code, the Bankruptcy Court can and should approve the negotiated releases and Injunctions set forth in the Agreement.

   **ii. The Buyback of the UMIA Policies can be Free and Clear of all Liens, Claims, Encumbrances and Interests Under Section 363(f) of the Bankruptcy Code.**

36. Section 363(f) of the Bankruptcy Code permits a debtor to sell property free and clear of another party's interest in the property if: (a) applicable nonbankruptcy law permits such

a free and clear sale; (b) the holder of the interest consents; (c) the interest is a lien and the sale price of the property exceeds the value of all liens on the property; (d) the interest is the subject of a *bona fide* dispute; or (e) the holder of the interest could be compelled in a legal or equitable proceeding to accept a monetary satisfaction of its interest. *See* 11 U.S.C. § 363(f). Section 363(f) is drafted in the disjunctive. Thus, satisfaction of any of the requirements enumerated therein will suffice to warrant the Debtor's sale of the UMIA Policies free and clear of all Claims (*i.e.*, all liens, Claims, rights, interests, charges, or encumbrances). *See In re Kellstrom Indus., Inc.*, 282 B.R. 787, 793 (Bankr. D. Del. 2002) ("[I]f any of the five conditions are met, the debtor has the authority to conduct the sale free and clear of all liens.").

37. The sale of the UMIA Policies back to UMIA free and clear of all liens, Claims, encumbrances and interests is permitted under Section 363(f)(4) and/or (f)(5) of the Bankruptcy Code. *See In re Sunland, Inc.*, 2014 Bankr. LEXIS 5000 *8-9 (Bankr. D. N.M. 2014). In the Insurance Coverage Litigation, UMIA has taken the position that no insurance coverage exists on account of the Year 1 Policy, whereas the Insureds argue to the contrary, *i.e.*, that they have valid claims to, and/or interests in, the insurance proceeds under the specific policy because coverage exists. Thus, Section 363(f)(4) of the Bankruptcy Code is satisfied because the Insureds' Claims and/or interests against the Year 1 Policy are in *bona fide* dispute. Regarding any other Claims as against the Year 2 Policy, any such claims sound in either contract or tort. To the extent such Claims are even valid (which UMIA disputes), the Tort Claimants and/or Insureds would be entitled only to money damages. Thus, Section 363(f)(5) of the Bankruptcy Code is satisfied because they would be compelled to accept a money judgment. Accordingly, the Debtor is entitled to effectuate the Buyback, pursuant to Sections 363(f)(4) or (f)(5) of the Bankruptcy Code, free and clear of all liens, Claims, encumbrances and interests.

   iii. **UMIA is a "Good Faith Purchaser" of the UMIA Policies Under Section 363(m) of the Bankruptcy Code.**

38. Section 363(m) of the Bankruptcy Code provides in pertinent part:

[t]he reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease or property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

11 U.S.C. § 363(m).

39. Section 363(m) of the Bankruptcy Code protects the purchaser of assets sold pursuant to Section 363 of the Bankruptcy Code from the risk that it will lose its interest in the purchased assets if the order allowing the sale is reversed on appeal, as long as such purchaser purchased the assets in "good faith." While the Bankruptcy Code does not define "good faith," courts have held that a purchaser shows its good faith through the integrity of its conduct during the course of the sale proceedings, finding that where there is a lack of such integrity, a good-faith finding may not be made. *See*, *e.g.*, *In re Abbotts Dairies*, 788 F.2d 143, 147 (3d Cir. 1986) ("Typically, the misconduct that would destroy a [buyer's] good faith status at a judicial sale involves fraud, collusion between the [proposed buyer] and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders."); *In the Matter of Andy Frain Services, Inc.*, 798 F.2d 1113 (7th Cir. 1986) (same); *In re Sasson Jeans, Inc.*, 90 B.R. 608, 610 (S.D.N.Y. 1988) (same).

40. In this case, UMIA is entitled to a finding that it is a "good faith" buyer of the UMIA Policies. Since the commencement of the Insurance Coverage Litigation and through the date of the filing of this Motion, all Parties involved therein have been adequately represented by counsel with respect to their various claims and defenses. Because the resulting Agreement was

negotiated against the backdrop of pending litigation with substantial legal interests at risk, the Parties at all times have been acting at arms' length.  Furthermore, the Parties have agreed to publish notice of the Agreement in two different Wyoming newspapers in an effort to provide any interested parties the opportunity to object to the relief requested.  Accordingly, UMIA is entitled to a finding that it is a "good faith" buyer in connection with the Buyback.

### V.     Notice

41.     Per the terms of the Agreement, the Debtor will provide notice of this Motion, pursuant to Fed. R. Bankr. P. 2002 and 9019 to the following Persons: (i) the Insureds (and their counsel to the extent known); (ii) the Tort Claimants (and their counsel to the extent known); (iii) all Persons who have made any Claim or provided notice of any potential Claim to the Debtor that is subject to either the UMIA Policies or the UMIA Tail Policy;  (iv) Homeland; (v) Lexington; (vi) all other creditors and parties in interest who have been listed in the Debtor's bankruptcy Schedules or who have filed an appearance or a proof of claim in the Bankruptcy Case; (vii) the proposed trustee for the PIT; (viii) all members of the PIT claims committee; and (ix) all governmental units responsible for administering Medicare or Medicaid benefits for any of the Tort Claimants.  Additionally, to provide further notice to all interested parties, UMIA shall publish notice of the Settlement Motion, substantially in the form attached hereto as Exhibit 3 to the Agreement (the "Notice of Publication"), twice in the regular edition of Casper Star Tribune and the Powell Tribune.

WHEREFORE, the Movants respectfully request that the Court enter the proposed order attached hereto as Exhibit B which: (i) grants the Motion; (ii) approves the Agreement under Fed. R. Bankr. P. 9019; (iii) approves the Buyback of the UMIA Policies to UMIA; and (iv)

approves such other and further relief as this Court deems fair and equitable under the circumstances

Dated: December 11, 2017

**MARKUS WILLIAMS YOUNG & ZIMMERMAN, LLC**

/s/
Bradley T. Hunsicker (WY Bar No 7-4579)
Jennifer Salisbury (WY Bar No. 7-5218)
106 East Lincolnway Suite 300
Cheyenne, WY 82001
Telephone: 307-778-8178
Facsimile: 307-638-1975
bhunsicker@markuswilliams.com
jsalisbury@markuswilliams.com

*Attorneys for Debtor Powell Valley Health Care, Inc.*

**MOYE WHITE LLP**

*/s/*
Timothy M. Swanson (Colorado Bar No. 47267)
*Admitted Pro Hac Vice*
James T. Burghardt (Colorado Bar No. 10431)
*Admitted Pro Hac Vice*
1400 16th Street, Sixth Floor
Denver, CO 80202
Telephone: (303) 292-2900
Facsimile: (303) 292-4510

--and--

Julie Tiedeken
McKellar, Tiedeken & Scoggin, LLC
702 Randall Avenue
Cheyenne, WY 82001
Telephone: (307) 637-5575
Facsimile: (307) 637-5515

jtiedeken@mtslegal.net

*Attorneys for UMIA Insurance, Inc.*

**SPENCER FANE LLP**

/s/
Scott J. Goldstein (Missouri Bar No. 28698)
Philip A. Pearlman (Colorado Bar No. 11426)
Jamie N. Cotter (Wyoming Bar No. 74721)
1700 Lincoln Street, Suite 2000
Denver, Colorado 80203
Telephone: (303) 839-3800
Facsimile: (303) 839-3838
sgoldstein@spencerfane.com
ppearlman@spencerfane.com
jcotter@spencerfane.com

*Attorneys for Committee*